# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MT. HAWLEY INSURANCE COMPANY,    )
                                 )
        Plaintiff,               )
                                 )
  vs.                            )    No. 1:22-cv-10354-GHW
                                 )
BEACH CRUISER, LLC and FLYWAY    )
MANAGEMENT, LLC,                 )
                                 )
        Defendants,              )
                                 )
and                              )
                                 )
NATIONWIDE GENERAL INSURANCE     )
COMPANY,                         )
                                 )
        Intervenor Defendant.    )
_____)

VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION
OF GRAY COLLINS UNDER FRCP RULE 30(b)(6)
TAKEN ON BEHALF OF THE INTERVENOR DEFENDANT
NATIONWIDE GENERAL INSURANCE

DATE           Friday, February 2, 2024
TIME:          10:04 a.m. - 1:05 p.m.
PLACE:         By Videoconference

Reported by:
April Goldberg, FPR
Magna Legal Services
866-624-6221
www.MagnaLS.com



Page 2

```
1   APPEARANCES VIA VIDEOCONFERENCE:
2   TIMOTHY E. DELAHUNT, ESQUIRE
    DELAHUNT LAW, PLLC
3   295 Main Street, Suite 836
    Buffalo, New York 14203
4   tdelahunt@delahuntpllc.com
5   Counsel for Plaintiff
6
    RENIER P. PIERANTONI, ESQUIRE
7   COOPER, LLC
    1345 Avenue of the Americas, Second Floor
8   New York, New York 10105
    renier@cooperllc.com
9
    Counsel for Defendants Beach Cruiser, LLC and
10  Flyway Management, LLC
11
    LUCAS D. KATZENMEIER, ESQUIRE
12  RIKER DANZIG, LLP
    489 Fifth Avenue, 33rd Floor
13  New York, New York 10110
    lkatzenmeier@riker.com
14
    Counsel for the Intervenor Defendant Nationwide General
15  Insurance Company
16
    JAMES PRESTON GAINEY, ESQUIRE
17  BASS UNDERWRITERS, INC.
    6951 W Sunrise Boulevard
18  Plantation, FL 33313
    jgainey@bassuw.com
19
    Counsel for Gray Collier and Bass Underwriters, Inc.
20
21  ALSO PRESENT VIA VIDEOCONFERENCE:
    TYLER CROTTY, VIDEOGRAPHER
22
23
24
25
```

Page 3

```
1                    I N D E X
2                                       PAGE
3   TESTIMONY OF GRAY COLLIER
4       Direct Examination by Mr. atzenmeier     6
5       Cross Examination by Mr. Pierantoni     69
6       Redirect Examination by Mr. Katzenmeier  111
7       Recross Examination by Mr. Pierantoni   117
8   CERTIFICATE OF OATH                        120
9   CERTIFICATE OF REPORTER                    121
10  ERRATA SHEET                          122
11  READ & SIGN LETTER                    123
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1            DEFENDANTS' EXHIBITS
2   No.    Description                  Page
3    1     Mt. Hawley Policy 8/2021 to 8/2022      20
4    2     Dwelling Supplemental Application Form  30
5    3     Allegheny Inspection Form      39
6    4     Allegheny Inspection Report    40
7    5     Mt. Hawley Underwriting Guidelines      44
8    6     Mt. Hawley Policy 8/2022 to 11/2023     48
9    7     Bass-USI February 2022 Emails  63
10   8     9/8/2022 Invoice         67
11   9     Bass Underwriters Subpoena     72
12   10    Mt. Hawley Underwriting Form   117
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1       THE VIDEOGRAPHER:  Good morning.  We are now
2   on the record.  This begins the video deposition of
3   Gray Collier in the matters of Mt. Hawley Insurance
4   Company v. Beach Cruiser, LLC, Flyway Management,
5   LLC, et al.  Today is February 2, 2024, and the
6   time is approximately 10:04 a.m.  This deposition
7   is being taken remotely via Zoom.  The videographer
8   is Tyler Crotty of Magna Legal Services and the
9   court reporter is April Goldberg also of Magna.
10      Counsel, at this time could you please
11  state your appearances and who you represent for
12  the record.
13      MR. DELAHUNT:  Good morning, everyone.  Tim
14  Delahunt, Delahunt Law, PLLC.  Attorneys for
15  Plaintiff, Mt. Hawley Insurance Company.
16      MR. PIERANTONI:  My name is Renier Pierantoni
17  from Cooper, LLC representing the Defendants in
18  this matter, Beach Cruiser and Flyway.
19      MR. KATZENMEIER:  Good morning, everyone.  I'm
20  Lucas Katzenmeier from Riker Danzig, LLP.  We
21  represent Intervenor Defendant, Nationwide General
22  Insurance Company.
23      MR. GAINEY:  Good morning, everyone.  I am Jim
24  Gainey, and I'm here on behalf of the deponent,
25  Gray Collier and Bass Underwriters, Inc.
```




1    THE VIDEOGRAPHER:  Thank you, Counsel.
2  Could the court reporter please swear in
3  our witness.
4    THE COURT REPORTER:  Please raise your right
5  hand.  Do you swear or affirm the testimony you are
6  about to give will be the truth, the whole truth,
7  and nothing but the truth?
8    THE WITNESS:  I do.
9  THEREUPON,
10    GRAY COLLIER,
11  being by me first duly sworn to tell the whole truth, as
12  hereinafter certified, testified as follows:
13    THE COURT REPORTER:  Thank you.  You may
14  proceed.
15    DIRECT EXAMINATION
16  BY MR. KATZENMEIER:
17    Q.  Good morn- -- good morning, Mr. Collier.  As I
18  said, my name is Lucas Katzenmeier, an attorney for
19  Nationwide in this matter.  And as I'm sure you're
20  aware, we're here for your deposition in response to a
21  subpoena issued by our office.  Before we get into the
22  deposition proper, we're going to go over some ground
23  rules.  First, you just took an oath, and that means
24  you're required to tell the truth in this deposition.
25    Do you understand that?

1    A.  I do.
2    Q.  Before I move on, are you having trouble
3  hearing me?
4    A.  No.
5    Q.  Okay.  Perfect.  We have a court reporter, who
6  is taking down everything we say, with us today.  And
7  because of that, and particularly because this is a
8  remote deposition, there are a couple specific
9  instructions to go over.
10    First, your ques- -- responses to questions
11  must be verbal.  You have to say yes or no or provide a
12  verbal response.  What that means, you can't just shake
13  your head yes or no because that won't show up in the
14  transcript.
15    Do you understand that?
16    A.  I do.
17    Q.  Okay.  Perfect.  And second, we should make an
18  effort to avoid talking over as much as possible so that
19  we can get a clear record here.  So when I ask a
20  question, please let me finish my question before you
21  begin your answer.  And during your answer, I will make
22  an effort to refrain from asking a new question until
23  you are finished.
24    Do you understand that?
25    A.  I do.

1    Q.  Okay.  Perfect.  So when we're going through
2  these and you're giving your responses, I don't want you
3  to guess in giving your responses.  If you don't know
4  the answer to a question, you can tell me that.  If you
5  can give me an approximation on an answer, that's fine,
6  but please when you're doing so, tell me that you're
7  approximating in your answer.
8    Do you understand?
9    A.  I do.
10    Q.  Okay.  And the purpose of this deposition
11  today is to just get all the information we can.  I'm
12  not here to try to trick you or swindle you into
13  something.  So if you don't understand a question, if
14  something is unclear, please ask me.
15    If you understand my question, or if you
16  answer my question without asking for clarification, I
17  will assume you've understood the question and we'll
18  move on.
19    During the course of this deposition, your
20  attorney may object to a question.  After your attorney
21  has voiced his objection, you can still answer unless
22  your attorney instructs you not to.
23    Do you understand that?
24    A.  I do.
25    Q.  Okay.  Perfect.  If you need a break for any

1  reason, please let me know.  I am more than happy to
2  take breaks whenever we need it, although I don't expect
3  this to be an overlong deposition today.  But all I ask
4  is that if we -- if there's a question pending, I would
5  ask that you answer that question before we take a
6  break.  Is that okay?
7    A.  Understood.
8    Q.  Okay.  And lastly, as far as these
9  instructions go, when answering a question, please try
10  to limit your answer to the question posed, or your
11  communication during the deposition should be limited to
12  the context of the deposition.  So what that means is,
13  unless we're taking a break, please no texting or
14  calling someone else during the course of the
15  deposition.
16    Do you have a phone on your person?
17    A.  I do.
18    Q.  Okay.  As long as that is reasonably on
19  vibrate or silent, that would be appreciated.  And
20  please no using your phone to write or receive notes
21  during the course of the deposition.
22    Any questions so far?
23    A.  No.
24    Q.  Perfect.  All right.  So have you taken any
25  medications today that could affect your ability to





Page 10

1    provide truthful testimony?
2        A.  No.
3        Q.  Okay.  Do you have any health problems that
4    could affect your ability to provide truthful testimony?
5        A.  Not that I'm aware of.
6        Q.  Okay.  Have you ever had your deposition taken
7    before?
8        A.  I have.
9        Q.  How many times?
10       A.  Three.
11       Q.  Three.
12       A.  This would be the fourth.
13       Q.  I'm sorry.  You said this would be four?
14       A.  This would be the fourth.
15       Q.  Okay.  How recent were those other
16   depositions?
17       A.  Not near.  Past.  Several years ago.
18       Q.  Okay.  Would you say more than five years?
19       A.  For one of them, yes.
20       Q.  Okay.
21       A.  One of them was the last two years.
22       Q.  Okay.  And for what reason were your
23   depositions previously taken?
24       A.  Various.
25       Q.  Various?

Page 11

1        A.  Nonparty witness in both cases.
2        Q.  Okay.  Have you ever provided testimony at
3    trial before?
4        A.  I'm sorry.  Say that again.
5        Q.  Have you ever provided testimony at trial
6    before?
7        A.  I have.
8        Q.  Okay.  And what was the purpose of that?
9        A.  I was a witness for the prosecution on a agent
10   theft matter in Brunswick, Georgia.
11       Q.  Okay.  Thank you.  So I'm going to move into a
12   little bit of your background.
13           Can you tell me who your current employer is?
14       A.  Bass Underwriters.
15       Q.  Okay.  And I think we -- before we get too far
16   removed from the background information, can you please
17   spell your name for me?
18       A.  G-R-A-Y.  Last name is Collier, C-O-L-L-I-E-R.
19       Q.  Okay.  Thank you Mr. Collier.
20           How long have you been at Bass Underwriters?
21       A.  19 years and change.
22       Q.  19 years.  That's quite a while.
23           What is your current position at Bass
24   Underwriters?
25       A.  Branch manager of the Atlanta branch.

Page 12

1        Q.  Okay.  How long have you been in that
2    position?
3        A.  Somewhere around 10 years.
4        Q.  10 years.  Okay.  So it's fair to say you were
5    in the same position during at least the period of
6    August 2022 to August 2023?
7        A.  That's correct.
8        Q.  Okay.  What are your responsibilities in your
9    position?
10       A.  I overlook business as well as 16 employees
11   that report in to me.  Overall management of the branch.
12       Q.  How long have you been in the
13   underwriting industry would you say?
14       A.  My entire time at Bass.
15       Q.  Okay.  No previous companies underwriting?
16       A.  No, no.
17       Q.  Do you have a college degree --
18       A.  I do.
19       Q.  -- Mr. Collier?  Where did you -- where did
20   you attend college?
21       A.  University of Georgia.
22       Q.  Okay.  And what years did you attend the
23   University of Georgia?
24       A.  I graduated in 2003.
25       Q.  2003.  Okay.  Any postgraduate education?

Page 13

1        A.  No.
2        Q.  Okay.  All right.  Thank you very much,
3    Mr. Collier.
4            So if you could tell me in your words, what
5    does Bass Underwriters do generally?
6        A.  We are a wholesale insurance agent.
7        Q.  Okay.
8        A.  Customers are the insurance agents.  Our -- we
9    place business on their behalf of insurance carriers.
10       Q.  Okay.  Do you work with multiple insurance
11   carriers?
12       A.  We do.
13       Q.  About how many would you say?
14       A.  This is a guess, but it's -- it's north of 30.
15       Q.  Okay.
16       A.  It could be many more.
17       Q.  Okay.  Okay.  Well, like I said, if you can --
18   if you can avoid guessing, please do so, but...
19       A.  I don't know the exact number.
20       Q.  Right.  I appreciate that.
21           Okay.  So in the course of that, does Bass
22   Underwriters work for Mt. Hawley?  Mt. Hawley Insurance
23   Company?
24       A.  Yes, yes.
25       Q.  Okay.  And is that Mt. Hawley Insurance

4  (Pages 10 to 13)



Page 14

1  Company or RLI Insurance Company?
2      A.  RLI is a parent company.  Mt. Hawley Insurance
3  Company is the paper that most of their policies are
4  written on.
5      Q.  Okay.  Is -- and just so I understand clearly,
6  is Bass Underwriters' relationship with RLI as the
7  parent company or Mt. Hawley as the insurance company?
8      A.  It would be RLI as the parent company.
9      Q.  RLI.  Okay.  Thank you.
10         What's -- how long has Bass Underwriters had a
11  relationship with RLI?
12      A.  To some extent my entire career.
13      Q.  Okay.  And what services, if you could give me
14  an idea, does Bass Underwriters perform for Mt. Hawley?
15      A.  We provide -- it depends on which business
16  unit, but we trade with several of their underlying
17  business units, whether it be a brokerage-type situation
18  and/or a delegated authority situation.
19      Q.  Okay.  Does -- is Bass Underwriters involved
20  in underwriting the policies issued on Mt. Hawley paper?
21      A.  In some cases, yes.
22      Q.  Okay.  In those cases where RLI or -- I'm
23  sorry -- Bass is involved in the underwriting process
24  for policies written on Mt. Hawley paper, how does the
25  underwriting process start?

Page 15

1      A.  With a application from an agent.
2      Q.  Okay.  And is that application sent directly
3  to Bass Underwriters?
4      A.  Yes, from the -- from the agent.  Correct.
5      Q.  From the agent.  Okay.  The application
6  materials, are those provided by Bass Underwriters or
7  another party?
8      A.  There's a standard in insurance called the
9  ACORD application which is provided by the agent.  Bass
10  Underwriters does not provide that.
11      Q.  Okay.
12      A.  Subsequent required documents that the carrier
13  requires would be provided by us.
14      Q.  Okay.  What about any supplemental materials
15  that might accompany an ACORD application?  Are those
16  provided by Bass Underwriters or the agent?
17      A.  Usually by Bass.
18      Q.  Usually by Bass.  So at -- I'm just trying to
19  get an idea of how this initial stage works, so if you
20  can tell me when would Bass provide those supplemental
21  materials to the agents?
22      A.  That varies.  Sometimes prior to the
23  submission if they ask for one or have a question.
24  Sometimes it accompanies a quote.  So, you know, it just
25  varies.

Page 16

1      Q.  Okay.  Okay.  Does -- does Bass have any --
2  strike that for now.
3         So after the application is received by Bass
4  Underwriters, what is Bass's process going forward with
5  the underwriting process?
6      A.  How we look at the application and see what
7  they're looking to cover, I guess.  You basically triage
8  the risk and, you know, read it and see what the -- what
9  they're looking to insure.
10      Q.  Okay.  And does Bass Underwriters communicate
11  with the insurer during this process?
12      A.  You said "the insurer"?
13      Q.  Yes.
14      A.  At times, yes.
15      Q.  Okay.  When Bass Underwriters is, for example,
16  working with RLI, does Bass Underwriters communicate
17  with RLI during the underwriting process?
18      A.  At times, yes.
19      Q.  Okay.  Under what circumstances would Bass
20  Underwriters reach out to RLI or another insurance
21  company during the underwriting process?
22      A.  There's a million different scenarios in which
23  that may happen, so that's -- that's pretty vague.
24      Q.  Uh-huh.  It was pretty vague.  Let me, I
25  guess, ask you more specifically with respect to the

Page 17

1  policies at issue here.
2         So are you familiar with Beach Cruiser, LLC?
3      A.  I am.
4      Q.  Okay.  And did Bass Underwriters assist in the
5  underwriting process for a policy or policies issued to
6  Beach Cruiser?
7      A.  Yes.
8      Q.  Okay.  What was your role in the underwriting
9  process for those policies?
10      A.  Specifically, you know, looking at the
11  applications, you know.  Identifying what needs to be
12  quoted and/or coverage needed and then providing a quote
13  based on that information.
14      Q.  Okay.  Do you recall when you -- strike that.
15         When did you first receive an application for
16  insurance from Beach Cruiser?
17      A.  I don't recall off the top of my head.
18      Q.  You don't recall.
19         All right.  Did Bass Underwriters receive an
20  insurance application or an application for insurance
21  from Beach Cruiser?
22      A.  We didn't receive anything from Beach Cruiser.
23  We received an application from Beach Cruiser's
24  insurance agent.
25      Q.  Okay.  And are you familiar with the materials



Page 18

1    that were submitted by the agent on behalf of Beach
2    Cruiser?
3        A.  I am.
4        Q.  Okay.  Let's see.  So what was the extent of
5    communication between Bass and Mt. Hawley during the
6    underwriting process, specifically for the policies for
7    Beach Cruiser?
8        A.  I don't recall.
9        Q.  Don't recall.  Was there any communication
10   between Bass Underwriters and Mt. Hawley during the
11   underwriting process for the policies issued to Beach
12   Cruiser?
13       A.  I don't remember.
14       Q.  Okay.  Do you recall when -- strike that.
15           When was the first policy issued by Bass
16   Underwriters to Beach Cruiser?
17       A.  Are you asking specifically about the policy
18   that we're talking about today?
19       Q.  Well, so I guess I'll address that first.
20           When you say the "policy we're talking about
21   today," what policy do you understand that to be?
22       A.  It looks like a 2020 -- excuse me -- 2021
23   year.
24       Q.  And let me -- let me do this for you.  I can
25   share my screen and go ahead and pull that up.

Page 19

1        Can you see my screen, Mr. Collier?
2        A.  I can.
3        Q.  Okay.  And I'll scroll down a bit, but does
4    this policy -- tell me if you -- as soon as you know,
5    does this policy look to be the policy that you're
6    referring to as the policy we're here to discuss today?
7        A.  Slow down.  It's one of the Mt. Hawley
8    policies.  You scrolled past the effective date fast, so
9    I didn't catch that.
10       Q.  Oh, I'm sorry.
11       A.  It's a 2021 to 2022 term, so that's the --
12   that's the policy that --
13       Q.  Okay.
14       A.  -- we're talking about today, yes.
15       Q.  Okay.  And you understand that to be the
16   policy issued to Beach Cruiser?
17       A.  I do.
18       Q.  Okay.  And is this a renewal policy, or is
19   this the initial policy?
20       A.  I believe that's a renewal policy.
21       Q.  Okay.  And the Policy No. here it says
22   GGL26067; correct?
23       A.  Yes.
24       Q.  So that's the '21 to '22 policy period.
25           MR. KATZENMEIER:  Can we go ahead and mark

Page 20

1    this as Nationwide Exhibit 1?
2        THE COURT REPORTER:  Noted.
3        MR. KATZENMEIER:  Okay.  Thank you.
4    BY MR. KATZENMEIER:
5        Q.  Okay.  I just need to find my place to where
6    we were before this.
7        Okay.  Mr. Collier, can you tell me what
8    Bass's role was in issuing this specific policy to Beach
9    Cruiser?
10       A.  Our role -- well, our role is to accept the
11   information given by the retail agent and to issue a
12   policy on behalf of Mt. Hawley Insurance Company.
13       Q.  Okay.  Take me through the underwriting
14   process for this policy to Beach Cruiser.  So you would
15   have accepted a -- you received an application for
16   insurance presumably from the agent for Beach Cruiser;
17   correct?
18       A.  Correct.
19       Q.  And then what?
20       A.  I'm sorry.  I missed that.
21       Q.  I said and what would have happened after you
22   received an application for insurance from Beach
23   Cruiser's agent?
24       A.  Oh.  I read the application and see what it is
25   they're looking for.

Page 21

1        Q.  Okay.  After reading the application, would
2    there have been any communication with Mt. Hawley at
3    that point?
4        A.  Would there have been or was there?
5        Q.  Well, was there?
6        A.  I don't -- I don't remember.
7        Q.  Okay.  Generally, would there have been?
8        A.  It depends.  I mean, in some cases, yes.  But
9    in this case, I don't believe so.
10       Q.  Okay.  To your knowledge, was there any
11   communication with Mt. Hawley -- between Mt. Hawley and
12   Bass Underwriters prior to the issuance of this policy?
13       A.  I don't recall.
14       Q.  Okay.  Is Bass Underwriters authorized to
15   issue policies on Mt. Hawley's behalf?
16       A.  Yes.
17       Q.  Okay.  And is Bass Underwriters required to
18   communicate with Mt. Hawley prior to the issuance of
19   those policies?
20           MR. GAINEY:  I'm going to object to form.
21   BY MR. KATZENMEIER:
22       Q.  Do you have a -- you can still answer.
23           MR. GAINEY:  You can answer, Gray.
24           THE WITNESS:  Oh.
25           MR. GAINEY:  It's fine, yeah.

6  (Pages 18 to 21)



Page 22

```
 1          THE WITNESS:  Can you ask the question one
 2     more time?
 3          MR. KATZENMEIER:  Yeah.  Sure, sure.
 4     BY MR. KATZENMEIER:
 5       Q.  Is -- was Mt. Hawley required or -- I'm sorry.
 6     Strike that.
 7          Was Bass Underwriters required to communicate
 8     with Mt. Hawley prior to the issuance of this policy?
 9          MR. GAINEY:  Object to form.  You can answer.
10          THE WITNESS:  I don't recall.
11     BY MR. KATZENMEIER:
12       Q.  Okay.  Does Bass Underwriters have an
13     agreement in place between Bass Underwriters and
14     Mt. Hawley?
15       A.  I'm sure that we do, yes.
16       Q.  Okay.  Does that agreement impose any
17     obligations on Bass Underwriters to communicate
18     between -- to communicate with Mt. Hawley about anything
19     in specific during the underwriting process?
20       A.  I don't know because I've never seen that
21     agreement.
22       Q.  Okay.  My earphones are falling out.
23          Okay.  So are you -- are you familiar with
24     what Beach Cruiser does?
25       A.  I am now.
```

Page 23

```
 1       Q.  When you say you are now, as of when?
 2       A.  I guess -- your question was am I aware of
 3     what Beach Cruiser does; correct?
 4       Q.  Correct.
 5       A.  So I had an understanding of what Beach
 6     Cruiser did in the past.
 7       Q.  Okay.
 8       A.  December of last year it was brought to my
 9     attention that their operations were something
10     different.
11       Q.  Okay.  Let's -- let's go through that, then.
12     So at the time of the issuance of this policy that I
13     have on my screen right now, what was your understanding
14     of Beach Cruiser's operations?
15       A.  That they rented a dwelling, tenant dwelling,
16     in Charleston, South Carolina.
17       Q.  And what was the basis for that understanding?
18       A.  The application provided by the agent.
19       Q.  Okay.  Let me -- okay.  I actually may have
20     that for you as well.  So let me...
21          Okay.  Mr. Collier, can you see my screen?
22       A.  I can.
23       Q.  Okay.  When you say the application provided
24     by the agents, are you referring to the applica- -- an
25     application that included this application?  This
```

Page 24

```
 1     dwelling supplemental --
 2       A.  Yes.
 3       Q.  I'm sorry?
 4       A.  That's correct.
 5       Q.  Okay.  Is this Dwelling Supplemental
 6     Application form the basis for your understanding of the
 7     Beach Cruiser's operations at the time the policy was
 8     issued?
 9       A.  At the time the policy was issued, that is
10     correct.
11       Q.  Okay.  And what information on this form is
12     the basis for your understanding, your previous
13     understanding, of Beach Cruiser's operations?
14          I can scroll through it if you need.
15       A.  Yeah, I mean, simply the questions that are on
16     the form.
17       Q.  Is there any specific answer to a specific
18     question?
19          MR. GAINEY:  Do you need to scroll up?
20          THE WITNESS:  No, no.  I mean, I --
21     BY MR. KATZENMEIER:
22       Q.  Yeah.  It was hard to hear that with people
23     talking over, but I can scroll up.
24       A.  I'm sorry.  Any specific basis on anything,
25     you know.  You're looking at the top, you know, I mean,
```

Page 25

```
 1     all the questions are applicable, but you're looking at
 2     the top- -- topic 7.  I don't see what the bottom says.
 3     I mean, really they're all applicable, right, for
 4     various different reasons.
 5       Q.  Okay.  But there's no specific question that
 6     was the basis for your understanding of what Beach
 7     Cruiser's operations were?
 8       A.  Well, I mean, Question 3 will give you, you
 9     know, certainly what their operations are.
10       Q.  Question 3.  Okay.
11       A.  It's a dwelling.
12       Q.  And is there any specific part of Question 3
13     that served as the basis for your understanding of what
14     Beach Cruiser's operations were?
15       A.  Well, they give you the average monthly rent,
16     and then they ask if the properties are rented by day or
17     by week.
18       Q.  Okay.  And that response is marked "no"; is
19     that correct?
20       A.  I'm sorry.  Say again.
21       Q.  That response is marked "no"; is that correct?
22       A.  It is.
23       Q.  Is that response to Question 3 the basis for
24     your understanding of what Beach Cruiser's operations
25     were at the time this was submitted?
```



Page 26

1     A. Yes.
2     Q. Okay. Before we move on from this Dwelling
3  Supplemental Application form, is -- I noticed this says
4  RSUI at the top.
5         Is that a form commonly used by Bass
6  Underwriters?
7     MR. GAINEY: Object to form. Answer it.
8     THE WITNESS: Yes. It's commonly used.
9  BY MR. KATZENMEIER:
10    Q. Okay. Was this a form that was provided by
11 Bass Underwriters to Beach Cruiser or Beach Cruiser's
12 agent?
13    A. Yes.
14    Q. Okay. Do you -- does Mt. Hawley have its own
15 supplemental dwelling application?
16    A. I'm sure they do.
17    Q. Is there a reason that this RSUI form might
18 have been provided to Beach Cruiser as opposed to Mt.
19 Hawley's own form?
20    A. Not specifically.
21    Q. Okay. Does -- is this RSUI form included
22 in -- or provided to all insureds seeking insurance?
23    A. No, because this is specifically a dwelling
24 supplemental application.
25    Q. Okay. So when is a dwelling supplemental

Page 27

1  application provided to insureds seeking insurance
2  through Bass Underwriters?
3     A. It varies. You can get a call or, you know, a
4  message that says, hey, I have a rental dwelling. Can
5  you send me an app?
6     Q. Okay.
7     A. And so you send them an app.
8     Q. Okay. So generally speaking, though, if you
9  were to get a call, or if Bass Underwriters were to get
10 a call, and the caller said send me an app for a
11 dwelling application form, is this the form that Bass
12 Underwriters would send them?
13    A. It's the form I obviously sent, but it could
14 change. I mean, that's pretty open-ended. I mean, we
15 run into so many different scenarios.
16    Q. Sure. I'm just asking generally right now.
17    A. In this specific instance, yes.
18    Q. Okay. Are there other Dwelling Supplemental
19 Application forms maintained by Bass Underwriters that
20 they may generally send?
21    A. Not maintained by Bass. We don't make them.
22    Q. Okay.
23    A. We have access to them, but yes.
24    Q. Okay. So how would Bass Underwriters
25 determine whether to send this RSUI Dwelling

Page 28

1  Supplemental Application form versus another Dwelling
2  Supplemental Application form?
3     A. Again, that -- that answer varies. Sometimes
4  when you're quoting business you don't know which
5  carrier you're quoting. So you send an application that
6  contains the questions and the information that you need
7  to know.
8     Q. Okay. So was -- was there a determination
9  made that this RSUI Dwelling Supplemental Application
10 form posed the questions that needed answered?
11    A. I don't recall specifically.
12    Q. Okay.
13    A. The application speaks for itself.
14    Q. Okay. Who makes the determination of what
15 Dwelling Supplemental Application form to send to the
16 applicant?
17    A. We do.
18    Q. I'm sorry, did you say "we do"?
19    A. Bass does the individual underwriter or
20 underwriter assistant.
21    Q. Okay. Is there any individual within Bass
22 that makes that determination?
23    A. On a corporate level, or are you talking about
24 a day-to-day business level?
25    Q. Well, I'm trying to find out who would have

Page 29

1  been the person responsible, and not even name, like --
2     A. Sure.
3     Q. -- who would have been the position --
4     A. It would be --
5     Q. -- or some person?
6     A. -- the underwriter. The underwriter.
7     Q. The underwriter.
8        Okay. Do you recall the name of the
9  underwriter for this specific application by Beach
10 Cruiser?
11    A. That would have been myself or my assistant.
12    Q. Yourself or your assistant.
13       Okay. And so you suggested earlier that your
14 understanding of Beach Cruiser's operations changed at
15 some point; is that correct?
16    A. Yes.
17    Q. At what point did your understanding of what
18 Beach Cruiser's operations were change?
19    A. I don't know the specific date, but sometime
20 in December. I was notified of a legal issue that had
21 come up between Beach Cruiser and a tenant of theirs.
22    Q. Okay.
23    MR. KATZENMEIER: Okay. And actually, before
24 we get too far removed, can you please mark this
25 Dwelling Supplemental Application form as

8  (Pages 26 to 29)



| | |
|---|---|
| **Page 30** | **Page 31** |

**Page 30**

1       Nationwide Exhibit 2.
2       THE COURT REPORTER:  Noted.
3       MR. KATZENMEIER:  Thank you.
4  BY MR. KATZENMEIER:
5    Q.  Okay.  And what is your current understanding
6  of what Beach Cruiser's operations are?
7    A.  My current understanding is that they were
8  leasing these units or buildings out, if you were, on a
9  short-term basis.
10    Q.  Okay.  You mentioned a legal issue was the
11  cause of the change of your understanding.
12     Can you tell me what that legal issue was?
13     MR. GAINEY:  Object to form.
14     THE WITNESS:  At that -- well, I mean, my
15  understanding of a legal issue started in December
16  when I got a call that there was a deposition
17  regarding a claim that happened, I believe, in 2021
18  or 2022.  RLI or Mt. Hawley, rather, was taking the
19  deposition or giving a deposition based on the
20  merits of the case.  Until that day, I didn't -- I
21  didn't even know there was a claim turned in on
22  this policy.
23  BY MR. KATZENMEIER:
24    Q.  Okay.  And when you say "September," is that
25  what year?

**Page 31**

1    A.  No, I said December.
2    Q.  Oh, December.
3    A.  December of 2023.
4    Q.  December.
5    A.  I think it was, you know, just before
6  Christmas.  I don't remember the exact date.
7    Q.  Okay.  Okay.  And how were you notified?
8    A.  It was -- received a call from counsel at RLI.
9    Q.  Received a call from counsel at RLI.  And do
10  you remember the name?  Strike that.
11     What was the name of counsel that called you?
12    A.  I don't recall.
13    Q.  Don't recall.
14    Okay.  Does the book of business at Bass
15  Underwriters for Beach Cruiser involve more than one
16  property?
17    A.  I believe it does.
18    Q.  Okay.  Do you -- how many properties?
19    A.  I don't know off the top of my head.
20    Q.  Okay.  Does the book of business for Beach
21  Cruiser involve more than one policy?
22    A.  I believe so.
23    Q.  Okay.  More than one -- does it involve more
24  than one contemporaneous policy or a different risk
25  perhaps?

| | |
|---|---|
| **Page 32** | **Page 33** |

**Page 32**

1    A.  Can you rephrase the question?
2    Q.  Sure, sure.  So when you say that the book of
3  business for Beach Cruiser involves more than one
4  policy, are you referring to consecutive policy periods,
5  or are you referring to more than one policy that might
6  insure a different risk?
7    A.  To my knowledge, both of those would be true.
8    Q.  Okay.  How many contemporaneous policies that
9  might insure different risks did Bass Underwriters issue
10  to Beach Cruiser?
11    A.  I --
12    MR. GAINEY:  Object to form.  Maybe you can
13  clarify, Luke, in a specific year or currently or
14  overall?
15    MR. KATZENMEIER:  I'm sorry.  You cut out
16  there a little bit at the end.
17    MR. GAINEY:  I just said, you know, are you
18  asking about a specific year or just overall?
19    MR. KATZENMEIER:  I'm just trying to get the
20  overall picture of Bass Underwriters' relationship
21  with Beach Cruiser right now.
22    THE WITNESS:  I don't know how many policies
23  there are off the top of my head.
24  BY MR. KATZENMEIER:
25    Q.  Okay.

**Page 33**

1    A.  Bass Underwriters has no relationship with
2  Beach Cruiser.
3    Q.  Okay.  Did -- so for those policies that Bass
4  Underwriters issued to Beach Cruiser, were all policies
5  issued on Mt. Hawley paper?
6    A.  I don't believe so.
7    Q.  You don't believe so.  Okay.  Do you know --
8  strike that.
9    What other company's paper would the insurance
10  policies issued to Beach Cruiser have been written on?
11    A.  I don't have it front of me, but I believe
12  there was a Lloyd's of London aspect to it.
13    Q.  Okay.  Are you familiar with Beach Cruiser's
14  operations involving other properties other than the Mt.
15  Hawley policy that we discussed earlier?
16    A.  I mean, off the top of my head, I don't
17  remember specifics.
18    Q.  Okay.
19    A.  I do remember they have other properties.
20    Q.  Okay.  But you don't recall what Beach Cruiser
21  might have been using those properties for?  Is that
22  what you're telling me?
23    A.  I don't.  I think they were all rental
24  dwellings of some sort, but I don't know for sure.
25    Q.  Okay.  Does Bass Underwriters have any



Page 34

1  policies or procedures in place for verification of the
2  information contained in the applications it receives?
3      A.  Bass Underwriters receives the application
4  from the agent and the subsequential -- the supplement
5  applications from the agent, and signed by the insured
6  and we take that as the truth.
7      Q.  Okay.  Is there any circumstance under which
8  Bass Underwriters will undertake an investigation of a
9  property to ensure that its use is the same as stated on
10  an application?
11     A.  There are circumstances.  Most notably, you
12  look at the property on Google online, look at the
13  picture, see if it looks like what they put on their
14  application.
15     Q.  Okay.  So what would prompt Bass Underwriters
16  to look at the property on Google to make sure it's the
17  same as what the insured listed on the application?
18     A.  Many different reasons.  I mean, you know, you
19  get an application.  The first thing you do is look at
20  the Google map to see what it looks like.
21     Q.  So the first thing Bass Underwriters would do
22  as soon as receiving an application is google the
23  property?
24     A.  I mean, generally speaking, yes.  It may not
25  be the first thing.  There's no -- there's no policy in

Page 35

1  force that does that.  But, you know, it's -- if the
2  application is clear, there's no questions on the way
3  the application was answered.
4      Q.  Okay.  All right.  I asked a similar question
5  earlier.  Do you recall or are you familiar with when
6  Bass Underwriters might have received this Dwelling
7  Supplemental Application from --
8      A.  When we received it?
9      Q.  Correct.
10     A.  I don't recall the specific date in which we
11  received it.
12     Q.  Okay.
13     A.  But it has a date on it; so...
14     Q.  Yeah, I'm going to scroll down to that.  So
15  the -- it looks like the date here is September 2, 2020;
16  is that correct?
17     A.  That's correct.
18     Q.  Do you have any reason to believe that is not
19  on or around the date Mt. Haw- -- sorry, not
20  Mt. Hawley -- Bass Underwriters received this
21  Supplemental Dwelling Application?
22     A.  I'm sorry, you cut out on the first -- the
23  first bit of that question.  What was it?
24     Q.  Sure.  Strike the last question.  I'll reask
25  it.

Page 36

1          Do you have any reason to believe that this
2  September 2, 2020, date is not the date that Bass
3  Underwriters would have received this Dwelling
4  Supplemental Application?
5      A.  I don't -- I don't recall, but...
6      Q.  Okay.  Would -- who would be the party that
7  would engage in, as you said, googling the property
8  after receiving the application?
9      A.  It would be the underwriter or an underwriting
10  assistant.
11     Q.  Okay.  So with respect to the specific policy
12  issued to Beach Cruiser, would that have been you?
13     A.  Excuse me?  I coughed.  Sorry.
14     Q.  With respect to this specific policy issued to
15  Beach Cruiser, would that have been you?
16     A.  It could have been me.  I don't recall in this
17  specific instance.
18     Q.  Okay.  Then just to clarify that, do -- did
19  you google this property after receiving the
20  application?
21     A.  I don't recall.
22     Q.  Don't recall.  Okay.
23         Okay.  Are there any other circumstances in
24  which Bass Underwriters would order an investigation of
25  a property?

Page 37

1      A.  Broadly, there are circumstances, but, I mean,
2  there's literally a million different scenarios that
3  could apply to that question.
4      Q.  Okay.  Did Bass Underwriters ever order an
5  investigation of Beach Cruiser's property?
6      A.  I don't recall.
7      Q.  Okay.  I believe I actually have an exhibit
8  here for you.  Let me share my screen.
9          Mr. Collier, can you see my screen right now?
10     A.  I can.
11     Q.  Okay.  Are you familiar with the document that
12  I've pulled up?
13     A.  I'm familiar with the type of document, yes.
14     Q.  Okay.  Can you tell me what type of document
15  this is?
16     A.  It looks like an inspection order date 9/8 of
17  2022.
18     Q.  Okay.  And that says Physical Inspection;
19  correct?
20     A.  Correct.
21     Q.  Okay.  And it says this is the inspection
22  of -- this lists the insured as Beach Cruiser, LLC; is
23  that right?
24     A.  Okay.
25     Q.  And does that look like the correct address



Page 38

1  for the property insured under the policy we discussed
2  earlier?
3      A.  It appears so, yes.
4      Q.  Okay.  And this says that this was ordered by
5  J. Dyer; correct?
6      A.  It does.
7      Q.  Can you tell me who J. Dyer is?
8      A.  I don't know him personally.  I think he is an
9  underwriter in our Charleston, South Carolina branch.
10     Q.  Okay.  So he's an employee of Bass
11  Underwriters; would that be right?
12     A.  To my knowledge, yes.
13     Q.  Okay.  Do you -- scratch that.  Strike that.
14         Why would this inspection order have been
15  placed?
16         MR. GAINEY:  I'm going to object to form.  You
17  can answer if you know.
18         THE WITNESS:  I don't know.  That's not my
19  file, so I couldn't tell you.
20  BY MR. KATZENMEIER:
21     Q.  Okay.  Is there any -- have you ever placed an
22  inspection order like one on this form?
23     A.  Yes.
24     Q.  Okay.  What are the -- what are the
25  circumstances that this form might be used to place an

Page 39

1  inspection order?
2         MR. GAINEY:  Object to form.
3         THE WITNESS:  It varies greatly.
4  BY MR. KATZENMEIER:
5      Q.  Okay.  Is this a -- just a general inspection
6  order form?
7      A.  To my knowledge, yes.
8      Q.  Okay.  Okay.  I'm going to --
9         MR. KATZENMEIER:  Can you mark the inspection
10  form I presently have up as Nationwide Exhibit 3,
11  please.
12         THE COURT REPORTER:  Noted.
13         MR. KATZENMEIER:  Thank you very much.
14  BY MR. KATZENMEIER:
15     Q.  I'm going to move on to a -- another document.
16  Can you see my screen, Mr. Collier?
17     A.  I do.
18     Q.  Okay.  Thank you.
19         Are you familiar with what this document is?
20     A.  I am.
21     Q.  Okay.  Can you tell me what this document is?
22     A.  It appears to be an inspection report.
23     Q.  Okay.  And is -- does this inspection report
24  indicate the same orderee and address as the inspection
25  order form I just showed you?

Page 40

1      A.  It appears so, yes.
2      Q.  Okay.  So would it be reasonable to believe
3  that this inspection -- that this inspection report is
4  the result of that inspection order?
5      A.  It would.
6      Q.  Okay.  Thank you.
7         MR. KATZENMEIER:  Can you mark the inspection
8  report that I presently have up as Nationwide
9  Exhibit 4.
10         THE COURT REPORTER:  Noted.
11         MR. KATZENMEIER:  Thank you.
12  BY MR. KATZENMEIER:
13     Q.  I want to scroll down just a bit.  And I want
14  to say -- so I notice that the date inspected says
15  September 20, 2022; is that correct?
16     A.  That's what it looks like, yes.
17     Q.  Okay.  Have you ever ordered one of these
18  inspection reports?
19     A.  Yes.
20     Q.  Okay.  What are the circumstances under which
21  an inspection report, such as this, might be requested?
22     A.  Again, it's very -- it's a -- it's a wide
23  variety of reasons.
24     Q.  Okay.  Are they typically ordered?  Strike
25  that.

Page 41

1         Are these inspections typically ordered to be
2  performed prior to the renewal of a policy?  Prior to
3  the issuance of a policy?
4      A.  When an inspection is ordered, it's ordered
5  after a policy is put into effect.
6      Q.  Okay.  Is there a reason for that?
7      A.  A reason it's not done before?
8      Q.  Correct.
9      A.  Well, it's very cost prohibitive for one to
10  pre-inspect a location when the insured might not buy
11  the insurance policy, and the inspection is done to
12  verify condition of said property after it's put on the
13  books.
14     Q.  So hypothetically, let's say an inspection
15  report was ordered and the property did not meet with
16  the represented quality.  What would Bass Underwriters
17  do in that circumstance?
18         MR. GAINEY:  Object to form.  You can answer.
19         THE WITNESS:  A number of different things
20  could transpire.  It depends.  I mean, you
21  mentioned a hypothetical question.  It's impossible
22  to answer a hypothetical.
23  BY MR. KATZENMEIER:
24     Q.  Okay.  Would Bass Underwriters ever cancel a
25  policy?



Page 42

1     A.  Yes.
2     Q.  Does Bass Underwriters have the authority to
3  cancel policies issued on Mt. Hawley paper without
4  referral to Mt. Hawley?
5     A.  We do.
6     Q.  Okay.  Does Bass Underwriters -- strike that.
7        What circumstances would lead to Bass
8  Underwriters canceling a policy?
9     A.  Again, it's -- it's so many different
10 circumstances.  It goes risk to risk.  So if you want to
11 ask about this specific policy, I can answer.  But, you
12 know, we deal with so many different types of risks.
13 That's really a tough question to answer.
14    Q.  Thank you, Mr. Collier.  I understand.  I'm
15 trying to go through the general risks first.
16    A.  I understand.
17    Q.  So if information had been revealed in a -- an
18 inspection report such as this, would that be grounds
19 for cancellation of a policy?
20    A.  There's a possibility.
21    Q.  How about -- how about recision of a
22 policy?  Does Bass Underwriters have the authority to
23 rescind a policy issued on Mt. Hawley paper?
24        MR. GAINEY:  Object to form.  If you know.
25        THE WITNESS:  In certain instances.

Page 43

1  BY MR. KATZENMEIER:
2     Q.  Okay.  Can you tell me what those instances
3  are?
4     A.  We have certain rules that are dictated by
5  Mt. Hawley based on time, you know, issue, so many
6  different issues it could be, and at times it would have
7  to go to them to approve a reinstatement, at times it
8  doesn't.
9     Q.  All right.  What is the source of those rules
10 imposed by Mt. Hawley?
11    A.  Their underwriting manual.
12    Q.  The underwriting manual.  Is -- so before we
13 move on from that, let me just pull something up.
14       Can you see my screen, Mr. Collier?
15    A.  I can.
16    Q.  Okay.  Is this the -- I'll scroll out a little
17 bit so you can see.
18       Is this the underwriting manual you're
19 referring to?
20    A.  It appears to be.
21    Q.  Okay.  And I can -- I'll scroll through it so
22 you can see the whole thing generally.  But are the --
23 these guidelines are the underwriting manual you're
24 referring to?
25    A.  It appears to be, yes.

Page 44

1     Q.  Okay.  Thank you.
2        MR. KATZENMEIER:  Can we mark the underwriting
3  manual I have pulled up right now as Nationwide
4  Exhibits 5, I believe we're on.
5        THE COURT REPORTER:  Noted.
6        MR. KATZENMEIER:  Thank you.
7  BY MR. KATZENMEIER:
8     Q.  So if you could, Mr. Collier, is there any --
9  what -- what portion of this underwriting manual are you
10 referring to insofar as grants Bass Underwriters
11 authority to rescind their policy?
12       MR. GAINEY:  Before you answer, do you even
13 see the rest of that to review that?
14       THE WITNESS:  No, I don't, because that --
15 that document wouldn't provide that information.
16 And I'm not exactly sure where the -- the data or
17 the instructions are on recisions in Mt. Hawley.  I
18 just don't know where that information is kept.
19 BY MR. KATZENMEIER:
20    Q.  Well, I mean, earlier you testified that the
21 rules were from the underwriting manual and that this --
22    A.  And underwriting rules.  They're -- I suspect,
23 and, again, I don't know this firsthand, there's a
24 cancellation policy that most likely exists with
25 Mt. Hawley but that is housed and handled by our

Page 45

1  dedicated team on the cancellation side.  So I just
2  don't get into that.
3     Q.  Okay.  But are the rules that authorize Bass
4  Underwriters to rescind the policy on Mt. Hawley's
5  behalf contained in this underwriting manual, or are
6  they contained somewhere else?
7     A.  They're not contained on that form there.  And
8  quite honestly, I don't know where they are contained.
9  That doesn't happen under my authority.
10    Q.  Okay.  But you do understand that Bass
11 Underwriters has the authority to rescind the policy
12 issued on Mt. Hawley paper?
13       MR. GAINEY:  Object to form.
14       THE WITNESS:  Under certain parameters, yes.
15 BY MR. KATZENMEIER:
16    Q.  Under certain parameters.  Would that
17 authorization be contained in a different document than
18 these underwrit-- this underwriting manual?
19    A.  Honestly, I don't know.  I'd have to go
20 through the whole underwriting manual.
21    Q.  Now, when you say you'd have to go through the
22 whole underwriting manual, are you referring to a
23 different document than what I have in front of you?
24 This is four pages.
25    A.  Yeah.  Well, you have to understand, the



1  underwriting manual is thousands of pages.
2      Q.  Okay.  So is what I have in front of me just a
3  portion of the underwriting manual?
4      A.  That's correct.
5      Q.  Okay.
6          Okay.  So I want to go back to the inspection
7  report --
8      A.  Sure.
9      Q.  -- I have here.  So you indicated that, and
10 correct me if I'm wrong, you indicated that sometimes
11 incorrect information provided or revealed through an
12 inspection report may be grounds for cancellation; is
13 that correct?
14     A.  Yes.
15         MR. GAINEY:  Object to form.
16 BY MR. KATZENMEIER:
17     Q.  I'm sorry.  Did you say "yes"?
18     A.  Yes.
19     Q.  Okay.  I want to scroll down -- and this is
20 inspection -- this inspection report is dated
21 September 20, 2002; correct?
22     A.  Yes.
23     Q.  And this says the Policy No. is GGL31463; is
24 that correct?
25     A.  Correct.

1      Q.  And do you know what that policy number refers
2  to?
3      A.  Do I know what it refers to?
4      Q.  Well, put another way:  What does that policy
5  number refer to?
6      A.  It refers to a Mt. Hawley policy.
7      Q.  Okay.  Do you know the policy period?
8      A.  I -- based on what you're showing me right
9  now, I don't.  I can look it up.
10     Q.  Okay.  I have -- I have a copy of it.  I
11 can -- I can pull it up for you.
12         So here is the policy and here are the
13 declarations.  Does that policy number at the top of
14 this document that I have read GGL31463?
15     A.  Correct.
16     Q.  And that matches the policy number on the
17 inspection report I just showed you; is that correct?
18     A.  Yes.
19     Q.  Okay.  And what is the policy period for this
20 policy period -- or for this policy?
21     A.  8/31/22 to 8/31/23.
22     Q.  Okay.  Thank you.
23         MR. KATZENMEIER:  Could we please mark the
24 policy I presently have up from August 2022 to
25 August 2023 as Nationwide Exhibit 6.

1          THE COURT REPORTER:  Noted.
2          MR. KATZENMEIER:  Thank you very much.
3  BY MR. KATZENMEIER:
4      Q.  So going back to the inspection report, do you
5  understand that policy number to refer to the 2022 to
6  2023 policy period I just showed you?
7      A.  Yes.
8      Q.  Okay.  Thank you.
9          And specifically, I want to scroll down on
10 this to -- I'm sorry.  I had it here earlier.
11         Okay.  This is what I wanted to show you.  So
12 the -- under building use here, it says residential
13 rental by the day; is that correct?
14     A.  Yes.
15     Q.  Okay.  Now, would receiving that information
16 in this inspection report be grounds for cancellation of
17 the policy?
18         MR. GAINEY:  Object to form.
19         THE WITNESS:  I don't know.  That's not my
20 policy.
21 BY MR. KATZENMEIER:
22     Q.  Okay.
23     A.  The policy was written after.  A different
24 agent took over the account than my retail agent, so I
25 mean, that file was no longer mine by then.

1      Q.  It was no longer yours, or it was no --
2  specifically, or it was no longer Beach Cruiser's?  I'm
3  sorry.  Let me rephrase that.
4          It was no longer yours specifically or it was
5  no longer Bass Underwriters'?
6      A.  It was no longer mine specifically.
7      Q.  Okay.  Is an inconsistency like that generally
8  grounds for cancellation of a policy?
9          MR. GAINEY:  Object to form.
10         MR. DELAHUNT:  I join the objection.
11         THE WITNESS:  It's possible.
12 BY MR. KATZENMEIER:
13     Q.  Okay.  What are the circumstances that would
14 determine whether a policy is canceled for an
15 inconsistency like that?
16         MR. GAINEY:  Object to form.
17         MR. DELAHUNT:  Same.
18         THE WITNESS:  Again, it varies so much.  The
19 inspection is designed to take a very brief
20 30,000-foot-above glance at the property from more
21 of a, you know, condition-type perspective.  So,
22 yeah, it's impossible to say exactly what can
23 trigger something.  But the intent of the
24 inspection is really not to re-underwrite the file,
25 but to, you know, ensure it's not falling down.





Page 50

1    You know, it's -- there's no windows broken.
2  There's no glaring potholes.  Stuff of that nature.
3  BY MR. KATZENMEIER:
4    Q.  So I want to go back to the underwriting
5  manual you mentioned just a moment ago.
6    And I'm going to scroll down to where it
7  says -- here.  To where it says, "Short-term rentals
8  (less than 12 months) and vacation rentals should be
9  referred."  Did I read that correctly?
10   A.  Yes.
11   Q.  What does that sentence mean in this
12 underwriting manual?
13   A.  It means that if you have a risk that is doing
14 short-term rentals, it needs to be referred to the
15 company.
16   Q.  Okay.  So returning to the inspection report,
17 if the inspection report returns information that says
18 the property is being rented by the day, is that
19 something that should then be referred to Mt. Hawley?
20     MR. GAINEY:  Object to form.
21     THE WITNESS:  It's possible.
22 BY MR. KATZENMEIER:
23   Q.  When you say "it's possible," when would it
24 be --
25   A.  Well, the inspections are reviewed by a

Page 51

1  department inside of Bass Underwriters' organization.
2    Q.  Okay.
3    A.  It basically looks at the inspection received,
4  reviews it, and then would, in fact, notify the
5  underwriter of any kind of, you know, glaring issues
6  with that inspection.  Again, it's not designed to
7  re-underwrite a file.  It's more of a -- an inexpensive
8  tool to give you, you know, eyes on the ground of the
9  property.
10   Q.  Okay.  Do you know whether Mt. Hawley was ever
11 notified of the results of this inspection report?
12   A.  I don't.
13   Q.  Are inspection reports performed for policies
14 written on Mt. Hawley paper generally sent to
15 Mt. Hawley?
16   A.  As in sent to the carrier, I believe so.  I'm
17 not involved in that part of this business, so I
18 can't -- I can't answer that with a hundred percent
19 certainty.
20   Q.  Okay.  Do you know if the policy issued to
21 Beach Cruiser by Bass Underwriters was ever canceled?
22   A.  I don't recall.  I think something from
23 yesterday -- there was a memo that maybe there was an
24 NOC sent out, but I don't recall if it was ever fully
25 canceled.

Page 52

1    Q.  Okay.  So take me through what that means.
2  What is -- why would it -- how would the policy not have
3  been fully canceled?
4    A.  I mean, it could have -- I don't know.  That's
5  what I'm saying.  I don't -- this file that you're
6  referring to here, I didn't have anything to do with
7  that file.  So --
8    Q.  Okay.
9    A.  -- I hate to speculate.
10   Q.  Again, we're going to move to a different
11 topic, so I'm back to generally now.
12     When you say "is not fully canceled," would
13 that refer to the cancellation not being completed or --
14   A.  That's correct.
15   Q.  Okay.  Thank you.
16     And if you recall, why was a Notice of
17 Cancellation issued with respect to a Beach Cruiser
18 policy?
19   A.  Which specific policy are you referring to?
20   Q.  Well, just a moment ago you mentioned seeing a
21 Notice of Cancellation, so I'm asking if you recall --
22   A.  Correct.  Yesterday, correct.  But without
23 looking back through the papers, I don't know which
24 policy that was on.  I just remember that there was a
25 DNOC issued.

Page 53

1    Q.  Okay.  Was a policy ever -- was any policy
2  issued to Beach Cruiser ever rescinded by Bass?
3    A.  Again, I believe so.  From yesterday, just
4  going through the paperwork for the first time, but I
5  don't remember what specific policy that pertained to.
6    Q.  Okay.  If you recall, what was the reason for
7  the recision by Bass?
8    A.  Well, I think you have the document.  If you
9  can pull it up, I can recall better.
10   Q.  I don't know what recision you're referring
11 to.
12   A.  I don't either.  That's the thing.
13   Q.  Gotcha.
14   A.  I don't recall when the recision was issued or
15 not, so...
16   Q.  Okay.
17   A.  I'm not trying to be vague.  I just don't know
18 what you're referring to.
19   Q.  I can share it.  In the event a policy was
20 ever rescinded by Bass, would the policy premium have
21 been returned?
22     MR. GAINEY:  Let me just object to form and
23   you can answer.
24     MR. DELAHUNT:  Same.  Thank you.
25



Page 54

```
1         THE WITNESS: Would the premium have been
2    returned?
3    BY MR. KATZENMEIER:
4         Q.  Correct.
5         A.  Well, if a policy is rescinded, the policy was
6    never technically canceled.  So there would be no return
7    premium to send.
8         Q.  So to clarify at this point, are you -- are
9    you referring to the recision of the cancellation?
10        A.  Well, so I think maybe we're just getting
11   confused on the terms.  A Notice of cancellation is sent
12   out, and it gives us a certain period of time whether it
13   can, you know, in the future, based on the state law, so
14   in case -- and this is generally speaking here because,
15   again, I don't know which one you're specifically
16   talking about -- if whatever generated the cancellation
17   was rectified, then a recision can be sent prior to the
18   actual cancellation date.  So, you know, when you say
19   "recision," there's, you know, if it's done before the
20   actual cancellation date, there's no money to return.
21   The policy was never canceled.
22        Q.  Okay.  Thank you for that, Mr. Collier.  So
23   for the purposes of this question, when I say
24   "recision," I mean a recision of coverage with the
25   policy.
```

Page 55

```
1         A.  Okay --
2         Q.  Did Bass ever --
3         A.  -- definition.
4         Q.  Did Bass ever rescind the policy as a whole?
5         MR. DELAHUNT:  Objection to form.
6         THE WITNESS:  I'm sorry, Luke.  I didn't -- I
7    thought you were finished.  If you weren't, I
8    apologize.
9         MR. KATZENMEIER:  I -- I realized it was a
10   little vague, so I was about to clarify.  I can
11   rephrase the question.
12        MR. GAINEY:  No.  Let him rephrase it.
13        MR. KATZENMEIER:  It's a -- it's a little hard
14   to hear you.
15        THE WITNESS:  If you could, just ask that one
16   more time.
17        MR. KATZENMEIER:  Of course.
18   BY MR. KATZENMEIER:
19        Q.  Did Bass ever rescind an entire policy issued
20   to Beach Cruiser?
21        MR. GAINEY:  Object to form.  Go ahead if you
22   know.
23        THE WITNESS:  Not that I'm aware of.
24   BY MR. KATZENMEIER:
25        Q.  Okay.  And going back, now that we've
```

Page 56

```
1    clarified the term issue, does Bass have the authority
2    to rescind policies issued on behalf of Beach Cruiser?
3         MR. GAINEY:  Object to form.
4         MR. KATZENMEIER:  Sorry.
5         THE WITNESS:  You understand that term
6    "rescind" meaning to cancel the policy like it
7    never existed?
8         MR. KATZENMEIER:  More or less, correct, yeah.
9         THE WITNESS:  I don't believe we have that
10   authority.
11   BY MR. KATZENMEIER:
12        Q.  Okay.  And I think I -- I think I may have
13   made a mistake there in my words.  So just to clarify,
14   that's whether Bass had authority to rescind a policy on
15   behalf of Mt. Hawley, not Beach Cruiser.
16        MR. GAINEY:  Object to form.
17   BY MR. KATZENMEIER:
18        Q.  Same answer?
19        MR. GAINEY:  He said do you have the same
20   answer.
21        THE WITNESS:  Oh, yes, yes.
22   BY MR. KATZENMEIER:
23        Q.  Okay.  Okay.  How -- so I want to take you --
24   I want you to take me through the process for issuing
25   and renewing a policy.  So in this instance, for
```

Page 57

```
1    policies written on behalf of Mt. Hawley, would
2    Mt. Hawley -- would Bass Underwriters send the
3    application materials to Mt. Hawley before issuing a
4    policy?
5         A.  I believe we send them to them just after the
6    issuance of the policy.
7         Q.  Okay.  And that -- does that include the ACORD
8    form and all supplemental application forms?
9         A.  That would be correct.
10        Q.  Okay.  But Bass Underwriters has the authority
11   to issue the policy without referral to Mt. Hawley under
12   certain circumstances; is that correct?
13        A.  That's correct.
14        Q.  Are there any certain circumstances under
15   which Mt. Hawley should be referring -- or the
16   application should be referred to Mt. Hawley?
17        A.  Are there certain instances when -- say that
18   again.  I'm sorry.  Somebody slammed the door.
19        Q.  Sure, sure.
20        Are there any certain instances under which an
21   application be referred to Mt. Hawley?
22        A.  Yes.
23        Q.  And what circumstances would those be?
24        A.  There's so many different circumstances.
25        Q.  Okay.
```



MAGNA
LEGAL SERVICES

Page 58

1     A.  Different businesses.  I mean, you know,
2  generally speaking we don't have time to go over it all.
3     Q.  Of course.  Would the circumstances under
4  which Bass Underwriters is required to refer an
5  application to Mt. Hawley be contained within the
6  underwriting manual?
7     A.  Yes.
8     Q.  Okay.  Do the circumstances change at all when
9  the issue -- the policy is a -- when the issuance is a
10 renewal of a policy versus a new business?
11    A.  I guess -- so rephrase the question.  I think
12 I know what you're asking, but I'm not clear.
13    Q.  Sure.  Due to the circumstances in which
14 Mt. Hawley -- or Beach Cruiser.  Sorry.  So many names.
15        Do the circumstances in which Bass
16 Underwriters is required to refer an application to
17 Mt. Hawley change when the policy being issued is a
18 renewal as opposed to new business?
19    A.  Okay.  I understand.  They could.  You know,
20 rules change, you know, as time goes by, with
21 acceptability.  So, yeah, they could very well be the
22 same rules, they may not.
23    Q.  Okay.  Would the change of those rules be
24 based on revisions to the underwriting manual?
25    A.  Correct.

Page 59

1     Q.  Okay.  So in other words, the circumstances
2  under which Bass Underwriters is required to refer to
3  Mt. Hawley don't change based on the same rules between
4  new business and -- or renewal of a policy; is that
5  correct?
6        MR. GAINEY:  Object to form.
7        THE WITNESS:  Yeah, I don't really -- I guess
8     I'm not clear.  Are you asking about this specific
9     policy, or are we talking in general business
10    practices?
11 BY MR. KATZENMEIER:
12    Q.  General business practice with respect to Bass
13 Underwriters' business with Mt. Hawley.
14    A.  It can change.  I mean, there's no -- there's
15 no set criteria of when they update manuals or
16 acceptabilities or rules.
17    Q.  Sure.  So let me clarify that.
18        Under the current set of underwriting manuals,
19 is there a different set of rules for where Bass
20 Underwriters is required to refer an issue to Mt. Hawley
21 for new business versus -- versus for the renewal of a
22 policy?
23    A.  I'm not aware of any.
24    Q.  Okay.  Okay.
25    A.  I apologize.  I just didn't understand the

Page 60

1  question.
2     Q.  No, that's fine.
3        So put another way, if Bass Underwriters was
4  required to refer a certain risk to Mt. Hawley for new
5  business, it would also be required to refer that risk
6  to Mt. Hawley when renewing the policy?
7        MR. GAINEY:  Object to form.
8        THE WITNESS:  I don't remember what it says,
9     to be honest with you.
10 BY MR. KATZENMEIER:
11    Q.  Okay.  Let me see.
12        How often are the application materials --
13 strike that, actually.
14        Is an insured required to submit new
15 application materials each time the policy is renewed?
16    A.  Not necessarily.
17    Q.  Not necessarily.  Under what circumstances
18 would an insured be required to submit new application
19 materials upon renewal of a policy?
20    A.  Excuse me.  If there's any material changes in
21 the risk.
22    Q.  Okay.  And would Bass Underwriters be the one
23 requesting or asking whether there were any material
24 changes in the risk?
25    A.  The agent is the -- is responsible for

Page 61

1  discussing a risk with the insured and convey that
2  information to us.
3     Q.  Okay.
4     A.  Because we don't have any -- any communication
5  with the insured.
6     Q.  Okay.  Does Bass Underwriters have any
7  processes in place for requesting updated applications?
8     A.  Bass follows the insurance company's rules
9  with regards to that.
10    Q.  Okay?
11    A.  Depending on the insurance company, so that's
12 why we refer to their rules.
13    Q.  So should I under--- should I take from that
14 that any requirements for new application materials
15 would flow from Mt. Hawley not from Bass?
16        MR. GAINEY:  I object to form.  Answer it.
17        THE WITNESS:  Based on their -- yeah.  It
18    would just be based on their specific guidelines.
19 BY MR. KATZENMEIER:
20    Q.  Okay.  And when you say "their specific
21 guidelines," would that be contained in the underwriting
22 manual?
23    A.  It should be, yes.
24    Q.  Okay.  I'll stop sharing my screen.
25        Okay.  Mr. Collier, I'm going to pull up

16  (Pages 58 to 61)



Page 62

```
 1  another communication here and let me know if you can
 2  see my screen.
 3      A.  Yeah.
 4      Q.  Okay.  This appears to be an email from
 5  February 2022 from a Tiffany Middleton to yourself; is
 6  that correct?
 7      A.  That's correct.
 8      Q.  Okay.  Who is Tiffany Middleton?
 9      A.  I think she was the CSR at the insurance
10  agent, USI.
11      Q.  Okay.  And CSR, can you tell me what that
12  means?
13      A.  Customer service representative.
14      Q.  Customer service representative.
15          Okay.  Now, Mr. Collier, this -- this email
16  asks for -- can you tell me how much information I would
17  need to provide her with a quote for a property for
18  short-term rentals; is that correct?
19      A.  Yes.
20      Q.  Okay.  And I'm looking at the subject line
21  here --
22      A.  Sure.
23      Q.  -- this one right in the middle of GGL0026067.
24  That matches the 2021 to 2022 policy period for the
25  Beach Cruiser policy I showed you earlier; is that
```

Page 63

```
 1  correct?
 2      A.  It appears to be, yes.
 3      Q.  Okay.
 4          MR. KATZENMEIER:  Can we go ahead and mark
 5  this set of emails and this thread as -- I'm on 7
 6  now, Nationwide Exhibit 7.
 7          THE COURT REPORTER:  Yes, but I think it might
 8  be 6.
 9          MR. KATZENMEIER:  I think I had 6 as the 2022
10  to 2023 policy period.  Did I mention that?  I
11  might have cut out or something.
12          MR. DELAHUNT:  No, Luke, you're right.  The
13  2022 policy is marked as 6, according to my notes.
14          MR. KATZENMEIER:  Okay.
15          THE COURT REPORTER:  Thank you.
16          MR. KATZENMEIER:  Thank you.
17  BY MR. KATZENMEIER:
18      Q.  Mr. Collier, can you tell me what the context
19  for this email is?
20      A.  It's a little bit all over the place.  It
21  appears the context is she's wanting to know what
22  information I need on a new project that this insured is
23  considering.
24      Q.  Okay.  And do you understand all of these
25  policy numbers to refer to policies issued to Beach
```

Page 64

```
 1  Cruiser?
 2      A.  I believe so.
 3      Q.  Okay.  So from this, was it your understanding
 4  that Beach Cruiser was involved in issu-- using
 5  short-term rentals at some point?
 6          MR. GAINEY:  Object to form.
 7          MR. DELAHUNT:  Same.
 8          THE WITNESS:  I don't recall.  You know,
 9  what -- I don't recall reading this email in 2022.
10  BY MR. KATZENMEIER:
11      Q.  Okay.
12      A.  Other than it appears to be very choppily
13  written.  I would say the basis of my thoughts would be
14  that, you know, we're talking about a new property and
15  they want to know what they need to provide specifics
16  for a quote.
17      Q.  Okay.  Do you know -- well, strike that.
18          Was a policy ever issued by Bass Underwriters
19  to Beach Cruiser for short-term rentals?
20      A.  Not that I recall.
21      Q.  Okay.  And these other policies numbers up
22  here, can you tell me what this -- what type of policy
23  this AN1246602 policy would have referred to?
24      A.  Yeah.  I believe that's an excess policy
25  that's in excess of primary.
```

Page 65

```
 1      Q.  Do you know which insurer's paper that would
 2  have been written on?
 3      A.  I believe it's Nautilus Insurance Company.
 4      Q.  Okay.  And how about this SAF010208?
 5      A.  Without looking it up, I don't know
 6  specifically which properties it pertains to, but that's
 7  a Safety Specialty Insurance Company prefix.
 8      Q.  Okay.  And this CCP988057?
 9      A.  That's a Century Surety policy.
10      Q.  Okay.  And the GPD0006297?
11      A.  I believe that's a Mt. Hawley property policy.
12  They use different prefixes for different things, so I'm
13  not a hundred percent sure.
14      Q.  Okay.  And were any of these policies issued
15  to cover short-term rentals?
16      A.  Not that I'm aware of.
17      Q.  Okay.  I'm going to stop sharing my screen on
18  that one.  I'm going to pull up another document
19  for you, Mr. Collier.
20          Can you see my screen, Mr. Collier?
21      A.  I can.
22      Q.  All right.  Are you familiar with this
23  document, Mr. Collier?
24      A.  I am.
25      Q.  Okay.  Can you tell me what this document is?
```



Page 66

1    A.  It looks like an invoice from Bass
2    Underwriters to the retail agent.
3    Q.  Okay.  And can you tell me the -- let's see --
4    the date of this invoice?
5    A.  You said the date?
6    Q.  The date of the invoice, correct.
7    A.  Looks like 9/8/22.
8    Q.  Okay.  Thank you, Mr. Collier.  Okay.  And I
9    just want to scroll up.
10        Can you tell me what this document is?
11    A.  I can't.  I mean, that's the first time I've
12    seen it back in -- it looks like a invoice from the
13    agent to the insured.
14    Q.  And I'm just going to scroll up one more time.
15    And this is -- can you tell me, are you familiar with
16    this document?
17    A.  I'm not, no.
18    Q.  Okay.  My question, based on these documents,
19    is -- refers to the process of payment between the
20    insured and Bass Underwriters for the policy.  So
21    does -- when a premium is paid for the policy by the
22    insured or the insured's agent, does that go directly to
23    Bass Underwriters?
24    A.  When the insured -- the insured pays the
25    agent, the agent pays us.

Page 67

1    Q.  Okay.  And then is that -- are those funds
2    then remitted to Mt. Hawley?
3    A.  That's correct.
4    Q.  Okay.  Okay.  That's what I was curious about.
5    MR. KATZENMEIER:  Now I'm -- can we go ahead
6    and mark this set of documents as Nationwide
7    Exhibit 8.
8    THE COURT REPORTER:  Noted.
9    MR. KATZENMEIER:  Okay.  Let's see.  It might
10    actually be a reasonable time to take a break if
11    guys want to do that.
12    THE WITNESS:  Love to.
13    MR. DELAHUNT:  Yes.
14    MR. KATZENMEIER:  Do you want five?
15    MR. GAINEY:  Five minutes?  Ten minutes?
16    MR. KATZENMEIER:  I'm okay with five minutes.
17    You guys want five minutes?
18    MR. GAINEY:  Yes.
19    THE VIDEOGRAPHER:  We are going off the
20    record.  The time is 11:45 a.m.
21    (A sort break.)
22    THE VIDEOGRAPHER:  We are back on the record;
23    the time is 11:55 a.m.
24    MR. KATZENMEIER:  Okay.  Before I get back
25    into things, I was going to say, Tim, this might be

Page 68

1    a good time if you or Ray have any questions.
2    MR. DELAHUNT:  Ray, you're first if you have
3    any.
4    MR. PIERANTONI:  You want to make me go before
5    you?
6    MR. DELAHUNT:  You know what --
7    MR. PIERANTONI:  I just had some --
8    MR. GAINEY:  Can you give us one second?  One
9    second.  I've got to turn our air off.
10    THE WITNESS:  We're turning the air off.  It
11    will be too loud.
12    MR. PIERANTONI:  I was just giving you the
13    courtesy, you know -- I'm giving you the courtesy
14    of going first.
15    MR. DELAHUNT:  I appreciate that.  I don't
16    have any questions.
17    MR. PIERANTONI:  Okay.
18    THE VIDEOGRAPHER:  Do you -- nevermind.  It
19    looks like the witness is coming back.
20    THE WITNESS:  My apologies guys.  The air
21    condition popped on and it's too loud in this room.
22    MR. PIERANTONI:  That's okay.  Okay.  We're
23    ready?  Yes?
24    THE WITNESS:  Yes, yes.
25    MR. PIERANTONI:  Okay.  Great.

Page 69

1              CROSS EXAMINATION
2    BY MR. PIERANTONI:
3    Q.  Okay.  Mr. Collier, my name is Ray Pierantoni,
4    Renier Pierantoni.  I represent the Defendants, Beach
5    Cruiser and Flyway in this case.  They're the insureds,
6    as you know.  And I'm just -- I just have a few
7    questions to follow up on Nationwide's questions.
8    MR. PIERANTONI:  If -- Luke, is it possible
9    for to you allow me to share?
10    MR. KATZENMEIER:  Yes.  I don't --
11    MR. PIERANTONI:  Okay.  I -- I see it.  Great.
12    BY MR. PIERANTONI:
13    Q.  Okay, Mr. Collier.  Do you -- what's your
14    understanding of what this matter is about?  This
15    litigation?
16    A.  This -- which litigation are you referring to?
17    I believe I'm aware of several different pieces in this
18    puzzle.
19    Q.  Okay.  That's okay.  Not a problem.  I will
20    share the screen.
21        Okay, Mr. Collier.  Do you see in front of you
22    a subpoena?
23    A.  I do.
24    Q.  Okay.  Great.  And the subpoena is a subpoena
25    for you to testify -- I'll make that representation --



Page 70

1  in the matter you'll see underneath -- oh, maybe it's a
2  little higher.  There you go -- is a matter of
3  Mt. Hawley Insurance Company versus Beach Cruiser, and I
4  can represent that the other Defendants is Flyway, and
5  the Intervenor Defendant is Nationwide.  So this -- when
6  I say "this matter," this is the litigation I'm
7  referring to.  No other litigation.
8      A.  Okay.
9      Q.  Sure.  Not a problem.
10        So what is your un-- do you have an
11  understanding of what this litigation is about, sir?
12      A.  I have a vague understanding.
13      Q.  Okay.  And what is that understanding?
14      A.  It appears that Mt. Hawley Insurance Company
15  is requesting a declaratory action, State of New York
16  for -- versus Beach Cruiser in the matter of the Policy
17  No. -- again, I would have to go through and tell you
18  what it is again because I don't remember it, but
19  insurance action between the carrier and the insured.
20      Q.  Okay.  Do you know what specifically
21  Mt. Hawley is seeking to do in the action?
22      A.  Again, not being a lawyer, it appears that
23  they're looking to get it thrown out to some degree, but
24  I don't know if that's the right term or not.
25      Q.  Okay.  I'll represent to you that the

Page 71

1  Mt. Hawley -- and, Tim, if you want to correct me in the
2  language -- Mt. Hawley is seeking to cancel or rescind
3  the policy in the action, the policy that's at issue.
4      MR. PIERANTONI:  Is that a fair
5  representation, Tim?
6      MR. DELAHUNT:  No, actually, Ray, I don't
7  think it is.
8      MR. PIERANTONI:  Okay.
9      MR. DELAHUNT:  Mt. Hawley is a declaration
10  that it has no duty to defend or indemnify the
11  insureds in connection with the --
12      MR. PIERANTONI:  Oh, that's right.  You -- I
13  stand corrected because you withdraw that other
14  claim.
15      MR. DELAHUNT:  Right.
16      MR. PIERANTONI:  There's a lot of cases in
17  front of me, so this is one of several.  Okay.
18  Fair enough.
19      MR. DELAHUNT:  That's cool.
20  BY MR. PIERANTONI:
21      Q.  And did you -- Mr. Collier, did you
22  hear what Mr. Delahunt mentioned?
23      A.  I did.
24      Q.  Fantastic.  Okay.  I'm going to scroll down,
25  sir, and -- just to go over the topics you're going to

Page 72

1  testify about, you'll see that one of the topics is
2  Topic 2 -- Topics 2 and 3.  Do you see that, sir?
3      A.  Under the 30(b)(6) topics?
4      Q.  Yes, sir.
5      A.  I do.
6      Q.  Okay.  And you understand you're here to
7  testify with the regard to the underwriting of the
8  Mt. Hawley policy; right?
9      A.  Right.
10      Q.  And the renewal of the Mt. Hawley policy;
11  correct?
12      A.  The renewal of the first year of the first
13  renewal.
14      Q.  Okay.  And to that extent there were documents
15  requested --
16      MR. PIERANTONI:  By the way, if we could enter
17  that as -- we can mark that Exhibit -- whatever the
18  next exhibit is.
19      MR. DELAHUNT:  It should be 9, I think.
20      MR. PIERANTONI:  9?  Okay.
21  BY MR. PIERANTONI:
22      Q.  Were you ever shown this, this subpoena, sir?
23      A.  I was.
24      Q.  Okay.  So you recognize this to be the
25  subpoena you're responding to today; correct?

Page 73

1      A.  Yes.
2      Q.  I'm sorry, sir.  I didn't catch that.
3      A.  Yes, yes.
4      Q.  Fantastic.
5      MR. PIERANTONI:  So we'll mark this and enter
6  it as Exhibit 9, I believe.  Great.
7  BY MR. PIERANTONI:
8      Q.  And in response to another subpoena relating
9  to the subpoena asking for documents, I'm going to show
10  you that Bass has produced three separate productions,
11  at least a production of documents in three parts.  And
12  then there appears to be a coversheet for each.  This is
13  the coversheet for one production, if you can take a
14  look at that, sir.
15      A.  Yes.
16      Q.  Okay.  Do you recognize what this number that
17  I'm highlighting here stands for?
18      A.  Yes, it's a policy number.  I don't know -- I
19  think -- because I have it written down -- I think it's
20  the 2021 year.
21      Q.  That is correct.  The August '20 to '21, and
22  I'll just scroll down -- hopefully the policy will pop
23  up shortly.
24      A.  Sure.
25      Q.  Okay.  Well, rather than waste everybody's



1  time, I think we can read the representation is the
2  August '20 to '21 policy. Is that okay with you,
3  Mr. Collier? That this policy --
4      A. That's a 2021 policy.
5      Q. Right. And the next document grouping is this
6  one here, and it has this policy number in front.
7          Do you recall what that policy number -- what
8  policy that policy number stands for, sir?
9      A. Yes. It's -- it appears to be '21/'22 renewal
10  policy.
11     Q. Great. And then the third grouping of the
12  production from Bass is this one here, and do you
13  recognize that policy number?
14     A. I recognize it as a policy number. I would
15  assume that it's the subsequent renewal after the '21 --
16  or '21/'22 policy.
17     Q. So would you -- is it fair to say that this is
18  for the August 31, 2022 to 2023 policy?
19     A. Yeah, I believe so without seeing it. I mean,
20  it's in the -- it's in the discovery, so...
21     Q. Okay. And just -- just so you know, to the
22  extent I refer to these groupings --
23     A. Sure.
24     Q. -- you'll see at the bottom I put page no. 1
25  of whatever, and I did that because it's not an answer

1  to anything -- but it's just so that everybody could
2  follow more easily, I put a page number at the bottom.
3  So to extent I refer to these documents, I'm going refer
4  to those numbers. Okay? You may not have it on your
5  end, sir, but it will help to the extent there's a page
6  count.
7          So with regard to your appearance today, did
8  you have at any point -- did you -- I believe you
9  testified earlier you spoke to somebody at Mt. Hawley
10  prior to your appearing for the deposition today?
11     MR. GAINEY: Object to form.
12  BY MR. PIERANTONI:
13     Q. I'm asking if that was your testimony, sir.
14     A. Yes.
15     Q. Okay. Do you recall who that person was at
16  Mt. Hawley you spoke to?
17     A. I honestly don't recall. It was several
18  people.
19     Q. Okay. You don't remember any of their names?
20     A. I believe -- I believe one was a Dana and then
21  I believe Tim was on the call as well.
22     Q. So when you say "Tim," you're referring to
23  counsel, Tim Delahunt, who is appearing at this
24  deposition?
25     A. I believe so. I don't recall, honestly.

1      Q. Okay. And can you communicate what was spoken
2  about during that call?
3      MR. GAINEY: Object to form.
4      MR. DELAHUNT: Wait, wait. Hold on.
5      MR. GAINEY: Objection.
6      MR. DELAHUNT: Ray, that's privileged
7  communication.
8      MR. PIERANTONI: On what basis?
9      MR. DELAHUNT: What's that?
10     MR. PIERANTONI: On what basis?
11     MR. DELAHUNT: Attorney-client.
12     MR. PIERANTONI: All right. Well, but he has
13  an attorney, Tim. So if his attorney wants to
14  interject that objection, that's fine. But you're
15  not --
16     MR. DELAHUNT: No. I --
17     MR. PIERANTONI: You're not --
18     MR. DELAHUNT: I'm free to object.
19     MR. PIERANTONI: Okay, but you're not his
20  attorney. So I'm waiting for --
21     MR. GAINEY: I'm asserting the same objection.
22     MR. DELAHUNT: You don't need to be --
23     (Counsel talk over.)
24     MR. GAINEY: We consider it to be
25  attorney-client privilege. I'll instruct the

1  witness not to answer it.
2      MR. PIERANTONI: Okay. So I just want
3  clarity. Who is the attorney -- were you on the
4  call, sir?
5      MR. GAINEY: I don't recall, but if I was, I
6  still have the same -- I'll interpose the same
7  objection.
8      MR. PIERANTONI: Okay. Well, just let's go to
9  a little colloquy here. Tim, you were asked
10  specifically whether or not you were -- Mt. Hawley
11  was claiming Bass to be part of a litigation
12  control group, do you recall that?
13     MR. DELAHUNT: Ray, that was form purposes of
14  service of the subpoena. That's a different issue
15  than whether the communications are privileged.
16  There are -- Bass is an MGA. Those communications
17  with -- "All Eyes Attorneys" [verbatim] are
18  privileged.
19     MR. PIERANTONI: So you're making the claim
20  that you're going to tell the witness to not
21  testify because of an attorney-client privilege
22  that you have as between Mt. Hawley and Bass? I
23  just want to get it for the record.
24     MR. DELAHUNT: Let me -- I will be clear.
25     MR. PIERANTONI: Okay.



Page 78

```
1          MR. DELAHUNT:  Mr. Gainey is here as Bass's
2     attorney.
3          MR. PIERANTONI:  Right.
4          MR. DELAHUNT:  And he is defending the
5     deposition.  I am here as Mt. Hawley's attorney.  I
6     did not instruct the witness not to answer,
7     Mr. Gainey did.  However, Mr. Gainey's instruction
8     is appropriate because he's protecting the
9     attorney-client privilege that Mt. Hawley holds.
10          MR. PIERANTONI:  With who?
11          MR. DELAHUNT:  Bass is the MGA for Mt. Hawley.
12     So my communications with Bass, and Mr. Collier
13     included in that, are privileged.
14          MR. PIERANTONI:  Okay.  I'm just going to
15     place on the record an exception to that, and I
16     disagree with your take on the litigation control
17     group to that extent as well.  So that's it.  I'm
18     just making the exception for the record and we'll
19     move on.  Okay?
20          MR. DELAHUNT:  Well, I can --
21          MR. PIERANTONI:  Go ahead.
22          MR. DELAHUNT:  I can make -- I can talk on the
23     record too.
24          MR. PIERANTONI:  Sure.
25          MR. DELAHUNT:  Okay.  Your exception is noted.
```

Page 79

```
1     It has no basis.  The litigation hold group
2     requests were not a request or a notice of waiver
3     of privilege.  They're apples and oranges.  You
4     made your statement on the record.  I have made
5     mine.  We can proceed if you're ready.
6          MR. PIERANTONI:  Okay.  We agree to disagree.
7     Not a problem.  Okay.
8     BY MR. PIERANTONI:
9          Q.  Sir, we'll go back to your testimony.
10          I'm sorry, sir?
11          A.  That was a cough.
12          Q.  Okay.  It's a little hard.  It's a little
13     garbled?
14          A.  I'm sorry.  That's --
15          Q.  That's okay.  I've had a bad cough myself.
16          Do you recall earlier, sir, you testified that
17     the first time you were aware of the claim at issue in
18     this case was in December of last year?
19          A.  That's correct.
20          Q.  Okay.  And you also recall that
21     Mr. Katzenmeier showed you documentation from
22     September 2020 --
23          MR. PIERANTONI:  What's the date, Luke, 2022?
24          MR. KATZENMEIER:  Are you referring to the
25     report?
```

Page 80

```
1          MR. PIERANTONI:  Yes.
2          MR. KATZENMEIER:  2022, yeah.
3          MR. PIERANTONI:  Okay.
4     BY MR. PIERANTONI:
5          Q.  -- that shows that Bass was actually aware of
6     short-term rentals, at least as early as that period?
7          MR. GAINEY:  Object to form.
8          MR. DELAHUNT:  Objection.  Same.
9          THE WITNESS:  Can you refer to that specific
10     instance again so I'm clear?
11          MR. PIERANTONI:  Sure.
12          Luke, can you bring up that document
13     again?
14          MR. KATZENMEIER:  Yeah, I can do that.  It
15     looks like you're sharing your screen right now.
16          MR. PIERANTONI:  Oh.  My apologies.  You know
17     what?  We'll get back to it later.  We'll switch
18     questions.  I'll retract that question.  I'll just
19     point out -- let me just bring up the document on
20     the screen.
21     BY MR. PIERANTONI:
22          Q.  Okay, Mr. Collier.  Okay.  I show in front of
23     Mr. Collier an excerpt from the third grouping of Bass's
24     production and ask you to read the bottom part of that
25     document, the email from Jackson Dyer to you dated
```

Page 81

```
1     August 31, 2022.
2          Do you see that, sir?
3          A.  I do.
4          Q.  Okay.  Can you read that to yourself and look
5     up to me when you finish?  Look, confirm when you
6     finish?
7          A.  Okay.
8          Q.  Okay, sir.  Do you recognize the document?
9          A.  I do.
10          Q.  What is the document?
11          A.  It's a email correspondence between myself and
12     another office within Bass Underwriters, specifically
13     the Charleston office.
14          Q.  Okay, great.  Do you see the -- so the next to
15     last sentence on the August 31, 2022, e-mail, and could
16     you read that aloud as to what you wrote in your email
17     to Jackson Dyer?
18          A.  You're referring to the -- "They also turned
19     in a habitability claim last week on past policies."?
20          Q.  Yes, sir.
21          Who is the "they" in that email?
22          A.  I don't recall who the "they" is.  My
23     presumption is it would have been either the insured or
24     agent attorney then.
25          Q.  Okay.  Do you see the subject line at the top
```

21  (Pages 78 to 81)



1  of the document?
2      A.  BOR Beach Cruiser.
3      Q.  Okay.  Do you have any reason to believe that
4  the "they" is not Beach Cruiser?
5      A.  I don't.
6      Q.  Okay.  So your statement that "they" or "Beach
7  Cruiser" turned in a habitability claim last week on
8  past policies, what are you referring to there?
9          MR. GAINEY:  Object to form.
10         THE WITNESS:  I don't recall the specific date
11     in which -- or exactly what we were talking about
12     then, but it appears that there was a habitability
13     claim turned in on -- and I don't recall which
14     policy it was on either, sir.
15  BY MR. PIERANTONI:
16     Q.  Okay.  The claim that is at issue in this
17  matter -- that Mt. Hawley seeks to have a declaration of
18  no defense and no indemnity, do you understand what that
19  claim is about?
20     A.  I vaguely understand it, but only due to the
21  nature of this deposition have I been made aware of
22  that.
23     Q.  Okay.  Do -- can you explain what your
24  understanding of that claim is?  What the coverage being
25  sought is for?

1      A.  And just to be clear, we're not talking about
2  this email now; correct?
3      Q.  No.  I'm just asking.
4      A.  We're talking about the matter at hand in
5  front of us today?
6      Q.  That's correct.
7      A.  As I understand it --
8      Q.  Just to be clear, I mean the underlying claim.
9      A.  The claim that -- which pertains to this
10  litigation?
11     Q.  That's right.
12     A.  My understanding is that two gentlemen were
13  hurt in some form or fashion, as they were a tenant at
14  this property, I believe 146 President Street.
15     Q.  Okay.  Now, getting back to the email, is that
16  what you mean by "the habitability claim"?
17     A.  No.  That's a separate matter.
18     Q.  Okay.  What is that matter, then?  I'm sorry,
19  sir.  I'm asking what is -- then what did you mean by
20  "the habitability claim"?
21     A.  I'd have to go and review the file, but I
22  think there was a habitability claim turned in on a
23  location that had a Beach Cruiser's policy.  I don't
24  recall which one it was.  Quite frankly, I don't
25  remember the details of it.

1      Q.  But you're sure that that claim that you can't
2  remember is different from the claim at issue in this
3  case?
4      A.  Ask that again, please.
5      Q.  So you're sure that that habitability claim
6  that you're referring to on August 31 is not the one
7  involving the two gentlemen at the property?
8      A.  Based on the knowledge that I have, the vague
9  knowledge of the claim and the current litigation, I
10  believe that to be correct.
11     Q.  That it's a different claim?
12     A.  It's a total different matter as I understand
13  it.
14     Q.  Okay.  But you can't remember what the other
15  claim is?
16     A.  Other than clearly it had to do something with
17  habitability, I don't remember the details of it.
18     Q.  Would you refer to an issue regarding whether
19  or not a property is a short-term rental or not?
20     A.  What I refer to counsel.
21     Q.  As a habitability claim?
22     A.  Habitability is a total different issue.
23     Q.  Okay.  What do you mean by "habitability,"
24  then, just generally speaking, when you use that term?
25     A.  I don't know the law, but with regards to

1  habitability, certain jurisdictions have rules that
2  tenants -- tenant protection rules regarding condition
3  of property and/or habitability of property.  So
4  habitability is a very broad term that can be, you know,
5  used in many different situations.
6      Q.  So is it at all possible that the habitability
7  claim that you're referring to in this email is related
8  in some way to the two gentlemen that are the subject of
9  the underlying claim in this action?
10         MR. GAINEY:  Object to form.  Asked and
11     answered.
12         THE WITNESS:  I simply don't know.
13  BY MR. PIERANTONI:
14     Q.  Okay.
15     A.  You know, as I understand it, it's a complete
16  separate matter.
17     Q.  But you can't recall how you understand it?
18  Is that your testimony?
19     A.  No, my testimony is I understand them to be
20  completely separate matters.
21     Q.  What is your understanding of -- or do you --
22  let me ask you this way:  Are you aware of when the
23  claim involving the two gentlemen that's the subject of
24  the underlying claim, do you recall when notice was
25  given to Mt. Hawley and Bass of that claim?

22  (Pages 82 to 85)



Page 86

```
 1          MR. GAINEY:  Object to form.  Go ahead.
 2          THE WITNESS:  I don't know.  It is my
 3     understanding that that claim was reported directly
 4     to the carrier.
 5     BY MR. PIERANTONI:
 6          Q.  Okay.
 7          A.  Bass Underwriters was not notified until much
 8     later.
 9          Q.  If I were to represent to you that the claim
10     was provided to Mt. Hawley in August 2022, would you
11     have any reason to disagree with that?
12          A.  I don't, but I wasn't privy -- I don't believe
13     I was privy to that knowledge.
14          Q.  Okay.
15          A.  In August.
16          MR. DELAHUNT:  Ray, just to keep the record
17     clean for everyone, the last couple questions were
18     referring to the underlying accident here, not
19     that -- what was called the habitability claim;
20     correct?
21          MR. PIERANTONI:  I'm referring to the accident
22     that's the underlying accident here.  However, you
23     know, the -- I'm just pointing out to you,
24     Mr. Collier, or asking you, you don't have any
25     reason to doubt that Mt. Hawley was notified of
```

Page 87

```
 1     that underlying claim between the two gentlemen --
 2          MR. GAINEY:  Object to form.
 3     BY MR. PIERANTONI:
 4          Q.  -- August 2022?  You don't have any -- you
 5     don't have -- you're not aware of any facts or
 6     circumstances that would lead you to believe that
 7     Mt. Hawley was not notified of the claim in August 2022;
 8     correct?
 9          A.  I don't have any reason to not believe that,
10     correct.
11          Q.  Okay.  And if you were to learn that that was
12     the case, would that change your answer earlier that
13     there is no connection between the habitability claim
14     referred to in this email and the one involving the two
15     gentlemen?
16          MR. GAINEY:  Object to form.
17          THE WITNESS:  Ask the question again, please.
18          MR. PIERANTONI:  Can you repeat, Court
19     Reporter, the last question.
20          THE COURT REPORTER:  Yeah, just give me a
21     minute.  My realtime is acting up.  Sorry for the
22     delay.
23          MR. PIERANTONI:  Okay.
24          (The requested portion was read back by the
25          court reporter.)
```

Page 88

```
 1          MR. GAINEY:  I object to form.
 2     BY MR. PIERANTONI:
 3          Q.  All right.  I'll rephrase it, then.
 4          Are you aware of any facts and circumstances
 5     that would lead you to believe that the habitability
 6     claim that's referred to in the August 31, 2022, email
 7     has nothing to do with the two gentlemen that are at the
 8     heart of the underlying claim in this action?
 9          A.  I'm not aware of any circumstances.  I
10     understand that they are separate matters completely.
11          Q.  Well, when you say they are separate matters
12     and it's your understanding -- just to be clear you're
13     not -- you're stating your -- that it's your
14     understanding that they are separate matters; however,
15     when I asked you what -- how you come to that
16     understanding you can't recall; is that correct?
17          MR. GAINEY:  Object to form.  You can answer.
18          THE WITNESS:  Well, I can't recall because as
19     I understand, the litigated matter that we're
20     talking about today is an injury of two parties.
21     BY MR. PIERANTONI:
22          Q.  Uh-huh.
23          A.  Habitability is something totally different.
24          Q.  Right.  I wasn't trying to equate the two to
25     the extent that you thought I was.  I apologize for
```

Page 89

```
 1     that.  I'm saying to the extent that they're related.
 2          Do you have any reason to doubt that they're
 3     related to each other?
 4          MR. DELAHUNT:  Objection.
 5          MR. GAINEY:  Yeah, object to form.
 6          THE WITNESS:  I don't have any reason to
 7     believe that they're related.
 8     BY MR. PIERANTONI:
 9          Q.  You don't have any reason to believe they're
10     related.  Do you have any reason to believe that they're
11     not related?
12          MR. GAINEY:  Object to form.
13          MR. DELAHUNT:  Same.
14          THE WITNESS:  I don't.
15     BY MR. PIERANTONI:
16          Q.  Okay.  That's all I was trying to get at, sir.
17     Thank you.
18          Just to clarify, I think maybe you mentioned
19     this earlier, the agent that you -- in your testimony
20     you're saying the agent for the insured, the agent, that
21     agent was USI; correct?
22          A.  That agent was initially USI, correct.
23          Q.  And then it became who, sir?
24          A.  You'd have to look in the -- in the documents
25     there.  I think it's Norton.  I'm not -- Legacy
```



Page 90

1    Partners.  It's a different -- different retail agent.
2        Q.  Uh-huh.  Did, at any point, Bass share with
3    Legacy a role on the renewal of the third policy?  And
4    I'll just bring you to policy number again.  That policy
5    right there?
6        A.  Which?  And the question was what again?
7        Q.  Did Bass share in recovering fees or other
8    monies for the renewal of this particular policy along
9    with another?  Let's say, Legacy?
10       MR. GAINEY:  Object to form.
11       THE WITNESS:  I mean, it's -- I still don't
12    understand the question, so it's --
13   BY MR. PIERANTONI:
14       Q.  What was -- what was Bass's role vis-à-vis
15   Legacy?
16       A.  I wasn't the underwriter on that file, so I
17   can't speak to that relationship and what happened
18   there.  But it appears to be that Bass Underwriters
19   handled the account for another retail agent.
20       Q.  All right.  So that's the clarification I was
21   looking for.  When you're saying you weren't involved,
22   you're saying somebody else at Bass Underwriters was
23   involved in that; correct?
24       A.  That's correct.
25       Q.  Okay.  Thank you.

Page 91

1        Now, you're also aware from --
2        MR. PIERANTONI:  And, Luke, I'm going to
3    switch -- I'm going to shop sharing.  If you could,
4    bring up the underwriting guidelines.
5        MR. KATZENMEIER:  Yeah, I can do that.
6    BY MR. PIERANTONI:
7        Q.  Okay, sir.  Do you recall this document that
8    you testified to earlier?
9        A.  I do.
10       Q.  Okay.  And I believe you testified earlier
11   that this constituted just a small part of the
12   underwriting file for Beach Cruiser that you maintain --
13   that Bass maintains for Beach Cruiser; correct?
14       A.  That is a small part of the underwriting
15   manual for Mt. Hawley Insurance Company.
16       Q.  Okay.  And to the extent that this applies to
17   issuing coverage to Beach Cruiser, you would refer to
18   these guidelines in issuing that coverage; correct?
19       A.  Correct.
20       Q.  And when I say "you," I mean Bass.
21       A.  Correct.
22       Q.  Okay.  And you'll see in the third paragraph
23   there one of the guidelines.  Can you read that aloud,
24   please?
25       A.  The one sentence?

Page 92

1        Q.  Yes, sir.
2        A.  "short-term rentals less than 12 months and
3    vacation rentals should be referred."
4        Q.  Can you explain what that means?
5        A.  It means that in the case that you have had a
6    short-term or vacation rental, it must be referred to
7    the carrier.
8        Q.  And what does it mean to refer to the carrier?
9        A.  You submit them.  A carrier underwriter has to
10   review it.
11       Q.  So it's not an option for Bass.  At that
12   point, if there's a short-term rental they would have to
13   submit it to the carrier for review; is that correct?
14       A.  Correct.
15       Q.  The document defines short-term rentals as
16   less than 12 months.  Do you see that?
17       A.  Yes.
18       Q.  Okay.
19       MR. PIERANTONI:  And if you can scroll down a
20   bit, Luke, to the next page.  The next page after
21   that.  Sorry.  Right there.
22   BY MR. PIERANTONI:
23       Q.  Mr. Collier, do you see the two areas?  I
24   guess the guidelines broken up into two different
25   sections, one titled "Submit" and the other titled

Page 93

1    "Ineligible"?
2        A.  Yes.
3        Q.  Are you able to explain the difference between
4    submit and ineligible?
5        MR. GAINEY:  Object to form.
6    BY MR. PIERANTONI:
7        Q.  Within the context of this document, are you
8    able to explain the difference between the two?
9        A.  Submit means just how we said it a minute ago.
10   It needs to be referred and/or submitted to a carrier
11   underwriter.  Ineligible means they don't write it.
12       Q.  It means Bass would not write it?
13       A.  It means --
14       MR. GAINEY:  Object to form.
15   BY MR. PIERANTONI:
16       Q.  Go ahead, sir.
17       A.  It means Mt. Hawley Insurance Company does not
18   write it.
19       Q.  Okay.  And Bass, therefore, can't issue it;
20   correct?
21       MR. GAINEY:  Object to form.
22       THE WITNESS:  Correct.
23   BY MR. PIERANTONI:
24       Q.  And just -- let's see, under submit, about,
25   one, two, three, four, five, sort of in the middle at





Page 94

1  the bottom you'll see that one of the bases that we had
2  sort of referred to earlier to the previous page, one of
3  the bases for submitting an application is short-term or
4  vacation rentals.  Do you see that, sir?
5      A.  I do.
6      Q.  Okay.  Do you see under ineligible where it
7  states "Airbnb, VRBO, and similar online rental
8  operations"?  Do you see that?
9      A.  I do.
10     Q.  What does it mean to be ineligible in that
11 context?
12         MR. GAINEY:  Object to form.
13         THE WITNESS:  Can you refer to the specific
14     question directly under ineligible?
15 BY MR. PIERANTONI:
16     Q.  I'm referring to the first basis for making an
17 application ineligible.
18     A.  It says it right there.  Airbnb, VRBO, and
19 similar online rental operations.
20     Q.  So can you describe the distinction between
21 that and short-term or vacation rentals above?
22     A.  They're very similar.
23     Q.  Okay.  In what way are they similar?
24     A.  A short-term vacation rental is very similar
25 to what Airbnb and VRBO do.

Page 95

1      Q.  Okay.  And so -- why is there a distinction
2  between the two?
3      A.  I don't know.
4      Q.  Okay.  Do you -- these underwriting
5  guidelines, is it important for Bass to follow the
6  underwriting guidelines from Mt. Hawley?
7      A.  Yes.
8      Q.  How important is it?
9          MR. GAINEY:  Object to form.
10         THE WITNESS:  It's speculation.  I -- I mean,
11     I can't answer a speculatory question.
12 BY MR. PIERANTONI:
13     Q.  Well, is it something that is -- it's a
14 guideline, so you have the option of following it or
15 not?
16     A.  We're required to follow the underwriting
17 manual.
18     Q.  Okay.  Is it fair to say that Bass is required
19 to follow the underwriting guidelines strictly?
20         MR. GAINEY:  Object to form.
21         THE WITNESS:  Yes.
22 BY MR. PIERANTONI:
23     Q.  Okay.
24         MR. PIERANTONI:  Luke, I hate to bother you
25     again, but can you bring up the underwriting

Page 96

1      application?  The supplemental application that was
2  used by Bass.
3  BY MR. PIERANTONI:
4      Q.  Okay, sir.  Do you recognize this document,
5  Mr. Collier?
6      A.  I do.
7      Q.  Your testimony earlier was that Bass often
8  uses this underwriting application when it comes to a
9  dwelling submission?
10     A.  Yes.
11     Q.  Can you point out to me where in this
12 underwriting application there is a question that
13 relates to short-term rentals?
14     A.  Three.
15     Q.  Three.  And what part of three refers to
16 short-term rentals?
17     A.  It's not bullet-pointed, but it would be
18 bullet point one if there was a bullet point.
19     Q.  I'm sorry, sir.  I hate to do that to you, but
20 I didn't catch what you said.  Can you repeat that one
21 more time?
22     A.  It would be the question directly under No. 3.
23     Q.  And can you read that question aloud for the
24 record?
25     A.  "Are any properties rented by day or by the

Page 97

1  week."
2      Q.  And that is Bass's understanding of what is
3  the question and this application relating to short-term
4  rentals; correct?
5          MR. GAINEY:  Object to form.
6          THE WITNESS:  Yes.
7  BY MR. PIERANTONI:
8      Q.  Do you see the question above it, sir?
9      A.  Yes.
10     Q.  Can you read that question?
11     A.  What is the average monthly rent?
12     Q.  Okay.  And do you see next to that -- what
13 appears next to that question?
14     A.  It looks like monetary numbers for the various
15 different units.
16     Q.  Okay.  So is it fair to say that that question
17 also refers to short-term rentals?
18         MR. DELAHUNT:  Form.
19         THE WITNESS:  I think it's two different
20     questions.
21 BY MR. PIERANTONI:
22     Q.  And how is it two different questions?
23     A.  It's simply asking what is the average monthly
24 rent.  The second question, "Are any properties rented
25 by the day or by the week?"



1    Q.  If the second question said rented by the day
2  or by the week or by the month, would that still be a
3  question about short-term rentals?
4         MR. DELAHUNT:  Form.
5         THE WITNESS:  The question doesn't say that.
6  BY MR. PIERANTONI:
7    Q.  I know.  I'm asking you a hypothetical.
8         MR. GAINEY:  Object to form.
9  BY MR. PIERANTONI:
10    Q.  If that question said the day, by the week, or
11  by the month, would that still be considered short-term
12  rentals?
13         MR. GAINEY:  Object to form.
14         THE WITNESS:  That question wouldn't be as
15  clear if it said that.
16  BY MR. PIERANTONI:
17    Q.  Why not, sir?
18    A.  Because by adding the month, you're changing
19  the question completely.
20    Q.  Okay, sir.  How would the question be changed
21  completely?
22    A.  Because that's not a short-term rental.
23    Q.  A monthly rental is not in a short-term
24  rental?
25    A.  No.

1    Q.  Do you recall the underwriting guidelines,
2  sir, that we just looked at?
3    A.  I don't.
4    Q.  Okay.
5         MR. PIERANTONI:  Luke, can you bring up the
6  underwriting guidelines again?  And can you go up
7  to that first page?
8  BY MR. PIERANTONI:
9    Q.  Okay, sir.  Do you see -- recall that
10  one-sentence paragraph that appears there?
11    A.  I do.
12    Q.  And do you see how Mt. Hawley defines
13  short-term rentals?
14    A.  I do.
15    Q.  How do they define it, sir?
16    A.  Twelve months or less.
17    Q.  Okay.  And it's still your position that
18  the -- by adding the word "monthly" to that question on
19  the application changes it entirely?
20         MR. GAINEY:  Object to form.
21         THE WITNESS:  The word is not there.  And
22  it's, again, it's a hypothetical question.
23         MR. PIERANTONI:  Right.  But it's a
24  hypothetical that I'm asking you to answer.
25         MR. GAINEY:  I object to form.

1  BY MR. PIERANTONI:
2    Q.  I'm saying given this -- this -- this part of
3  the underwriting guidelines, do you still want to change
4  your answer with regard to the underwriting application?
5         MR. GAINEY:  Object to form.
6         MR. DELAHUNT:  Same.
7         THE WITNESS:  They're still two separate
8  questions.  I don't know exactly what you're asking
9  here.
10         MR. PIERANTONI:  Okay.  Luke --
11         THE WITNESS:  The first question asks --
12         MR. PIERANTONI:  Can you bring up the
13  application?
14         MR. KATZENMEIER:  I'm sorry, the application?
15         MR. PIERANTONI:  Yes.
16  BY MR. PIERANTONI:
17    Q.  Okay.  Sir, I'm just simply trying to
18  understand.  That's all I'm trying to do here.
19    A.  Sure.
20    Q.  And I'm just trying to understand why you
21  think adding the words "or by the month" to that part
22  two of 3A would entirely change the question as to the
23  issue of short-term rentals.
24    A.  I guess it would change the perception of what
25  I understand that question to be asking.

1    Q.  In what way?
2    A.  Question -- the first part of that question is
3  average monthly rent.  When you underwrite insurance for
4  a living, or whatever, you want to make sure that it's a
5  average monthly rent that is not below market, and so
6  it's important just to see what they charge per month.
7  I see the second question as a completely different
8  question.  That's why it's answered as a separate answer
9  blank that is simply asked, "Are any properties rented
10  by the day or by the week?"
11    Q.  Is there anything on the application that
12  explains this distinction between the two questions to
13  the insured?
14         MR. GAINEY:  Object to form.
15         MR. DELAHUNT:  Same.
16         THE WITNESS:  Not that I'm aware of.
17  BY MR. PIERANTONI:
18    Q.  So by merely inserting the word "by the month"
19  in that second part, your testimony, just so I can
20  understand it, is that it's no longer a question about
21  short-term rentals?
22         MR. DELAHUNT:  Object to form.  It's been
23  asked and answered about three times.
24         MR. PIERANTONI:  Right.  But he doesn't seem
25  to understand, so I'm just asking for clarity so I



MAGNA
LEGAL SERVICES

Page 102

```
1    can understand.
2         MR. DELAHUNT:  Objection.
3         MR. GAINEY:  Same objection.  Do you
4    understand the question?
5         THE WITNESS:  Yeah, I understand the question.
6    I just -- I don't understand -- and forgive me, a
7    public school kid -- when we're adding words to a
8    question, maybe I'm not smart enough to follow
9    that.
10   BY MR. PIERANTONI:
11        Q.  Is it -- I could ask a different question.
12             Is it fair to say that reading the first part
13   of the question, "What is the average monthly rent?" if
14   that question could refer to a short-term rental?
15        MR. GAINEY:  Objection to form.
16        THE WITNESS:  I don't believe so.  I believe
17   they're two separate questions.
18   BY MR. PIERANTONI:
19        Q.  If an insured rented by the month and answered
20   this application and put down the average monthly rent
21   as this person did -- 1,000, 1,800, 3,000 -- wouldn't
22   that be considered a short-term rental?
23        MR. GAINEY:  Object to form.
24        THE WITNESS:  Based on the guidelines, yes.
25
```

Page 103

```
1    BY MR. PIERANTONI:
2         Q.  Are you aware, sir, of -- have you ever seen
3    Mt. Hawley's underwriting application for dwellings?
4         A.  Have I seen it?  I don't recall.
5         Q.  Okay.
6         A.  It's possible.
7         MR. PIERANTONI:  Luke, if you could, switch
8    the share to me.
9    BY MR. PIERANTONI:
10        Q.  All right, Mr. Collier, do you see the
11   document I have in front -- on the screen in front of
12   you?
13        A.  Not yet.
14        Q.  Oh.  My apologies.  It helps if I actually
15   press "share."
16        A.  Sorry.  I have trouble with computers as well.
17        Q.  Do you see it now, sir?
18        A.  I do.
19        Q.  Great.  Have you seen that document before?
20        A.  I believe I have.
21        Q.  And what would you refer this document to --
22   why would you -- how would you refer to this document?
23        A.  How would I refer to it?
24        Q.  Yeah.
25        A.  It looks like a Mt. Hawley-branded rental
```

Page 104

```
1    dwelling supplement.
2         Q.  Is there a reason why Bass doesn't use this --
3    didn't use this application with the regard to issuing
4    coverage to Beach Cruiser?
5         MR. DELAHUNT:  Objection.
6         THE WITNESS:  There's not a specific reason,
7    no.
8    BY MR. PIERANTONI:
9         Q.  Was Mt. -- I'm sorry -- was Bass aware of this
10   application at the time it issued coverage to Beach
11   Cruiser?
12        A.  I don't recall.
13        MR. GAINEY:  Let me just object to form.  Ray,
14   when you refer to Bass, are you referring to Bass
15   as the corporate entity or to Mr. Collier?
16   BY MR. PIERANTONI:
17        Q.  Are you aware if Bass had in its files this
18   Mt. Hawley supplemental application at the time coverage
19   was issued?
20        A.  I'm not aware either way on that instance.
21        Q.  All right.  Do you want me to wait, Counsel,
22   for you to sit back down?
23        MR. GAINEY:  Yeah, I had to get close to read
24   the document, Ray.
25        MR. PIERANTONI:  Oh, okay.  No problem.
```

Page 105

```
1         MR. GAINEY:  That's all I was doing, reading
2    it.  We've never seen it before.  I hadn't seen it
3    before; so...
4    BY MR. PIERANTONI:
5         Q.  Okay.  I'll go to -- I'm scrolling down here,
6    sir.  There it is.
7             On that first page, do you see a reference,
8    Mr. Collier, to Airbnb or similar?  To help you along,
9    it's in the middle of the bottom.
10        A.  Yeah, I see it.  It's in the middle, yeah.
11        Q.  Okay.  What do you think that question is
12   referring to?
13        A.  Short-term rentals or similar.
14        Q.  Okay.  And do you recall the underwriting
15   application made a distinction between short-term
16   rentals and Airbnb, VRBO, and other similar rentals?
17        A.  The underwriting application referred to
18   short-term rentals.
19        Q.  Right, sir.  But what I'm asking is do you
20   recall the underwriting app- -- the underwriting
21   guidelines -- I'm sorry -- the underwriting
22   guidelines --
23        A.  Yes.
24        Q.  -- Mt. Hawley issued?  That they made a
25   distinction between short-term rentals and Airbnb?
```



1    A.  Correct.
2    Q.  Do you recall what that distinction was
3  between the two?
4    A.  Short-term rental, anything less than 12
5  months.
6    Q.  In terms of referral versus -- in terms of
7  ineligibility versus submission?
8    A.  One was a referral; one was ineligible, yes.
9    Q.  Which of the two was the ineligible?
10   A.  The VRBO or V-R-B-O, or the other one, Airbnb.
11   Q.  Okay.  Is there a question specifically asking
12 about Airbnb, VRBO, or similar on the underwriting
13 application that was used by Bass for Beach Cruiser?
14   A.  No.
15   Q.  When Bass comes across an error or an issue
16 that contradicts the information provided in an
17 application, what steps does Bass take next?
18      MR. GAINEY:  Object to form.
19      THE WITNESS:  It varies depending on the
20   information.
21 BY MR. PIERANTONI:
22   Q.  And you testified earlier that was -- that it
23 was expected that Bass would strictly follow the
24 underwriting guidelines issued by Mt. Hawley.  Do you
25 recall that testimony?

1    A.  I do.
2    Q.  Okay.  So if Bass came across information that
3  would lead it to believe that there was short-term
4  rentals at an insured property or property they were
5  going to insure, would that sound an alarm bell to look
6  into that issue further if it contradicted the
7  application?
8      MR. GAINEY:  Object to form.
9      THE WITNESS:  It's possible.
10 BY MR. PIERANTONI:
11   Q.  You mean there are instances where it wouldn't
12 trigger a further investigation or research?
13   A.  There is infinite number of situations that
14 can apply to various topics.
15   Q.  Right.  I'm just -- I'm actually being more
16 specific than that, sir.  I'm referring to an instance
17 where an underwriting application, specifically the one
18 that was issued to Beach Cruiser, if that underwriting
19 application had something in it, right, that
20 contradicted something found out later by Bass, what
21 would -- what steps would Bass take to look into that
22 discrepancy?
23      MR. GAINEY:  Object to form.
24      MR. DELAHUNT:  Objection.
25      THE WITNESS:  Again, that varies from case to

1  case.
2  BY MR. PIERANTONI:
3    Q.  Okay.  I'll be even more specific, then, sir.
4       If the Bass underwriting application submitted
5  to Beach Cruiser had a response in it that there were no
6  daily or weekly rentals, as it does, and the response to
7  that is a no, but Bass later found out that there was
8  a -- there was information that contradicted that prior
9  to renewing the app- -- prior to renewing the insurance
10 policy, what steps would Bass take to resolve that
11 discrepancy?
12      MR. GAINEY:  Object to form.
13      THE WITNESS:  Bass would seek to clarify the
14   information further.
15 BY MR. PIERANTONI:
16   Q.  Okay.  And how -- in what way would Bass take
17 steps to clarify the information further?
18   A.  We would contact the retail agent.
19   Q.  And in this case that would be, at the time of
20 the second policy, USI; correct?
21   A.  Correct.
22      MR. GAINEY:  Object to form based on what I
23   think you're getting at, Ray.  But in terms of the
24   different policies, I want to make sure we're clear
25   on which agency we're talking about in regard to

1  the additional information you referred to.
2      MR. PIERANTONI:  Right.  I'm referring to --
3  that's why I said the second policy.  The one
4  ending in -- the one -- this one here, 26067.
5  BY MR. PIERANTONI:
6    Q.  Before renewing that, if Bass learned of
7  information that contradicted the application, would
8  Bass take steps to look into that further?
9      MR. GAINEY:  Object to form.
10      THE WITNESS:  Yes.
11 BY MR. PIERANTONI:
12   Q.  And I'm asking what steps would Bass take?
13   A.  As I previously said, we would confer with the
14 retail agent.
15   Q.  Okay.  I'm just getting clarity because
16 counsel raised "objection to form," so we're just
17 getting clarity with regard to this.
18      So are you aware of Bass taking any steps to
19 clarify the information on the underwriting application
20 before renewing this particular policy, 26067?
21      MR. GAINEY:  Object to form.
22      THE WITNESS:  I don't recall.
23 BY MR. PIERANTONI:
24   Q.  Are you aware, sir, that --
25      MR. PIERANTONI:  Actually, Luke, would you



Page 110

```
 1   mind very much -- I'll stop sharing -- can you
 2   bring that invoice that you had?  I forgot what
 3   exhibit it was.
 4   BY MR. PIERANTONI:
 5      Q.  Okay.  Mr. Collier, do you recognize this
 6   document from before?
 7      A.  I do.
 8      Q.  Are you aware that the invoice was, in fact,
 9   paid by the insured, Beach Cruiser?
10      A.  I have no personal knowledge of it at all.
11      Q.  Do you have any reason, or are you aware of
12   any facts or circumstances, that would lead you to
13   believe that the insured did not pay this invoice?
14      A.  I'm not.
15      Q.  Okay.
16      MR. PIERANTONI:  Okay.  I have no further
17   questions right now depending on what further
18   questions I hear from other counsel.
19          Thank you, Mr. Collier.
20      MR. GAINEY:  He said "thank you."
21      THE WITNESS:  You're welcome.
22      MR. KATZENMEIER:  Let me stop sharing my
23   screen for now.  I just have a -- still no
24   questions, Tim?
25      MR. DELAHUNT:  Yeah.  No, I'm all set.
```

Page 111

```
 1      Thank you.
 2      MR. KATZENMEIER:  Okay.  I just have a few
 3   follow-up questions for you, Mr. Collier.
 4            REDIRECT EXAMINATION
 5   BY MR. KATZENMEIER:
 6      Q.  The first of which is, I want to refer back to
 7   the supplemental application form.  And I can pull that
 8   up if you need me to, but is it your understanding that
 9   the date on that supplemental application form was
10   September 2, 2020?
11      A.  That's correct.
12      Q.  Okay.  And the -- I just want to clarify that
13   the policy period for what I think we're referring to as
14   policy number one, which was that -- I don't have it
15   pulled up -- but the 19322 number?
16      A.  That's correct.
17      Q.  That policy incepted August 31, 2020; is that
18   correct?
19      A.  That sounds right.
20      Q.  Okay.  So my question is that -- is it fair to
21   say that that supplemental application -- Supplemental
22   Dwelling Application form dated September 2020 was
23   submitted in connection with the application for what
24   we're referring to as policy number one?
25      A.  That's correct.
```

Page 112

```
 1      Q.  Okay.  Did Bass ever request an updated
 2   Supplemental Dwelling Application form from Beach
 3   Cruiser?
 4      MR. GAINEY:  Object to form.
 5      THE WITNESS:  I don't recall.  It's possible.
 6   BY MR. KATZENMEIER:
 7      Q.  Okay.  Did Bass ever request an updated
 8   supplemental application form on behalf of Beach Cruiser
 9   from USI?
10      A.  I don't recall.
11      Q.  Okay.  Was that same Supplemental Dwelling
12   Application form used for -- in connection with the
13   renewal of the policy for what we're calling policy two
14   and policy three?
15      A.  I can't speak to policy three.  But for policy
16   two, yes.
17      Q.  Okay.  And was a renewed Supplemental Dwelling
18   Application form not required for that renewal?
19      A.  For which one?
20      Q.  For policy number two.
21      A.  For policy number two, I don't have the
22   carrier guidelines in front of me, but I understand it's
23   every third year a new application is required.
24      Q.  Okay.  And that would be for Mt. Hawley's
25   underwriting manual?
```

Page 113

```
 1      A.  I believe so, yes.
 2      Q.  Okay.  Which is the document we referred to
 3   earlier as the underwriting guidelines; correct?
 4      A.  Correct.
 5      Q.  Okay.  Let's see.  Would -- so after -- if
 6   Bass had discovered that through the course of its
 7   investigation or any application submitted by the
 8   insured that the risk of policy covered was ineligible
 9   for Mt. Hawley's underwriting guidelines, would it issue
10   a renewal of the policy?
11      MR. GAINEY:  Object to form.
12      THE WITNESS:  I'm sorry.  I missed the -- and
13   I apologize.
14      MR. KATZENMEIER:  Yes.
15      THE WITNESS:  I missed a second of the
16   question.
17      MR. KATZENMEIER:  Yeah.  I can -- I can
18   rephrase.
19   BY MR. KATZENMEIER:
20      Q.  So if Bass became aware that an insured risk
21   under a policy was ineligible per Mt. Hawley's
22   underwriting guidelines, or the underwriting manual as
23   you've called it, would Bass Underwriters renew that
24   policy?
25      MR. GAINEY:  Object to form.
```



Page 114

1      THE WITNESS: That would be up to the carrier
2  in that instance.
3  BY MR. KATZENMEIER:
4      Q.  Okay.  Would -- sorry.  I didn't realize you
5  were still going.  Please continue.
6      A.  We would most likely get the carrier involved
7  at that point or offer coverage with a carrier that
8  accepts such risks.
9      Q.  Okay.  So is it -- so would Bass not be
10  entitled to renew the policy under those circumstances
11  without referral to Mt. Hawley?  Is that fair?
12      MR. GAINEY:  Object to form.
13      THE WITNESS:  Well, it would have to follow
14  the state laws, of course, for nonrenewal and/or
15  cancellation of a policy --
16      MR. KATZENMEIER:  Of course.
17      THE WITNESS:  -- yes.
18  BY MR. KATZENMEIER:
19      Q.  Right.  Okay.  And a similar question, would
20  Bass Underwriters be authorized to renew a policy -- or
21  scratch that, please.
22      Would Bass Underwriters be authorized to
23  increase coverage available under a policy after
24  discovering that the risk insured was, in fact,
25  ineligible?

Page 115

1      MR. GAINEY:  Objection.
2      MR. DELAHUNT:  Form.
3      THE WITNESS:  No.
4  BY MR. KATZENMEIER:
5      Q.  No.  Okay.  Would -- would Bass Underwriters
6  be authorized to extend the policy period for the policy
7  covering a risk after discovery that a risk was
8  ineligible?
9      MR. GAINEY:  Objection.
10      THE WITNESS:  Bass Underwriters would follow
11  the carrier's instructions if a policy had to be
12  extended.
13  BY MR. KATZENMEIER:
14      Q.  Okay.  And is it your understanding that
15  Mt. Hawley's underwriting manual provides for extension
16  of policy periods?
17      MR. GAINEY:  Objection.  Extension of policy
18  periods is usually done to comply with state law --
19  BY MR. KATZENMEIER:
20      Q.  Okay.
21      A.  -- with regards to nonrenewal.
22      Q.  Okay.  And -- let's see.  I think I had one
23  more thing.  Let's see.  Let me share my screen right
24  here.  Mr. Collier, can you see my screen?
25      A.  I do.

Page 116

1      Q.  All right.  Do you recognize this email as one
2  we referred to earlier?
3      A.  I do.
4      Q.  Okay.  And I want to -- I want to go back to
5  the -- the investigation issue that we -- matter that we
6  discussed earlier.  If Mt. Hawley -- or not
7  Mt. Hawley -- strike that.  Sorry.
8      If Bass Underwriters had discovered that
9  certain information provided in a rental or in a -- in
10  application for insurance had been incorrect, would that
11  prompt an investigation?
12      MR. GAINEY:  Object to form.
13      MR. DELAHUNT:  Objection.
14      THE WITNESS:  It's possible.
15  BY MR. KATZENMEIER:
16      Q.  Okay.  So if Bass Underwriters had, for
17  example, come into information that Beach Cruiser was
18  using certain properties for short-term rentals, would
19  that have prompted investigation by Bass Underwriters?
20      MR. GAINEY:  Object to form.
21      MR. DELAHUNT:  Same.
22      THE WITNESS:  Again, it's possible.
23  BY MR. KATZENMEIER:
24      Q.  Okay.  Are you aware of whether any
25  investigation into Beach Cruiser's use of any property

Page 117

1  was ever ordered by Bass Underwriters?
2      MR. GAINEY:  Object to form.
3      THE WITNESS:  I am not.
4      MR. KATZENMEIER:  Okay.  Let's see.  I think
5  that might be all that I have for you.
6      THE WITNESS:  I'm sorry?
7      MR. KATZENMEIER:  I said I think that might be
8  all I have for you.  Let me check my notes real
9  fast.  Yeah, I think that's all I have for you.
10      Do you have anything more, Ray?
11      MR. PIERANTONI:  Just give me a moment.
12      I guess, yeah, just real quick,
13  Mr. Collier, then I have no more.
14      RECROSS EXAMINATION
15  BY MR. PIERANTONI:
16      Q.  Are you aware of any reason why Bass didn't
17  use the Mt. Hawley underwriting application for Beach
18  Cruiser?
19      MR. GAINEY:  Form.
20      THE WITNESS:  I am not.
21  BY MR. PIERANTONI:
22      Q.  Upon seeing the application --
23      MR. PIERANTONI:  And by the way, Court
24  Reporter, I may not have marked it, it's whatever
25  the next exhibit is in line, the Mt. Hawley





Page 118

```
 1        underwriting application would be marked and
 2        entered as that number.
 3     BY MR. PIERANTONI:
 4        Q.  Now that you've seen the Mt. Hawley
 5     underwriting application, sir, and the questions that
 6     are set forth therein, would you have used that
 7     application instead of the one that was used --
 8        MR. GAINEY:  Objection.
 9        MR. PIERANTONI:  -- for Beach Cruiser in
10     issuing coverage?
11        MR. GAINEY:  Sorry.  Objection.  Form.
12        THE WITNESS:  It's impossible to say.
13     BY MR. PIERANTONI:
14        Q.  Is it something that Bass could have done,
15     could have used that Mt. Hawley underwriting
16     application?
17        MR. DELAHUNT:  Objection.
18        MR. GAINEY:  Yeah.  Objection to form.
19        THE WITNESS:  Yes, we could have.
20        MR. PIERANTONI:  I have no further questions.
21        MR. DELAHUNT:  I have no questions.
22        MR. GAINEY:  I have no questions.
23        MR. PIERANTONI:  All right.  Thank you,
24     Mr. Collier.  I appreciate your time and, Counsel,
25     yours as well.  Thank you.
```

Page 119

```
 1        MR. DELAHUNT:  Thanks, guys.  Have a good one.
 2        THE VIDEOGRAPHER:  This marks -- I'm sorry,
 3     Luke.  Do you have more?
 4        MR. KATZENMEIER:  Before we go, I was just
 5     going to ask if we could get a rough of the
 6     transcripts.
 7        THE VIDEOGRAPHER:  Let me just close out the
 8     video record, if you don't mind.
 9        This marks the end of today's testimony.
10     We are going off the record.  The time is 1:05 p.m.
11        (The deposition concluded at 1:05 p.m.)
12        (After the conclusion of the deposition,
13        Defendants' Exhibit Nos. 1 through 10 were
14        marked for identification.)
15
16
17
18
19
20
21
22
23
24
25
```

Page 120

```
 1                CERTIFICATE OF OATH
 2
 3     THE STATE OF FLORIDA
 4     COUNTY OF POLK
 5
 6        I, April Goldberg, Florida Professional
 7     Reporter, Notary Public, State of Florida, certify that
 8     GRAY COLLIER personally appeared before me via
 9     videoconference on the 2nd day of February, 2024, and
10     was duly sworn.
11
12        Signed this 8th day of February, 2024.
13
14        _____
           April Goldberg, FPR
15        Florida Professional Reporter
           Notary Public, State of Florida
16        Commission #GG 966379
           Expires:  June 16, 2024
17
18
19     Produced Identification:  X
20     Identification Produced:  Georgia Driver's License
21
22
23
24
25
```

Page 121

```
 1              CERTIFICATE OF REPORTER
 2
 3     THE STATE OF FLORIDA
 4     COUNTY OF POLK
 5
 6        I, April Goldberg, Florida Professional
 7     Reporter, do hereby certify that I was authorized to and
       did stenographically remotely report the videoconference
 8     deposition of GRAY COLLIER; that a review of the
       transcript was requested; and that the foregoing
 9     transcript, pages 5 through 119, is a true and complete
       record of my stenographic notes.
10        I further certify that I am not a relative,
       employee, attorney, or counsel of any of the parties,
11     nor am I a relative or employee of any of the parties'
       attorney or counsel connected with the action, nor am I
12     financially interested in the action.
13        The foregoing certification of this transcript
       does not apply to any reproduction of the same by any
14     means unless under the direct control and/or direction
       of the certifying reporter.
15
16        Dated this 8th day of February, 2024.
17
18        _____
           April Goldberg, FPR
19        Florida Professional Reporter
20
21
22
23
24
25
```





|  | Page 122 |
|---|---|

1   PLEASE ATTACH TO THE DEPOSITION OF:  GRAY COLLIER
2   IN THE CASE OF:  MT. HAWLEY V. BEACH CRUISER  2/2/2024
3            ERRATA SHEET
4   INSTRUCTIONS:  Please read the original transcript of
    your deposition and make note of errors or amendments
5   in transcription on this page.  DO NOT MARK on the
    original transcript itself.  Please sign and date this
6   sheet.
7   PAGE   LINE   ERROR OR AMENDMENT   REASON FOR CHANGE
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it
23  are true.
24  Signature of Deponent: _____
25  Date:  _____

|  | Page 123 |
|---|---|

1   February 8, 2024
2   JAMES PRESTON GAINEY, ESQUIRE
    BASS UNDERWRITERS, INC.
3   6951 W Sunrise Boulevard
    Plantation, FL 33313
4   jgainey@bassuw.com
5
6   Re:  Mt. Hawley v. Beach Cruiser
    Deposition of:  Gray Collier
7   Dear Mr. Gainey:
8       Please take notice that on the 2nd day of
    February, 2024, your client gave their deposition in the
9   above-referred matter.  At that time, your client did
    not waive their signature.  It is now necessary that
10  your client sign their deposition.
11      Please call our office at the below-listed
    number to schedule an appointment between the hours of
12  9:00 a.m. and 4:30 p.m., Monday through Friday.
13      If you do not read and sign the deposition
    within a reasonable time, the original, which has
14  already been forwarded to the ordering attorney, may be
    filed with the Clerk of the Court.  If you wish to waive
15  your signature, sign your name in the blank at the
    bottom of this letter and return this letter to us.
16
17      Very truly yours,
18
19  MAGNA LEGAL SERVICES
    Seven Penn Center
20  1635 Market Street - 8th Floor
    Philadelphia, PA 19103
21  866-624-6221
22  I do hereby waive my signature:
23
    _____
24  GRAY COLLIER
25  cc via email:  All counsel of record

32  (Pages 122 to 123)



**A**

**a.m**
1:18 5:6 67:20,23
   123:12
**ability**
9:25 10:4
**able**
93:3,8
**above-referred**
123:9
**accept**
20:10
**acceptabilities**
59:16
**acceptability**
58:21
**accepted**
20:15
**accepts**
114:8
**access**
27:23
**accident**
86:18,21,22
**accompanies**
15:24
**accompany**
15:15
**account**
48:24 90:19
**ACORD**
15:9,15 57:7
**acting**
87:21
**action**
70:15,19,21 71:3
   85:9 88:8 121:11,12
**actual**
54:18,20
**adding**
98:18 99:18 100:21
   102:7
**additional**
109:1
**address**

18:19 37:25 39:24
**affect**
9:25 10:4
**affirm**
6:5
**agency**
108:25
**agent**
11:9 13:6 15:1,4,5,9
   15:16 17:24 18:1
   20:11,16,23 23:18
   26:12 34:4,5 48:24
   48:24 60:25 62:10
   66:2,13,22,25,25
   81:24 89:19,20,20
   89:21,22 90:1,19
   108:18 109:14
**agents**
13:8 15:21 23:24
**ago**
10:17 50:5 52:20
   93:9
**agree**
79:6
**agreement**
22:13,16,21
**ahead**
18:25 19:25 55:21
   63:4 67:5 78:21
   86:1 93:16
**air**
68:9,10,20
**Airbnb**
94:7,18,25 105:8,16
   105:25 106:10,12
**al**
5:5
**alarm**
107:5
**Allegheny**
4:5,6
**allow**
69:9
**aloud**
81:16 91:23 96:23
**AMENDMENT**

122:7
**amendments**
122:4
**Americas**
2:7
**AN1246602**
64:23
**and/or**
14:18 17:12 85:3
   93:10 114:14
   121:14
**answer**
7:21,21 8:4,5,7,16,21
   9:5,10 21:22,23
   22:9 24:17 26:7
   28:3 38:17 41:18,22
   42:11,13 44:12
   51:18 53:23 56:18
   56:20 61:16 74:25
   77:1 78:6 87:12
   88:17 95:11 99:24
   100:4 101:8
**answered**
28:10 35:3 85:11
   101:8,23 102:19
**answering**
9:9
**apologies**
68:20 80:16 103:14
**apologize**
55:8 59:25 88:25
   113:13
**app**
27:5,7,10
**app-**
105:20 108:9
**appearance**
75:7
**appearances**
2:1 5:11
**appeared**
120:8
**appearing**
75:10,23
**appears**
38:3 39:22 40:1

43:20,25 62:4 63:2
63:21 64:12 70:14
70:22 73:12 74:9
82:12 90:18 97:13
99:10
**apples**
79:3
**applica-**
23:24
**applicable**
25:1,3
**applicant**
28:16
**application**
4:4 15:1,2,5,9,15
   16:3,6 17:15,20,20
   17:23 20:15,22,24
   21:1 23:18,23,25,25
   24:6 26:3,15,24
   27:1,11,19 28:1,2,5
   28:9,13,15 29:9,25
   34:3,10,14,17,19,22
   35:2,3,7,21 36:4,8
   36:20 57:3,8,16,21
   58:5,16 60:12,15,18
   61:14 94:3,17 96:1
   96:1,8,12 97:3
   99:19 100:4,13,14
   101:11 102:20
   103:3 104:3,10,18
   105:15,17 106:13
   106:17 107:7,17,19
   108:4 109:7,19
   111:7,9,21,22,23
   112:2,8,12,18,23
   113:7 116:10
   117:17,22 118:1,5,7
   118:16
**applications**
17:11 34:2,5 61:7
**applies**
91:16
**apply**
37:3 107:14 121:13
**appointment**
123:11



**appreciate**
13:20 68:15 118:24
**appreciated**
9:19
**appropriate**
78:8
**approve**
43:7
**approximately**
5:6
**approximating**
8:7
**approximation**
8:5
**April**
1:23 5:9 120:6,14
    121:6,18
**areas**
92:23
**asked**
35:4 77:9 85:10
    88:15 101:9,23
**asking**
7:22 8:16 18:17
    27:16 32:18 52:21
    58:12 59:8 60:23
    73:9 75:13 83:3,19
    86:24 97:23 98:7
    99:24 100:8,25
    101:25 105:19
    106:11 109:12
**asks**
62:16 100:11
**aspect**
33:12
**asserting**
76:21
**assist**
17:4
**assistant**
28:20 29:11,12 36:10
**assume**
8:17 74:15
**Atlanta**
11:25
**ATTACH**

122:1
**attend**
12:20,22
**attention**
23:9
**attorney**
6:18 8:20,20,22
    76:13,13,20 77:3
    78:2,5 81:24 121:10
    121:11 123:14
**attorney-client**
76:11,25 77:21 78:9
**Attorneys**
5:14 77:17
**atzenmeier**
3:4
**August**
12:6,6 47:24,25
    73:21 74:2,18 81:1
    81:15 84:6 86:10,15
    87:4,7 88:6 111:17
**authority**
14:18 42:2,22 44:11
    45:9,11 56:1,10,14
    57:10
**authorization**
45:17
**authorize**
45:3
**authorized**
21:14 114:20,22
    115:6 121:6
**available**
114:23
**Avenue**
2:7,12
**average**
25:15 97:11,23 101:3
    101:5 102:13,20
**avoid**
7:18 13:18
**aware**
6:20 10:5 23:2 55:23
    59:23 65:16 69:17
    79:17 80:5 82:21
    85:22 87:5 88:4,9

91:1 101:16 103:2
104:9,17,20 109:18
109:24 110:8,11
113:20 116:24
117:16

---

**B**

**back**
46:6 48:4 50:4 52:11
    52:23 55:25 66:12
    67:22,24 68:19 79:9
    80:17 83:15 87:24
    104:22 111:6 116:4
**background**
11:12,16
**bad**
79:15
**based**
17:13 30:19 43:5
    47:8 54:13 58:24
    59:3 61:17,18 66:18
    84:8 102:24 108:22
**bases**
94:1,3
**basically**
16:7 51:3
**basis**
23:17 24:6,12,24
    25:6,13,23 30:9
    64:13 76:8,10 79:1
    94:16
**Bass**
2:17,19 4:11 5:25
    11:14,20,23 12:14
    13:5,21 14:6,10,14
    14:19,23 15:3,6,9
    15:16,17,18,20 16:1
    16:3,10,15,16,19
    17:4,19 18:5,10,15
    21:12,14,17 22:7,12
    22:13,17 26:5,11
    27:2,9,11,19,21,24
    28:19,21 31:14 32:9
    32:20 33:1,3,25
    34:3,8,15,21 35:6
    35:20 36:2,24 37:4

38:10 41:16,24 42:2
42:6,7,22 44:10
45:3,10 49:5 51:1
51:21 53:2,7,20
55:2,4,19 56:1,14
57:2,10 58:4,15
59:2,12,19 60:3,22
61:6,8,15 64:18
66:1,20,23 73:10
74:12 77:11,16,22
78:11,12 80:5 81:12
85:25 86:7 90:2,7
90:18,22 91:13,20
92:11 93:12,19 95:5
95:18 96:2,7 104:2
104:9,14,14,17
106:13,15,17,23
107:2,20,21 108:4,7
108:10,13,16 109:6
109:8,12,18 112:1,7
113:6,20,23 114:9
114:20,22 115:5,10
116:8,16,19 117:1
117:16 118:14
123:2
**Bass's**
16:4 20:8 78:1 80:23
90:14 97:2
**Bass-USI**
4:9
**Beach**
1:6 2:9 5:4,18 17:2,6
17:16,21,22,23 18:1
18:7,11,16 19:16
20:8,14,16,22 22:24
23:3,5,14 24:7,13
25:6,14,24 26:11,11
26:18 29:9,14,18,21
30:6 31:15,20 32:3
32:10,21 33:2,4,10
33:13,20 36:12,15
37:5,22 49:2 51:21
52:17 53:2 55:20
56:2,15 58:14 62:25
63:25 64:4,19 69:4
70:3,16 82:2,4,6



83:23 91:12,13,17
104:4,10 106:13
107:18 108:5 110:9
112:2,8 116:17,25
117:17 118:9 122:2
123:5
**begins**
5:2
**behalf**
1:13 5:24 13:9 18:1
20:12 21:15 45:5
56:2,15 57:1 112:8
**believe**
19:20 21:9 30:17
31:17,22 33:6,7,11
35:18 36:1 37:7
40:2 44:4 51:16
53:3 56:9 57:5 64:2
64:24 65:3,11 69:17
73:6 74:19 75:8,20
75:20,21,25 82:3
83:14 84:10 86:12
87:6,9 88:5 89:7,9
89:10 91:10 102:16
102:16 103:20
107:3 110:13 113:1
**bell**
107:5
**below-listed**
123:11
**better**
53:9
**bit**
11:12 19:3 32:16
35:23 40:13 43:17
63:20 92:20
**blank**
101:9 123:15
**book**
31:14,20 32:2
**books**
41:13
**BOR**
82:2
**bother**
95:24

**bottom**
25:2 74:24 75:2
80:24 94:1 105:9
123:15
**Boulevard**
2:17 123:3
**branch**
11:25,25 12:11 38:9
**break**
8:25 9:6,13 67:10,21
**breaks**
9:2
**brief**
49:19
**bring**
80:12,19 90:4 91:4
95:25 99:5 100:12
110:2
**broad**
85:4
**Broadly**
37:1
**broken**
50:1 92:24
**brokerage-type**
14:17
**brought**
23:8
**Brunswick**
11:10
**Buffalo**
2:3
**building**
48:12
**buildings**
30:8
**bullet**
96:18,18
**bullet-pointed**
96:17
**business**
12:10 13:9 14:15,17
28:4,24 31:14,20
32:3 51:17 58:10,18
59:4,9,12,13,21
60:5

**businesses**
58:1
**buy**
41:10

----

**C**

**C-O-L-L-I-E-R**
11:18
**call**
27:3,9,10 30:16 31:8
31:9 75:21 76:2
77:4 123:11
**called**
15:8 31:11 86:19
113:23
**caller**
27:10
**calling**
9:14 112:13
**cancel**
41:24 42:3 56:6 71:2
**canceled**
49:14 51:21,25 52:3
52:12 54:6,21
**canceling**
42:8
**cancellation**
42:19 44:24 45:1
46:12 48:16 49:8
52:13,17,21 54:9,11
54:16,18,20 114:15
**career**
14:12
**Carolina**
23:16 38:9
**carrier**
15:12 28:5 51:16
70:19 86:4 92:7,8,9
92:13 93:10 112:22
114:1,6,7
**carrier's**
115:11
**carriers**
13:9,11
**case**
21:9 30:20 54:14

69:5 79:18 84:3
87:12 92:5 107:25
108:1,19 122:2
**cases**
11:1 14:21,22 21:8
71:16
**catch**
19:9 73:2 96:20
**cause**
30:11
**cc**
123:25
**CCP988057**
65:8
**Center**
123:19
**Century**
65:9
**certain**
42:25 43:4 45:14,16
54:12 57:12,14,17
57:20 60:4 85:1
116:9,18
**certainly**
25:9
**certainty**
51:19
**CERTIFICATE**
3:8,9 120:1 121:1
**certification**
121:13
**certified**
6:12
**certify**
120:7 121:6,10
**certifying**
121:14
**change**
11:21 27:14 29:18
30:11 58:8,17,20,23
59:3,14 87:12 100:3
100:22,24 122:7
**changed**
29:14 98:20
**changes**
60:20,24 99:19



changing
98:18
charge
101:6
Charleston
23:16 38:9 81:13
check
117:8
choppily
64:12
Christmas
31:6
circumstance
34:7 41:17
circumstances
16:19 34:11 36:23
    37:1 38:25 40:20
    42:7,10 49:13 57:12
    57:14,23,24 58:3,8
    58:13,15 59:1 60:17
    87:6 88:4,9 110:12
    114:10
claim
30:17,21 71:14 77:19
    79:17 81:19 82:7,13
    82:16,19,24 83:8,9
    83:16,20,22 84:1,2
    84:5,9,11,15,21
    85:7,9,23,24,25
    86:3,9,19 87:1,7,13
    88:6,8
claiming
77:11
clarification
8:16 90:20
clarified
56:1
clarify
32:13 36:18 54:8
    55:10 56:13 59:17
    89:18 108:13,17
    109:19 111:12
clarity
77:3 101:25 109:15
    109:17
clean

86:17
clear
7:19 35:2 58:12 59:8
    77:24 80:10 83:1,8
    88:12 98:15 108:24
clearly
14:5 84:16
Clerk
123:14
client
123:8,9,10
close
104:23 119:7
college
12:17,20
Collier
2:19 3:3 5:3,25 6:10
    6:17 11:18,19 12:19
    13:3 19:1 20:7
    23:21 37:9 39:16
    42:14 43:14 44:8
    54:22 61:25 62:15
    63:18 65:19,20,23
    66:8 69:3,13,21
    71:21 74:3 78:12
    80:22,23 86:24
    92:23 96:5 103:10
    104:15 105:8 110:5
    110:19 111:3
    115:24 117:13
    118:24 120:8 121:7
    122:1 123:6,24
COLLINS
1:13
colloquy
77:9
come
29:21 88:15 116:17
comes
96:8 106:15
coming
68:19
Commission
120:16
commonly
26:5,8

communicate
16:10,16 21:18 22:7
    22:17,18 76:1
communication
9:11 18:5,9 21:2,11
    61:4 62:1 76:7
communications
77:15,16 78:12
companies
12:15
company
1:3,10 2:15 5:4,15,22
    13:23 14:1,1,2,3,7,7
    14:8 16:21 20:12
    50:15 61:11 65:3,7
    70:3,14 91:15 93:17
company's
33:9 61:8
complete
85:15 121:8
completed
52:13
completely
85:20 88:10 98:19,21
    101:7
comply
115:18
computers
103:16
concluded
119:11
conclusion
119:12
condition
41:12 68:21 85:2
condition-type
49:21
confer
109:13
confirm
81:5
confused
54:11
connected
121:11
connection

71:11 87:13 111:23
    112:12
consecutive
32:4
consider
76:24
considered
98:11 102:22
considering
63:23
constituted
91:11
contact
108:18
contained
34:2 45:5,6,7,8,17
    58:5 61:21
contains
28:6
contemporaneous
31:24 32:8
context
9:12 63:18,21 93:7
    94:11
continue
114:5
contradicted
107:6,20 108:8 109:7
contradicts
106:16
control
77:12 78:16 121:14
convey
61:1
cool
71:19
Cooper
2:7 5:17
copy
47:10
corporate
28:23 104:15
correct
12:7 15:4 19:22
    20:17,18 23:3,4
    24:4,10 25:19,21



29:15 35:9,16,17
37:19,20,25 38:5
40:15 41:8 46:4,10
46:13,21,24,25
47:15,17 48:13
52:14,22,22 54:4
56:8 57:9,12,13
58:25 59:5 62:6,7
62:18 63:1 66:6
67:3 71:1 72:11,25
73:21 79:19 83:2,6
84:10 86:20 87:8,10
88:16 89:21,22
90:23,24 91:13,18
91:19,21 92:13,14
93:20,22 97:4 106:1
108:20,21 111:11
111:16,18,25 113:3
113:4
**corrected**
71:13
**correctly**
50:9
**correspondence**
81:11
**cost**
41:9
**cough**
79:11,15
**coughed**
36:13
**counsel**
2:5,9,14,19 5:10 6:1
31:8,9,11 75:23
76:23 84:20 104:21
109:16 110:18
118:24 121:10,11
123:25
**count**
75:6
**COUNTY**
120:4 121:4
**couple**
7:8 86:17
**course**
8:19 9:14,21 13:21

55:17 58:3 113:6
114:14,16
**court**
1:1 5:9 6:2,4,13 7:5
20:2 30:2 39:12
40:10 44:5 48:1
63:7,15 67:8 87:18
87:20,25 117:23
123:14
**courtesy**
68:13,13
**cover**
16:7 65:15
**coverage**
17:12 54:24 82:24
91:17,18 104:4,10
104:18 114:7,23
118:10
**covered**
113:8
**covering**
115:7
**coversheet**
73:12,13
**criteria**
59:15
**Cross**
3:5 69:1
**Crotty**
2:21 5:8
**Cruiser**
1:6 2:9 5:4,18 17:2,6
17:16,21,22 18:2,7
18:12,16 19:16 20:9
20:14,16 22:24 23:3
23:6 26:11,18 29:10
29:21 31:15,21 32:3
32:10,21 33:2,4,10
33:20 36:12,15
37:22 51:21 52:17
53:2 55:20 56:2,15
58:14 62:25 64:1,4
64:19 69:5 70:3,16
82:2,4,7 91:12,13
91:17 104:4,11
106:13 107:18

108:5 110:9 112:3,8
116:17 117:18
118:9 122:2 123:5
**Cruiser's**
17:23 20:23 23:14
24:7,13 25:7,14,24
26:11 29:14,18 30:6
33:13 37:5 49:2
83:23 116:25
**CSR**
62:9,11
**curious**
67:4
**current**
11:13,23 30:5,7
59:18 84:9
**currently**
32:13
**Customer**
62:13,14
**Customers**
13:8
**cut**
32:15 35:22 63:11

---

## D

**D**
2:11 3:1
**daily**
108:6
**Dana**
75:20
**Danzig**
2:12 5:20
**data**
44:16
**date**
1:17 19:8 29:19 31:6
35:10,13,15,19 36:2
36:2 37:16 40:14
54:18,20 66:4,5,6
79:23 82:10 111:9
122:5,25
**dated**
46:20 80:25 111:22
121:16

**day**
25:16 30:20 48:13
50:18 96:25 97:25
98:1,10 101:10
120:9,12 121:16
123:8
**day-to-day**
28:24
**deal**
42:12
**Dear**
123:7
**December**
23:8 29:20 30:15
31:1,2,3,4 79:18
**declaration**
71:9 82:17
**declarations**
47:13
**declaratory**
70:15
**declare**
122:22
**dedicated**
45:1
**defend**
71:10
**Defendant**
1:11,13 2:14 5:21
70:5
**Defendants**
1:7 2:9 5:17 69:4
70:4
**Defendants'**
4:1 119:13
**defending**
78:4
**defense**
82:18
**define**
99:15
**defines**
92:15 99:12
**definition**
55:3
**degree**


MAGNA
LEGAL SERVICES

12:17 70:23
**Delahunt**
2:2,2 5:13,14,14
49:10,17 53:24 55:5
63:12 64:7 67:13
68:2,6,15 71:6,9,15
71:19,22 72:19
75:23 76:4,6,9,11
76:16,18,22 77:13
77:24 78:1,4,11,20
78:22,25 80:8 86:16
89:4,13 97:18 98:4
100:6 101:15,22
102:2 104:5 107:24
110:25 115:2
116:13,21 118:17
118:21 119:1
**delay**
87:22
**delegated**
14:18
**department**
51:1
**depending**
61:11 106:19 110:17
**depends**
14:15 21:8 41:20
**deponent**
5:24 122:24
**deposition**
1:12 5:2,6 6:20,22,24
7:8 8:10,19 9:3,11
9:12,15,21 10:6
30:16,19,19 75:10
75:24 78:5 82:21
119:11,12 121:7
122:1,4 123:6,8,10
123:13
**depositions**
10:16,23
**describe**
94:20
**Description**
4:2
**designed**
49:19 51:6

**details**
83:25 84:17
**determination**
28:8,14,22
**determine**
27:25 49:14
**dictated**
43:4
**difference**
93:3,8
**different**
16:22 23:10 25:4
27:15 31:24 32:6,9
34:18 37:2 41:19
42:9,12 43:6 45:17
45:23 48:23 52:10
57:24 58:1 59:19
65:12,12 69:17
77:14 84:2,11,12,22
85:5 88:23 90:1,1
92:24 97:15,19,22
101:7 102:11
108:24
**direct**
3:4 6:15 121:14
**direction**
121:14
**directly**
15:2 66:22 86:3
94:14 96:22
**disagree**
78:16 79:6 86:11
**discovered**
113:6 116:8
**discovering**
114:24
**discovery**
74:20 115:7
**discrepancy**
107:22 108:11
**discuss**
19:6
**discussed**
33:15 38:1 116:6
**discussing**
61:1

**distinction**
94:20 95:1 101:12
105:15,25 106:2
**DISTRICT**
1:1,1
**DNOC**
52:25
**document**
37:11,13,14 39:15,19
39:21 44:15 45:17
45:23 47:14 53:8
65:18,23,25 66:10
66:16 74:5 80:12,19
80:25 81:8,10 82:1
91:7 92:15 93:7
96:4 103:11,19,21
103:22 104:24
110:6 113:2 122:22
**documentation**
79:21
**documents**
15:12 66:18 67:6
72:14 73:9,11 75:3
89:24
**doing**
8:6 50:13 105:1
**door**
57:18
**doubt**
86:25 89:2
**Driver's**
120:20
**due**
58:13 82:20
**duly**
6:11 120:10
**duty**
71:10
**dwelling**
4:4 23:15,15 24:1,5
25:11 26:2,15,23,25
27:4,11,18,25 28:1
28:9,15 29:25 35:6
35:21 36:3 96:9
104:1 111:22 112:2
112:11,17

**dwellings**
33:24 103:3
**Dyer**
38:5,7 80:25 81:17

**E**
**E**
2:2 3:1
**e-mail**
81:15
**earlier**
29:13 33:15 35:5
38:2 44:20 48:10
62:25 75:9 79:16
87:12 89:19 91:8,10
94:2 96:7 106:22
113:3 116:2,6
**early**
80:6
**earphones**
22:22
**easily**
75:2
**education**
12:25
**effect**
41:5
**effective**
19:8
**effort**
7:18,22
**either**
53:12 81:23 82:14
104:20
**email**
62:4,15 63:19 64:9
80:25 81:11,16,21
83:2,15 85:7 87:14
88:6 116:1 123:25
**emails**
4:9 63:5
**employee**
38:10 121:10,11
**employees**
12:10
**employer**



11:13
**engage**
36:7
**ensure**
34:9 49:25
**enter**
72:16 73:5
**entered**
118:2
**entire**
12:14 14:12 55:19
**entirely**
99:19 100:22
**entitled**
114:10
**entity**
104:15
**equate**
88:24
**ERRATA**
3:10 122:3
**error**
106:15 122:7
**errors**
122:4
**ESQUIRE**
2:2,6,11,16 123:2
**et**
5:5
**event**
53:19
**everybody**
75:1
**everybody's**
73:25
**exact**
13:19 31:6
**exactly**
44:16 49:22 82:11
100:8
**Examination**
3:4,5,6,7 6:15 69:1
111:4 117:14
**example**
16:15 116:17
**exception**

78:15,18,25
**excerpt**
80:23
**excess**
64:24,25
**excuse**
18:22 36:13 60:20
**exhibit**
20:1 30:1 37:7 39:10
40:9 47:25 63:6
67:7 72:17,18 73:6
110:3 117:25
119:13
**Exhibits**
4:1 44:4
**existed**
56:7
**exists**
44:24
**expect**
9:2
**expected**
106:23
**Expires**
120:16
**explain**
82:23 92:4 93:3,8
**explains**
101:12
**extend**
115:6
**extended**
115:12
**extension**
115:15,17
**extent**
14:12 18:4 72:14
74:22 75:3,5 78:17
88:25 89:1 91:16
**eyes**
51:8 77:17

———————————
**F**
———————————
**fact**
51:4 110:8 114:24
**facts**

87:5 88:4 110:12
122:22
**fair**
12:4 71:4,18 74:17
95:18 97:16 102:12
111:20 114:11
**falling**
22:22 49:25
**familiar**
17:2,25 22:23 33:13
35:5 37:11,13 39:19
65:22 66:15
**Fantastic**
71:24 73:4
**far**
9:8,22 11:15 29:24
**fashion**
83:13
**fast**
19:8 117:9
**February**
1:17 4:9 5:5 62:5
120:9,12 121:16
123:1,8
**fees**
90:7
**Fifth**
2:12
**file**
38:19 48:25 49:24
51:7 52:5,7 83:21
90:16 91:12
**filed**
123:14
**files**
104:17
**financially**
121:12
**find**
20:5 28:25
**fine**
8:5 21:25 60:2 76:14
**finish**
7:20 81:5,6
**finished**
7:23 55:7

**first**
6:11,23 7:10 17:15
18:15,19 34:19,21
34:25 35:22,23
42:15 53:4 66:11
68:2,14 72:12,12
79:17 94:16 99:7
100:11 101:2
102:12 105:7 111:6
**firsthand**
44:23
**five**
10:18 67:14,15,16,17
93:25
**FL**
2:18 123:3
**Floor**
2:7,12 123:19
**Florida**
120:3,6,7,15,15
121:3,6,19
**flow**
61:15
**Flyway**
1:6 2:10 5:4,18 69:5
70:4
**follow**
69:7 75:2 95:5,16,19
102:8 106:23
114:13 115:10
**follow-up**
111:3
**following**
95:14
**follows**
6:12 61:8
**force**
35:1
**foregoing**
121:8,13 122:22
**forgive**
102:6
**forgot**
110:2
**form**
4:4,5,12 21:20 22:9



24:6,11,16 26:3,5,7
26:10,17,19,21
27:11,11,13 28:1,2
28:10,15 29:25
30:13 32:12 38:16
38:22,25 39:2,6,10
39:25 41:18 42:24
45:7,13 46:15 48:18
49:9,16 50:20 53:22
55:5,21 56:3,16
57:8 59:6 60:7
61:16 64:6 75:11
76:3 77:13 80:7
82:9 83:13 85:10
86:1 87:2,16 88:1
88:17 89:5,12 90:10
93:5,14,21 94:12
95:9,20 97:5,18
98:4,8,13 99:20,25
100:5 101:14,22
102:15,23 104:13
106:18 107:8,23
108:12,22 109:9,16
109:21 111:7,9,22
112:2,4,8,12,18
113:11,25 114:12
115:2 116:12,20
117:2,19 118:11,18
**forms**
27:19 57:8
**forth**
118:6
**forward**
16:4
**forwarded**
123:14
**found**
107:20 108:7
**four**
10:13 45:24 93:25
**fourth**
10:12,14
**FPR**
1:23 120:14 121:18
**frankly**
83:24

**FRCP**
1:13
**free**
76:18
**Friday**
1:17 123:12
**front**
33:11 45:23 46:2
69:21 71:17 74:6
80:22 83:5 103:11
103:11 112:22
**fully**
51:24 52:3,12
**funds**
67:1
**further**
107:6,12 108:14,17
109:8 110:16,17
118:20 121:10
**future**
54:13

——————————
**G**
——————————
**G-R-A-Y**
11:18
**Gainey**
2:16 5:23,24 21:20
21:23,25 22:9 24:19
26:7 30:13 32:12,17
38:16 39:2 41:18
42:24 44:12 45:13
46:15 48:18 49:9,16
50:20 53:22 55:12
55:21 56:3,16,19
59:6 60:7 61:16
64:6 67:15,18 68:8
75:11 76:3,5,21,24
77:5 78:1,7 80:7
82:9 85:10 86:1
87:2,16 88:1,17
89:5,12 90:10 93:5
93:14,21 94:12 95:9
95:20 97:5 98:8,13
99:20,25 100:5
101:14 102:3,15,23
104:13,23 105:1

106:18 107:8,23
108:12,22 109:9,21
110:20 112:4
113:11,25 114:12
115:1,9,17 116:12
116:20 117:2,19
118:8,11,18,22
123:2,7
**Gainey's**
78:7
**garbled**
79:13
**general**
1:9,14 2:14 5:21 39:5
42:15 59:9,12
**generally**
13:5 21:7 27:8,16,20
34:24 43:22 49:7
51:14 52:11 54:14
58:2 84:24
**generated**
54:16
**gentlemen**
83:12 84:7 85:8,23
87:1,15 88:7
**Georgia**
11:10 12:21,23
120:20
**getting**
54:10 83:15 108:23
109:15,17
**GG**
120:16
**GGL0026067**
62:23
**GGL26067**
19:22
**GGL31463**
46:23 47:14
**give**
6:6 8:5 14:13 25:8,15
51:8 68:8 87:20
117:11
**given**
20:11 85:25 100:2
**gives**

54:12
**giving**
8:2,3 30:19 68:12,13
**glance**
49:20
**glaring**
50:2 51:5
**go**
6:22 7:9 9:9 18:25
19:25 23:11 42:15
43:7 45:19,21 46:6
50:4 55:21 58:2
63:4 66:22 67:5
68:4 70:2,17 71:25
77:8 78:21 79:9
83:21 86:1 93:16
99:6 105:5 116:4
119:4
**goes**
42:10 58:20
**going**
6:22 8:1 11:11 16:4
21:20 35:14 38:16
39:8,15 48:4 50:6
52:10 53:4 55:25
61:25 65:17,18
66:14 67:19,25
68:14 71:24,25 73:9
75:3 77:20 78:14
91:2,3 107:5 114:5
119:5,10
**Goldberg**
1:23 5:9 120:6,14
121:6,18
**good**
5:1,13,19,23 6:17,17
68:1 119:1
**google**
34:12,16,20,22 36:19
**googling**
36:7
**Gotcha**
53:13
**GPD0006297**
65:10
**graduated**



12:24
**grants**
44:10
**Gray**
1:13 2:19 3:3 5:3,25
  6:10 21:23 120:8
  121:7 122:1 123:6
  123:24
**great**
68:25 69:11,24 73:6
  74:11 81:14 103:19
**greatly**
39:3
**ground**
6:22 51:8
**grounds**
42:18 46:12 48:16
  49:8
**group**
77:12 78:17 79:1
**grouping**
74:5,11 80:23
**groupings**
74:22
**guess**
8:3 13:14 16:7,25
  18:19 23:2 58:11
  59:7 92:24 100:24
  117:12
**guessing**
13:18
**guideline**
95:14
**guidelines**
4:7 43:23 61:18,21
  91:4,18,23 92:24
  95:5,6,19 99:1,6
  100:3 102:24
  105:21,22 106:24
  112:22 113:3,9,22
**guys**
67:11,17 68:20 119:1

**H**

**habitability**
81:19 82:7,12 83:16

83:20,22 84:5,17,21
84:22,23 85:1,3,4,6
86:19 87:13 88:5,23
**hand**
6:5 83:4
**handled**
44:25 90:19
**happen**
16:23 45:9
**happened**
20:21 30:17 90:17
**happy**
9:1
**hard**
24:22 55:13 79:12
**hate**
52:9 95:24 96:19
**Haw-**
35:19
**Hawley**
1:3 4:3,7,8,12 5:3,15
  13:22,22,25 14:2,7
  14:14,20,24 18:5,10
  19:7 20:12 21:2,11
  21:11,18 22:5,8,14
  22:18 26:14 30:18
  33:5,15 35:20 42:3
  42:4,23 43:5,10
  44:17,25 45:12 47:6
  50:19 51:10,14,15
  56:15 57:1,2,3,11
  57:15,16,21 58:5,14
  58:17 59:3,13,20
  60:4,6 61:15 65:11
  67:2 70:3,14,21
  71:1,2,9 72:8,10
  75:9,16 77:10,22
  78:9,11 82:17 85:25
  86:10,25 87:7 91:15
  93:17 95:6 99:12
  104:18 105:24
  106:24 114:11
  116:6,7 117:17,25
  118:4,15 122:2
  123:5
**Hawley's**

21:15 26:19 45:4
  78:5 103:3 112:24
  113:9,21 115:15
**Hawley-branded**
103:25
**head**
7:13 17:17 31:19
  32:23 33:16
**health**
10:3
**hear**
24:22 55:14 71:22
  110:18
**hearing**
7:3
**heart**
88:8
**help**
75:5 105:8
**helps**
103:14
**hereinafter**
6:12
**hey**
27:4
**higher**
70:2
**highlighting**
73:17
**hold**
76:4 79:1
**holds**
78:9
**honest**
60:9
**honestly**
45:8,19 75:17,25
**hopefully**
73:22
**hours**
123:11
**housed**
44:25
**hundred**
51:18 65:13
**hurt**

83:13
**hypothetical**
41:21,22 98:7 99:22
  99:24
**hypothetically**
41:14

**I**

**idea**
14:14 15:19
**identification**
119:14 120:19,20
**Identifying**
17:11
**important**
95:5,8 101:6
**impose**
22:16
**imposed**
43:10
**impossible**
41:21 49:22 118:12
**incepted**
111:17
**include**
57:7
**included**
23:25 26:21 78:13
**inconsistency**
49:7,15
**incorrect**
46:11 116:10
**increase**
114:23
**indemnify**
71:10
**indemnity**
82:18
**indicate**
39:24
**indicated**
46:9,10
**individual**
28:19,21
**industry**
12:13



**ineligibility**
106:7
**ineligible**
93:1,4,11 94:6,10,14
    94:17 106:8,9 113:8
    113:21 114:25
    115:8
**inexpensive**
51:7
**infinite**
107:13
**information**
8:11 11:16 17:13
    20:11 24:11 28:6
    34:2 42:17 44:15,18
    46:11 48:15 50:17
    61:2 62:16 63:22
    106:16,20 107:2
    108:8,14,17 109:1,7
    109:19 116:9,17
**initial**
15:19 19:19
**initially**
89:22
**injury**
88:20
**inserting**
101:18
**inside**
51:1
**insofar**
44:10
**inspected**
40:14
**inspection**
4:5,6 37:16,18,21
    38:14,22 39:1,5,9
    39:22,23,24 40:3,3
    40:4,7,18,21 41:4
    41:11,14 42:18 46:6
    46:12,20,20 47:17
    48:4,16 49:19,24
    50:16,17 51:3,6,11
    51:13
**inspections**
41:1 50:25

**instance**
27:17 36:17 56:25
    80:10 104:20
    107:16 114:2
**instances**
42:25 43:2 57:17,20
    107:11
**instruct**
76:25 78:6
**instruction**
78:7
**instructions**
7:9 9:9 44:17 115:11
    122:4
**instructs**
8:22
**insurance**
1:3,9,14 2:15 5:3,15
    5:22 13:6,8,9,10,22
    13:25 14:1,2,7 15:8
    16:20 17:16,20,20
    17:24 20:12,16,22
    26:22 27:1 33:9
    41:11 61:8,11 62:9
    65:3,7 70:3,14,19
    91:15 93:17 101:3
    108:9 116:10
**insure**
16:9 32:6,9 107:5
**insured**
34:5,17 37:22 38:1
    41:10 60:14,18 61:1
    61:5 63:22 66:13,20
    66:22,24,24 70:19
    81:23 89:20 101:13
    102:19 107:4 110:9
    110:13 113:8,20
    114:24
**insured's**
66:22
**insureds**
26:22 27:1 69:5
    71:11
**insurer**
16:11,12
**insurer's**

65:1
**intent**
49:23
**interested**
121:12
**interject**
76:14
**interpose**
77:6
**Intervenor**
1:11,13 2:14 5:21
    70:5
**investigation**
34:8 36:24 37:5
    107:12 113:7 116:5
    116:11,19,25
**invoice**
4:10 66:1,4,6,12
    110:2,8,13
**involve**
31:15,21,23
**involved**
14:19,23 51:17 64:4
    90:21,23 114:6
**involves**
32:3
**involving**
33:14 84:7 85:23
    87:14
**issu-**
64:4
**issuance**
21:12,18 22:8 23:12
    41:3 57:6 58:9
**issue**
17:1 20:11 21:15
    29:20 30:10,12,15
    32:9 43:5 56:1
    57:11 58:9 59:20
    71:3 77:14 79:17
    82:16 84:2,18,22
    93:19 100:23
    106:15 107:6 113:9
    116:5
**issued**
6:21 14:20 17:5

18:11,15 19:16 24:8
    24:9 33:4,5,10
    36:12,14 42:3,23
    45:12 51:20 52:17
    52:25 53:2,14 55:19
    56:2 58:17 63:25
    64:18 65:14 104:10
    104:19 105:24
    106:24 107:18
**issues**
43:6 51:5
**issuing**
20:8 56:24 57:3
    91:17,18 104:3
    118:10

---

**J**

**J**
38:5,7
**Jackson**
80:25 81:17
**JAMES**
2:16 123:2
**jgainey@bassuw.c...**
2:18 123:4
**Jim**
5:23
**join**
49:10
**June**
120:16
**jurisdictions**
85:1

---

**K**

**Katzenmeier**
2:11 3:6 5:19,20 6:16
    6:18 19:25 20:3,4
    21:21 22:3,4,11
    24:21 26:9 29:23
    30:3,4,23 32:15,19
    32:24 38:20 39:4,9
    39:13,14 40:7,11,12
    41:23 43:1 44:2,6,7
    44:19 45:15 46:16
    47:23 48:2,3,21



49:12 50:3,22 54:3
55:9,13,17,18,24
56:4,8,11,17,22
59:11 60:10 61:19
63:4,9,14,16,17
64:10 67:5,9,14,16
67:24 69:10 79:21
79:24 80:2,14 91:5
100:14 110:22
111:2,5 112:6
113:14,17,19 114:3
114:16,18 115:4,13
115:19 116:15,23
117:4,7 119:4
**keep**
86:16
**kept**
44:18
**kid**
102:7
**kind**
51:5
**know**
8:3 9:1 13:19 15:24
16:8 17:10,11 19:4
22:20 24:25,25 25:9
27:3 28:4,7 29:19
30:21 31:5,19 32:17
32:22 33:7,24 34:18
35:1 38:8,17,18
42:12,24 43:5 44:18
44:23 45:8,19 47:1
47:3,7 48:19 49:21
49:25 50:1 51:5,8
51:10,20 52:4,23
53:10,17 54:13,15
54:18,19 55:22 58:1
58:12,19,20 62:1
63:21 64:8,14,15,17
65:1,5 68:6,13 69:6
70:20,24 73:18
74:21 80:16 84:25
85:4,12,15 86:2,23
95:3 98:7 100:8
**knowledge**
21:10 32:7 38:12

39:7 84:8,9 86:13
110:10

---

## L

**language**
71:2
**lastly**
9:8
**law**
2:2 5:14 54:13 84:25
115:18
**laws**
114:14
**lawyer**
70:22
**lead**
42:7 87:6 88:5 107:3
110:12
**learn**
87:11
**learned**
109:6
**leasing**
30:8
**Legacy**
89:25 90:3,9,15
**legal**
1:24 5:8 29:20 30:10
30:12,15 123:18
**let's**
18:4 23:11,11 41:14
66:3 67:9 77:8 90:9
93:24 113:5 115:22
115:23 117:4
**letter**
3:11 123:15,15
**level**
28:23,24
**License**
120:20
**limit**
9:10
**limited**
9:11
**line**
62:20 81:25 117:25

122:7
**listed**
34:17
**lists**
37:22
**literally**
37:2
**litigated**
88:19
**litigation**
69:15,16 70:6,7,11
77:11 78:16 79:1
83:10 84:9
**little**
11:12 32:16 43:16
55:10,13 63:20 70:2
77:9 79:12,12
**living**
101:4
**lkatzenmeier@rik...**
2:13
**LLC**
1:6,6 2:7,9,10 5:4,5
5:17 17:2 37:22
**Lloyd's**
33:12
**LLP**
2:12 5:20
**location**
41:10 83:23
**London**
33:12
**long**
9:18 11:20 12:1,12
14:10
**longer**
48:25 49:1,2,4,5,6
101:20
**look**
16:6 19:5 34:12,12
34:16,19 37:25 47:9
73:14 81:4,5 89:24
107:5,21 109:8
**looked**
99:2
**looking**

16:7,9 17:10 20:25
24:25 25:1 52:23
62:20 65:5 70:23
90:21
**looks**
18:22 34:13,20 35:15
37:16 40:16 51:3
66:1,7,12 68:19
80:15 97:14 103:25
**lot**
71:16
**loud**
68:11,21
**Love**
67:12
**Lucas**
2:11 5:20 6:18
**Luke**
32:13 55:6 63:12
69:8 79:23 80:12
91:2 92:20 95:24
99:5 100:10 103:7
109:25 119:3

---

## M

**Magna**
1:24 5:8,9 123:18
**Main**
2:3
**maintain**
91:12
**maintained**
27:19,21
**maintains**
91:13
**making**
77:19 78:18 94:16
**management**
1:6 2:10 5:4 12:11
**manager**
11:25
**manual**
43:11,12,18,23 44:3
44:9,21 45:5,18,20
45:22 46:1,3 50:5
50:12 58:6,24 61:22



91:15 95:17 112:25
113:22 115:15
**manuals**
59:15,18
**map**
34:20
**mark**
19:25 29:24 39:9
40:7 44:2 47:23
63:4 67:6 72:17
73:5 122:5
**marked**
25:18,21 63:13
117:24 118:1
119:14
**market**
101:5 123:19
**marks**
119:2,9
**matches**
47:16 62:24
**material**
60:20,23
**materials**
15:6,14,21 17:25
57:3 60:12,15,19
61:14
**matter**
5:18 6:19 11:10
69:14 70:1,2,6,16
82:17 83:4,17,18
84:12 85:16 88:19
116:5 123:9
**matters**
5:3 85:20 88:10,11
88:14
**mean**
21:8 24:15,20,25
25:3,8 27:14,14
30:14 33:16 34:18
34:24 37:1 41:20
44:20 48:25 50:11
52:4 54:24 58:1
59:14 66:11 74:19
83:8,16,19 84:23
90:11 91:20 92:8

94:10 95:10 107:11
**meaning**
56:6
**means**
6:23 7:12 9:12 50:13
52:1 62:12 92:4,5
93:9,11,12,13,17
121:14
**medications**
9:25
**meet**
41:15
**memo**
51:23
**mention**
63:10
**mentioned**
30:10 41:21 50:5
52:20 71:22 89:18
**merely**
101:18
**merits**
30:20
**message**
27:4
**MGA**
77:16 78:11
**middle**
62:23 93:25 105:9,10
**Middleton**
62:5,8
**million**
16:22 37:2
**mind**
110:1 119:8
**mine**
48:25 49:6 79:5
**minute**
87:21 93:9
**minutes**
67:15,15,16,17
**missed**
20:20 113:12,15
**mistake**
56:13
**moment**

50:5 52:20 117:11
**Monday**
123:12
**monetary**
97:14
**money**
54:20
**monies**
90:8
**month**
98:2,11,18 100:21
101:6,18 102:19
**monthly**
25:15 97:11,23 98:23
99:18 101:3,5
102:13,20
**months**
50:8 92:2,16 99:16
106:5
**morn-**
6:17
**morning**
5:1,13,19,23 6:17
**move**
7:2 8:18 11:11 26:2
39:15 43:13 52:10
78:19
**Mt**
1:3 4:3,7,8,12 5:3,15
13:22,22,25 14:2,7
14:14,20,24 18:5,10
19:7 20:12 21:2,11
21:11,15,18 22:5,8
22:14,18 26:14,18
30:18 33:5,14 35:19
35:20 42:3,4,23
43:5,10 44:17,25
45:4,12 47:6 50:19
51:10,14,15 56:15
57:1,2,3,11,15,16
57:21 58:5,14,17
59:3,13,20 60:4,6
61:15 65:11 67:2
70:3,14,21 71:1,2,9
72:8,10 75:9,16
77:10,22 78:5,9,11

82:17 85:25 86:10
86:25 87:7 91:15
93:17 95:6 99:12
103:3,25 104:9,18
105:24 106:24
112:24 113:9,21
114:11 115:15
116:6,7 117:17,25
118:4,15 122:2
123:5
**multiple**
13:10

_____
**N**
_____
**N**
3:1
**name**
5:16 6:18 11:17,18
29:1,8 31:10,11
69:3 123:15
**names**
58:14 75:19
**Nationwide**
1:9,14 2:14 5:21 6:19
20:1 30:1 39:10
40:8 44:3 47:25
63:6 67:6 70:5
**Nationwide's**
69:7
**nature**
50:2 82:21
**Nautilus**
65:3
**near**
10:17
**necessarily**
60:16,17
**necessary**
123:9
**need**
8:25 9:2 20:5 24:14
24:19 28:6 62:17
63:22 64:15 76:22
111:8
**needed**
17:12 28:10



**needs**
17:11 50:14 93:10
**never**
22:20 54:6,21 56:7
  105:2
**nevermind**
68:18
**new**
1:1 2:3,8,8,13,13
  7:22 58:10,18 59:4
  59:21 60:4,14,18
  61:14 63:22 64:14
  70:15 112:23
**NOC**
51:24
**Nonparty**
11:1
**nonrenewal**
114:14 115:21
**north**
13:14
**Norton**
89:25
**Nos**
119:13
**notably**
34:11
**Notary**
120:7,15
**note**
122:4
**noted**
20:2 30:2 39:12
  40:10 44:5 48:1
  67:8 78:25
**notes**
9:20 63:13 117:8
  121:9
**notice**
40:14 52:16,21 54:11
  79:2 85:24 123:8
**noticed**
26:3
**notified**
29:20 31:7 51:11
  86:7,25 87:7

**notify**
51:4
**number**
13:19 41:19 47:1,5
  47:13,16 48:5 73:16
  73:18 74:6,7,8,13
  74:14 75:2 90:4
  107:13 111:14,15
  111:24 112:20,21
  118:2 123:11
**numbers**
63:25 64:21 75:4
  97:14

─────────────────

## O

**oath**
3:8 6:23 120:1
**object**
8:20 21:20 22:9 26:7
  30:13 32:12 38:16
  39:2 41:18 42:24
  45:13 46:15 48:18
  49:9,16 50:20 53:22
  55:21 56:3,16 59:6
  60:7 61:16 64:6
  75:11 76:3,18 80:7
  82:9 85:10 86:1
  87:2,16 88:1,17
  89:5,12 90:10 93:5
  93:14,21 94:12 95:9
  95:20 97:5 98:8,13
  99:20,25 100:5
  101:14,22 102:23
  104:13 106:18
  107:8,23 108:12,22
  109:9,21 112:4
  113:11,25 114:12
  116:12,20 117:2
**objection**
8:21 49:10 55:5 76:5
  76:14,21 77:7 80:8
  89:4 102:2,3,15
  104:5 107:24
  109:16 115:1,9,17
  116:13 118:8,11,17
  118:18

**obligations**
22:17
**obviously**
27:13
**offer**
114:7
**office**
6:21 81:12,13 123:11
**oh**
19:10 20:24 21:24
  31:2 56:21 70:1
  71:12 80:16 103:14
  104:25
**okay**
7:5,17 8:1,10,25 9:6
  9:8,18 10:3,6,15,18
  10:20,22 11:2,8,11
  11:15,19 12:1,4,8
  12:12,15,22,25 13:2
  13:7,10,15,17,17,21
  13:25 14:5,9,13,19
  14:22 15:2,5,11,14
  16:1,1,10,15,19
  17:4,8,14,25 18:4
  18:14 19:3,13,15,18
  19:21,21 20:3,5,7
  20:13 21:1,7,10,14
  21:17 22:12,16,22
  22:23 23:7,11,19,19
  23:21,23 24:5,11
  25:5,10,18 26:2,10
  26:14,21,25 27:6,8
  27:18,22,24 28:8,12
  28:14,21 29:8,13,22
  29:23 30:5,10,24
  31:7,7,14,18,20,23
  32:8,25 33:3,7,13
  33:18,20,25 34:7,15
  35:4,12 36:6,11,18
  36:22,23 37:4,7,11
  37:14,18,21,24 38:4
  38:10,13,21,24 39:5
  39:8,8,18,21,23
  40:2,6,17,20,24
  41:6,24 42:6,21
  43:2,16,21 44:1

45:3,10 46:2,5,6,19
47:7,10,19,22 48:8
48:11,15,22 49:7,13
50:16 51:2,10,20
52:1,8,15 53:1,6,16
54:22 55:1,25 56:12
56:23,23 57:7,10,25
58:8,19,23 59:1,24
59:24 60:11,22 61:3
61:6,10,20,24,25
62:4,8,11,15,20
63:3,14,24 64:3,11
64:17,21 65:4,8,10
65:14,17,18,25 66:3
66:8,8,18 67:1,4,4,9
67:16,24 68:17,22
68:22,25 69:3,11,13
69:19,19,21,24 70:8
70:13,20,25 71:8,17
71:21,24 72:6,14,20
72:24 73:16,25 74:2
74:21 75:4,15,19
76:1,19 77:2,8,25
78:14,19,25 79:6,7
79:12,15,20 80:3,22
80:22 81:4,7,8,14
81:25 82:3,6,16,23
83:15,18 84:14,23
85:14 86:6,14 87:11
87:23 89:16 90:25
91:7,10,16,22 92:18
93:19 94:6,23 95:1
95:4,18,23 96:4
97:12,16 98:20 99:4
99:9,17 100:10,17
103:5 104:25 105:5
105:11,14 106:11
107:2 108:3,16
109:15 110:5,15,16
111:2,12,20 112:1,7
112:11,17,24 113:2
113:5 114:4,9,19
115:5,14,20,22
116:4,16,24 117:4
**one-sentence**
99:10



online
34:12 94:7,19
open-ended
27:14
operations
23:9,14 24:7,13 25:7
    25:9,14,24 29:14,18
    30:6 33:14 94:8,19
opposed
26:18 58:18
option
92:11 95:14
oranges
79:3
order
36:24 37:4,16 38:14
    38:22 39:1,6,25
    40:4
ordered
38:4 40:17,24 41:1,4
    41:4,15 117:1
orderee
39:24
ordering
123:14
organization
51:1
original
122:4,5 123:13
overall
12:11 32:14,18,20
overlong
9:3
overlook
12:10

─────── P ───────

P
2:6
p.m
1:18 119:10,11
    123:12
PA
123:20
page
3:2 4:2 74:24 75:2,5

92:20,20 94:2 99:7
    105:7 122:5,7
pages
45:24 46:1 121:8
paid
66:21 110:9
paper
14:3,20,24 33:5,9
    42:3,23 45:12 51:14
    65:1
papers
52:23
paperwork
53:4
paragraph
91:22 99:10
parameters
45:14,16
parent
14:2,7,8
part
25:12 51:17 77:11
    80:24 91:11,14
    96:15 100:2,21
    101:2,19 102:12
particular
90:8 109:20
particularly
7:7
parties
88:20 121:10
parties'
121:11
Partners
90:1
parts
73:11
party
15:7 36:6
pay
110:13
payment
66:19
pays
66:24,25
penalties

122:22
pending
9:4
Penn
123:19
people
24:22 75:18
percent
51:18 65:13
perception
100:24
Perfect
7:5,17 8:1,25 9:24
perform
14:14
performed
41:2 51:13
period
12:5 19:24 47:7,19
    47:20 48:6 54:12
    62:24 63:10 80:6
    111:13 115:6
periods
32:4 115:16,18
perjury
122:22
person
9:16 29:1,5 75:15
    102:21
personal
110:10
personally
38:8 120:8
perspective
49:21
pertained
53:5
pertains
65:6 83:9
Philadelphia
123:20
phone
9:16,20
Physical
37:18
picture

32:20 34:13
pieces
69:17
Pierantoni
2:6 3:5,7 5:16,16
    68:4,7,12,17,22,25
    69:2,3,4,8,11,12
    71:4,8,12,16,20
    72:16,20,21 73:5,7
    75:12 76:8,10,12,17
    76:19 77:2,8,19,25
    78:3,10,14,21,24
    79:6,8,23 80:1,3,4
    80:11,16,21 82:15
    85:13 86:5,21 87:3
    87:18,23 88:2,21
    89:8,15 90:13 91:2
    91:6 92:19,22 93:6
    93:15,23 94:15
    95:12,22,24 96:3
    97:7,21 98:6,9,16
    99:5,8,23 100:1,10
    100:12,15,16
    101:17,24 102:10
    102:18 103:1,7,9
    104:8,16,25 105:4
    106:21 107:10
    108:2,15 109:2,5,11
    109:23,25 110:4,16
    117:11,15,21,23
    118:3,9,13,20,23
place
1:19 13:9 20:5 22:13
    34:1 38:25 61:7
    63:20 78:15
placed
38:15,21
Plaintiff
1:4 2:5 5:15
Plantation
2:18 123:3
please
5:10 6:2,4 7:20 8:6
    8:14 9:1,9,13,20
    11:16 13:18 29:24
    39:11 47:23 84:4



87:17 91:24 114:5
114:21 122:1,4,5
123:8,11
**PLLC**
2:2 5:14
**point**
21:3 29:15,17 54:8
64:5 75:8 80:19
90:2 92:12 96:11,18
96:18 114:7
**pointing**
86:23
**policies**
14:3,20,24 17:1,5,9
18:6,11 19:8 21:15
21:19 32:8,22 33:3
33:4,10 34:1 42:3
51:13 56:2 57:1
63:25 64:21 65:14
81:19 82:8 108:24
**policy**
4:3,8 17:5 18:15,17
18:20,21 19:4,5,5,6
19:12,16,18,19,20
19:21,24 20:8,12,14
21:12 22:8 23:12
24:7,9 30:22 31:21
31:24 32:4,4,5
33:15 34:25 36:11
36:14 38:1 41:2,3,5
41:11,25 42:8,11,19
42:22,23 44:11,24
45:4,11 46:23 47:1
47:4,6,7,12,13,16
47:19,20,20,24 48:5
48:6,17,20,23 49:8
49:14 51:20 52:2,18
52:19,24 53:1,1,5
53:19,20 54:5,5,21
54:25 55:4,19 56:6
56:14,25 57:4,6,11
58:9,10,17 59:4,9
59:22 60:6,15,19
62:24,25 63:10,13
63:25 64:18,22,23
64:24 65:9,11 66:20

66:21 70:16 71:3,3
72:8,10 73:18,22
74:2,3,4,6,7,8,8,10
74:13,14,16,18
82:14 83:23 90:3,4
90:4,8 108:10,20
109:3,20 111:13,14
111:17,24 112:13
112:13,14,15,15,20
112:21 113:8,10,21
113:24 114:10,15
114:20,23 115:6,6
115:11,16,17
**POLK**
120:4 121:4
**pop**
73:22
**popped**
68:21
**portion**
44:9 46:3 87:24
**posed**
9:10 28:10
**position**
11:23 12:2,5,9 29:3
99:17
**possibility**
42:20
**possible**
7:18 49:11 50:21,23
69:8 85:6 103:6
107:9 112:5 116:14
116:22
**postgraduate**
12:25
**potholes**
50:2
**practice**
59:12
**practices**
59:10
**pre-inspect**
41:10
**prefix**
65:7
**prefixes**

65:12
**premium**
53:20 54:1,7 66:21
**PRESENT**
2:21
**presently**
39:10 40:8 47:24
**President**
83:14
**press**
103:15
**PRESTON**
2:16 123:2
**presumably**
20:16
**presumption**
81:23
**pretty**
16:23,24 27:14
**previous**
12:15 24:12 94:2
**previously**
10:23 109:13
**primary**
64:25
**prior**
15:22 21:12,18 22:8
41:2,2 54:17 75:10
108:8,9
**privilege**
76:25 77:21 78:9
79:3
**privileged**
76:6 77:15,18 78:13
**privy**
86:12,13
**problem**
69:19 70:9 79:7
104:25
**problems**
10:3
**procedures**
34:1
**proceed**
6:14 79:5
**process**

14:23,25 16:4,5,11
16:17,21 17:5,9
18:6,11 20:14 22:19
56:24 66:19
**processes**
61:7
**produced**
73:10 120:19,20
**production**
73:11,13 74:12 80:24
**productions**
73:10
**Professional**
120:6,15 121:6,19
**prohibitive**
41:9
**project**
63:22
**prompt**
34:15 116:11
**prompted**
116:19
**proper**
6:22
**properties**
25:16 31:18 33:14,19
33:21 65:6 96:25
97:24 101:9 116:18
**property**
31:16 34:9,12,16,23
36:7,19,25 37:5
38:1 41:12,15 49:20
50:18 51:9 62:17
64:14 65:11 83:14
84:7,19 85:3,3
107:4,4 116:25
**prosecution**
11:9
**protecting**
78:8
**protection**
85:2
**provide**
7:11 10:1,4 14:15
15:10,20 44:15
62:17 64:15



**provided**
11:2,5 15:6,9,13,16
23:18,23 26:10,18
26:22 27:1 46:11
86:10 106:16 116:9
**provides**
115:15
**providing**
17:12
**public**
102:7 120:7,15
**pull**
18:25 43:13 47:11
53:9 61:25 65:18
111:7
**pulled**
37:12 44:3 111:15
**purpose**
8:10 11:8
**purposes**
54:23 77:13
**put**
34:13 41:5,12 47:4
60:3 74:24 75:2
102:20
**puzzle**
69:18

**Q**

**quality**
41:16
**ques-**
7:10
**question**
7:20,20,22 8:4,13,15
8:16,17,20 9:4,5,9
9:10 15:23 22:1
23:2 24:18 25:5,8
25:10,12,23 32:1
35:4,23,24 37:3
41:21 42:13 54:23
55:11 58:11 60:1
66:18 80:18 87:17
87:19 90:6,12 94:14
95:11 96:12,22,23
97:3,8,10,13,16,24

98:1,3,5,10,14,19
98:20 99:18,22
100:11,22,25 101:2
101:2,7,8,20 102:4
102:5,8,11,13,14
105:11 106:11
111:20 113:16
114:19
**questions**
7:10 9:22 24:15 25:1
28:6,10 35:2 68:1
68:16 69:7,7 80:18
86:17 97:20,22
100:8 101:12
102:17 110:17,18
110:24 111:3 118:5
118:20,21,22
**quick**
117:12
**quite**
11:22 45:8 83:24
**quote**
15:24 17:12 62:17
64:16
**quoted**
17:12
**quoting**
28:4,5

**R**

**raise**
6:4
**raised**
109:16
**Ray**
68:1,2 69:3 71:6 76:6
77:13 86:16 104:13
104:24 108:23
117:10
**re-underwrite**
49:24 51:7
**reach**
16:20
**read**
3:11 16:8 20:24
47:14 50:9 74:1

80:24 81:4,16 87:24
91:23 96:23 97:10
104:23 122:4,22
123:13
**reading**
21:1 64:9 102:12
105:1
**ready**
68:23 79:5
**real**
117:8,12
**realize**
114:4
**realized**
55:9
**really**
25:3 42:13 49:24
59:7
**realtime**
87:21
**reask**
35:24
**reason**
9:1 10:22 26:17
35:18 36:1 41:6,7
53:6 82:3 86:11,25
87:9 89:2,6,9,10
104:2,6 110:11
117:16 122:7
**reasonable**
40:2 67:10 123:13
**reasonably**
9:18
**reasons**
25:4 34:18 40:23
**recall**
17:14,17,18 18:8,9
18:14 21:13 22:10
28:11 29:8 31:12,13
33:20 35:5,10 36:5
36:16,21,22 37:6
51:22,24 52:16,21
53:6,9,14 64:8,9,20
74:7 75:15,17,25
77:5,12 79:16,20
81:22 82:10,13

83:24 85:17,24
88:16,18 91:7 99:1
99:9 103:4 104:12
105:14,20 106:2,25
109:22 112:5,10
**receive**
9:20 17:15,19,22
**received**
16:3 17:23 20:15,22
31:8,9 35:6,8,11,20
36:3 51:3
**receives**
34:2,3
**receiving**
34:22 36:8,19 48:15
**recision**
42:21 53:7,10,14
54:9,17,19,24,24
**recisions**
44:17
**recognize**
72:24 73:16 74:13,14
81:8 96:4 110:5
116:1
**record**
5:2,12 7:19 67:20,22
77:23 78:15,18,23
79:4 86:16 96:24
119:8,10 121:9
123:25
**recovering**
90:7
**Recross**
3:7 117:14
**rectified**
54:17
**Redirect**
3:6 111:4
**refer**
47:5 48:5 52:13 58:4
58:16 59:2,20 60:4
60:5 61:12 63:25
74:22 75:3,3 80:9
84:18,20 91:17 92:8
94:13 102:14
103:21,22,23



104:14 111:6
**reference**
105:7
**referral**
42:4 57:11 106:6,8
114:11
**referred**
50:9,14,19 57:16,21
64:23 87:14 88:6
92:3,6 93:10 94:2
105:17 109:1 113:2
116:2
**referring**
19:6 23:24 32:4,5
43:19,24 44:10
45:22 52:6,19 53:10
53:18 54:9 57:15
69:16 70:7 75:22
79:24 81:18 82:8
84:6 85:7 86:18,21
94:16 104:14
105:12 107:16
109:2 111:13,24
**refers**
47:1,3,6 66:19 96:15
97:17
**refrain**
7:22
**regard**
72:7 75:7 100:4
104:3 108:25
109:17
**regarding**
30:17 84:18 85:2
**regards**
61:9 84:25 115:21
**reinstatement**
43:7
**related**
85:7 89:1,3,7,10,11
**relates**
96:13
**relating**
73:8 97:3
**relationship**
14:6,11 32:20 33:1

90:17
**relative**
121:10,11
**remember**
18:13 21:6 31:6,10
33:17,19 52:24 53:5
60:8 70:18 75:19
83:25 84:2,14,17
**remitted**
67:2
**remote**
7:8
**remotely**
5:7 121:7
**removed**
11:16 29:24
**renew**
113:23 114:10,20
**renewal**
19:18,20 41:2 58:10
58:18 59:4,21 60:19
72:10,12,13 74:9,15
90:3,8 112:13,18
113:10
**renewed**
60:15 112:17
**renewing**
56:25 60:6 108:9,9
109:6,20
**Renier**
2:6 5:16 69:4
**renier@cooperllc.c...**
2:8
**rent**
25:15 97:11,24 101:3
101:5 102:13,20
**rental**
27:4 33:23 48:13
84:19 92:6,12 94:7
94:19,24 98:22,23
98:24 102:14,22
103:25 106:4 116:9
**rentals**
50:7,8,14 62:18 64:5
64:19 65:15 80:6
92:2,3,15 94:4,21

96:13,16 97:4,17
98:3,12 99:13
100:23 101:21
105:13,16,18,25
107:4 108:6 116:18
**rented**
23:15 25:16 50:18
96:25 97:24 98:1
101:9 102:19
**repeat**
87:18 96:20
**rephrase**
32:1 49:3 55:11,12
58:11 88:3 113:18
**report**
4:6 12:11 39:22,23
40:3,8,21 41:15
42:18 46:7,12,20
47:17 48:4,16 50:16
50:17 51:11 79:25
121:7
**reported**
1:23 86:3
**reporter**
3:9 5:9 6:2,4,13 7:5
20:2 30:2 39:12
40:10 44:5 48:1
63:7,15 67:8 87:19
87:20,25 117:24
120:7,15 121:1,6,14
121:19
**reports**
40:18 51:13
**represent**
5:11,21 69:4 70:4,25
86:9
**representation**
69:25 71:5 74:1
**representative**
62:13,14
**represented**
41:16
**representing**
5:17
**reproduction**
121:13

**request**
79:2 112:1,7
**requested**
40:21 72:15 87:24
121:8
**requesting**
60:23 61:7 70:15
**requests**
79:2
**required**
6:24 15:12 21:17
22:5,7 58:4,16 59:2
59:20 60:4,5,14,18
95:16,18 112:18,23
**requirements**
61:14
**requires**
15:13
**rescind**
42:23 44:11 45:4,11
55:4,19 56:2,6,14
71:2
**rescinded**
53:2,20 54:5
**research**
107:12
**residential**
48:12
**resolve**
108:10
**respect**
16:25 36:11,14 52:17
59:12
**responding**
72:25
**response**
6:20 7:12 25:18,21
25:23 73:8 108:5,6
**responses**
7:10 8:2,3
**responsibilities**
12:8
**responsible**
29:1 60:25
**rest**
44:13



**result**
40:4
**results**
51:11
**retail**
20:11 48:24 66:2
  90:1,19 108:18
  109:14
**retract**
80:18
**return**
54:6,20 123:15
**returned**
53:21 54:2
**returning**
50:16
**returns**
50:17
**revealed**
42:17 46:11
**review**
44:13 83:21 92:10,13
  121:7
**reviewed**
50:25
**reviews**
51:4
**revisions**
58:24
**right**
6:4 9:24 13:2,20
  17:19 23:13 25:3
  27:16 32:21 35:4
  37:9,23 38:11 43:9
  44:3 47:8 62:23
  63:12 65:22 70:24
  71:12,15 72:8,9
  74:5 76:12 78:3
  80:15 83:11 88:3,24
  90:5,20 92:21 94:18
  99:23 101:24
  103:10 104:21
  105:19 107:15,19
  109:2 110:17
  111:19 114:19
  115:23 116:1

118:23
**Riker**
2:12 5:20
**risk**
16:8 31:24 32:6
  42:10,10 50:13 60:4
  60:5,21,24 61:1
  113:8,20 114:24
  115:7,7
**risks**
32:9 42:12,15 114:8
**RLI**
14:1,2,6,8,9,11,22
  16:16,17,20 30:18
  31:8,9
**role**
17:8 20:8,10,10 90:3
  90:14
**room**
68:21
**rough**
119:5
**RSUI**
26:4,17,21 27:25
  28:9
**RULE**
1:13
**rules**
6:23 43:4,9 44:21,22
  45:3 58:20,22,23
  59:3,16,19 61:8,12
  85:1,2
**run**
27:15

———————
**S**
———————
**SAF010208**
65:4
**Safety**
65:7
**saying**
52:5 89:1,20 90:21
  90:22 100:2
**says**
19:21 25:2 26:3 27:4
  37:18,21 38:4 40:14

46:23 48:12 50:7,7
  50:17 60:8 94:18
**scenarios**
16:22 27:15 37:2
**schedule**
123:11
**school**
102:7
**scratch**
38:13 114:21
**screen**
18:25 19:1 23:13,21
  37:8,9 39:16 43:14
  61:24 62:2 65:17,20
  69:20 80:15,20
  103:11 110:23
  115:23,24
**scroll**
19:3 24:14,19,23
  35:14 40:13 43:16
  43:21 46:19 48:9
  50:6 66:9,14 71:24
  73:22 92:19
**scrolled**
19:8
**scrolling**
105:5
**second**
2:7 7:17 68:8,9 97:24
  98:1 101:7,19
  108:20 109:3
  113:15
**sections**
92:25
**see**
16:6,8 18:4 19:1
  20:24 23:21 25:2
  34:13,20 37:9 39:16
  43:14,17,22 44:13
  60:11 62:2 65:20
  66:3 67:9 69:11,21
  70:1 72:1,2 74:24
  81:2,14,25 91:22
  92:16,23 93:24 94:1
  94:4,6,8 97:8,12
  99:9,12 101:6,7

103:10,17 105:7,10
  113:5 115:22,23,24
  117:4
**seeing**
52:20 74:19 117:22
**seek**
108:13
**seeking**
26:22 27:1 70:21
  71:2
**seeks**
82:17
**seen**
22:20 66:12 103:2,4
  103:19 105:2,2
  118:4
**send**
27:5,7,10,12,20,25
  28:5,15 54:7 57:2,5
**sent**
15:2 27:13 51:14,16
  51:24 54:11,17
**sentence**
50:11 81:15 91:25
**separate**
73:10 83:17 85:16,20
  88:10,11,14 100:7
  101:8 102:17
**September**
30:24 35:15 36:2
  40:15 46:21 79:22
  111:10,22
**served**
25:13
**service**
62:13,14 77:14
**services**
1:24 5:8 14:13
  123:18
**set**
59:15,18,19 63:5
  67:6 110:25 118:6
**Seven**
123:19
**shake**
7:12



**share**
18:25 37:8 53:19
69:9,20 90:2,7
103:8,15 115:23
**sharing**
61:24 65:17 80:15
91:3 110:1,22
**sheet**
3:10 122:3,6
**shop**
91:3
**short-term**
30:9 50:7,14 62:18
64:5,19 65:15 80:6
84:19 92:2,6,12,15
94:3,21,24 96:13,16
97:3,17 98:3,11,22
98:23 99:13 100:23
101:21 102:14,22
105:13,15,18,25
106:4 107:3 116:18
**shortly**
73:23
**show**
7:13 48:11 73:9
80:22
**showed**
39:25 47:17 48:6
62:25 79:21
**showing**
47:8
**shown**
72:22
**shows**
80:5
**side**
45:1
**sign**
3:11 122:5 123:10,13
123:15
**signature**
122:24 123:9,15,22
**signed**
34:5 120:12
**silent**
9:19

**similar**
35:4 94:7,19,22,23
94:24 105:8,13,16
106:12 114:19
**simply**
24:15 85:12 97:23
100:17 101:9
**sir**
70:11 71:25 72:2,4
72:22 73:2,14 74:8
75:5,13 77:4 79:9
79:10,16 81:2,8,20
82:14 83:19 89:16
89:23 91:7 92:1
93:16 94:4 96:4,19
97:8 98:17,20 99:2
99:9,15 100:17
103:2,17 105:6,19
107:16 108:3
109:24 118:5
**sit**
104:22
**situation**
14:17,18
**situations**
85:5 107:13
**slammed**
57:18
**Slow**
19:7
**small**
91:11,14
**smart**
102:8
**somebody**
57:18 75:9 90:22
**soon**
19:4 34:22
**sorry**
10:13 11:4 14:23
19:10 20:20 22:5
24:3,24 25:20 28:18
32:15 35:19,22
36:13 46:17 48:10
49:3 55:6 56:4
57:18 58:14 73:2

79:10,14 83:18
87:21 92:21 96:19
100:14 103:16
104:9 105:21
113:12 114:4 116:7
117:6 118:11 119:2
**sort**
33:24 67:21 93:25
94:2
**sought**
82:25
**sound**
107:5
**sounds**
111:19
**source**
43:9
**South**
23:16 38:9
**SOUTHERN**
1:1
**speak**
90:17 112:15
**speaking**
27:8 34:24 54:14
58:2 84:24
**speaks**
28:13
**Specialty**
65:7
**specific**
7:8 20:8 22:19 24:17
24:17,24 25:5,12
27:17 29:9,19 32:13
32:18 35:10 36:11
36:14,17 42:11
52:19 53:5 59:8
61:18,20 80:9 82:10
94:13 104:6 107:16
108:3
**specifically**
16:25 17:10 18:6,17
26:20,23 28:11 48:9
49:2,4,6 54:15 65:6
70:20 77:10 81:12
106:11 107:17

**specifics**
33:17 64:15
**speculate**
52:9
**speculation**
95:10
**speculatory**
95:11
**spell**
11:17
**spoke**
75:9,16
**spoken**
76:1
**stage**
15:19
**stand**
71:13
**standard**
15:8
**stands**
73:17 74:8
**start**
14:25
**started**
30:15
**state**
5:11 54:13 70:15
114:14 115:18
120:3,7,15 121:3
**stated**
34:9 122:22
**statement**
79:4 82:6
**states**
1:1 94:7
**stating**
88:13
**stenographic**
121:9
**stenographically**
121:7
**steps**
106:17 107:21
108:10,17 109:8,12
109:18


MAGNA
LEGAL SERVICES

**stop**
61:24 65:17 110:1,22
**Street**
2:3 83:14 123:19
**strictly**
95:19 106:23
**strike**
16:2 17:14 18:14
22:6 31:10 33:8
35:24 38:13 40:24
42:6 60:13 64:17
114:21 116:7
**Stuff**
50:2
**subject**
62:20 81:25 85:8,23
**submission**
15:23 96:9 106:7
**submit**
60:14,18 92:9,13,25
93:4,9,24
**submitted**
18:1 25:25 93:10
108:4 111:23 113:7
**submitting**
94:3
**subpoena**
4:11 6:21 69:22,24
69:24 72:22,25 73:8
73:9 77:14
**subsequent**
15:12 74:15
**subsequental**
34:4
**suggested**
29:13
**Suite**
2:3
**Sunrise**
2:17 123:3
**supplement**
34:4 104:1
**supplemental**
4:4 15:14,20 24:1,5
26:3,15,24,25 27:18
28:1,2,9,15 29:25

35:7,21 36:4 57:8
96:1 104:18 111:7,9
111:21,21 112:2,8
112:11,17
**sure**
6:19 22:3,3,15 26:16
27:16 29:2 32:2,2
33:24 34:16 35:24
44:16 46:8 57:19,19
58:13 59:17 62:22
65:13 70:9 73:24
74:23 78:24 80:11
84:1,5 100:19 101:4
108:24
**Surety**
65:9
**suspect**
44:22
**swear**
6:2,5
**swindle**
8:12
**switch**
80:17 91:3 103:7
**sworn**
6:11 120:10

_____

**T**

**take**
9:2,5 20:13 34:6
49:19 52:1 56:23,24
61:13 67:10 73:13
78:16 106:17
107:21 108:10,16
109:8,12 123:8
**taken**
1:13 5:7 9:24 10:6,23
**talk**
76:23 78:22
**talking**
7:18 18:18,20 19:14
24:23 28:23 54:16
59:9 64:14 82:11
83:1,4 88:20 108:25
**tdelahunt@delahu...**
2:4

**team**
45:1
**technically**
54:6
**tell**
6:11,24 8:4,6 11:13
13:4 15:20 19:4
20:7 30:12 37:14
38:7,19 39:21 43:2
62:11,16 63:18
64:22 65:25 66:3,10
66:15 70:17 77:20
**telling**
33:22
**Ten**
67:15
**tenant**
23:15 29:21 83:13
85:2
**tenants**
85:2
**term**
19:11 56:1,5 70:24
84:24 85:4
**terms**
54:11 106:6,6 108:23
**testified**
6:12 44:20 75:9
79:16 91:8,10
106:22
**testify**
69:25 72:1,7 77:21
**testimony**
3:3 6:5 10:1,4 11:2,5
75:13 79:9 85:18,19
89:19 96:7 101:19
106:25 119:9
**texting**
9:13
**thank**
6:1,13 11:11,19 13:2
14:9 20:3 30:3
39:13,18 40:6,11
42:14 44:1,6 47:22
48:2,8 52:15 53:24
54:22 63:15,16 66:8

89:17 90:25 110:19
110:20 111:1
118:23,25
**Thanks**
119:1
**theft**
11:10
**theirs**
29:21
**thing**
34:19,21,25 43:22
53:12 115:23
**things**
41:19 65:12 67:25
**think**
11:15 31:5 33:23
38:8 51:22 53:8
54:10 56:12,12
58:11 62:9 63:7,9
71:7 72:19 73:19,19
74:1 83:22 89:18,25
97:19 100:21
105:11 108:23
111:13 115:22
117:4,7,9
**third**
74:11 80:23 90:3
91:22 112:23
**thought**
55:7 88:25
**thoughts**
64:13
**thousands**
46:1
**thread**
63:5
**three**
10:10,11 73:10,11
93:25 96:14,15,15
101:23 112:14,15
**thrown**
70:23
**Tiffaney**
62:5,8
**Tim**
5:13 67:25 71:1,5



75:21,22,23 76:13
77:9 110:24
**time**
1:18 5:6,10 12:14
22:2 23:12 24:7,9
25:25 43:5 53:4
54:12 55:16 58:2,20
60:15 66:11,14
67:10,20,23 68:1
74:1 79:17 96:21
104:10,18 108:19
118:24 119:10
123:9,13
**times**
10:9 16:14,18 43:6,7
101:23
**TIMOTHY**
2:2
**titled**
92:25,25
**today**
5:5 7:6 8:11 9:3,25
18:18,21 19:6,14
72:25 75:7,10 83:5
88:20
**today's**
119:9
**tool**
51:8
**top**
17:17 24:25 26:4
31:19 32:23 33:16
47:13 81:25
**top-**
25:2
**topic**
25:2 52:11 72:2
**topics**
71:25 72:1,2,3
107:14
**total**
84:12,22
**totally**
88:23
**tough**
42:13

**trade**
14:16
**transcript**
7:14 121:8,8,13
122:4,5
**transcription**
122:5
**transcripts**
119:6
**transpire**
41:20
**triage**
16:7
**trial**
11:3,5
**trick**
8:12
**trigger**
49:23 107:12
**trouble**
7:2 103:16
**true**
32:7 121:8 122:23
**truly**
123:17
**truth**
6:6,6,7,11,24 34:6
**truthful**
10:1,4
**try**
8:12 9:9
**trying**
15:18 28:25 32:19
42:15 53:17 88:24
89:16 100:17,18,20
**turn**
68:9
**turned**
30:21 81:18 82:7,13
83:22
**turning**
68:10
**Twelve**
99:16
**two**
10:21 83:12 84:7

85:8,23 87:1,14
88:7,20,24 92:23,24
93:8,25 95:2 97:19
97:22 100:7,22
101:12 102:17
106:3,9 112:13,16
112:20,21
**Tyler**
2:21 5:8
**type**
37:13,14 64:22
**types**
42:12
**typically**
40:24 41:1

---

**U**

**Uh-huh**
16:24 88:22 90:2
**un-**
70:10
**unclear**
8:14
**under-**
61:13
**underlying**
14:16 83:8 85:9,24
86:18,22 87:1 88:8
**underneath**
70:1
**understand**
6:25 7:15,24 8:8,13
8:15,23 14:5 18:21
19:15 42:14,16
45:10,25 48:5 56:5
58:19 59:25 63:24
72:6 82:18,20 83:7
84:12 85:15,17,19
88:10,19 90:12
100:18,20,25
101:20,25 102:1,4,5
102:6 112:22
**understanding**
23:5,13,17 24:6,12
24:13 25:6,13,24
29:14,17 30:5,7,11

30:15 64:3 69:14
70:11,12,13 82:24
83:12 85:21 86:3
88:12,14,16 97:2
111:8 115:14
**understood**
8:17 9:7
**undertake**
34:8
**underwrit-**
45:18
**underwrite**
101:3
**underwriter**
28:19,20 29:6,6,7,9
36:9 38:9 51:5
90:16 92:9 93:11
**Underwriters**
2:17,19 4:11 5:25
11:14,20,24 13:5,22
14:10,14,19 15:3,6
15:10,16 16:4,10,15
16:16,20 17:4,19
18:10,16 21:12,14
21:17 22:7,12,13,17
26:6,11 27:2,9,12
27:19,24 31:15 32:9
33:1,4,25 34:3,8,15
34:21 35:6,20 36:3
36:24 37:4 38:11
41:16,24 42:2,6,8
42:22 44:10 45:4,11
51:21 57:2,10 58:4
58:16 59:2,20 60:3
60:22 61:6 64:18
66:2,20,23 81:12
86:7 90:18,22
113:23 114:20,22
115:5,10 116:8,16
116:19 117:1 123:2
**Underwriters'**
14:6 32:20 49:5 51:1
59:13
**underwriting**
4:7,12 12:13,15
14:20,23,25 16:5,17



16:21 17:5,8 18:6
18:11 20:13 22:19
36:9 43:11,12,18,23
44:2,9,21,22 45:5
45:18,20,22 46:1,3
50:4,12 58:6,24
59:18 61:21 72:7
91:4,12,14 95:4,6
95:16,19,25 96:8,12
99:1,6 100:3,4
103:3 105:14,17,20
105:20,21 106:12
106:24 107:17,18
108:4 109:19
112:25 113:3,9,22
113:22 115:15
117:17 118:1,5,15

**unit**
14:16

**UNITED**
1:1

**units**
14:17 30:8 97:15

**University**
12:21,23

**update**
59:15

**updated**
61:7 112:1,7

**use**
34:9 48:12 65:12
84:24 104:2,3
116:25 117:17

**uses**
96:8

**USI**
62:10 89:21,22
108:20 112:9

**usually**
15:17,18 115:18

**———— V ————**

**v**
5:4 122:2 123:5

**V-R-B-O**
106:10

**vacation**
50:8 92:3,6 94:4,21
94:24

**vague**
16:23,24 53:17 55:10
70:12 84:8

**vaguely**
82:20

**varies**
15:22,25 27:3 28:3
39:3 49:18 106:19
107:25

**variety**
40:23

**various**
10:24,25 25:4 97:14
107:14

**verbal**
7:11,12

**verbatim**
77:17

**verification**
34:1

**verify**
41:12

**versus**
28:1 58:10 59:21,21
70:3,16 106:6,7

**vibrate**
9:19

**video**
5:2 119:8

**VIDEO-RECORD...**
1:12

**videoconference**
1:12,19 2:1,21 120:9
121:7

**videographer**
2:21 5:1,7 6:1 67:19
67:22 68:18 119:2,7

**vis-à-vis**
90:14

**voiced**
8:21

**VRBO**
94:7,18,25 105:16

106:10,12

**vs**
1:5

**———— W ————**

**W**
2:17 123:3

**wait**
76:4,4 104:21

**waiting**
76:20

**waive**
123:9,14,22

**waiver**
79:2

**want**
8:2 40:13,13 42:10
46:6,19 48:9 50:4
56:23,24 64:15 66:9
67:11,14,17 68:4
71:1 77:2,23 100:3
101:4 104:21
108:24 111:6,12
116:4,4

**wanted**
48:11

**wanting**
63:21

**wants**
76:13

**wasn't**
86:12 88:24 90:16

**waste**
73:25

**way**
35:2 47:4 60:3 72:16
85:8,22 94:23 101:1
104:20 108:16
117:23

**we'll**
8:17 73:5 78:18 79:9
80:17,17

**we're**
6:20,22 8:1 9:13
18:18,20 19:6,14
44:4 52:10 54:10

64:14 68:10,22 83:1
83:4 88:19 95:16
102:7 108:24,25
109:16 111:13,24
112:13

**we've**
55:25 105:2

**week**
25:17 81:19 82:7
97:1,25 98:2,10
101:10

**weekly**
108:6

**welcome**
110:21

**weren't**
55:7 90:21

**wholesale**
13:6

**wide**
40:22

**windows**
50:1

**wish**
123:14

**withdraw**
71:13

**witness**
6:3,8 11:1,9 21:24
22:1,10 24:20 26:8
30:14 32:22 38:18
39:3 41:19 42:25
44:14 45:14 48:19
49:11,18 50:21 54:1
55:6,15,23 56:5,9
56:21 59:7 60:8
61:17 64:8 67:12
68:10,19,20,24 77:1
77:20 78:6 80:9
82:10 85:12 86:2
87:17 88:18 89:6,14
90:11 93:22 94:13
95:10,21 97:6,19
98:5,14 99:21 100:7
100:11 101:16
102:5,16,24 104:6



106:19 107:9,25
108:13 109:10,22
110:21 112:5
113:12,15 114:1,13
114:17 115:3,10
116:14,22 117:3,6
117:20 118:12,19
**word**
99:18,21 101:18
**words**
13:4 56:13 59:1
100:21 102:7
**work**
13:10,22
**working**
16:16
**works**
15:19
**wouldn't**
44:15 98:14 102:21
107:11
**write**
9:20 93:11,12,18
**written**
14:4,24 33:10 48:23
51:14 57:1 64:13
65:2 73:19
**wrong**
46:10
**wrote**
81:16
**www.MagnaLS.com**
1:25

---

**X**

**X**
3:1 120:19

---

**Y**

**yeah**
21:25 22:3 24:15,22
35:14 45:25 49:22
56:8 58:21 59:7
61:17 62:3 64:24
74:19 80:2,14 87:20
89:5 91:5 102:5

103:24 104:23
105:10,10 110:25
113:17 117:9,12
118:18
**year**
18:23 23:8 30:25
32:13,18 72:12
73:20 79:18 112:23
**years**
10:17,18,21 11:21,22
12:3,4,22
**yesterday**
51:23 52:22 53:3
**York**
1:1 2:3,8,8,13,13
70:15

---

**Z**

**Zoom**
5:7

---

**0**

---

**1**

**1**
4:3 20:1 74:24
119:13
**1,000**
102:21
**1,800**
102:21
**1:05**
1:18 119:10,11
**1:22-cv-10354-GHW**
1:5
**10**
4:12 12:3,4 119:13
**10:04**
1:18 5:6
**10105**
2:8
**10110**
2:13
**11/2023**
4:8
**11:45**

67:20
**11:55**
67:23
**111**
3:6
**117**
3:7 4:12
**119**
121:8
**12**
50:8 92:2,16 106:4
**120**
3:8
**121**
3:9
**122**
3:10
**123**
3:11
**1345**
2:7
**14203**
2:3
**146**
83:14
**16**
12:10 120:16
**1635**
123:19
**19**
11:21,22
**19103**
123:20
**19322**
111:15

---

**2**

**2**
1:17 4:4 5:5 30:1
35:15 36:2 72:2,2
111:10
**2/2/2024**
122:2
**20**
4:3 40:15 46:21
73:21 74:2

**2002**
46:21
**2003**
12:24,25
**2020**
18:22 35:15 36:2
79:22 111:10,17,22
**2021**
18:22 19:11 30:17
62:24 73:20 74:4
**2022**
4:9 12:6 19:11 30:18
37:17 40:15 47:24
48:5 62:5,24 63:9
63:13 64:9 74:18
79:23 80:2 81:1,15
86:10 87:4,7 88:6
**2023**
12:6 31:3 47:25 48:6
63:10 74:18
**2024**
1:17 5:5 120:9,12,16
121:16 123:1,8
**21**
19:24 73:21 74:2,15
**21/'22**
74:9,16
**22**
19:24
**26067**
109:4,20
**295**
2:3
**2nd**
120:9 123:8

---

**3**

**3**
4:5 25:8,10,12,23
39:10 72:2 96:22
**3,000**
102:21
**30**
4:4 13:14
**30(b)(6)**
1:13 72:3



**30,000-foot-above**
49:20
**31**
74:18 81:1,15 84:6
  88:6 111:17
**33313**
2:18 123:3
**33rd**
2:12
**39**
4:5
**3A**
100:22

___

**4**

**4**
4:6 40:9
**4:30**
123:12
**40**
4:6
**44**
4:7
**48**
4:8
**489**
2:12

___

**5**

**5**
4:7 44:4 121:8

___

**6**

**6**
3:4 4:8 47:25 63:8,9
  63:13
**63**
4:9
**67**
4:10
**69**
3:5
**6951**
2:17 123:3

___

**7**

**7**
4:9 25:2 63:5,6
**72**
4:11

___

**8**

**8**
4:10 67:7 123:1
**8/2021**
4:3
**8/2022**
4:3,8
**8/31/22**
47:21
**8/31/23**
47:21
**836**
2:3
**866-624-6221**
1:24 123:20
**8th**
120:12 121:16
  123:19

___

**9**

**9**
4:11 72:19,20 73:6
**9/8**
37:16
**9/8/2022**
4:10
**9/8/22**
66:7
**9:00**
123:12
**966379**
120:16

