# EXHIBIT B

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MT. HAWLEY INSURANCE      )
COMPANY,                  )
                          )
Plaintiff,                )
                          )
vs.                       )No. 1:22-cv-10354
                          )
BEACH CRUISER, LLC        )
and FLYWAY                )
MANAGEMENT, LLC,          )
                          )
Defendants.               )
                          )
and                       )
                          )
NATIONWIDE GENERAL        )
INSURANCE COMPANY,        )
                          )
Intervenor Defendant.     )

            The deposition via Zoom of

MT. HAWLEY INSURANCE COMPANY  called by

the Defendant for examination, taken

pursuant to notice and pursuant to the

Federal Rules of Civil Procedure for the

United States District Courts pertaining

to the taking of depositions, taken

before Alyssa N. Kuipers, Certified

Shorthand Reporter, Registered

Professional Reporter, commencing at

10:09 a.m. on the 15th day of

December, 2023.



---

**2**

```
 1   APPEARANCES:
 2   DELAHUNT LAW, PLLC
     MR. TIMOTHY E. DELAHUNT
 3   295 Main Street
     Suite 836
 4   Buffalo, New York 14203
     E-mail: tdelahunt@delahuntpllc.com
 5
          On behalf of the Plaintiff;
 6
     RENIER P. PIERANTONI COOPER, LLC
 7   MR. RENIER P. PIERANTONI
     1345 Avenue of the Americas
 8   Second Floor
     New York, New York 10105
 9   Phone:  (212) 878-3636
10        On behalf of the Defendants
          Beach Cruiser, LLC and
11        Flyway Management, LLC;
12   RIKER DANZIG, LLP
     MR. LUCAS D. KATZENMEIER
13   489 Fifth Avenue
     33rd Floor
14   New York, New York 10110
     Phone:  (973) 538-0800
15   E-mail: lkatzenmeier@riker.com
16        On behalf of the Intervenor
          Defendant Nationwide General
17        Insurance Company.
18
19        *   *   *   *   *   *
20
21
22
23
24
25
```

---

**3**

```
 1              I N D E X
 2   WITNESS:                          PAGE
 3   MT. HAWLEY INSURANCE COMPANY
 4   Direct Examination by Mr. Katzenmeier.   4
 5   Cross-Examination by Mr. Pierantoni... 75
 6   Redirect Examination by
 7   Mr. Katzenmeier.....................133
 8   Recross-Examination by Mr. Pierantoni.139
 9
10           E X H I B I T S
11   NATIONWIDE DEPOSITION EXHIBIT        PAGE
12   Exhibit A   supplemental application  18
13   Exhibit B   e-mail, 8/17/22          28
14   Exhibit C   underwriting guidelines  33
15   Exhibit D   November 14th letter     51
16   Exhibit E   '21 to '22 policy        58
17   Exhibit F   claim notes              67
18   Exhibit G   letter to David Hoffman  70
19   Exhibit H   Delahunt Law letter      75
20   Exhibit I   e-mail, MH1305          110
21   Exhibit J   invoice                 128
22
23   (Exhibits I and J retained by
24          Mr. Pierantoni.)
25
```

---

**4**

```
 1              (Witness sworn.)
 2   WHEREUPON:
 3      MT. HAWLEY INSURANCE COMPANY,
 4   called as a witness herein, having been
 5   first duly sworn, was examined and
 6   testified as follows:
 7          DIRECT EXAMINATION
 8   BY MR. KATZENMEIER:
 9      Q.   Well, good morning,
10   Mr. Brownell.  My name is Lucas
11   Katzenmeier.  I'm an attorney with Riker
12   Danzig.  We represent Nationwide General
13   Insurance Company in this matter,
14   intervener defendant.
15      Before we get started on the
16   deposition proper, I'm going to give you
17   some ground rules.  First, you just took
18   an oath.  That means you're required to
19   tell the truth in this deposition.  Do
20   you understand that?
21      A.   Yes.
22      Q.   Okay.  And as you're aware,
23   we have a court reporter with us, who is
24   taking down everything we say, because of
25   that and especially because this
```

---

**5**

```
 1   deposition is virtual, your responses
 2   need to be verbal.  You have to say yes,
 3   no, or otherwise verbalize your response
 4   to a question.  That means you can't just
 5   shake your head no.  Do you understand
 6   that?
 7      A.   Yes, I do.
 8      Q.   Okay.  Second, because we
 9   need a clean transcript, we have to avoid
10   talking over each other, so when I ask a
11   question, please let me finish my
12   question before you start answering.  And
13   when you answer, I will try to let you
14   finish your answer before I ask another
15   question.  Is that okay?
16      A.   Yes.
17      Q.   Okay.  When we're going
18   through these and you're responding to my
19   questions, I don't want you to guess in
20   your answers.  If you don't know the
21   answer to the question, you can say that.
22   If you can give me an approximation of
23   something, that's okay.  Just tell me
24   you're approximating, but don't guess.
25   Do you understand that?
```

---

MAGNA LEGAL SERVICES

**6**

1      A.   Yes.
2      Q.   Okay.  Perfect.  I'm not
3  here to trick you when we're doing this.
4  If you don't understand a question I'm
5  asking, please ask for clarification.  If
6  you answer my question without asking for
7  clarification, I'll assume you heard my
8  question and you understood it.
9           With that said, during the
10  course of this deposition, your attorney,
11  Mr. Delahunt, may object to a question.
12  After your attorney has voiced his
13  objection, pause.  You can answer the
14  question unless your attorney instructs
15  you not to, though.
16          If you need a break for any
17  reason, just please let me know.  I'm
18  amenable to that.  All I ask is, if
19  there's a question pending at the time
20  you request to take a break, the question
21  is answered before we leave.  Is that
22  okay for you?
23      A.   Yes.
24      Q.   Okay.  And, lastly, you
25  shouldn't be communicating with anyone

**7**

1  else during the course of the deposition.
2  I mean like taking phone calls, texting,
3  anything like that, e-mails.  Do you have
4  a phone on you right now?
5      A.   I have a personal cell phone
6  that's on the table in the sleep mode
7  just for family emergency purposes.
8      Q.   Okay.  Perfect.  So, yeah.
9  As long as you understand that, we should
10  be fine.  Okay.
11          MR. DELAHUNT:  I'm sorry.  I
12  just want to test if you can hear
13  me on Kevin's microphone.
14          MR. KATZENMEIER:  It's a
15  little faint, but yes.
16          MR. DELAHUNT:  Okay.  All
17  right.  If I need to talk, I will
18  speak up.  Alyssa, can you hear me
19  sufficiently?
20          THE COURT REPORTER:  Yes, I
21  can hear you.
22  BY MR. KATZENMEIER:
23      Q.   Okay.  So, Mr. Brownell,
24  have you taken any medications today that
25  could affect your ability to provide

**8**

1  truthful testimony?
2      A.   No.
3      Q.   Do you have any health
4  problems that could affect your ability
5  to provide truthful testimony?
6      A.   No.
7      Q.   Okay.  Have you ever had a
8  deposition taken before?
9      A.   Yes.
10      Q.   Okay.  How many times, would
11  you say?
12      A.   Roughly a half dozen.
13      Q.   A half dozen.  Okay.  And
14  have those all been within the past
15  couple years, within the past year?
16      A.   Within the past 10 to
17  15 years total.
18      Q.   10 to 15 years.  Okay.  And
19  for what reason was your deposition taken
20  previously?
21      A.   With respect to my current
22  or former jobs.
23      Q.   Okay.  So we will -- we'll
24  get into that in a second.
25          Have you ever provided

**9**

1  testimony at a trial before?
2      A.   No.
3      Q.   Okay.  Did you review any
4  documents to refresh your recollection
5  prior to this deposition?
6      A.   I did review documents, but
7  not for that purpose.
8      Q.   Okay.  For what purpose did
9  you review documents prior to this
10  deposition?
11      A.   To prepare for this
12  deposition.
13      Q.   To prepare for this
14  deposition.  Okay.  What documents were
15  those?
16      A.   All of them were documents
17  that had been produced as part of
18  Mt. Hawley's document production in this
19  lawsuit.
20      Q.   Okay.  Did you review any
21  pleadings prior to this deposition?
22      A.   Not specifically.
23      Q.   Okay.  By which I mean, for
24  example, Mt. Hawley's declaratory
25  judgment complaint in this action.

MAGNA LEGAL SERVICES

**MAGNA** ▶
LEGAL SERVICES

10

1     A.   I may have seen that at some
2  point, but I don't have a specific
3  recollection of doing so.  I did not
4  review the complaint in preparation for
5  this deposition.
6     Q.   Okay.  Thank you very much.
7  Just so we have it going back, can you
8  please state your full name.
9     A.   Kevin Brownell, B R O W N E
10  L L.
11     Q.   Okay.  And your age for me,
12  please?
13     A.   49.
14     Q.   Thank you, sir.  So you
15  mentioned you have been deposed in
16  connection with your current position and
17  prior positions.  What is your current --
18  who is your current employer?
19     A.   RLI.
20     Q.   RLI.  And is that -- that's
21  an insurance company?
22     A.   Yes.
23     Q.   Or is that a holding
24  company?
25     A.   It is both an insurer

11

1  itself, and also it is the parent company
2  of Mt. Hawley Insurance Company.
3     Q.   Okay.  So is Mt. Hawley a
4  wholly-owned subsidiary of RLI?
5     A.   Yes.
6     Q.   How long have you been at
7  RLI?
8     A.   Since August of 2018.
9     Q.   August 2018.  Okay.  And
10  what is your current position at RLI?
11     A.   Assistant Vice-President,
12  Claims.
13     Q.   Okay.  How long have you
14  been in that position?
15     A.   Since March 2023.
16     Q.   March 2023.  And what do you
17  do as Assistant Vice-President of Claims?
18     A.   I manage and run the
19  casualty, general liability claims team
20  for the Central and South regions.
21     Q.   Okay.  And let's dig into
22  that a little bit.
23          As far as managing and
24  running claims, what does that entail?
25     A.   I oversee the claims

12

1  examiners that handle commercial general
2  liability claims, casualty claims in the
3  Central and South regions of the United
4  States.
5     Q.   Okay.  And when you say
6  "Central and South regions of the United
7  States," would that include areas like
8  South Carolina?
9     A.   South Carolina is part of my
10  territory, yes.
11     Q.   Okay.  Sounds good.
12          Prior to this position, what
13  position did you hold in RLI or
14  elsewhere?
15     A.   Claims Director.
16     Q.   Claims Director.  Was that
17  at RLI?
18     A.   Yes.
19     Q.   Okay.  And when were you the
20  Claims Director at RLI?
21     A.   I had that title from the
22  beginning of my employment at RLI through
23  March of 2023.
24     Q.   Okay.  And when did you
25  begin your employment at RLI?

13

1     A.   August of 2018.
2     Q.   August 2018.  Okay.  What
3  was your position before taking the
4  position at RLI?
5     A.   I had a claim examiner
6  position at a company called Starr
7  Indemnity.
8     Q.   And when did you leave that
9  position?
10     A.   When I came to RLI.
11     Q.   Okay.  And when did you
12  start that position?
13     A.   I don't remember the exact
14  date, but it was in 2014.
15     Q.   2014.  Okay.  And what were
16  your job responsibilities at Starr?
17     A.   I was a claims examiner.
18     Q.   Claims examiner.  Okay.
19  Mr. Brownell, could you tell me the
20  highest level of education you have?
21     A.   I have a law degree.
22     Q.   A law degree.  Okay.  And
23  where did you obtain the law degree?
24     A.   University of Illinois at
25  Urbana-Champaign.

4  (Pages 10 to 13)

14

1    Q.   Okay.  And what year was
2 that?
3    A.   2000.
4    Q.   2000.  Okay.  And did you
5 have an undergrad somewhere else or ...
6    A.   I have an undergraduate
7 degree in media studies from the same
8 institution.
9    Q.   Okay.  And when did you
10 obtain that degree?
11    A.   1997.
12    Q.   '97.  Okay.  All right.  So
13 are you familiar with the declaratory
14 judgment action filed by
15 Mt. Hawley?
16    A.   Yes.
17    Q.   Okay.  Are you familiar with
18 the claims that are asserted in that
19 declaratory judgment action?
20    A.   Yes.
21    Q.   So if you could, in your
22 words, just what is your understanding of
23 the claims asserted by Mt. Hawley in that
24 complaint?
25    A.   I would say, generally, the

15

1 complaint speaks for itself, but my
2 understanding of the complaint is that we
3 are seeking a declaration that there's no
4 coverage under the Mt. Hawley policy at
5 issue for the claims asserted against the
6 defendants in the underlying lawsuit.
7    Q.   Okay.  So whose decision was
8 it to file a declaratory judgment action
9 within Mt. Hawley?
10    A.   That would have been made by
11 claim counsel.
12    Q.   Claim counsel.  Okay.  But
13 if there was -- So was there anyone in
14 Mt. Hawley who, administratively, it was
15 their decision?
16    A.   I'm not sure what you mean
17 by "administratively."
18    Q.   So, for example -- to be
19 clear, I'm not asking anything your
20 counsel told you or any recommendation
21 made to you.  I'm purely asking about
22 procedure here.
23       So if a recommendation was
24 made for litigation, who would have been
25 the one saying yes or no?

16

1    A.   It would have been our Claim
2 Counsel Unit.
3    Q.   Claim Counsel Unit.  Okay.
4 And do you have any idea -- or do you
5 know who it would have been with respect
6 to this declaratory judgment action in
7 particular?
8    A.   The claim counsel attorney
9 that works with my unit, her name is Dana
10 Kanellakes.
11    Q.   When was the decision made
12 to file the declaratory judgement action?
13       MR. PIERANTONI:  Can you
14       spell that last name for me?  I'm
15       sorry.
16       THE WITNESS:
17       K A N E L L A K E S.
18 BY MR. KATZENMEIER:
19    Q.   Okay.  I'm sorry,
20 Mr. Brownell.  I don't know if you got my
21 last question.  I can ask it again, if
22 not.
23    A.   Please ask it again.
24    Q.   Do you know when the
25 decision was made to file a declaratory

17

1 judgment action in this case?
2    A.   I don't know the exact date,
3 but it would have been shortly before the
4 complaint was filed.
5    Q.   Okay.  Thank you.  So would
6 it be fair to say that the complaint in
7 this case touches on an application for
8 insurance submitted by Beach Cruiser?
9    A.   Yes.
10    Q.   Okay.  Are you familiar with
11 that application?
12    A.   Yes.
13    Q.   Okay.  Have you reviewed
14 that application for insurance?
15    A.   Yes.
16    Q.   Okay.  I am going to go
17 ahead and pull that application up on my
18 screen, just so we have a point of
19 reference while we're talking about it.
20       Okay.  Mr. Brownell, can you
21 see my screen?
22    A.   Yes.
23       MR. KATZENMEIER:  Can
24 everybody else see my screen?
25 Okay.  Let's go ahead and mark

18

1    this as Nationwide Exhibit A. And
2    just so everyone's aware, this is
3    the entire conversation thread.
4    The application is an attachment
5    to this e-mail.
6        (Nationwide Deposition Exhibit A
7        marked for identification.)
8    BY MR. KATZENMEIER:
9        Q.   Okay. Mr. Brownell, do you
10   recognize this document?
11       A.   Yes.
12       Q.   Okay. Can you tell me what
13   this document is?
14       A.   This is the supplemental
15   application submitted by Beach Cruiser
16   for coverage with Mt. Hawley.
17       Q.   And is this the document you
18   mentioned reviewing prior to this
19   deposition?
20       A.   It's one of them.
21       Q.   I will -- so this is -- This
22   would be part of the application
23   submitted by Beach Cruiser; is that fair
24   to say?
25       A.   This is the supplemental

19

1    application, and there's also a basic
2    application.
3        Q.   Right. Okay. So let me
4    scroll down a bit.
5            Is this the other part of
6    the application?
7        A.   It looks like it, yes.
8        Q.   The basic application.
9    Okay. So I will scroll back up here for
10   you.
11           You mentioned that
12   Mt. Hawley's claims in this action
13   involve some alleged misrepresentations
14   in Beach Cruiser's application for
15   insurance. Can you tell me specifically
16   what misrepresentation or alleged
17   misrepresentation you may be referring
18   to?
19       A.   Yes. It's the second
20   question listed under No. 3: Are any
21   properties rented by the day or by the
22   week?
23       Q.   Okay. And is it correct
24   that this -- that checkmark next to that
25   question is marked no, correct?

20

1        A.   That's correct.
2        Q.   Is that what you're alleging
3    is a misrepresentation in this case?
4        A.   Yes.
5        Q.   Okay. Are there any other
6    aspects of this supplemental application
7    that you consider to be a
8    misrepresentation?
9        A.   No.
10       Q.   Okay. Let's scroll back
11   down to the -- This is the second page.
12   Is there any aspect on the second page of
13   this supplemental dwelling application
14   that you would consider to be a
15   misrepresentation?
16       A.   Not to my knowledge, no.
17       Q.   Okay. And we're going to go
18   through the same question with the basic
19   application, as you termed it. Is there
20   any information on this page of the basic
21   application that you would consider to be
22   a misrepresentation?
23       A.   Not to my knowledge, no.
24       Q.   Okay. And it looks like
25   everything is blank on the rest of this

21

1    except for the address list. Do you see
2    -- Are you familiar with the allegations
3    asserted in the underlying action?
4        A.   Yes.
5        Q.   Okay. Are you familiar with
6    the address to the property in question
7    involved in the underlying action?
8        A.   I reviewed it in preparation
9    for this deposition, but I don't remember
10   which one of them, as I sit here right
11   now, is the one we're talking about.
12       Q.   Okay. That sounds good to
13   me.
14           MR. DELAHUNT: Luke, if you
15   want to represent which property
16   is at issue, so we can -- you
17   know, I don't have any problem
18   with that.
19           MR. KATZENMEIER: I mean,
20   yeah. I'm fine with that. I just
21   didn't want to put words in his
22   mouth.
23           MR. DELAHUNT: I understand.
24   BY MR. KATZENMEIER:
25       Q.   So, I mean, I guess, along

MAGNA LEGAL SERVICES

MAGNA ▶
LEGAL SERVICES

22

1   those lines, Mr. Brownell -- your names
2   being switched is getting to me.
3          Mr. Brownell, would it be --
4   would it sound correct that 146 President
5   Street is the property in question in
6   this case?
7       A.   I have no reason to dispute
8   that.
9       Q.   Okay.  Thank you.  So
10  scrolling back up a little bit, we've --
11  you've singled out the "are properties
12  rented by the day or by the week" as the
13  point of the alleged misrepresentation.
14  What is your basis for asserting that
15  that was incorrect?
16      A.   Well, the property that is
17  the subject of the underlying lawsuit was
18  -- prior to this policy and at the time
19  of the alleged loss, was being used as an
20  Airbnb or Vrbo property.
21      Q.   Okay.  And when did
22  Mt. Hawley become aware of this?
23      A.   David Hoffman, who was the
24  claims examiner assigned to this, learned
25  that information during his investigation

23

1   of the claim.  And I believe that the
2   final confirmation that this property was
3   an Airbnb and Vrbo property and had been
4   prior to any coverage with Mt. Hawley,
5   that final determination was -- the final
6   conclusion was come to in, I want to say,
7   September 2nd of 2022, I believe is the
8   date.
9       Q.   You say the "final
10  confirmation."  Was there an initial
11  conclusion or suspicion?
12      A.   He learned earlier during
13  his investigation process that, at time
14  of this loss, the property was rented
15  through Airbnb and Vrbo.  When I say
16  "final," I'm referring to the fact that
17  he then confirmed it had been rented out
18  through Airbnb and Vrbo for several years
19  prior to Mt. Hawley's coverage.
20      Q.   Okay.  And we'll dig into
21  that a little bit, but have you discussed
22  this matter with Mr. Hoffman, I think you
23  said?
24      A.   I have not.
25      Q.   You have not.  Okay.  How

24

1   did Mr. Hoffman first become aware prior
2   to the final confirmation as you said?  I
3   guess, what was the first point that
4   raised the suspicion?
5       A.   The answer to that question
6   will be found in the claim file notes
7   that were produced in litigation, but
8   it's my understanding, from those claim
9   notes, that Mr. Hoffman most likely
10  gleaned that information during a phone
11  call with the insured.
12      Q.   Okay.  And when you say
13  final confirmation was reached in
14  September 2022, I believe you mentioned,
15  what form did this final confirmation
16  take?
17      A.   The last piece of
18  information to make that determination
19  was information from the insured stating
20  that the property had been an Airbnb and
21  Vrbo property for several years prior to
22  Mt. Hawley's coverage.  The claim file
23  notes will reflect in what form that
24  information came in.  Whether it was a
25  phone call or e-mail, I don't recall, but

25

1   that's in the claim file notes.
2       Q.   Okay.  When did Mt. Hawley
3   receive the claim from Beach Cruiser in
4   this case?
5       A.   Well, the claim didn't come
6   in from Beach Cruiser.  The claim was
7   submitted by Beach Cruiser's retail
8   agent.
9       Q.   And who is that?
10      A.   I don't recall the name of
11  their retail agent.
12      Q.   Okay.  Does the name USI
13  sound correct?
14      A.   Yes.  That refreshes my
15  recollection.  I believe it's USI.
16      Q.   Okay.  Thank you,
17  Mr. Brownell.
18          So having reached that
19  recollection, do you recall when
20  Mt. Hawley would have received notice of
21  the claim from USI?
22      A.   No, but the claim file would
23  document that.
24      Q.   Okay.  Let me pull up some
25  other documents just to see if this

MAGNA LEGAL SERVICES

MAGNA ▶
LEGAL SERVICES

26

1    refreshes our memory.
2        Okay.  Mr. Brownell, can you
3    see my screen?
4        A.   Yes.
5        Q.   Okay.  So what I have up for
6    you is an e-mail right now.  It appears
7    to be from David Hoffman.  Does that look
8    correct?
9        A.   Yes.
10        Q.   Okay.  And it appears to be
11    sent to Drew Augustine.  Do you know who
12    Drew Augustine is?
13        A.   It's my understanding he's
14    the property manager for this property
15    with Beach Cruiser.
16        Q.   And it looks like it also
17    went to someone at Flyway; is that
18    correct?
19        A.   Yes.
20        Q.   Okay.  So I guess, just
21    reading the first paragraph, the first
22    sentence -- you can either read it
23    yourself or I can read it out loud into
24    the record.
25        A.   I can read it myself.

27

1        Q.   Okay.  Would it be correct
2    to say that that first sentence confirms
3    the rental units at 146 President Street
4    were rented out both in Airbnb and Vrbo?
5        A.   Yes.  This appears to be
6    Mr. Hoffman's e-mail summary of portions
7    of the phone call he had earlier that
8    day.
9        Q.   Okay.  And the date of this
10    e-mail is August 17th, 2022, correct?
11        A.   Yes.
12        Q.   Would this be the final
13    confirmation that you referred to
14    earlier?
15        A.   No.
16        Q.   No?  Would the final
17    confirmation have taken the form of an
18    e-mail to Beach Cruiser or Flyway?
19        A.   I would have to refer to the
20    claim notes to answer that question.
21        Q.   Okay. I'll stop sharing.
22    And before we get too far away from that,
23    let's mark that as Nationwide Exhibit B.
24    Okay.  So I'm going to -- I think I can
25    share my screen here again.  All right.

28

1    Mr. Brownell, can you see my screen?
2        (Nationwide Deposition Exhibit B
3        marked for identification.)
4    BY THE WITNESS:
5        A.   Yes.
6        Q.   Thank you.  We're back on
7    the supplemental dwelling application,
8    correct?
9        A.   Yes.
10        Q.   Okay.  So I just want you to
11    take me through the process of this
12    supplemental dwelling application and
13    also the basic application.  So once --
14    Putting aside the -- whether there was a
15    misrepresentation or not, in the normal
16    course of events, the insured fills this
17    out.  Who does it go to?
18        MR. DELAHUNT:  I'm going to
19        object to the extent that that
20        assumes the insured fills out the
21        application.  That hasn't been put
22        into evidence yet.
23    BY THE WITNESS:
24        A.   It depends on which product
25    we're talking about.  The product at

29

1    issue here is what we call general
2    binding authority, or GBA for short.
3    Within GBA, the process is that the
4    managing general agent, which in this
5    case is Bass, would obtain a completed
6    application and supplemental application
7    from the retail agent.
8        Q.   Okay.  And who drafted the
9    dwelling supplemental application?
10        A.   This particular supplemental
11    application was actually prepared by a
12    different insurance company, RSUI.
13        Q.   Okay.  Is this dwelling
14    application drafted by RSUI used by
15    Mt. Hawley?
16        A.   Not specifically.  However,
17    it's not uncommon for Mt. Hawley to
18    accept supplemental applications on
19    another insurance company's form provided
20    that it asks the same information or
21    similar information that we would ask.
22        Q.   Okay.  So, I guess, put
23    another way:  This isn't the standard
24    dwelling application used by
25    Mt. Hawley; would that be fair?

MAGNA LEGAL SERVICES

MAGNA

LEGAL SERVICES

30

```
1          A.   That's fair.
2          Q.   Okay.  So assuming -- once
3   this -- assuming it's been filled out by
4   the insured, once a supplemental dwelling
5   application is submitted by an insurance
6   retail agent, who does it go to?
7          A.   For this product, it goes to
8   the MGA, which is Bass.
9          Q.   And you said the MGA.  Can
10  you tell me what that means?
11         A.   Managing general agent.
12         Q.   Okay.  And you said that was
13  Bass?
14         A.   Bass Underwriters, yes.
15         Q.   Bass Underwriters.  Okay.
16  And is Bass Underwriters the MGA for
17  Mt. Hawley?
18         A.   It's one of several.
19         Q.   It's one of several.  Is
20  Bass Underwriters owned by Mt. Hawley?
21         A.   No.
22         Q.   Okay.  As far as you know,
23  does Bass Underwriters underwrite for
24  companies other than Mt. Hawley?
25         A.   I believe that they do.
```

31

```
1          Q.   Okay.  And for this type of
2   product insurance -- or for this type of
3   insurance product, does Mt. Hawley use
4   other underwriting companies aside from
5   Bass Underwriters?
6          A.   Yes.  At present, the GBA
7   product, I believe, has nine different
8   MGAs that they work with.
9          Q.   How about at the time this
10  Mt. Hawley policy was issued?  Do you
11  know?
12         A.   I don't know for sure.  At
13  the time this product began, there were
14  about four to five MGAs that they used
15  and there are nine now, so it would be
16  somewhere in between there.
17         Q.   So building on that, once
18  this application has reached Bass, what
19  would Bass do with the application?
20         A.   Bass has a set of
21  underwriting guidelines that they have to
22  follow when they are reviewing an
23  application to determine whether a policy
24  can be issued.  And I'm speaking
25  generally right now.
```

32

```
1          Q.   Of course.
2          A.   If the application --
3   information submitted with the
4   application falls within the guidelines,
5   Bass is authorized to issue a policy.
6   There are certain times where the
7   guidelines require that, depending on the
8   answers to certain questions in the
9   applications, Bass has to refer or submit
10  the application into a Mt. Hawley
11  underwriter for review before they can --
12  before a policy can be issued.
13         Q.   Okay.  And you mentioned the
14  underwriting guidelines.  We'll dig into
15  that, but I'm going to pull them up, just
16  so we have them for reference while we're
17  discussing it.
18              Okay.  Mr. Brownell, can you
19  see my screen?
20         A.   Yes.
21         Q.   Okay.  Can we mark this as
22  Nationwide Exhibit C.
23              Mr. Brownell, does this look
24  like the underwriting guidelines you were
25  just referring to?
```

33

```
1              (Nationwide Deposition Exhibit C
2              marked for identification.)
3   BY THE WITNESS:
4          A.   For rental dwellings, yes.
5          Q.   Okay.  So are there other
6   underwriting guidelines that are provided
7   by Mt. Hawley to Bass?
8          A.   For different classes of
9   insureds, yes.
10         Q.   Would this have been the
11  underwriting guidelines provided to Bass
12  for the Mt. Hawley policy for the --
13  Sorry.  Let me strike that and clarify
14  because I can see how that was a little
15  confusing.
16              Would this have been the
17  underwriting guidelines to be used in
18  connection with the Mt. Hawley policy
19  issued to Beach Cruiser in this case?
20         A.   Yes.
21         Q.   So you mentioned referrals a
22  short while ago.  I'm reading this
23  sentence here.  I don't know if you can
24  see my cursor.
25         A.   Yes, I can.
```

9  (Pages 30 to 33)

34

1     Q.   It says short-term rentals
2  less than 12 months and vacation rentals
3  should be referred.  Can you tell me what
4  "referred" means in this sentence?
5     A.   That's what I indicated
6  earlier, that if the application
7  indicated that there was a short-term
8  rental or a vacation rental for the
9  property for which coverage was being
10 sought, Bass would have to refer that
11 application into a Mt. Hawley underwriter
12 for review.
13    Q.   Okay.  So assuming --
14 hypothetically, if there were no issues
15 or incorrect information relayed in an
16 application, you mentioned Bass has the
17 authority to issue a policy on behalf of
18 Mt. Hawley; is that correct?
19    A.   As long as the risk falls
20 within the underwriting guidelines and
21 there are no facts which require a
22 referral per those guidelines, yes.
23    Q.   So is Bass the entity that
24 would be responsible for comparing the
25 application to the underwriting

35

1  guidelines?
2     A.   Initially, yes.
3     Q.   Okay.  So you say
4  "initially, yes."  After Bass, who would
5  it be?
6     A.   It would be Mt. Hawley if it
7  was a matter that had been referred.
8     Q.   Okay.  But only if it had
9  been referred?
10    A.   Correct.
11    Q.   So if Bass determined that
12 the application fell within the
13 underwriting guidelines without need for
14 referral, Bass would have the authority
15 to issue a policy on behalf of
16 Mt. Hawley; is that correct?
17    A.   Yes.
18    Q.   Okay.  So, for example, in
19 the Mt. Hawley -- Sorry.  Strike that.
20        In the application that was
21 attached to Mt. Hawley's DJ complaint in
22 this case, which I showed you earlier, if
23 the application had marked yes instead
24 under short-term rentals, is that a
25 situation in which the application should

36

1  have been referred to Mt. Hawley?
2     A.   Yes.
3     Q.   Okay.  How often does
4  Mt. Hawley deal with Bass or communicate
5  with Bass during the underwriting
6  process?
7     A.   It depends on whether the
8  application is referred or not.
9     Q.   Okay.  Does Bass communicate
10 with Mt. Hawley in the process of
11 renewing a policy?
12    A.   I think the answer remains
13 the same.  It depends on if there's a
14 reason for referral.
15    Q.   Okay.  So in the event that
16 Bass determines that no referral is
17 necessary, what is the process for
18 issuing a policy on behalf of Mt. Hawley
19 in that event?
20    A.   I'm not sure what you mean
21 by process of issuing a policy.  If Bass
22 concludes that there is no reason for
23 referral and the risk otherwise falls
24 within the underwriting guidelines, they
25 may issue a policy to that insured.

37

1     Q.   Okay.  And is there any sort
2  of communication sent by Bass to
3  Mt. Hawley when such a policy had been
4  issued?
5     A.   I know that the policy is
6  communicated back to Mt. Hawley, but I'm
7  not exactly sure the form that that
8  takes.
9     Q.   Okay.  I mean, so is there
10 any form of, I guess, confirmation sent
11 from Bass to Mt. Hawley that a policy has
12 been issued on Mt. Hawley's behalf?
13    A.   Bass provides a copy of the
14 issued policy to Mt. Hawley.
15    Q.   Okay.  And what does
16 Mt. Hawley do with those policies, if
17 anything?
18    A.   Nothing.  They're stored
19 electronically.
20    Q.   Okay.  As far as you are
21 aware, is there any sort of review
22 process Bass undergoes with respect to
23 the information contained on an
24 application for insurance?
25    A.   I'm not sure I understand

10  (Pages 34 to 37)



38

1  that question.
2       Q.   Put another way:  If Bass
3  **receives an application for insurance, is**
4  **there any steps taken to verify the**
5  **information in an application?**
6       A.   I would say not typically.
7  Bass relies on the representations that
8  are made by the applicants who are
9  filling out the application forms.
10      Q.   Okay.  Does Mt. Hawley
11 **impose any requirements on Bass to verify**
12 **the information in insurance**
13 **applications?**
14      A.   Not to my knowledge.
15      Q.   Okay.  Would there have been
16 **any steps taken to verify any of the**
17 **information contained in any application**
18 **for insurance submitted by Beach Cruiser**
19 **in this case?**
20      A.   If you mean did Bass
21 undertake any efforts to confirm the
22 accuracy of the application responses,
23 I'm not aware of any.
24      Q.   Okay.  So in the event that
25 **a referral is necessary to Mt. Hawley,**

39

1  **what is the process for reviewing the**
2  **application that Mt. Hawley -- that has**
3  **been referred to Mt. Hawley?**
4       A.   Mt. Hawley will receive the
5  application documents from Bass, and then
6  Mt. Hawley will direct Bass to ask
7  further questions pertaining to the
8  issues that led to the referral.
9       Q.   Okay.  So in this case,
10 **let's assume that the short-term rental**
11 **question on the application had been**
12 **marked yes.  What follow-up questions, if**
13 **any, would Mt. Hawley have had?**
14      A.   There may have been several
15 follow-up questions, but among them would
16 definitely have been a question about
17 whether the property was rented through
18 Airbnb, Vrbo, or a similar service.
19      Q.   And I pointed to the
20 **supplemental dwelling application**
21 **earlier.  Does Mt. Hawley have its own**
22 **standard form dwelling application?**
23      A.   Supplemental application,
24 yes.
25      Q.   And is that information

40

1  **regarding Airbnb, Vrbo, is that on**
2  **Mt. Hawley's own supplemental**
3  **application?**
4       A.   I haven't reviewed that
5  application, but it is my understanding
6  that there is a question or questions on
7  it that would be substantially similar to
8  the one on the RSUI supplemental
9  application.
10      Q.   Okay.  And when you say
11 **"substantially similar to the one on the**
12 **RSUI," do you -- are you saying it would**
13 **say short-term rentals or it would**
14 **specifically mention Airbnb, Vrbo, and**
15 **other service?**
16      A.   Not having reviewed the
17 Mt. Hawley version of the supplemental
18 application for rental dwellings, I can't
19 answer that question as I sit here, but
20 it is my understanding that it has a
21 question designed to elicit the type of
22 information we've been talking about with
23 respect to short-term rentals.
24      Q.   Okay.  Let me return to the
25 **underwriting guidelines we have here.**

41

1  **You can still see these on my screen,**
2  **correct?**
3       A.   Yes.
4       Q.   Okay.  Thank you.  Do you
5  **know when these underwriting guidelines**
6  **were first promulgated by Mt. Hawley?**
7       A.   I believe in 2016.
8       Q.   2016.  And how often, if
9  **regularly, are they updated?**
10      A.   I don't know how often or
11 regularly or if they are updated
12 regularly.  I know, over time, changes
13 have been made to these guidelines
14 generally, but it's my understanding that
15 the guidelines pertaining to short-term
16 rentals, Airbnb, Vrbo, have remained
17 unchanged since 2016.
18      Q.   Okay.  And who is it or what
19 **department is it within Mt. Hawley that**
20 **updates these underwriting guidelines?**
21      A.   The GBA underwriters.
22      Q.   Can you explain for me what
23 **the GBA underwriters are?**
24      A.   They are underwriters who
25 work for the GBA product.

MAGNA LEGAL SERVICES

**MAGNA** ▶
**LEGAL SERVICES**

42

```
 1        Q.   Okay.  And I'm scrolling
 2   down -- It looks like, at the bottom of
 3   this, this says version or V11/01/2020.
 4   Would that be the date that this
 5   particular iteration of the underwriting
 6   guidelines was promulgated?
 7        A.   It appears so, but I'm not
 8   -- I don't know, but that appears to be
 9   the case.
10        Q.   Okay.  How are Mt. Hawley's
11   underwriting guidelines provided to Bass?
12        A.   Do you mean in what medium
13   they're transmitted?
14        Q.   Yeah.
15        A.   I don't know.
16        Q.   Okay.  Fair to say either
17   e-mail or physical mail?
18        A.   It would have to be.  I know
19   that they have them.
20        Q.   Okay.  So I'm going to
21   scroll down in this.  Looking at the
22   underwriting guidelines, the Airbnb,
23   Vrbo, and other similar online rental
24   operations are listed under ineligible
25   risks, as you mentioned; is that correct?
```

43

```
 1        A.   Yes.
 2        Q.   What is the reason for the
 3   inclusion of Airbnb, Vrbo, and similar
 4   rental operations as ineligible risks?
 5        A.   It's fairly standard in the
 6   insurance industry that Airbnb, Vrbo, and
 7   other similar types of rentals are very
 8   short-term rentals with high turnover and
 9   occupants and unfamiliarity with the
10   properties, which increases the risk of
11   loss.
12        Q.   Are all short-term rentals
13   ineligible risks?
14        A.   No.
15        Q.   In what circumstances would
16   short-term rentals not be ineligible?
17        A.   Well, certainly, it couldn't
18   be an Airbnb, Vrbo, or similar operation.
19   The rest of the answer, I would have to
20   defer to the underwriters for GBA, but
21   it's my understanding it's extremely rare
22   to issue a policy to a short-term rental.
23   And even in those rare cases, the premium
24   is certainly larger.
25        Q.   So, in this case, did
```

44

```
 1   Mt. Hawley ever receive a copy of the
 2   policy that was eventually issued to
 3   Beach Cruiser from Bass?
 4        A.   Yes.
 5        Q.   Yes?  Was that prior to
 6   issuance of the policy?
 7        A.   I don't know, but probably
 8   not.
 9        Q.   Okay.  Relatedly, was this
10   -- was Beach Cruiser's application for
11   insurance in this case referred to
12   Mt. Hawley?
13        A.   No.
14        Q.   Okay.  And the same
15   questions with respect to the renewal of
16   the Mt. Hawley policy issued to Beach
17   Cruiser in this case.  Would that have
18   ever been referred to Mt. Hawley by Bass?
19        MR. DELAHUNT:  Luke, can I
20   ask, are you referring to the
21   renewal of the policy at issue?
22        MR. KATZENMEIER:  Yes.
23   BY THE WITNESS:
24        A.   Now I'm confused because
25   there's two renewals.  There's the
```

45

```
 1   initial policy, then a first renewal,
 2   which I believe is the policy at issue in
 3   the declaratory judgment.  And then
 4   there's a second renewal in the
 5   subsequent year.
 6        Q.   Okay.  Let's go through both
 7   of them.  How about it?  So the first
 8   renewal, would it be correct to state
 9   that is the '21 to '22 policy period?
10        A.   Yes.
11        Q.   Okay.  And would that have
12   ever been referred to Mt. Hawley by Bass?
13        A.   It was not.
14        Q.   It was not.  Okay.  And you
15   mentioned a second renewal.  Is that for
16   the '22 to '23 policy period?
17        A.   Yes.
18        Q.   Okay.  And what date was
19   that renewal issued?
20        A.   I would have to see the
21   policy to answer that question.
22        Q.   Okay.  Would that have been
23   referred to Mt. Hawley by Bass?
24        A.   I don't believe that was
25   either.
```

12  (Pages 42 to 45)

46

1    Q.  Okay.  And for either of
2  those renewals, was there any
3  communication between Bass and Mt. Hawley
4  prior to the issuance of the renewal?
5    A.  I can't fully answer that
6  question because in my preparation for
7  this deposition, I only reviewed the
8  documents that had been produced in
9  discovery in the declaratory judgment
10  case; and the underwriting file for that
11  second renewal was not part of that
12  documentation.
13    Q.  Okay.  Let's see.  The
14  renewal that we just mentioned, the '22
15  to '23 policy period, is that also
16  subject to Mt. Hawley's now dismissed
17  recision claim in this case?
18    A.  I'm sorry.
19    MR. DELAHUNT:  Can you read that
20  back?
21    (Record read as requested.)
22    MR. DELAHUNT:  If you can
23  answer, go ahead.
24    MR. KATZENMEIER:  I can
25  rephrase if not.

47

1  BY THE WITNESS:
2    A.  I think that calls for a
3  legal conclusion.
4    MR. DELAHUNT:  I don't want
5  to interfere, but I will state I
6  don't know that's a legal
7  conclusion, but it would be
8  answered by the pleading prior to
9  withdrawal of the recision claim.
10  I'm not going to answer the
11  question for the witness, but --
12  BY MR. KATZENMEIER:
13    Q.  I think I can -- Let's do it
14  another way.
15    So I'll tell you what, I'm
16  going to stop sharing my screen on the
17  dwelling application.  And I'm going to
18  pull up correspondence issued in this
19  case.  Mr. Brownell, can you see my
20  screen?
21    A.  Yes.
22    Q.  Are you familiar with
23  this document?
24    A.  Can I ask you to scroll
25  through it quickly to the end, please?

48

1    Q.  Yeah.  Absolutely.  Just let
2  me know if I'm going too fast or too
3  slow.
4    A.  Okay.  You can jump to the
5  last page.  Yes, I recognize this
6  document.
7    Q.  Okay.  Can you tell me what
8  this document is?
9    A.  This was a dual purpose
10  letter sent to the insured to advise them
11  of a notice of recision of the policy
12  and, alternatively, to assert the
13  coverage defense based on the amended
14  conditions endorsement.
15    Q.  Okay.  And the date of this
16  letter is November 14, 2022, correct?
17    A.  Yes.
18    Q.  And I'm looking at the
19  Mt. Hawley policy number as GGL0026067.
20  Do you understand that to be connected to
21  the '21 to '22 policy period for the
22  Mt. Hawley policy?
23    A.  According to what's there in
24  the caption of that letter, yes.
25    Q.  Okay.  Thank you.  So

49

1  following up on my earlier question,
2  before we get too deep into this, would
3  the 2022 to '23 renewal period you've
4  mentioned also be included in this notice
5  of recision or does it just refer to the
6  '21, '22 policy period?
7    A.  It just refers to the '21,
8  '22 policy period.
9    Q.  So as we sit here today, as
10  far as you know, is the '22 to '23 policy
11  period still in effect?
12    A.  If you mean has that policy
13  been rescinded, no, it has not.
14    Q.  Okay.  Thank you, sir.  Did
15  Mt. Hawley accept a premium payment for
16  the '22 to '23 policy period?
17    A.  I assume it did.
18    Q.  Did Mt. Hawley accept a
19  premium payment for the '21 to '22
20  renewal period?
21    A.  I assume it did as well.
22    Q.  Okay.  Was the premium for
23  the '21 to '22 period ever returned?
24    A.  I don't believe it was.  I
25  believe it was offered, and this letter

13  (Pages 46 to 49)

50

1  will refer to itself in that regard.
2      Q.   And as far as you're aware,
3  was that offer ever accepted?
4      A.   I don't believe it was.
5      Q.   So, speaking generally, what
6  is your role, if any, in issuing
7  insurance policies on behalf of
8  Mt. Hawley?
9      A.   My role individually?
10      Q.   Yeah.
11      A.   I work in the Claims
12  Department.  I'm not an underwriter, so I
13  don't have any role in underwriting
14  coverage.
15      Q.   Okay.  So I assume -- the
16  same question as far as renewing
17  policies.  Do you have any role in
18  renewing policies?
19      A.   Same answer.
20      Q.   Okay.  And building on that,
21  did you have any role in issuing or
22  renewing the '21 to '22 renewal period
23  for the Mt. Hawley policy at issue in
24  this case?
25      A.   Individually, no.

51

1      Q.   Okay.  I'm going to --
2  Actually, I don't remember whether we
3  marked the November 14th letter as an
4  exhibit.  If not, let's mark it as
5  Nationwide Exhibit D.
6      (Nationwide Deposition Exhibit D
7       marked for identification.)
8  BY MR. KATZENMEIER:
9      Q.   Okay.  I'm going to share my
10  screen again with you, Mr. Brownell.  Can
11  you see my screen, Mr. Brownell?
12      A.   Yes.
13      Q.   Okay.  Do you recognize this
14  document?
15      A.   Can you scroll to the top?
16      Q.   Sure.
17      A.   Can you scroll down until I
18  say stop?
19      Q.   Yeah.  Absolutely.
20      A.   I'm just looking for a form
21  that identifies Beach Cruiser as the
22  insured.
23      Q.   Presumably, that would be in
24  the declarations page, correct?
25      A.   It actually refers to forms

52

1  below.  That's why I was having you
2  scroll down to the named insured form.
3      Q.   I can continue.
4      A.   It's coming.  There it is.
5  Yes.  Okay.  This appears to be the '21,
6  '22 policy issued to Beach Cruiser.
7      Q.   Okay.  And I'm going to zoom
8  in just a little bit.  Is that number --
9  The policy number at the top of the
10  screen, GGL0026067, is that consistent
11  with the policy number on the letter I
12  just showed you?
13      A.   I would have to see the
14  letter again to confirm, but I believe
15  that's the case, yes.
16      Q.   Okay.  All right.  I have it
17  up for you right here.
18      A.   Yes, it is.
19      Q.   Okay.  So I am going to take
20  you down to the amended conditions
21  endorsement.  Is this the endorsement
22  that is referred to in the complaint?
23      A.   Yes.
24      Q.   Okay.  And this is the
25  endorsement that Mt. Hawley is -- well,

53

1  has asserted that Beach Cruiser has made
2  representations based on?
3      A.   This is the endorsement that
4  Mt. Hawley is contending precludes
5  coverage for this loss.
6      Q.   Okay.  So is this a standard
7  endorsement in Mt. Hawley's policies?
8      A.   Yes.
9      Q.   Okay.  Now when we say
10  "standard," does that mean all Mt. Hawley
11  policies contain this form?
12      A.   I know, in the GBA product,
13  this form is mandatory on all policies.
14  And for other Mt. Hawley policies that
15  are not part of the GBA product, I do
16  believe it is also mandatory on theirs as
17  well, but I know for certain that this is
18  a mandatory endorsement on all policies
19  issued by GBA -- or through the GBA
20  product.
21      Q.   Okay.  And do you know how
22  long has this been a standard required
23  endorsement?
24      A.   Well, since early 2021,
25  March, I believe.



MAGNA LEGAL SERVICES

54

```
 1          Q.   March 2021.  Okay.  And I'm
 2    going to -- it looks like I don't have it
 3    bookmarked here, but it's actually the
 4    next page.  So I'm looking at the service
 5    of suit and conditions endorsement.  Can
 6    you see that on my screen?
 7          A.   Yes.
 8          Q.   Okay.  Under Condition 1,
 9    Section BB, it says:  Choice of law.
10          It says:  All matters
11    arising hereunder, including questions
12    related to validity, interpretation,
13    performance, and enforcement for this
14    policy shall be determined in accordance
15    with the law and practice of the State of
16    New York notwithstanding New York's
17    conflicts of law rules.
18          Did I read that correctly?
19          A.   Yes.
20          Q.   Okay.  Do you understand
21    that to mean that New York's laws -- that
22    this policy must be interpreted in
23    accordance with New York's laws?
24          A.   That's a legal question,
25    but, yes, that's my understanding.
```

55

```
 1          Q.   Okay.  Now, as far as you
 2    understand, would that include statutes,
 3    regulations?
 4          A.   What statutes or
 5    regulations?
 6          Q.   Just New York's statutes and
 7    regulations.  Put another way:  If there
 8    were states whose statutes and
 9    regulations applied to the interpretation
10    of this policy, would it be New York's?
11          A.   I'm not sure that this
12    endorsement makes this policy subject to
13    any particular New York statute.
14          Q.   I guess put another way:  Is
15    this choice of law provision here why
16    recision was issued pursuant to -- or
17    recision was asserted, I'll say,
18    according to New York Insurance Law 3105
19    in the recision letter?
20          A.   That's a legal question, and
21    that would have been the purview of claim
22    counsel in conjunction with outside
23    coverage counsel.  I can't answer that
24    question.
25          Q.   Okay.  Who was the party
```

56

```
 1    responsible for issuing the November 14th
 2    recision letter?
 3          A.   It has two signatories,
 4    David Hoffman and Eric White.
 5          Q.   Okay.  And we've discussed
 6    Hoffman briefly, I believe.  Who is Eric
 7    White?
 8          A.   He is the head underwriter
 9    for the GBA product.
10          Q.   Okay.  And have you ever
11    communicated with Mr. White in connection
12    with this Mt. Hawley policy?
13          A.   Yes.
14          Q.   Okay.  When did you
15    communicate with Mr. White in connection
16    with this Mt. Hawley policy?
17          A.   Tuesday afternoon.
18          Q.   Tuesday afternoon.  Is that
19    the only time, or is that the last time?
20          A.   The only time.  Oh.  There
21    was a five or ten-minute follow-up
22    conversation with him yesterday
23    afternoon.
24          Q.   Okay.  And what was the
25    subject of that conversation?
```

57

```
 1          A.   Both of those conversations
 2    occurred in preparation for this
 3    deposition with Mr. Delahunt, our
 4    attorney, present.
 5          Q.   Okay.  Let's see here.  The
 6    New York choice of law provision that I
 7    showed you earlier on the Mt. Hawley
 8    policy -- and if you would like me to go
 9    back to that, I can.  Just let me know --
10    is that standard in Mt. Hawley policies?
11          A.   It is now.
12          Q.   When you say "now," what do
13    you mean?
14          A.   That endorsement has only
15    existed for a few years, three to
16    four years, so, obviously, before that,
17    we wouldn't have been using it.
18          Q.   Okay.  Did Mt. Hawley have a
19    different standard choice of law prior to
20    that?
21          A.   Had a different service of
22    suit endorsement, yes.
23          Q.   Did that previous service of
24    suit endorsement contain a choice of law
25    provision?
```

15  (Pages 54 to 57)

58

1          A.   I don't remember.
2          Q.   Okay.  Going to -- I'm going
3     to return to the policy.  And I believe
4     we should mark the Mt. Hawley policy for
5     the '21 to '22 period as Nationwide
6     Exhibit E, I think we're on now.
7              (Nationwide Deposition Exhibit E
8          marked for identification.)
9              THE COURT REPORTER:  Yes,
10    we're on E.
11             MR. KATZENMEIER:  Okay.
12    Thank you very much.
13    BY MR. KATZENMEIER:
14         Q.   Mr. Brownell, are you
15    familiar with the terms and endorsements
16    of this particular policy?
17         A.   Generally, yes.
18         Q.   Okay.  As far as you are
19    aware, is there a -- any exclusion or
20    endorsement to the policy specifically
21    referring to Airbnb or Vrbo?
22         A.   I don't think those terms
23    are referenced by name in the policy, no.
24         Q.   How about any similar
25    short-term rental service specifically or

59

1     generically?
2          A.   No.
3          Q.   Why is that?  Why would
4     there not be any such exclusion or
5     endorsement?
6          A.   There wouldn't need to be.
7     It would have been handled during the
8     underwriting process.
9          Q.   Okay.  Would that have --
10    Strike that.
11              Okay.  So I'm looking at the
12    November 14th letter noticing the
13    recision of the Mt. Hawley policy.  This
14    is Nationwide Exhibit D.  What led to the
15    decision to issue this recision letter?
16         A.   Generally speaking, it would
17    have been the sum and substance of David
18    Hoffman's coverage investigation and most
19    likely consultation with claim counsel.
20         Q.   Okay.  And is there a reason
21    that this letter was not issued until
22    November 14th when, as you said, final
23    confirmation of the use of the property
24    took place in September?
25              MR. DELAHUNT:  Object to the

60

1          form.  Kevin can answer.
2     BY THE WITNESS:
3          A.   I'm not really sure what you
4     mean by "a reason," but this letter is
5     dated November 14th, 2022.  It says what
6     it says, and it is the sum and substance
7     of the coverage investigation and
8     coverage evaluation.
9          Q.   Well, let's put it this way:
10    Take me through the process that resulted
11    in this letter after final confirmation
12    of the use of the property in
13    September 2022.
14         A.   David Hoffman would have
15    considered all those facts that he had
16    acquired during his investigation.  He
17    would have reviewed the policy and likely
18    re-reviewed the policy.  And then he
19    likely would have consulted with claim
20    counsel.
21         Q.   Okay.  And all of this would
22    have occurred in September/October 2022;
23    is that --
24         A.   It would have occurred
25    between September 2, 2022, and whatever

61

1     date this particular letter was drafted
2     on, which I assume would have been
3     shortly before November 14th, 2022.
4              MR. KATZENMEIER:  Okay.
5     Let's see.  I have some more, but
6     this might be a good time to take
7     a break since we're at an hour and
8     a half.  Does that sound good to
9     you guys?
10             MR. DELAHUNT:  Yes.  Sure.
11    Do you want to say 10:35, 10:40?
12    What do you prefer?
13             MR. KATZENMEIER:  You're
14    working on Central Time, aren't
15    you?
16             MR. DELAHUNT:  I am.  Sorry.
17    Yeah.  Just adjust it an hour.
18             MR. KATZENMEIER:  Yeah.  I
19    think 11:35 should work for us.
20             MR. DELAHUNT:  Okay.  We'll
21    see you then.
22             (A short break was had.)
23    BY MR. KATZENMEIER:
24         Q.   So I'm going to pull up
25    another document on my screen for you,



62

```
 1      Mr. Brownell.  Can you see my screen
 2  right now?
 3      A.  Yes.
 4      Q.  And can you read what's on
 5  it?  I can zoom in if not.
 6      A.  No.  That's fine.  I can
 7  read it.
 8      Q.  Okay.  Does this look
 9  familiar to you?
10      A.  Yes.  It looks like a
11  printout of our claim file notes.
12      Q.  Okay.  Yeah.  And I'll tell
13  you right now it's not the full claim
14  notes.  It's just a brief portion of it.
15  These claims notes were authored by David
16  Hoffman, correct?
17      A.  Yes.
18      Q.  That's what it says right
19  here.  I'm going to scroll down to this
20  August 18, 2022, entry.  And is it
21  correct that that entry entered by David
22  Hoffman says:  Info from Airbnb website.
23  See screenshots from Airbnb website saved
24  to file on this date.  Reflects Flyway
25  joined as host in July 2018.
```

63

```
 1      Is that correct?
 2      A.  Yes.
 3      Q.  And reflects a user review
 4  of the subject property dating back to
 5  September 2018; is that right?
 6      A.  It says that, yes.
 7      Q.  Okay.  So my question is:
 8  What would have prompted Mr. Hoffman to
 9  investigate Airbnb's website in
10  connection with this claim note?
11      A.  That likely would have been
12  his initial conversation with the insured
13  wherein he was advised that this property
14  was being used as an Airbnb property at
15  the time of the loss.
16      Q.  Okay.  Going back to the
17  supplemental dwelling application we
18  discussed earlier, are there ever
19  instances where -- as far as you're
20  aware, where Bass has issued policies
21  with short-term rentals involved without
22  referring them to Mt. Hawley?
23      A.  I'm not aware of any such
24  instances.
25      Q.  Okay.  And so if Bass, for
```

64

```
 1  example, knew that the property was being
 2  used as a short-term rental and issued
 3  the policy anyway without referring it to
 4  Mt. Hawley, what would be Mt. Hawley's, I
 5  suppose, process of resolving that
 6  dispute with Bass?
 7      MR. DELAHUNT:  I'm going to
 8      object to the form.  You can
 9      answer, if you can.
10  BY THE WITNESS:
11      A.  That would be a clear
12  violation of the underwriting guidelines
13  provided by Mt. Hawley to Bass.  And
14  beyond that, I'm unaware of it ever
15  happening, so I'm not really sure if I
16  can answer that question as to what the
17  process would be.
18      Q.  Okay.  If there ever were an
19  instance where Bass had issued a policy
20  where a short-term rental was involved
21  and Mt. Hawley had discovered that, would
22  there be a record of that?
23      MR. DELAHUNT:  Same
24      objection.
25  BY THE WITNESS:
```

65

```
 1      A.  I'm not sure.
 2      Q.  Okay.
 3      A.  Again, I'm not aware that
 4  that's ever happened.
 5      Q.  If Bass had known that the
 6  property owned by Beach Cruiser was being
 7  used as a short-term rental and issued
 8  the policy anyway without referring the
 9  matter to Mt. Hawley, would that still be
10  a basis for denial of coverage based on
11  Mt. Hawley's amended conditions
12  endorsement?
13      MR. DELAHUNT:  Same
14      objection.
15  BY THE WITNESS:
16      A.  It's a hypothetical, so it's
17  difficult to answer a hypothetical that
18  didn't actually happen, but it very well
19  could be.
20      Q.  Okay.  Would Mt. Hawley,
21  generally speaking, be entitled to deny
22  coverage based on the amended conditions
23  endorsement in the policy even if the
24  mistake was a typo?
25      MR. DELAHUNT:  Same
```

17 (Pages 62 to 65)

66

```
 1        objection.
 2   BY THE WITNESS:
 3        A.   It's a little difficult to
 4   respond to that question because the
 5   answer to that question on the
 6   supplemental application isn't one that
 7   the insured -- or the retail agent can
 8   type an answer into, so there wouldn't be
 9   a typo.  They have to check a box yes or
10   no.
11        Q.   So I mentioned we're
12   speaking generally now.  So putting
13   aside, for the moment, the specific
14   supplemental dwelling application filled
15   out or submitted on behalf of Beach
16   Cruiser.  Generally speaking, if Bass had
17   received an application with a typo in it
18   and then issued a policy without
19   referring to Mt. Hawley based on that
20   application containing a typo, would a
21   typo -- could a typo serve as the basis
22   for denial under the amended conditions
23   endorsement in the Mt. Hawley policy?
24             MR. DELAHUNT:  Same
25        objection.
```

67

```
 1   BY THE WITNESS:
 2        A.   There's no way to answer
 3   that question generally.  It would really
 4   depend on the particular facts and
 5   circumstances surrounding the typo at
 6   issue.
 7        Q.   Okay.  Let's see.  I believe
 8   I've got another exhibit to pull up for
 9   you, but I believe we need to mark the
10   claim note I have presently as Nationwide
11   Exhibit F.
12        (Nationwide Deposition Exhibit F
13         marked for identification.)
14   BY MR. KATZENMEIER:
15        Q.   Okay.  I'm pulling up
16   another document for you, Mr. Brownell.
17   Do you see my screen?
18        A.   Yes.
19        Q.   And can you read the
20   document that I've pulled up?
21        A.   Yes.
22        Q.   Okay.  Do you recognize the
23   document that I've pulled up?
24        A.   Can you scroll to the
25   signature page, please?
```

68

```
 1        Q.   Yes, sir.
 2        A.   Okay.  Yes, I do recognize
 3   this document.
 4        Q.   Okay.  What is the document
 5   that I have pulled up?
 6        A.   This is a letter that David
 7   Hoffman sent to Beach Cruiser to
 8   reiterate its prior coverage position,
 9   which we do when an amended complaint has
10   been filed.
11        Q.   Okay.  And was it an amended
12   complaint filed in this case that
13   prompted the sending of this letter?
14        A.   Yes.
15        Q.   Okay.  Is there any change
16   in Mt. Hawley's position, from the
17   previous letter to this letter, with
18   regard to its position on defense in the
19   underlying action?
20        A.   No.  And, as a matter of
21   fact, the prior letter you're referring
22   to, as it's stated there in the second
23   paragraph, is fully incorporated into
24   this letter.
25        Q.   Okay.  So the two letters
```

69

```
 1   are consistent with each other, in other
 2   words?
 3        A.   Other than the fact that
 4   each one is in reference to a different
 5   version of the complaint, yes.
 6        Q.   Okay.  And you said it was
 7   standard to issue these types of letters
 8   when an amended complaint is filed; is
 9   that correct?
10        A.   Yes.
11        Q.   Okay.  And whose decision
12   would it have been to issue this
13   follow-up letter?
14        A.   Mr. Hoffman's.
15        Q.   Mr. Hoffman.  Is there
16   anybody else involved in that decision?
17        A.   No.
18        Q.   And would it have been
19   Mr. Hoffman drafting this letter?
20        A.   Usually.  Typically, it
21   would be, yes.
22        Q.   Okay.  And, just to cover
23   all the bases, the policy number listed
24   on this letter is the same as on the
25   prior letter and on the '21 to '22
```

18  (Pages 66 to 69)

70

```
 1    renewal, correct?
 2        A.   Yes.
 3        Q.   Okay.  Thank you.  And I
 4    believe we should mark this as Nationwide
 5    Exhibit G, if I remember my alphabet.
 6             And this follow-up letter,
 7    do you know when the decision to issue a
 8    follow-up letter would have been made?
 9        (Nationwide Deposition Exhibit G
10         marked for identification.)
11    BY THE WITNESS:
12        A.   Sometime following receipt
13    and review of the amended complaint.
14        Q.   Okay.  Thank you.  Is
15    Mt. Hawley seeking the recovery of
16    attorney's fees that are already expended
17    to defense of the underlying action as
18    part of its DJ, or declaratory judgment
19    action?  Sorry.
20        A.   I would have to refer you to
21    the DJ complaint itself.
22        Q.   Okay.  Do you know the
23    extent of attorney's fees or defense
24    costs incurred by Mt. Hawley to date with
25    respect to the underlying action?
```

71

```
 1        A.   I don't.
 2        Q.   You don't.  Okay.  Does
 3    Mt. Hawley have those figures available
 4    anywhere?
 5        A.   Yes.
 6        Q.   Okay.  So going back to the
 7    declaratory judgment complaint we were
 8    just talking about, is it correct that
 9    Mt. Hawley has agreed to dismiss its
10    recision count in the first amended
11    declaratory judgment complaint in this
12    action?
13        A.   It's my understanding that
14    the recision count was withdrawn, yes.
15        Q.   Okay.  Without -- Again
16    here, I'm not asking for advice of
17    counsel or anything, just purely
18    administrative.  What was the internal
19    procedure within Mt. Hawley leading up to
20    the dismissal of the recision count?
21        A.   That would have been a legal
22    strategic question addressed by
23    Mt. Hawley's claim counsel and outside
24    coverage counsel.
25        Q.   Okay.  Who is the individual
```

72

```
 1    that would have made the final call as to
 2    whether to dismiss that recision count?
 3        A.   Ms. Kanellakes.
 4        Q.   That was Dana Kanellakes; is
 5    that correct?
 6        A.   Yes.
 7        Q.   Okay.  I have another letter
 8    here.  We'll stop sharing my screen.
 9             Okay.  I'm going to share my
10    screen with you once again, Mr. Brownell.
11    Can you see my screen?
12        A.   Yes.
13        Q.   Okay.  And can you read what
14    is on my screen right now?
15        A.   Yes.
16        Q.   Okay.  And this is a letter
17    filed in the declaratory judgment action
18    by your counsel, correct?
19        A.   I don't know if it was filed
20    or not.
21        Q.   Do you see at the time top
22    of the screen this blue lettering, blue
23    text?
24        A.   Yes.
25        Q.   Does that say filed on
```

73

```
 1    September 11, 2023?
 2        A.   Yes.
 3        Q.   Okay.  So would it be
 4    reasonable to assume this was filed in
 5    the declaratory judgment action on
 6    September 11, 2023?
 7        A.   I honestly don't know if
 8    this was filed or not, but that's what it
 9    appears.
10        Q.   I only have a brief question
11    on this letter.  So this is -- this
12    letter appears to have been signed by
13    your counsel; is that correct?
14        A.   Yes.
15        Q.   Okay.  And I just want to
16    draw your attention to this one sentence
17    here.  I can highlight it.  Let me know
18    if you can see my highlighting.
19        A.   I can see it.
20        Q.   Okay.  It says:  However,
21    after internally reviewing the matter,
22    Mt. Hawley agreed to discontinue that
23    cause of action only.
24             Is that correct?
25        A.   Yes.
```

MAGNA LEGAL SERVICES
MAGNA
LEGAL SERVICES

74

1      Q.   Reading the rest of the
2  paragraph -- and we can take a moment if
3  you need to -- do you understand the
4  reference to that cause of action only
5  within that paragraph to refer to the
6  recision cause of action?
7      A.   That's how I understand it,
8  yes.
9      Q.   Okay.  My specific question
10 here is:  The sentence's reference to
11 "after internally reviewing the matter,"
12 was there any document or fact discovered
13 during your internal review that led to
14 the decision to withdraw the recision
15 cause of action?
16     A.   The internal review
17 referenced in this letter is consultation
18 between Mr. Delahunt and
19 Ms. Kanellakes.
20     Q.   So I'm not asking you for
21 anything your counsel told you, but is
22 there any document in Mt. Hawley's
23 possession that led to the decision to
24 withdraw the recision cause of action?
25     A.   I don't have any information

75

1  regarding the internal review referenced
2  in this letter other than what I've been
3  told by counsel.
4      (Nationwide Deposition Exhibit H
5       marked for identification.)
6      MR. KATZENMEIER:  Okay.  And
7  this was filed in the action.  We
8  might as well go ahead and mark
9  this as Nationwide Exhibit H.
10     Now I might have a bit more
11 after reviewing stuff, but, Ray,
12 if you -- do you have anything?
13     MR. PIERANTONI:  Yeah.  I
14 have some questions.
15     CROSS-EXAMINATION
16 BY MR. PIERANTONI:
17     Q.   Mr. Brownell, I sort of get
18 confused with the name identification
19 with the photo as well, so I apologize if
20 I call you Mr. Delahunt at some point.
21     MR. DELAHUNT:  We switched
22 computers because Kevin's wasn't
23 --
24     MR. PIERANTONI:  It's okay.
25 It's okay.  It will be on me, so

76

1  don't worry about it.
2      Luke, is there any way you
3  can switch the sharing screen and
4  give me rights to share as well?
5  The court reporter can?
6      MR. KATZENMEIER:  I believe
7  the reporter could.  I don't think
8  I'm the host of this.  Am I
9  correct in that, Ms. Kuipers?
10     THE COURT REPORTER:  I
11 believe that the tech that's on is
12 the host.
13     MR. PIERANTONI:  It looks
14 like I can.  Okay.  One second.
15     Okay.  Did it show up?
16     THE WITNESS:  Yes.
17     MR. PIERANTONI:  It has.
18 Okay.  It showed up for you guys,
19 but not for me, so ...
20 BY MR. PIERANTONI:
21     Q.   Okay.  All right.
22 Mr. Brownell, you understand that you're
23 giving your deposition testimony today
24 not individually as a fact witness, but
25 on behalf of the company, Mt. Hawley

77

1  and/or RLI?
2      A.   Yes.
3      Q.   Okay.  And you're here to --
4  you're appearing pursuant to this notice
5  of deposition that appears in front of
6  you.  Would you like to look at the
7  entire document just to be sure?
8      A.   That appears to be it, yes.
9      Q.   I'll scroll down just to
10 show you the signature at the bottom,
11 okay?
12     A.   Yes.
13     Q.   So who designated you to be
14 the corporate designee for these topics,
15 for the topics listed, 1 through 14 on
16 pages 6 and 7?
17     A.   Claim counsel.
18     Q.   Claim counsel.  Okay.  And
19 that's Ms. Kanelkallakes (phonetic)?
20     A.   Kanellakes.
21     Q.   Kanellakes.  I'm sorry.
22     Why were you designated to
23 testify as to all these topics?
24     MR. DELAHUNT:  Objection,
25 but you can answer as long as you

MAGNA LEGAL SERVICES

78

```
 1        don't testify to any
 2     communications with counsel.
 3  BY MR. PIERANTONI:
 4     Q.  Absolutely not.  I'm not
 5  asking for any privileged communications.
 6     A.   I don't have any independent
 7  knowledge as to why I was selected other
 8  than what I was told by claim counsel.
 9     Q.  Do you understand the
10  subject matter areas, 1 through 14, that
11  you are testifying about?  Do you have
12  lack of understanding as to what these
13  topics are about?
14     A.   Yes, with the exception that
15  I'm not privy to any communications or
16  discussions that went on between and
17  among counsel in this case as to the
18  scope of those topics and what may or may
19  not have been agreed to or eliminated,
20  but I can see the ones that appear on the
21  screen.
22     Q.  Okay.  But you are the
23  person that has been designated by
24  Mt. Hawley as the person most
25  knowledgeable about each of these topics,
```

79

```
 1  correct?
 2        MR. DELAHUNT:  Objection.
 3     There's no representation under
 4     30(b)(6) that he's most
 5     knowledgeable.  He's been produced
 6     as a 30(b)(6) witness to be
 7     reasonably prepared within the
 8     federal rules.
 9        MR. PIERANTONI:  I would
10     dispute that contention.
11  BY MR. PIERANTONI:
12     Q.  Let me ask this --
13        MR. DELAHUNT:  Ray, with all
14     due respect, you can dispute it.
15     If you wanted a 30(b)(1)
16     deposition of the person most
17     knowledgeable, that's how you
18     notice it.  That's not how
19     30(b)(6) works.
20        MR. PIERANTONI:  I
21     understand how 30(b)(6) works.
22        MR. DELAHUNT:  It's not our
23     obligation to provide the most
24     knowledgeable, just a prepared
25     witness.
```

80

```
 1  BY MR. PIERANTONI:
 2     Q.  Okay.  Is there anyone else
 3  in Mt. Hawley that's more knowledgeable,
 4  to your knowledge, about each of these
 5  topics or any of these topics than you?
 6     A.   I'm not sure what that
 7  means.
 8     Q.  Sure.  Is there anybody that
 9  you're aware of at Mt. Hawley who is more
10  knowledgeable than you about any of these
11  topics?
12     A.   It depends on which topic
13  you're talking about.  There are various
14  people in this company that have various
15  different roles and have different
16  knowledge levels about different topics.
17     Q.  Okay.  Well, we can go
18  through each.  It's not a long list.
19        With regard to the amended
20  conditions endorsement that Mt. Hawley is
21  relying on in the first amended
22  complaint, are you aware of anybody that
23  has more knowledge than you about the
24  basis for this topic?
25     A.   I have two issues with that
```

81

```
 1  question.  One, I don't know what other
 2  people's knowledge are.  I only know what
 3  my knowledge is.  And, No. 2, I'm not
 4  sure what more knowledge about an
 5  endorsement would mean.
 6     Q.  Okay.  Mr. Eric Wright
 7  [sic], you remember you mentioned him
 8  today?
 9     A.   Eric White, yes.
10     Q.  Right.  And he was a
11  signatory to the initial disclaimer
12  letter, I believe?
13     A.   Yes.
14     Q.  Do you know if you had
15  conversations -- and I'm not asking you
16  to divulge because I know counsel was
17  present.  Do you know, from those
18  conversations, if you walked away getting
19  the impression that Mr. White was more
20  knowledgeable than you about any of these
21  topics?
22     A.   No, other than he is the one
23  most familiar with the underwriting
24  process for the product that he oversees.
25     Q.  So he would be more
```

21 (Pages 78 to 81)

82

1  knowledgeable than you about the
2  underwriting process; is that a fair
3  statement?
4      A.   It would really depend on
5  what the question would be.
6      Q.   Generally speaking, though,
7  is he more knowledgeable about the
8  underwriting process than you are since
9  your background is in claims?
10     A.   I suppose that's true.
11         MR. PIERANTONI:  Okay.
12     Luke, do you want to go back in,
13     and then I can follow up later or
14     --
15         MR. KATZENMEIER:  You can
16     keep going for now if you want.
17     I've got a couple more, but I'm
18     writing them down.
19 BY MR. PIERANTONI:
20     Q.   Okay.  Mr. Brownell, how
21  important is it that Bass follow
22  Mt. Hawley's underwriting guidelines?
23     A.   I would say it's very
24  important.
25     Q.   Is it expected that they're

83

1  to follow those guidelines strictly?
2      A.   Yes.
3      Q.   And not deviate from them,
4  right?
5      A.   Correct.
6      Q.   And you stated that not to
7  your knowledge, you're not aware at least
8  of Bass ever deviating from those
9  guidelines, correct?  That's your
10  testimony today?
11     A.   Yes.
12     Q.   But it doesn't mean that it
13  didn't happen, correct?
14         MR. DELAHUNT:  Form.
15 BY THE WITNESS:
16     A.   That's true.
17     Q.   Okay.  Is it possible that
18  Mr. Wright might be aware of an instance
19  where Bass -- Since he's the head of
20  underwriting, is it possible that
21  Mr. Wright is more knowledgeable or might
22  have knowledge as to Bass deviating from
23  those guidelines that you're not aware
24  of?
25     A.   It's possible.

84

1          THE COURT REPORTER:  I'm
2      sorry.  I didn't hear your
3      objection, if you objected to
4      that.
5          MR. DELAHUNT:  Yes.  I just
6      said objection.
7  BY MR. PIERANTONI:
8      Q.   Earlier today, you were
9  asked about the documents reviewed.  Do
10  you remember that, Mr. Brownell?
11     A.   Yeah.
12     Q.   Okay.  And you said that you
13  had generally reviewed the complaint, but
14  not, I guess, fully?
15     A.   I didn't read it word for
16  word, but I have seen our declaratory
17  judgment complaint at some point.
18     Q.   Okay.  Were you able to
19  review the counterclaims filed by my
20  clients?  Just for the record, my
21  clients, as you know, are the insureds,
22  Flyway and Beach Cruiser.  Were you able
23  to review the counterclaims that were
24  filed against Mt. Hawley?
25     A.   No, I have not.

85

1      Q.   Are you aware that the
2  counterclaims -- one of the counterclaims
3  involves the fact that a premium payment
4  was received by Mt. Hawley for renewal of
5  the policy on the 2022, 2023 period?
6      A.   The only information I have
7  regarding that topic would be what I've
8  learned from counsel.
9      Q.   And are you aware that the
10  allegations -- one of the allegations in
11  the counterclaims is that Mt. Hawley
12  cashed that premium after knowing
13  everything that they needed to know --
14  Well, let's rephrase that.
15          Are you aware that the
16  allegation claims that Mt. Hawley cashed
17  that premium after being made aware of
18  the short-term rentals that existed at
19  the property?
20         MR. DELAHUNT:  Objection.
21 BY THE WITNESS:
22     A.   I am aware that that is
23  Beach Cruiser's contention, yes.
24     Q.   And are you aware if the
25  premium that was charged for the 2202,

MAGNA LEGAL SERVICES

MAGNA ▶
LEGAL SERVICES

86

```
1    2023 period was significantly different
2    than the premium for the previous year?
3        A.   I don't know what the
4    relative premiums were.  I would have to
5    look at the policy declarations pages to
6    answer that question.
7        Q.   Okay.  You testified earlier
8    that the -- Mr. Hoffman became aware of
9    the short-term rentals at a certain
10   point, correct?
11       A.   Yes.
12       Q.   Do you recall what time
13   period that was -- the earliest time
14   period he became suspicious of the
15   short-term rentals?
16       MR. DELAHUNT:  Objection.
17   BY THE WITNESS:
18       A.   I don't believe it was
19   anything regarding suspicion.  I know
20   that at one -- on an early, if not the
21   first phone call with the insured that
22   Mr. Hoffman had, he learned during that
23   phone call that this property at issue,
24   at the time of the loss, was being rented
25   out through Vrbo and Airbnb.
```

87

```
1        Q.   So there's no evidence that
2    you have on behalf of Mt. Hawley -- Since
3    you're testifying on their behalf,
4    there's no evidence that Mt. Hawley has
5    of any nefarious conduct taken by my
6    client to hide the ball from Mt. Hawley
7    on the short-term rentals?
8        MR. DELAHUNT:  Objection.
9    BY THE WITNESS:
10       A.   Other than the
11   misrepresentation on the supplemental
12   application, no.
13       Q.   Okay.  And in what way was
14   that misrepresentation?  Let's focus on
15   the application for a second.
16       In what way was the --
17   Specifically, what way was the
18   application misrepresenting anything that
19   led Mt. Hawley to dispute coverage?
20       A.   I would need to see the
21   verbiage of that particular question on
22   the supplemental application to fully
23   answer that question, but, generally, the
24   insured was asked if the properties for
25   which they were seeking insurance were
```

88

```
1    being used as short-term rentals, and
2    they answered no.
3        MR. PIERANTONI:  Luke, is it
4    possible to bring up that
5    application?
6        MR. KATZENMEIER:  The
7    application for insurance?
8        MR. PIERANTONI:  Yeah.
9        MR. KATZENMEIER:  Yeah, I
10   can do that.  I believe you will
11   have to stop sharing your screen
12   for me.
13   BY MR. PIERANTONI:
14       Q.   Okay.  Is this the
15   application?  And I'm referring -- I know
16   it's a supplemental application, so if I
17   use the terms interchangeably, I'm
18   referring to this document so we're on
19   the same page.
20       Is this the application that
21   you're referring to with regard to the
22   answer to the question that represents
23   the misrepresentation in this case?
24       A.   Yes.
25       Q.   Okay.  And what question is
```

89

```
1    that again?
2        A.   It's part 2 of Question No.
3    3.
4        Q.   Right.  And if you could
5    read that out loud for the record.
6        A.   "Are any properties rented
7    by the day or by the week?"
8        Q.   And the answer to that
9    was ...
10       A.   No.
11       Q.   Okay.  Now, that's a part 2
12   to the question, correct?
13       A.   Yes.
14       Q.   Part 1 to the question asks
15   what?
16       A.   "What is the average monthly
17   rent?"
18       Q.   Okay.  And did my client
19   answer that question?
20       A.   Through their retail agent,
21   yes.
22       Q.   Well, the answer is provided
23   in the, application, correct?
24       A.   Correct.
25       Q.   And what is the answer to
```

23  (Pages 86 to 89)

90

```
 1      what is the average monthly rent?
 2          A.  For a one-bedroom property,
 3      $1,000, for a two-bedroom property --
 4      it's a little small, but it looks like
 5      $1,800.  And then for a three-bedroom, it
 6      looks like $3,000, but the print's a
 7      little small.
 8          Q.  So is it safe to assume, in
 9      answering that question, that they were
10      acknowledging that they were renting out
11      the property on a monthly basis?
12          MR. DELAHUNT:  Objection.
13      BY THE WITNESS:
14          A.  It indicates that they were
15      being paid for renting out that property
16      on a monthly basis.
17          Q.  Well, you would agree a
18      tenant wouldn't pay for the rent of a
19      property unless it was being rented and
20      that tenant lived in it, correct?
21          MR. DELAHUNT:  Objection.
22      BY THE WITNESS:
23          A.  Yes, but you can have a
24      property that's rented out for two years
25      with a monthly rent, and you can have a
```

91

```
 1      property that's rented for two months
 2      with a monthly rent.
 3          Q.  So it's not really clear, is
 4      it?
 5          MR. DELAHUNT:  Objection.
 6      Ray, I'm going to direct him not
 7      to answer a question that that's
 8      argumentative.
 9          MR. PIERANTONI:  You can't
10      direct him not to answer a
11      question.  It's a fair question.
12      BY MR. PIERANTONI:
13          Q.  So I'll ask it again.  Is it
14      fair to say that this question is not
15      clear as to whether or not it's a monthly
16      rental in the course of a long-term lease
17      or a short-term lease?
18          A.  I don't think it's not
19      unclear because it's a separate question
20      from the subpart below it.
21          Q.  Okay.  Well, how do we know
22      that part A of the question refers only
23      to long-term rentals?  How do we know
24      that?
25          MR. DELAHUNT:  Objection.
```

92

```
 1      BY THE WITNESS:
 2          A.  It doesn't make that
 3      distinction.
 4          Q.  Right.  So it could be for
 5      short-term rentals as well, can't it?
 6          MR. DELAHUNT:  Objection.
 7      BY THE WITNESS:
 8          A.  You would make the
 9      assumption, based on how this application
10      is responded to, that it would not be
11      because they answered no to the question
12      "are there any properties rented by the
13      day or by the week."
14          Q.  I understand that, but we're
15      focusing on part A, right?  And all I'm
16      asking you, with regard to part A:  Is it
17      a fair assumption that it may be a
18      monthly rental for, let's say, a
19      six-month rental?
20          A.  That portion of the question
21      doesn't reference the length of the
22      lease.  It simply is asking how much
23      money do the tenants pay per month for
24      those properties.
25          Q.  That's correct.  I agree.
```

93

```
 1      However, my question is really just
 2      asking:  Are you able to tell from that
 3      question that the monthly rent is with
 4      regard to a long-term lease, a six-month
 5      lease, a three-month lease, a nine-month
 6      lease, a five-year lease?  Are you able
 7      to tell that from that question?
 8          A.  From that question, no.
 9          Q.  Right.  And we recall that
10      the underwriting guidelines from
11      Mt. Hawley define short-term rentals as
12      anything under 12 months, correct?
13          A.  Yes.
14          Q.  Okay.  Earlier, you
15      testified, sir, that you were aware of
16      Mr. Hoffman's communications on the
17      claim, but you did not necessarily
18      discuss with Hoffman anything with regard
19      to the claim; is that what you testified
20      to earlier?  I just want to make sure
21      that's clear.
22          A.  That's correct.  There was a
23      -- In conjunction with a call that
24      Mr. Delahunt was participating in, we did
25      bring in Mr. Hoffman to ask him one
```

24  (Pages 90 to 93)

94

1  specific question, but that's the extent
2  of any of my communications with him
3  regarding this claim.
4      Q.   Was that during the meeting
5  that you attended with Mr. Wright on
6  either -- I think you said this past
7  Tuesday or yesterday?
8      A.   No.  Mr. White was not on
9  that call.
10     Q.   Okay.  Are there any
11 discussions you had with Mr. Hoffman
12 regarding the claim that took place
13 outside the presence of counsel?
14     A.   No.
15     Q.   And the same question with
16 regard to Mr. Wright, just to be sure.
17     A.   Same answer.
18     Q.   Same answer.  Thank you.
19 Does Mt. Hawley consider USI to be an
20 agent on behalf of my client -- an
21 insurance agent?
22     A.   Yes.
23     Q.   Okay.  Does Mt. Hawley
24 consider Bass to be an agent on behalf of
25 Mt. Hawley?

95

1      A.   That's a legal conclusion
2  that I can't really speak to, but we do
3  give Bass the power to issue Mt. Hawley
4  policies on Mt. Hawley paper within the
5  underwriting guidelines.
6      Q.   Well, in fairness, the
7  previous question I asked you if USI was
8  considered an agent.  The same question
9  with two different people, you answered
10 the first and you claim the second one is
11 a legal conclusion.  So I'm just asking a
12 simple question.  If Bass is treated as
13 an agent from Mt. Hawley -- you said that
14 USI was an agent for my client.
15     A.   Okay.  That would also be a
16 legal conclusion, but to the best of my
17 knowledge, the answer to both is yes.
18     Q.   You testified also earlier
19 that Mt. Hawley -- and this goes to the
20 issue of how Bass has to strictly follow
21 these underwriting guidelines, sir.  You
22 testified earlier that Mt. Hawley relied
23 upon the underwriting application even
24 though it's not their own standard
25 underwriting application.  Do you

96

1  remember that testimony?
2      A.   I don't think that's
3  accurate.  I think Bass relied on that
4  application even though it's not a
5  Mt. Hawley application, but otherwise,
6  correct.
7      Q.   But Mt. Hawley would have
8  relied on Bass' reliance on that
9  application, correct?
10     A.   Yes.
11     Q.   And would have expected Bass
12 to follow the underwriting guidelines,
13 correct?
14     A.   Yes.
15     Q.   And not deviate from them at
16 all, right?
17     A.   They would not be expected
18 to deviate from the underwriting
19 guidelines, correct.
20     Q.   How important is it for an
21 insured to fill out the application for
22 insurance correctly?  How important is
23 that?
24     A.   It's critically important.
25     Q.   Okay.  Yet the application

97

1  that was used wasn't a Mt. Hawley
2  application, correct?
3      A.   Correct.  This is a common
4  happening in the insurance industry where
5  applicants for coverage may use a form
6  that happened to come from a different
7  insurer.
8      Q.   And the insurer in this case
9  was RSUI?
10     A.   That's what it says there on
11 the top, yes.
12     Q.   Do you know what that
13 acronym stands for?
14     A.   I don't.
15     Q.   Okay.  So Mt. Hawley relied
16 on an application for an insurance
17 company they're not aware of; that's your
18 testimony?
19         MR. DELAHUNT:  Objection.
20 BY THE WITNESS:
21     A.   No, that's not my testimony.
22     Q.   Okay.  Well, Bass relied on
23 the application?
24         MR. DELAHUNT:  Objection.
25 BY MR. PIERANTONI:

MAGNA LEGAL SERVICES
MAGNA ›
LEGAL SERVICES

98

```
 1        Q.   It's not a Mt. Hawley
 2   application, correct?
 3        A.   I took issue with the part
 4   of the question where you suggested that
 5   Mt. Hawley didn't know what RSUI was.  I
 6   just don't know what the acronym stands
 7   for.
 8        Q.   Okay.  If I asked it another
 9   way, what does RSUI stand for, are you
10   able to answer it that way?
11        A.   I know that they are another
12   insurer.  I just don't know what the
13   letters RSUI stand for.
14        Q.   Okay.  You had testified
15   also that your understanding of the
16   Mt. Hawley underwriting application
17   that's similar to this one -- this
18   supplemental one was worded differently
19   with regard to short-term rentals.  Do
20   you recall that testimony?
21        A.   I testified that I have not
22   reviewed that application, so I can't
23   confirm that it is the same as the RSUI
24   application.
25        Q.   Okay.  But you did testify
```

99

```
 1        -- and you can correct me if I'm wrong --
 2   that there were differences that you were
 3   aware of between the RSUI application and
 4   Mt. Hawley's?  You just couldn't be
 5   specific about it?
 6        A.   I don't know what the
 7   differences are.
 8        Q.   Wasn't your testimony
 9   earlier today, with regard to the RSUI
10   application vis-a-vis the Mt. Hawley
11   application, that you know that
12   Mt. Hawley's underwriting application
13   addresses short-term rentals, just not in
14   the same way as RUSI's?
15        A.   Given how important that
16   question -- that issue is to the
17   underwriting process, I'm confident that
18   a question designed to elicit that type
19   of information is in Mt. Hawley's rental
20   dwelling supplemental application.  If
21   you're going to ask me any specifics
22   about the wording of that question, I
23   can't answer it without seeing that
24   application.
25        MR. PIERANTONI:  Okay.  I'll
```

100

```
 1   ask this question for counsel.
 2   Counsel, do you know if that
 3   application form was produced in
 4   response to discovery in this
 5   case, the Mt. Hawley underwriting
 6   application form?
 7        MR. DELAHUNT:  It was not
 8   produced.
 9        MR. PIERANTONI:  Okay.  I
10   want to make a request for that
11   document to be produced, please,
12   in response since it's reasonably
13   calculated to lead to discovery of
14   admissible evidence.
15        MR. DELAHUNT:  I object to
16   the commentary on what it may lead
17   to.  Of course, I'll consider the
18   request for supplemental
19   production.  I would ask, just
20   because I may forget, that you
21   follow up sure in writing.
22        MR. PIERANTONI:  Sure.
23        MR. DELAHUNT:  Ray, it can
24   be in an e-mail.  You know, it can
25   be a formal demand.  I don't
```

101

```
 1   particularly care.  I just don't
 2   want to forget.
 3        MR. PIERANTONI:  I just want
 4   to have -- I think we should have
 5   a copy of that just so we can --
 6   Since the witness can't remember
 7   or recall or identify the
 8   distinctions between the two, I
 9   think it might be important in
10   this case.  That's all.
11        MR. DELAHUNT:  We can
12   disagree on that.
13        MR. PIERANTONI:  I'm sorry?
14        MR. DELAHUNT:  I don't --
15   Ray, if you say it's important,
16   then you're inviting me to explain
17   why it's not important, and I
18   don't want to do this during a
19   deposition.
20        MR. PIERANTONI:  Okay.  No,
21   we're not.  I'm going to make the
22   request.
23        MR. DELAHUNT:  No -- but
24   you're in front of a witness
25   stating that it's an important
```

MAGNA LEGAL SERVICES
MAGNA
LEGAL SERVICES

102

1    document.
2        MR. PIERANTONI:  It's not my
3    witness.  It's your witness.
4        MR. DELAHUNT:  This is a
5    deposition.
6        MR. PIERANTONI:  All right.
7    I'm just clarifying.  Your witness
8    doesn't know what that
9    underwriting application states,
10   right?
11       MR. DELAHUNT:  You already
12   asked him.
13       MR. PIERANTONI:  He's
14   testified he doesn't know what it
15   states, and I'm just saying I need
16   it produced.
17       MR. DELAHUNT:  Again, my
18   client --
19       MR. PIERANTONI:  If you want
20   to fight me over it, what he can
21   testify to, then I'll move on.
22   BY MR. PIERANTONI:
23       Q.  Let's see.  Are you aware of
24   any communication between Mt. Hawley and
25   Bass after the date of this application,

103

1    which is, I believe, September 2nd, 2020?
2    Are you aware of any communications
3    between Bass and Mt. Hawley regarding the
4    differences between Mt. Hawley's
5    underwriting application and this RSUI
6    application form?
7        A.   I'm aware of no such
8    communications.
9        Q.   What's the purpose for the
10   Underwriting Department to know whether a
11   short-term rental is an Airbnb, Vrbo,
12   versus some other short-term rental?
13       A.   Because Airbnb, Vrbo, and
14   similar services make a risk ineligible
15   for a Mt. Hawley policy under the GBA
16   program.
17       Q.   Okay, but short-term rentals
18   are not ineligible, correct?
19       A.   It depends on the facts and
20   circumstances surrounding that particular
21   short-term rental.
22       Q.   Okay, but were you able to
23   identify short-term rentals that would be
24   potentially covered?
25       A.   That's too general of a

104

1    question for me to answer.
2        Q.   Well, I'm just referring to
3    the underwriting guidelines that were
4    discussed earlier.
5        MR. PIERANTONI:  Luke, I
6    hate to bother you, but if you
7    could bring up that section of the
8    underwriting guidelines where they
9    make the distinction between the
10   two.
11       MR. KATZENMEIER:  Yeah.  So
12   short-term rentals is up here at
13   the top and the --
14       MR. PIERANTONI:  Yeah --
15       MR. KATZENMEIER:  -- at the
16   bottom.
17       MR. PIERANTONI:  Yeah.  It's
18   a few pages later.  It's the one
19   where -- there you go.
20   BY MR. PIERANTONI:
21       Q.   So you see at the top, the
22   top section says "submit," right?  That's
23   with regard to the referral process,
24   right, that Bass would undergo?
25       A.   That's an inexhaustive list

105

1    of that, but correct.
2        Q.   Right.  And under that
3    referral or submission process,
4    short-term or vacation rentals is listed,
5    right?
6        A.   Yes.
7        Q.   So it's not automatically
8    deemed ineligible at that point, correct?
9        A.   Correct.
10       Q.   Okay.  The only thing that's
11   listed as ineligible are Airbnb, Vrbo,
12   and similar online rental operations,
13   correct?
14       A.   Yes.
15       Q.   Okay.  But as you sit here
16   now, you can't testify as to the
17   difference between short-term or vacation
18   rentals and Airbnb, Vrbo, and similar
19   online rental operations?
20       MR. DELAHUNT:  Objection.
21   BY THE WITNESS:
22       A.   If coverage is going to be
23   issued for a short-term or vacation
24   rental, it would be reviewed by the
25   Mt. Hawley underwriter depending on the

27 (Pages 102 to 105)

106

```
 1   facts and circumstances, but in no
 2   situation would the policy be issued if
 3   it was Airbnb, Vrbo, or similar online
 4   rental operation.
 5        Q.   So is it fair to say that
 6   what you're saying is that Airbnb, Vrbo
 7   are sort of subsections or subheadings
 8   under short-term or vacation rentals; and
 9   if a short-term or vacation rental were
10   submitted and it came up Vrbo, no
11   coverage?
12        A.   Correct.  We would not issue
13   a policy in that situation.
14        Q.   And the same thing with
15   Airbnb, right?
16        A.   Yes.  Airbnb, Vrbo, and
17   similar online rental operations.
18        Q.   Right.  So similar online
19   rental operations means anybody that's on
20   the Internet that does that, that rents
21   out these properties, correct?  Is that
22   what you mean?  Is that what Mt. Hawley
23   means?
24        A.   I think that language on the
25   form that's on the screen speaks for
```

107

```
 1   itself, but it refers to Airbnb, Vrbo,
 2   and similar online rental operations.
 3        Q.   Okay.  Is there any of this
 4   -- any explanation of the distinction
 5   between short-term or vacation rentals
 6   and this subcategory of these other
 7   rentals?  Is there anything like that in
 8   the underwriting application that my
 9   client would have seen to understand that
10   distinction?
11        A.   This document is not part of
12   the underwriting application.  These are
13   part of the guidelines that Bass must
14   follow in issuing policies for
15   Mt. Hawley.
16        Q.   I take you at your word, but
17   what I'm taking you, though, is a
18   different question.  Is there anything in
19   the underwriting application itself that
20   points out to the insured that Mt. Hawley
21   makes this distinction between short-term
22   rentals -- between the various types of
23   short-term rentals?
24        A.   In this particular case,
25   only the question that we've been
```

108

```
 1   referring to about rentals by the day or
 2   by the week.
 3        Q.   Or references to the monthly
 4   average rent, correct?
 5        A.   I don't believe that
 6   question is relevant to any of these
 7   issues.
 8        Q.   Is it not -- Not to beat a
 9   dead horse, but given that's what you
10   just stated, I'm just going to follow up
11   on that.
12             You will concede that the
13   underwriting guidelines define short-term
14   rentals as anything less than 12 months,
15   correct?
16        A.   Yes.
17        Q.   I believe you testified that
18   it was as early as, I believe,
19   August 2022 that Mr. Hoffman was aware of
20   the short-term rental.  It was after a
21   conversation with someone at -- was it
22   Bass or USI?  Can you just clarify that?
23        A.   The claim notes in e-mail
24   correspondence between Mr. Hoffman and
25   the insured make that clear, but, yes, I
```

109

```
 1   believe that's the time frame.
 2        Q.   Around August 2022?
 3        A.   Yes.
 4        Q.   Is there anyone else at
 5   either Bass or Mt. Hawley that would have
 6   known earlier in time about the
 7   short-term rental period?
 8        A.   Not that I'm aware of.
 9        MR. PIERANTONI:  Okay.
10   Luke, can you switch this back to
11   me?
12        MR. KATZENMEIER:  Yes.
13        MR. PIERANTONI:  Thank you.
14   BY MR. PIERANTONI:
15        Q.   Okay.  Mr. Brownell, are you
16   able to see the document I placed in
17   front of you?  It's an e-mail.
18        A.   Yes.
19        Q.   Okay.  And can you see my
20   cursor moving around so I can direct your
21   attention?
22        A.   Yes.
23        Q.   So I'll represent that this
24   is a document from Mt. Hawley's
25   production.
```

28  (Pages 106 to 109)

110

1          MR. PIERANTONI: What's the
2    next exhibit?
3          THE COURT REPORTER: It's I.
4    (Nationwide Deposition Exhibit I
5    marked for identification.)
6    BY MR. PIERANTONI:
7          Q.   And focusing here, this
8    e-mail right here, and it goes over to
9    the next page slightly with the signature
10   block. Do you recognize the e-mail
11   that's been marked as Exhibit I?
12         A.   Give me a second to read it.
13         Q.   Sure. Would you like me to
14   make it bigger for you?
15         A.   No. I don't recall having
16   seen this particular e-mail before.
17         Q.   Okay, but you would concede
18   that this is from Mt. Hawley's own
19   production, correct?
20         A.   I would defer to
21   Mr. Delahunt.
22         MR. DELAHUNT: Is there a
23   Bates stamp on it?
24         MR. PIERANTONI: Yes. At
25   the bottom, it says MH1305.

111

1    BY MR. PIERANTONI:
2          Q.   All right. So we're on the
3    same page on that. Okay. What do you
4    recognize the e-mail to be, sir?
5          A.   This appears to be an e-mail
6    exchange having to do with requesting a
7    policy or a renewal. It's not quite
8    clear from the face of it.
9          Q.   Sure. You see that -- I'm
10   going to highlight this right here.
11   That's the wrong policy. Do you see this
12   one here, GGL0026067 in the reference
13   line?
14         A.   Yes.
15         Q.   Is that the same as the
16   policy number at issue in this case?
17         A.   I believe it is.
18         Q.   Okay. So, again, does this
19   help clarify what this e-mail is
20   concerning?
21         A.   To be entirely sure, I would
22   have to see the broader context, but it
23   appears to be e-mail exchanges during the
24   process of seeking a renewal of a number
25   of policies, actually.

112

1          Q.   Okay. Including the policy
2    at issue here, right, sir?
3          A.   Yes.
4          Q.   Okay. And we had discussed
5    earlier USI's role and Bass' role. And
6    there's an exchange between Gray Collier
7    at Bass with Tiffany Middleton at USI
8    with regard to this matter?
9          A.   On one occasion, yes.
10         Q.   Was counsel present at the
11   time?
12         A.   Yes.
13         Q.   Which counsel?
14         A.   Mr. Delahunt and
15   Ms. Kanellakes.
16         Q.   At all times? There was no
17   other discussion with him?
18         A.   Correct. I've never spoken
19   to him outside of that conversation with
20   those people present.
21         Q.   Can you just read the --
22   let's see -- fourth sentence that begins
23   with: Can you tell me information?
24         Can you read that sentence
25   out loud that's written by Ms. Middleton

113

1    to Gray Collier?
2          A.   Sure. It says: Can you
3    tell me information I would need to
4    provide her with a quote for a property
5    short-term rentals? I assume much like
6    they have. Total construction costs are
7    estimated to $1,032,500.
8          Q.   Okay. Do you know who the
9    "she" is that's being referred to?
10         A.   No.
11         Q.   Is it fair to say -- would
12   you be surprised to say the "she" is the
13   representative from the insured asking
14   the question about coverage?
15         A.   That's possible.
16         Q.   Okay. And Mr. Collier is
17   being informed about the property being a
18   short-term rental in this e-mail,
19   correct? At least the property -- I take
20   that back.
21         That the property listed --
22   at least the properties with regard to
23   the insurance policies listed in the
24   subject line are subject to short-term
25   rentals, correct?

MAGNA LEGAL SERVICES
MAGNA
LEGAL SERVICES

114

```
 1         A.   Actually, the e-mail refers
 2   to a quote for a property, short-term
 3   rentals.  And the e-mail body itself
 4   doesn't specify which property that
 5   that's referring to.
 6         Q.   Right.  But the subject line
 7   does refer to the policy at issue in this
 8   case, right?
 9         A.   No.  The subject line has RE
10   colon in front of it, so, apparently, the
11   same subject line has been used in
12   multiple replies back and forth.
13         Q.   Okay.  That was never
14   changed, was it?
15         A.   No.
16         Q.   Okay.  Would this change
17   your testimony as to when Mt. Hawley was
18   aware, whether on its own or through
19   Bass, of the short-term rentals?
20         MR. DELAHUNT:  Objection.
21   BY THE WITNESS:
22         A.   The discussion we've had
23   previously about Mt. Hawley being aware
24   was in reference to when Mt. Hawley was
25   aware that it was a Vrbo or Airbnb or
```

115

```
 1   similar property.  That's a different
 2   issue than it being a short-term rental.
 3         Q.   Okay.  Your testimony today
 4   was that -- I mean, clearly it's
 5   important because you're making a claim
 6   to disclaim coverage.  If Mt. Hawley
 7   learned of the possibility of the
 8   property being a short-term rental, it
 9   would either have to be deemed ineligible
10   for coverage or referred, right?  That
11   was your testimony today, that Bass would
12   have to refer -- I'll rephrase the
13   question.
14         Bass would have to refer any
15   short-term rental to Mt. Hawley under the
16   underwriting guidelines, correct?
17         A.   That's what they're supposed
18   to do, correct.
19         Q.   Those guidelines are
20   supposed to be strictly followed,
21   correct?
22         A.   They're supposed to be.
23         Q.   Right.  What I'm asking you
24   now is:  On February 2nd, 2022, which is
25   the date of this e-mail, are you aware of
```

116

```
 1   Bass informing Mt. Hawley of the
 2   possibility of there being short-term
 3   rentals for property covered under that
 4   policy, under the policy at issue?
 5         MR. DELAHUNT:  Objection.
 6   BY THE WITNESS:
 7         A.   I can't say that that
 8   e-mail's reference to short-term rentals
 9   refers to the properties at issue in the
10   underlying suit.
11         Q.   Okay.  But we established
12   that the subject line, even though it's
13   been followed up from maybe previous
14   e-mails, still contains the policy number
15   in it, correct?
16         A.   Yes, but that doesn't
17   logically mean that the reference to
18   short-term rentals in the body of that
19   e-mail is referring to the property that
20   was the subject of GGL0026060.
21         Q.   Right.  It doesn't mean, but
22   it could mean, correct?
23         MR. DELAHUNT:  Objection.
24   BY THE WITNESS:
25         A.   That would be speculation.
```

117

```
 1         Q.   So it's not one thing to
 2   speculate that it doesn't mean, but it's
 3   not something to speculate that it could
 4   mean?
 5         MR. DELAHUNT:  Objection.
 6   BY THE WITNESS:
 7         A.   I didn't say it doesn't
 8   mean.  I said I can't make that
 9   connection based on what's here in this
10   e-mail.
11         Q.   So it's possible that it
12   does refer to the property that's the
13   subject of this claim, right?
14         A.   It's possible, but I would
15   say unlikely.
16         Q.   Why would you say that?
17         A.   Because if it were, then
18   Bass would have referred that in to us.
19         Q.   I see.  So it's impossible
20   for Bass to have ever made a mistake?
21         MR. DELAHUNT:  Objection.
22   BY THE WITNESS:
23         A.   Impossible, no.  We're all
24   human beings.
25         Q.   Okay.  With regard to -- I
```

MAGNA LEGAL SERVICES

MAGNA
LEGAL SERVICES

118

1    mean, with regard to the importance
2    that's attached to the short-term
3    rentals, given it's the major issue here
4    in this case, that it was a Vrbo or
5    Airbnb as a subset and that coverage is
6    ineligible for that, but it may be
7    eligible for a different type of
8    short-term rental, right, where is there
9    -- are you aware -- Let me rephrase it.
10        Are you aware of any efforts
11   by Mr. Collier or Mt. Hawley to look
12   further into the possibility that this
13   short-term rental may have been an Airbnb
14   or Vrbo?
15       A.   I don't even know if
16   Mr. Collier knew that the property at
17   issue was a short-term rental.
18       Q.   Right.  But he clearly was
19   aware of short-term rentals at, possibly,
20   the property that's at issue in this case
21   on February 2nd, 2022, correct?
22       MR. DELAHUNT:  Objection.
23   BY THE WITNESS:
24       A.   It's also possible that this
25   reference to short-term rentals in this

119

1    e-mail on the screen refers to a
2    completely different property for which
3    coverage was never issued.
4        Q.   Could be.  That's right.
5        MR. DELAHUNT:  You're
6    testifying in these questions, and
7    I'm going to start doing likewise.
8    Okay?  Please.
9        MR. PIERANTONI:  I'm going
10   to ask you to stop coaching the
11   witness and let me ask my
12   questions.
13       MR. DELAHUNT:  I didn't
14   coach the witness, Ray.  You're
15   testifying in your questions.
16       MR. PIERANTONI:  I'm not
17   testifying.  I'm asking for
18   clarity.  That's all I'm doing.
19   BY MR. PIERANTONI:
20       Q.   So, Mr. Brownell, you would
21   concede that it's possible that the
22   subject property at issue in this
23   litigation is the property that's
24   referenced here in this e-mail?  Is it
25   possible?

120

1        A.   Lots of things are possible.
2    It is possible, but I would say unlikely.
3        Q.   Okay.  Given that it is
4    possible, okay, would it be -- would Gray
5    Collier or anybody at Bass or anybody at
6    Mt. Hawley be concerned and look into
7    that situation further if they had a red
8    flag on a short-term rental?
9        MR. DELAHUNT:  Objection.
10   BY THE WITNESS:
11       A.   Only if coverage were
12   actually pursued for whatever short-term
13   rental this e-mail refers to.
14       Q.   Okay.  And if it wasn't
15   pursued, then somebody dropped the ball,
16   correct?
17       MR. DELAHUNT:  Objection.
18   BY THE WITNESS:
19       A.   Or the insured decided not
20   to pursue coverage for that particular
21   property with Bass or with Mt. Hawley.
22       Q.   Well, we know that
23   short-term rental coverage was issued,
24   right, because Mt. Hawley renewed the
25   policy for the following year and

121

1    accepted the premium payment when they
2    already knew that there were short-term
3    rentals occurring at the property, right?
4        MR. DELAHUNT:  Objection.
5    BY THE WITNESS:
6        A.   I'm not sure where you're
7    getting the basis for that question.
8        Q.   What I'm saying is that we
9    know that Mt. Hawley renewed the 2022 to
10   2023 policy knowing already there were
11   short-term rentals at the property in
12   question in this litigation?
13       MR. DELAHUNT:  Objection.
14   BY THE WITNESS:
15       A.   I have not reviewed the
16   underwriting file for the '22, '23
17   policy.
18       Q.   Well, wasn't that one of the
19   topics that you're here to testify about?
20   I think it was Topic 1 or 2.  Do you want
21   to go over that again?
22       MR. DELAHUNT:  Yeah, we can.
23   BY MR. PIERANTONI:
24       Q.   Yeah.  Okay.  Do you see
25   topic No. 2, sir?

MAGNA LEGAL SERVICES

MAGNA ▶
LEGAL SERVICES

122

```
 1        A.   There's no reference to the
 2  '22, '23 policy in that No. 2.
 3        Q.   I wasn't asking about that.
 4  I was just asking -- you mentioned
 5  underwriting, that you're not here to
 6  talk about the underwriting guidelines --
 7  or the underwriting process for the
 8  renewal policy, right?
 9            MR. DELAHUNT:  Objection.
10  He said he did not read the 2022
11  underwriting file.
12            MR. PIERANTONI:  Okay.
13            MR. DELAHUNT:  Ray, if you
14  don't mind, find the definition of
15  the Mt. Hawley policy in the
16  notice.
17            MR. PIERANTONI:  Just give
18  me a second.
19  BY MR. PIERANTONI:
20        Q.   Do you see Topic No. 7?
21        A.   Yes.
22        Q.   Any incorrect, false,
23  inaccurate, or incomplete information
24  contained in any application for
25  insurance provided by Beach Cruiser to
```

123

```
 1  Mt. Hawley or to any other entity on
 2  behalf of Mt. Hawley.  Do you understand
 3  that subject?
 4        A.   Yes.
 5        Q.   Okay.  So what I'm asking
 6  you is:  When the renewal came up for the
 7  policy at issue in this case, was there
 8  an acceptance of the premium payment for
 9  that renewal?
10        A.   As I said, I have not
11  reviewed the underwriting file for that
12  particular renewal, but it's my
13  understanding that yes.
14        Q.   Okay.  And the renewal was
15  accepted and put into place and the new
16  policy was issued for the 2022, 2023
17  period after Mt. Hawley was made aware of
18  the short-term rentals taking place at
19  the property that's the subject of the
20  same policy, correct?
21        A.   Except I don't know what
22  supplemental or different applications or
23  information are part of that second
24  renewal's underwriting file, so I can't
25  comment on what information was or wasn't
```

124

```
 1  considered for the renewal.
 2        Q.   Right.  So even though this
 3  topic says you're here to testify, at
 4  least reasonably prepared to testify with
 5  regard to applications for insurance,
 6  you're not here to testify as to the
 7  application for insurance under renewal?
 8        A.   I'm here to discuss any
 9  incorrect, false, inaccurate, or
10  incomplete information contained in any
11  application.  And the incorrect, false,
12  inaccurate, or incomplete information I
13  have knowledge of and I'm testifying
14  about is the supplemental application
15  dated September of 2020.
16        Q.   Okay.  Are you aware of any
17  incorrect, false, inaccurate, or
18  incomplete information with regard to the
19  renewal?
20        A.   Which renewal?
21        Q.   The 2022 to 2023 renewal of
22  the policy.
23        A.   I can't answer that question
24  because I haven't reviewed the
25  underwriting file for that policy.
```

125

```
 1        Q.   Right.  Even though the
 2  question clearly asks for a witness to be
 3  reasonably informed to testify about
 4  that, correct?
 5            MR. DELAHUNT:  Objection.
 6  BY THE WITNESS:
 7        A.   I don't think you're reading
 8  No. 7 the right way.
 9        Q.   We differ then.  Let me just
10  see here.
11            MR. PIERANTONI:  You wanted
12  to look, Tim, at the definition of
13  a policy?
14            MR. DELAHUNT:  Yeah.
15            MR. PIERANTONI:  Okay.  It
16  says the '21 to '22 policy.  I
17  don't dispute that, but that's not
18  my question.
19  BY MR. PIERANTONI:
20        Q.   Is the renewal process for
21  this Mt. Hawley policy, for the 2022 to
22  2023 renewal, is that renewal process
23  considered part of the underwriting
24  process?
25        A.   Yes.
```

32 (Pages 122 to 125)

126

```
 1        Q.   Okay.  And topic 2 says:
 2   Mt. Hawley's underwriting guidelines
 3   applicable to the Mt. Hawley policy,
 4   including any guideline for issuance of a
 5   policy for the owner of a policy used for
 6   short-term rentals?
 7        Do you see that, sir?
 8   A.   Yes.
 9        Q.   You're not able to testify
10   as to the underwriting process for the
11   renewal; is that correct?
12        MR. DELAHUNT:  Objection.
13        MR. PIERANTONI:  Maybe it's
14   a twitch, but I am a little
15   concerned about the witness
16   looking over to you before he
17   gives an answer.
18        THE WITNESS:  Because I have
19   to know when he's done with his
20   objection before I can speak.
21        MR. PIERANTONI:  Fair
22   enough.  Thank you.  I just wanted
23   to make sure because it won't look
24   good on the video.  That's why.
25   Thank you for clarifying.
```

127

```
 1   BY MR. PIERANTONI:
 2        Q.   So you're not here to
 3   testify as to the underwriting process
 4   for the renewal, correct?
 5        A.   The processes for the
 6   renewal are the same from policy to
 7   policy.  Specifically how the second
 8   renewal was underwritten or what
 9   information was provided or considered,
10   no, I have not reviewed that underwriting
11   file.
12        MR. PIERANTONI:  Okay.  I'm
13   finishing up here soon.
14        Luke, are you still going to
15   ask that question or do you want
16   me to ask the question?
17        MR. KATZENMEIER:  You can
18   ask that question if you want.
19   I've got a couple more once you're
20   done.
21   BY MR. PIERANTONI:
22        Q.   Just to be clear, I produced
23   documents during our last break to
24   counsel.  They were documents that were
25   shared with regard to the back-and-forth,
```

128

```
 1   but it was with regard to requesting that
 2   Mt. Hawley withdraw its statutory
 3   recision claim.  And in the course of the
 4   earlier testimony today, I discovered
 5   that these three documents were not
 6   produced even though the parties -- at
 7   least counsel was aware, so I just wanted
 8   to show you because I wanted to pinpoint
 9   the date that the premium was paid.  Just
10   give me a second here.
11        Okay, sir.  Is this big
12   enough for you to see?
13        A.   Yes.
14        (Nationwide Deposition Exhibit J
15        marked for identification.)
16   BY MR. PIERANTONI:
17        Q.   All right.  Can you identify
18   the document marked as Exhibit J?  By the
19   way -- I'm sorry.  Before we do that, I'm
20   going to enter Exhibit I that was marked
21   before.  So if we could mark this as
22   Exhibit J.
23        Can you look at the document
24   and then explain to me what that document
25   is?
```

129

```
 1        A.   I haven't seen this document
 2   before, so the document just has to refer
 3   to itself.
 4        Q.   Okay.  Have you ever seen a
 5   document like this?
 6        A.   I'm not sure what you mean.
 7        Q.   Well, what is the document
 8   to you?  I'm not asking you to -- Just
 9   what is the document to you?
10        A.   Generally, it appears to be
11   some kind of invoice.
12        Q.   Okay.  And the invoice is
13   from who?
14        A.   It's on Bass Underwriters'
15   letterhead.
16        Q.   Okay.  And it's issued to
17   which insured?
18        A.   Beach Cruiser, LLC, 40 Ounce
19   Highway, LLC.
20        Q.   Okay.  Do you see the
21   invoice date?
22        A.   Yes.  It looks like
23   September 8, 2022.
24        Q.   Okay.  And the renewal
25   policy number is GGL0031463.  Do you see
```

33  (Pages 126 to 129)

130

```
 1   that?
 2       A.   Yes.
 3       Q.   Okay.  The next page --
 4   let's see if I can get to the next page.
 5   The next page is a receipt for payment of
 6   the invoice that was referred to earlier.
 7   Would you dispute that?
 8       A.   That's what it appears to
 9   be.
10       Q.   Okay.  So if I can have this
11   entered as Exhibit I.
12           Do you have any reason to
13   doubt this is the invoice for the policy
14   renewal for the 2022, 2023 period?
15       A.   As I've never seen this
16   before, no.
17       Q.   Okay.  So the date upon
18   which the invoice was remitted and paid
19   was on or about September 8th, 2022.  I
20   think the actual payment date was
21   September 28th, as reflected here.  Do
22   you see that?
23       A.   Yes, that's what those
24   documents said.
25       Q.   And, by that time,
```

131

```
 1   Mt. Hawley was already aware of the
 2   short-term rental situation at the
 3   property that's the subject of this
 4   litigation, correct?
 5       A.   Yes.
 6       Q.   Okay.  Give me a second.
 7       A.   I don't know what the terms
 8   of that renewal policy are.  I would have
 9   to look at the policy.
10       Q.   Okay.  Sir, are you aware --
11   The position taken by Mt. Hawley is that
12   New York law applies to this matter.  We
13   had that discussion earlier.  You
14   testified to that earlier, correct?
15       A.   Yeah.  I would defer to the
16   language of the service of suit
17   endorsement that we spoke about earlier,
18   but yes.
19       Q.   Are you aware of the law in
20   New York stating that a declaratory
21   judgment action filed by an insurer
22   should -- should there be a decision that
23   coverage is in fact in place, that
24   defense costs would also include the
25   costs of my client defending against the
```

132

```
 1   DJ action?
 2           MR. DELAHUNT:  Objection.
 3   BY THE WITNESS:
 4       A.   That's a legal issue within
 5   the confines of the declaratory judgment
 6   action, and I would defer to outside
 7   coverage counsel, who is experienced in
 8   New York law.
 9       Q.   Okay.  So you're not aware
10   of that.  I'm just asking if you're
11   aware.
12       A.   I'm not aware one way or the
13   other.
14       Q.   Okay.  Do you know what that
15   means, what I just said?
16       A.   Yes.
17           MR. PIERANTONI:  Okay.
18   Thank you.  I don't think -- I'm
19   just going to reserve maybe a
20   couple questions at the end
21   depending on what happens, but it
22   won't be long.  Luke, if you want
23   to go ahead and step in.
24           MR. KATZENMEIER:  Yeah.  I
25   just have a few more.
```

133

```
 1           REDIRECT EXAMINATION
 2   BY MR. KATZENMEIER:
 3       Q.   Mr. Brownell, we talked
 4   about the underwriting guidelines earlier
 5   and correct me if I'm wrong, but you said
 6   it was, more or less, standard that
 7   properties listed on Airbnb, Vrbo, et
 8   cetera were considered ineligible risks
 9   in these types of policies?
10       A.   I think you're referring to
11   the testimony where I was talking about
12   the industry in general?
13       Q.   Yes, with respect to this
14   question.
15       A.   It is my general
16   understanding that most insurers would
17   not have an appetite to insure risks that
18   are Airbnb, Vrbo, or similar properties.
19       Q.   Okay.  And, certainly, you
20   would agree that on the underwriting
21   guidelines we looked at earlier -- I can
22   pull them up if needed -- that Airbnb,
23   Vrbo, and similar rental options are
24   listed as ineligible risks; is that
25   correct?
```

34  (Pages 130 to 133)

134

1      A.  Yes.
2      Q.  Have those underwriting
3  guidelines -- as far as you're aware,
4  have they been updated within the past
5  two years, say?
6      A.  Not the provisions related
7  to the Vrbo, no.
8      Q.  So even if there was an
9  updated version of the underwriting
10 guidelines, the ineligible risk section
11 would still display that Airbnb, Vrbo, or
12 similar rental options are ineligible
13 risks?
14     A.  Yes.  Airbnb, Vrbo, and
15 similar operations have been ineligible
16 since this product began and continue to
17 be so through the present day.
18     Q.  And, presumably, that would
19 be the case at the same time the 2022 to
20 2023 renewal was issued, correct?
21     A.  Yes.
22     MR. KATZENMEIER:  Okay.
23 Ray, if you could pull up
24 Exhibit I for me again.  I believe
25 it was the communications between

135

1  Bass Underwriters and USI.
2      MR. PIERANTONI:  Sorry.  It
3  helps to unmute yourself.  What's
4  the document again, Luke?
5      MR. KATZENMEIER:  Exhibit I.
6  It should be the February 2022
7  correspondence between Bass and
8  USI.  I have a copy as well.  I
9  just wanted to make sure the copy
10 we're using is consistent.
11     MR. PIERANTONI:  Give me a
12 second here.  I have to sort of
13 move it a little.  Sorry about the
14 movement on the screen, gentlemen.
15 BY MR. KATZENMEIER:
16     Q.  It's this right here.  And I
17 want to scroll in particular to these
18 policy numbers that are in the subject
19 line.  Can you see those?
20     A.  Yes.
21     Q.  Can you read any of those?
22     A.  I can read all of them.
23     Q.  Okay.  Do you recognize any
24 of those policy numbers as policies
25 issued by Mt. Hawley to Beach Cruiser?

136

1      A.  Yes, the one with the GGL
2  prefix.
3      Q.  Okay.  Are either -- or any
4  of the other policies policies issued by
5  Mt. Hawley to Beach Cruiser?
6      A.  I don't think so.  I don't
7  recognize the format of those policy
8  numbers.
9      Q.  Okay.  And aside from that
10 GGL policy number, are you aware of any
11 other policies issued by Mt. Hawley to
12 Beach Cruiser?
13     A.  No, other than the previous
14 year's policy and the subsequent year's
15 policy.
16     Q.  Sure.  Is it possible that
17 Mt. Hawley has issued insurance policies
18 to Beach Cruiser for a different
19 property, for example?
20     A.  I suppose it could be
21 possible, but I have no information that
22 that was ever done.
23     Q.  Okay.  If Mt. Hawley had
24 issued other policies to Beach Cruiser
25 for a different property, for example,

137

1  would discovering that the property
2  insured under this policy was listed on
3  Airbnb, Vrbo have prompted Mt. Hawley to
4  check in on the other properties or
5  verify whether they were being used on
6  Airbnb or Vrbo?
7      MR. DELAHUNT:  Objection to
8  form.
9  BY THE WITNESS:
10     A.  I don't think so.
11     Q.  You don't think so?  Why
12 would Mt. Hawley not have checked on the
13 usage of other properties?
14     MR. DELAHUNT:  Objection.
15 BY THE WITNESS:
16     A.  They would have -- the
17 underwriters would have relied on the
18 application information submitted in
19 connection with the request for insurance
20 for those properties.
21     Q.  And that's the case even
22 after the application in this would have
23 been, in that scenario, demonstratively
24 incorrect?
25     MR. DELAHUNT:  Objection.

MAGNA LEGAL SERVICES

138

```
 1    BY THE WITNESS:
 2        A.   I'm not aware of a procedure
 3    by which other hypothetical properties
 4    for which an insured is seeking coverage
 5    would be investigated in a different way
 6    because of an issue with another policy,
 7    if that's what you're asking.
 8        MR. KATZENMEIER:  Okay.  Let
 9    me see if I have anything else.  I
10    think that's all I have for you.
11    Do you have anything else, Ray?
12        MR. PIERANTONI:  I just have
13    a couple of quick follow-up
14    questions specifically with regard
15    to the endorsement, and then I'm
16    done, okay?
17        Luke, would you mind
18    bringing up the endorsement?
19        MR. KATZENMEIER:  The
20    amended conditions endorsement?
21        MR. PIERANTONI:  Yeah.  And
22    thank you, Mr. Brownell.  I know
23    we're going through lunch here,
24    but I promise it will be short.
25        THE WITNESS:  It's only noon
```

139

```
 1    here.
 2        MR. PIERANTONI:  My stomach
 3    is churning right now.
 4        RECROSS-EXAMINATION
 5    BY MR. PIERANTONI:
 6        Q.   Great.  Okay, Mr. Brownell.
 7    You recall your testimony earlier today
 8    about this endorsement?
 9        A.   Generally, yes.
10        Q.   Okay.  Let's focus on
11    Section 4A, okay?  And I'm going to ask
12    you to read the last two sentences of
13    that.  Is that okay?  Can you read it out
14    loud for the record?
15        A.   Yes.  For purposes of this
16    endorsement, the application(s) includes,
17    without limitation, any application forms
18    and any other forms, documents, or
19    information submitted to us in connection
20    with or relating to issuance of this
21    policy.
22        For purposes of this
23    endorsement, the application(s) is a part
24    of this policy and is incorporated
25    herein.
```

140

```
 1        And the two instances where
 2    I said the word "applications" the S is
 3    in parentheticals.
 4        Q.   Right.  So is it fair to say
 5    that this part of the form sort of
 6    defines the term "application" as being
 7    not just the application at issue?
 8        A.   Yes.  It's including all
 9    other information provided by the insured
10    in the application process.
11        Q.   Well, does it say -- Does it
12    say it has to be provided by the insured,
13    or does it just say submitted to
14    Mt. Hawley generally?
15        A.   The latter.
16        Q.   Okay.  And the documents
17    that's referred to in that sentence could
18    be e-mails, correct?
19        A.   It could.
20        MR. PIERANTONI:  Okay.
21    Thank you.  I have no further
22    questions.  Thank you so much for
23    your time.  I appreciate it.
24    Thank you, Tim.
25        MR. DELAHUNT:  All right.
```

141

```
 1    Thanks, Ray and Luke.  And I don't
 2    have any questions.
 3        (Witness excused, 1:03.)
 4        THE COURT REPORTER:  You
 5    still want the transcript
 6    expedited for Monday, right?
 7        MR. PIERANTONI:  Yeah.  I
 8    just need it Monday or Tuesday,
 9    would be helpful.
10        MR. KATZENMEIER:  I believe
11    we should do the same, yeah.
12        THE COURT REPORTER:  Tim, do
13    you want a copy?
14        MR. DELAHUNT:  I think I'm
15    entitled to it.  It's my witness.
16        MR. PIERANTONI:  We're
17    talking about if you want it
18    expedited, Tim.
19        MR. DELAHUNT:  I already
20    lived through it.  I don't need it
21    expedited.
22        Listen, I dont want to pay
23    for my witness' transcript.  You
24    are obligated to produce a copy.
25        MR. PIERANTONI:  If you want
```

36  (Pages 138 to 141)

142

1    to expedite one and not the other,
2    and we'll split the costs for
3    that, I'm fine with that.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

143

1
                UNITED STATES OF AMERICA         )
2        SOUTHERN DISTRICT OF NEW YORK     )
                                 )  SS
3        STATE OF ILLINOIS            )
         COUNTY OF COOK               )
4
5            I, Alyssa N. Kuipers,
6    Certified Shorthand Reporter, Registered
7    Professional Reporter, do hereby certify
8    that MT. HAWLEY INSURANCE COMPANY was
9    first duly sworn by me to testify to the
10   whole truth and that the above deposition
11   was reported stenographically via Zoom by
12   me and reduced to typewriting under my
13   personal direction.
14           I further certify that the
15   said deposition was taken at the time
16   specified and that the taking of said
17   deposition commenced on the 15th day of
18   December, 2023.
19           I further certify that I am
20   not a relative or employee or attorney or
21   counsel of any of the parties, nor a
22   relative or employee of such attorney or
23   counsel, nor financially interested
24   directly or indirectly in this action.
25

144

1            Witness my official
2    signature on this 19th day of December
3    2023.
4
5
6
7
8
     _____
         ALYSSA N. KUIPERS, CSR, RPR
9
10
11   CSR No. 084-004857
12
13
14
15
16
17
18
19
20
21
22
23
24
25

37  (Pages 142 to 144)



## A

**a.m**
1:24
**ability**
7:25 8:4
**able**
84:18,22 93:2,6
  98:10 103:22
  109:16 126:9
**Absolutely**
48:1 51:19 78:4
**accept**
29:18 49:15,18
**acceptance**
123:8
**accepted**
50:3 121:1 123:15
**accuracy**
38:22
**accurate**
96:3
**acknowledging**
90:10
**acquired**
60:16
**acronym**
97:13 98:6
**action**
9:25 14:14,19 15:8
  16:6,12 17:1 19:12
  21:3,7 68:19 70:17
  70:19,25 71:12
  72:17 73:5,23 74:4
  74:6,15,24 75:7
  131:21 132:1,6
  143:24
**actual**
130:20
**address**
21:1,6
**addressed**
71:22
**addresses**
99:13
**adjust**

61:17
**administrative**
71:18
**administratively**
15:14,17
**admissible**
100:14
**advice**
71:16
**advise**
48:10
**advised**
63:13
**affect**
7:25 8:4
**afternoon**
56:17,18,23
**age**
10:11
**agent**
25:8,11 29:4,7 30:6
  30:11 66:7 89:20
  94:20,21,24 95:8,13
  95:14
**ago**
33:22
**agree**
90:17 92:25 133:20
**agreed**
71:9 73:22 78:19
**ahead**
17:17,25 46:23 75:8
  132:23
**Airbnb**
22:20 23:3,15,18
  24:20 27:4 39:18
  40:1,14 41:16 42:22
  43:3,6,18 58:21
  62:22,23 63:14
  86:25 103:11,13
  105:11,18 106:3,6
  106:15,16 107:1
  114:25 118:5,13
  133:7,18,22 134:11
  134:14 137:3,6
**Airbnb's**

63:9
**allegation**
85:16
**allegations**
21:2 85:10,10
**alleged**
19:13,16 22:13,19
**alleging**
20:2
**alphabet**
70:5
**alternatively**
48:12
**Alyssa**
1:21 7:18 143:5
  144:8
**amenable**
6:18
**amended**
48:13 52:20 65:11,22
  66:22 68:9,11 69:8
  70:13 71:10 80:19
  80:21 138:20
**AMERICA**
143:1
**Americas**
2:7
**and/or**
77:1
**answer**
5:13,14,21 6:6,13
  24:5 27:20 36:12
  40:19 43:19 45:21
  46:5,23 47:10 50:19
  55:23 60:1 64:9,16
  65:17 66:5,8 67:2
  77:25 86:6 87:23
  88:22 89:8,19,22,25
  91:7,10 94:17,18
  95:17 98:10 99:23
  104:1 124:23
  126:17
**answered**
6:21 47:8 88:2 92:11
  95:9
**answering**

5:12 90:9
**answers**
5:20 32:8
**anybody**
69:16 80:8,22 106:19
  120:5,5
**anyway**
64:3 65:8
**apologize**
75:19
**apparently**
114:10
**appear**
78:20
**APPEARANCES**
2:1
**appearing**
77:4
**appears**
26:6,10 27:5 42:7,8
  52:5 73:9,12 77:5,8
  111:5,23 129:10
  130:8
**appetite**
133:17
**applicable**
126:3
**applicants**
38:8 97:5
**application**
3:12 17:7,11,14,17
  18:4,15,22 19:1,2,6
  19:8,14 20:6,13,19
  20:21 28:7,12,13,21
  29:6,6,9,11,14,24
  30:5 31:18,19,23
  32:2,4,10 34:6,11
  34:16,25 35:12,20
  35:23,25 36:8 37:24
  38:3,5,9,17,22 39:2
  39:5,11,20,22,23
  40:3,5,9,18 44:10
  47:17 63:17 66:6,14
  66:17,20 87:12,15
  87:18,22 88:5,7,15
  88:16,20 89:23 92:9



95:23,25 96:4,5,9
96:21,25 97:2,16,23
98:2,16,22,24 99:3
99:10,11,12,20,24
100:3,6 102:9,25
103:5,6 107:8,12,19
122:24 124:7,11,14
137:18,22 139:17
140:6,7,10
**application(s)**
139:16,23
**applications**
29:18 32:9 38:13
123:22 124:5 140:2
**applied**
55:9
**applies**
131:12
**appreciate**
140:23
**approximating**
5:24
**approximation**
5:22
**areas**
12:7 78:10
**argumentative**
91:8
**arising**
54:11
**aside**
28:14 31:4 66:13
136:9
**asked**
84:9 87:24 95:7 98:8
102:12
**asking**
6:5,6 15:19,21 71:16
74:20 78:5 81:15
92:16,22 93:2 95:11
107:17 113:13
115:23 119:17
122:3,4 123:5 129:8
132:10 138:7
**asks**
29:20 89:14 125:2

**aspect**
20:12
**aspects**
20:6
**assert**
48:12
**asserted**
14:18,23 15:5 21:3
53:1 55:17
**asserting**
22:14
**assigned**
22:24
**Assistant**
11:11,17
**assume**
6:7 39:10 49:17,21
50:15 61:2 73:4
90:8 113:5
**assumes**
28:20
**assuming**
30:2,3 34:13
**assumption**
92:9,17
**attached**
35:21 118:2
**attachment**
18:4
**attended**
94:5
**attention**
73:16 109:21
**attorney**
4:11 6:10,12,14 16:8
57:4 143:20,22
**attorney's**
70:16,23
**August**
11:8,9 13:1,2 27:10
62:20 108:19 109:2
**Augustine**
26:11,12
**authored**
62:15
**authority**

29:2 34:17 35:14
**authorized**
32:5
**automatically**
105:7
**available**
71:3
**Avenue**
2:7,13
**average**
89:16 90:1 108:4
**avoid**
5:9
**aware**
4:22 18:2 22:22 24:1
37:21 38:23 50:2
58:19 63:20,23 65:3
80:9,22 83:7,18,23
85:1,9,15,17,22,24
86:8 93:15 97:17
99:3 102:23 103:2,7
108:19 109:8
114:18,23,25
115:25 118:9,10,19
123:17 124:16
128:7 131:1,10,19
132:9,11,12 134:3
136:10 138:2

---

**B**

**B**
3:10,13 10:9 27:23
28:2
**back**
10:7 19:9 20:10
22:10 28:6 37:6
46:20 57:9 63:4,16
71:6 82:12 109:10
113:20 114:12
**back-and-forth**
127:25
**background**
82:9
**ball**
87:6 120:15
**based**

48:13 53:2 65:10,22
66:19 92:9 117:9
**bases**
69:23
**basic**
19:1,8 20:18,20
28:13
**basis**
22:14 65:10 66:21
80:24 90:11,16
121:7
**Bass**
29:5 30:8,13,14,15
30:16,20,23 31:5,18
31:19,20 32:5,9
33:7,11 34:10,16,23
35:4,11,14 36:4,5,9
36:16,21 37:2,11,13
37:22 38:2,7,11,20
39:5,6 42:11 44:3
44:18 45:12,23 46:3
63:20,25 64:6,13,19
65:5 66:16 82:21
83:8,19,22 94:24
95:3,12,20 96:3,11
97:22 102:25 103:3
104:24 107:13
108:22 109:5 112:7
114:19 115:11,14
116:1 117:18,20
120:5,21 129:14
135:1,7
**Bass'**
96:8 112:5
**Bates**
110:23
**BB**
54:9
**Beach**
1:7 2:10 17:8 18:15
18:23 19:14 25:3,6
25:7 26:15 27:18
33:19 38:18 44:3,10
44:16 51:21 52:6
53:1 65:6 66:15
68:7 84:22 85:23



122:25 129:18
135:25 136:5,12,18
136:24
**beat**
108:8
**began**
31:13 134:16
**beginning**
12:22
**begins**
112:22
**behalf**
2:5,10,16 34:17
35:15 36:18 37:12
50:7 66:15 76:25
87:2,3 94:20,24
123:2
**beings**
117:24
**believe**
23:1,7 24:14 25:15
30:25 31:7 41:7
45:2,24 49:24,25
50:4 52:14 53:16,25
56:6 58:3 67:7,9
70:4 76:6,11 81:12
86:18 88:10 103:1
108:5,17,18 109:1
111:17 134:24
141:10
**best**
95:16
**beyond**
64:14
**big**
128:11
**bigger**
110:14
**binding**
29:2
**bit**
11:22 19:4 22:10
23:21 52:8 75:10
**blank**
20:25
**block**

110:10
**blue**
72:22,22
**body**
114:3 116:18
**bookmarked**
54:3
**bother**
104:6
**bottom**
42:2 77:10 104:16
110:25
**box**
66:9
**break**
6:16,20 61:7,22
127:23
**brief**
62:14 73:10
**briefly**
56:6
**bring**
88:4 93:25 104:7
**bringing**
138:18
**broader**
111:22
**Brownell**
4:10 7:23 10:9 13:19
16:20 17:20 18:9
22:1,3 25:17 26:2
28:1 32:18,23 47:19
51:10,11 58:14 62:1
67:16 72:10 75:17
76:22 82:20 84:10
109:15 119:20
133:3 138:22 139:6
**Buffalo**
2:4
**building**
31:17 50:20
_____
**C**
_____
**C**
3:14 32:22 33:1
**calculated**

100:13
**call**
24:11,25 27:7 29:1
72:1 75:20 86:21,23
93:23 94:9
**called**
1:15 4:4 13:6
**calls**
7:2 47:2
**caption**
48:24
**care**
101:1
**Carolina**
12:8,9
**case**
17:1,7 20:3 22:6 25:4
29:5 33:19 35:22
38:19 39:9 42:9
43:25 44:11,17
46:10,17 47:19
50:24 52:15 68:12
78:17 88:23 97:8
100:5 101:10
107:24 111:16
114:8 118:4,20
123:7 134:19
137:21
**cases**
43:23
**cashed**
85:12,16
**casualty**
11:19 12:2
**cause**
73:23 74:4,6,15,24
**cell**
7:5
**Central**
11:20 12:3,6 61:14
**certain**
32:6,8 53:17 86:9
**certainly**
43:17,24 133:19
**Certified**
1:21 143:6

**certify**
143:7,14,19
**cetera**
133:8
**change**
68:15 114:16
**changed**
114:14
**changes**
41:12
**charged**
85:25
**check**
66:9 137:4
**checked**
137:12
**checkmark**
19:24
**choice**
54:9 55:15 57:6,19
57:24
**churning**
139:3
**circumstances**
43:15 67:5 103:20
106:1
**Civil**
1:18
**claim**
3:17 13:5 15:11,12
16:1,3,8 23:1 24:6,8
24:22 25:1,3,5,6,21
25:22 27:20 46:17
47:9 55:21 59:19
60:19 62:11,13
63:10 67:10 71:23
77:17,18 78:8 93:17
93:19 94:3,12 95:10
108:23 115:5
117:13 128:3
**claims**
11:12,17,19,24,25
12:2,2,15,16,20
13:17,18 14:18,23
15:5 19:12 22:24
50:11 62:15 82:9



85:16
**clarification**
6:5,7
**clarify**
33:13 108:22 111:19
**clarifying**
102:7 126:25
**clarity**
119:18
**classes**
33:8
**clean**
5:9
**clear**
15:19 64:11 91:3,15
93:21 108:25 111:8
127:22
**clearly**
115:4 118:18 125:2
**client**
87:6 89:18 94:20
95:14 102:18 107:9
131:25
**clients**
84:20,21
**coach**
119:14
**coaching**
119:10
**Collier**
112:6 113:1,16
118:11,16 120:5
**colon**
114:10
**come**
23:6 25:5 97:6
**coming**
52:4
**commenced**
143:17
**commencing**
1:23
**comment**
123:25
**commentary**
100:16

**commercial**
12:1
**common**
97:3
**communicate**
36:4,9 56:15
**communicated**
37:6 56:11
**communicating**
6:25
**communication**
37:2 46:3 102:24
**communications**
78:2,5,15 93:16 94:2
103:2,8 134:25
**companies**
30:24 31:4
**company**
1:4,12,15 2:17 3:3
4:3,13 10:21,24
11:1,2 13:6 29:12
76:25 80:14 97:17
143:8
**company's**
29:19
**comparing**
34:24
**complaint**
9:25 10:4 14:24 15:1
15:2 17:4,6 35:21
52:22 68:9,12 69:5
69:8 70:13,21 71:7
71:11 80:22 84:13
84:17
**completed**
29:5
**completely**
119:2
**computers**
75:22
**concede**
108:12 110:17
119:21
**concerned**
120:6 126:15
**concerning**

111:20
**concludes**
36:22
**conclusion**
23:6,11 47:3,7 95:1
95:11,16
**Condition**
54:8
**conditions**
48:14 52:20 54:5
65:11,22 66:22
80:20 138:20
**conduct**
87:5
**confident**
99:17
**confines**
132:5
**confirm**
38:21 52:14 98:23
**confirmation**
23:2,10 24:2,13,15
27:13,17 37:10
59:23 60:11
**confirmed**
23:17
**confirms**
27:2
**conflicts**
54:17
**confused**
44:24 75:18
**confusing**
33:15
**conjunction**
55:22 93:23
**connected**
48:20
**connection**
10:16 33:18 56:11,15
63:10 117:9 137:19
139:19
**consider**
20:7,14,21 94:19,24
100:17
**considered**

60:15 95:8 124:1
125:23 127:9 133:8
**consistent**
52:10 69:1 135:10
**construction**
113:6
**consultation**
59:19 74:17
**consulted**
60:19
**contain**
53:11 57:24
**contained**
37:23 38:17 122:24
124:10
**containing**
66:20
**contains**
116:14
**contending**
53:4
**contention**
79:10 85:23
**context**
111:22
**continue**
52:3 134:16
**conversation**
18:3 56:22,25 63:12
108:21 112:19
**conversations**
57:1 81:15,18
**COOK**
143:3
**COOPER**
2:6
**copy**
37:13 44:1 101:5
135:8,9 141:13,24
**corporate**
77:14
**correct**
19:23,25 20:1 22:4
25:13 26:8,18 27:1
27:10 28:8 34:18
35:10,16 41:2 42:25



45:8 48:16 51:24
62:16,21 63:1 69:9
70:1 71:8 72:5,18
73:13,24 76:9 79:1
83:5,9,13 86:10
89:12,23,24 90:20
92:25 93:12,22 96:6
96:9,13,19 97:2,3
98:2 99:1 103:18
105:1,8,9,13 106:12
106:21 108:4,15
110:19 112:18
113:19,25 115:16
115:18,21 116:15
116:22 118:21
120:16 123:20
125:4 126:11 127:4
131:4,14 133:5,25
134:20 140:18
**correctly**
54:18 96:22
**correspondence**
47:18 108:24 135:7
**costs**
70:24 113:6 131:24
131:25 142:2
**counsel**
15:11,12,20 16:2,3,8
55:22,23 59:19
60:20 71:17,23,24
72:18 73:13 74:21
75:3 77:17,18 78:2
78:8,17 81:16 85:8
94:13 100:1,2
112:10,13 127:24
128:7 132:7 143:21
143:23
**count**
71:10,14,20 72:2
**counterclaims**
84:19,23 85:2,2,11
**COUNTY**
143:3
**couple**
8:15 82:17 127:19
132:20 138:13

**course**
6:10 7:1 28:16 32:1
91:16 100:17 128:3
**court**
1:2 4:23 7:20 58:9
76:5,10 84:1 110:3
141:4,12
**Courts**
1:19
**cover**
69:22
**coverage**
15:4 18:16 23:4,19
24:22 34:9 48:13
50:14 53:5 55:23
59:18 60:7,8 65:10
65:22 68:8 71:24
87:19 97:5 105:22
106:11 113:14
115:6,10 118:15
119:3 120:11,20,23
131:23 132:7 138:4
**covered**
103:24 116:3
**critically**
96:24
**Cross-Examination**
3:5 75:15
**Cruiser**
1:7 2:10 17:8 18:15
18:23 25:3,6 26:15
27:18 33:19 38:18
44:3,17 51:21 52:6
53:1 65:6 66:16
68:7 84:22 122:25
129:18 135:25
136:5,12,18,24
**Cruiser's**
19:14 25:7 44:10
85:23
**CSR**
144:8,11
**current**
8:21 10:16,17,18
11:10
**cursor**

33:24 109:20

---
**D**
---
**D**
2:12 3:1,15 51:5,6
59:14
**Dana**
16:9 72:4
**Danzig**
2:12 4:12
**date**
13:14 17:2 23:8 27:9
42:4 45:18 48:15
61:1 62:24 70:24
102:25 115:25
128:9 129:21
130:17,20
**dated**
60:5 124:15
**dating**
63:4
**David**
3:18 22:23 26:7 56:4
59:17 60:14 62:15
62:21 68:6
**day**
1:24 19:21 22:12
27:8 89:7 92:13
108:1 134:17
143:17 144:2
**dead**
108:9
**deal**
36:4
**December**
1:25 143:18 144:2
**decided**
120:19
**decision**
15:7,15 16:11,25
59:15 69:11,16 70:7
74:14,23 131:22
**declaration**
15:3
**declarations**
51:24 86:5

**declaratory**
9:24 14:13,19 15:8
16:6,12,25 45:3
46:9 70:18 71:7,11
72:17 73:5 84:16
131:20 132:5
**deemed**
105:8 115:9
**deep**
49:2
**defendant**
1:13,16 2:16 4:14
**defendants**
1:9 2:10 15:6
**defending**
131:25
**defense**
48:13 68:18 70:17,23
131:24
**defer**
43:20 110:20 131:15
132:6
**define**
93:11 108:13
**defines**
140:6
**definitely**
39:16
**definition**
122:14 125:12
**degree**
13:21,22,23 14:7,10
**Delahunt**
2:2,2 3:19 6:11 7:11
7:16 21:14,23 28:18
44:19 46:19,22 47:4
57:3 59:25 61:10,16
61:20 64:7,23 65:13
65:25 66:24 74:18
75:20,21 77:24 79:2
79:13,22 83:14 84:5
85:20 86:16 87:8
90:12,21 91:5,25
92:6 93:24 97:19,24
100:7,15,23 101:11
101:14,23 102:4,11



102:17 105:20
110:21,22 112:14
114:20 116:5,23
117:5,21 118:22
119:5,13 120:9,17
121:4,13,22 122:9
122:13 125:5,14
126:12 132:2 137:7
137:14,25 140:25
141:14,19
**demand**
100:25
**demonstratively**
137:23
**denial**
65:10 66:22
**deny**
65:21
**department**
41:19 50:12 103:10
**depend**
67:4 82:4
**depending**
32:7 105:25 132:21
**depends**
28:24 36:7,13 80:12
103:19
**deposed**
10:15
**deposition**
1:14 3:11 4:16,19 5:1
6:10 7:1 8:8,19 9:5
9:10,12,14,21 10:5
18:6,19 21:9 28:2
33:1 46:7 51:6 57:3
58:7 67:12 70:9
75:4 76:23 77:5
79:16 101:19 102:5
110:4 128:14
143:10,15,17
**depositions**
1:20
**designated**
77:13,22 78:23
**designed**
40:21 99:18

**designee**
77:14
**determination**
23:5 24:18
**determine**
31:23
**determined**
35:11 54:14
**determines**
36:16
**deviate**
83:3 96:15,18
**deviating**
83:8,22
**differ**
125:9
**difference**
105:17
**differences**
99:2,7 103:4
**different**
29:12 31:7 33:8
57:19,21 69:4 80:15
80:15,16 86:1 95:9
97:6 107:18 115:1
118:7 119:2 123:22
136:18,25 138:5
**differently**
98:18
**difficult**
65:17 66:3
**dig**
11:21 23:20 32:14
**direct**
3:4 4:7 39:6 91:6,10
109:20
**direction**
143:13
**directly**
143:24
**Director**
12:15,16,20
**disagree**
101:12
**disclaim**
115:6

**disclaimer**
81:11
**discontinue**
73:22
**discovered**
64:21 74:12 128:4
**discovering**
137:1
**discovery**
46:9 100:4,13
**discuss**
93:18 124:8
**discussed**
23:21 56:5 63:18
104:4 112:4
**discussing**
32:17
**discussion**
112:17 114:22
131:13
**discussions**
78:16 94:11
**dismiss**
71:9 72:2
**dismissal**
71:20
**dismissed**
46:16
**display**
134:11
**dispute**
22:7 64:6 79:10,14
87:19 125:17 130:7
**distinction**
92:3 104:9 107:4,10
107:21
**distinctions**
101:8
**District**
1:2,2,19 143:2
**divulge**
81:16
**DJ**
35:21 70:18,21 132:1
**document**
9:18 18:10,13,17

25:23 47:23 48:6,8
51:14 61:25 67:16
67:20,23 68:3,4
74:12,22 77:7 88:18
100:11 102:1
107:11 109:16,24
128:18,23,24 129:1
129:2,5,7,9 135:4
**documentation**
46:12
**documents**
9:4,6,9,14,16 25:25
39:5 46:8 84:9
127:23,24 128:5
130:24 139:18
140:16
**doing**
6:3 10:3 119:7,18
**dont**
141:22
**doubt**
130:13
**dozen**
8:12,13
**drafted**
29:8,14 61:1
**drafting**
69:19
**draw**
73:16
**Drew**
26:11,12
**dropped**
120:15
**dual**
48:9
**due**
79:14
**duly**
4:5 143:9
**dwelling**
20:13 28:7,12 29:9
29:13,24 30:4 39:20
39:22 47:17 63:17
66:14 99:20
**dwellings**



33:4 40:18

**E**

**E**
2:2 3:1,10,16 10:9
    16:17,17 58:6,7,10
**e-mail**
2:4,15 3:13,20 18:5
    24:25 26:6 27:6,10
    27:18 42:17 100:24
    108:23 109:17
    110:8,10,16 111:4,5
    111:19,23 113:18
    114:1,3 115:25
    116:19 117:10
    119:1,24 120:13
**e-mail's**
116:8
**e-mails**
7:3 116:14 140:18
**earlier**
23:12 27:7,14 34:6
    35:22 39:21 49:1
    57:7 63:18 84:8
    86:7 93:14,20 95:18
    95:22 99:9 104:4
    109:6 112:5 128:4
    130:6 131:13,14,17
    133:4,21 139:7
**earliest**
86:13
**early**
53:24 86:20 108:18
**education**
13:20
**effect**
49:11
**efforts**
38:21 118:10
**either**
26:22 42:16 45:25
    46:1 94:6 109:5
    115:9 136:3
**electronically**
37:19
**elicit**

40:21 99:18
**eligible**
118:7
**eliminated**
78:19
**emergency**
7:7
**employee**
143:20,22
**employer**
10:18
**employment**
12:22,25
**endorsement**
48:14 52:21,21,25
    53:3,7,18,23 54:5
    55:12 57:14,22,24
    58:20 59:5 65:12,23
    66:23 80:20 81:5
    131:17 138:15,18
    138:20 139:8,16,23
**endorsements**
58:15
**enforcement**
54:13
**entail**
11:24
**enter**
128:20
**entered**
62:21 130:11
**entire**
18:3 77:7
**entirely**
111:21
**entitled**
65:21 141:15
**entity**
34:23 123:1
**entry**
62:20,21
**Eric**
56:4,6 81:6,9
**especially**
4:25
**established**

116:11
**estimated**
113:7
**et**
133:7
**evaluation**
60:8
**event**
36:15,19 38:24
**events**
28:16
**eventually**
44:2
**everybody**
17:24
**everyone's**
18:2
**evidence**
28:22 87:1,4 100:14
**exact**
13:13 17:2
**exactly**
37:7
**examination**
1:16 3:4,6 4:7 133:1
**examined**
4:5
**examiner**
13:5,17,18 22:24
**examiners**
12:1
**example**
9:24 15:18 35:18
    64:1 136:19,25
**exception**
78:14
**exchange**
111:6 112:6
**exchanges**
111:23
**exclusion**
58:19 59:4
**excused**
141:3
**exhibit**
3:11,12,13,14,15,16

3:17,18,19,20,21
18:1,6 27:23 28:2
32:22 33:1 51:4,5,6
58:6,7 59:14 67:8
67:11,12 70:5,9
75:4,9 110:2,4,11
128:14,18,20,22
130:11 134:24
135:5
**Exhibits**
3:23
**existed**
57:15 85:18
**expected**
82:25 96:11,17
**expedite**
142:1
**expedited**
141:6,18,21
**expended**
70:16
**experienced**
132:7
**explain**
41:22 101:16 128:24
**explanation**
107:4
**extent**
28:19 70:23 94:1
**extremely**
43:21

**F**

**F**
3:17 67:11,12
**face**
111:8
**fact**
23:16 68:21 69:3
    74:12 76:24 85:3
    131:23
**facts**
34:21 60:15 67:4
    103:19 106:1
**faint**
7:15



**fair**
17:6 18:23 29:25
30:1 42:16 82:2
91:11,14 92:17
106:5 113:11
126:21 140:4
**fairly**
43:5
**fairness**
95:6
**falls**
32:4 34:19 36:23
**false**
122:22 124:9,11,17
**familiar**
14:13,17 17:10 21:2
21:5 47:22 58:15
62:9 81:23
**family**
7:7
**far**
11:23 27:22 30:22
37:20 49:10 50:2,16
55:1 58:18 63:19
134:3
**fast**
48:2
**February**
115:24 118:21 135:6
**federal**
1:18 79:8
**fees**
70:16,23
**fell**
35:12
**Fifth**
2:13
**fight**
102:20
**figures**
71:3
**file**
15:8 16:12,25 24:6
24:22 25:1,22 46:10
62:11,24 121:16
122:11 123:11,24

124:25 127:11
**filed**
14:14 17:4 68:10,12
69:8 72:17,19,25
73:4,8 75:7 84:19
84:24 131:21
**fill**
96:21
**filled**
30:3 66:14
**filling**
38:9
**fills**
28:16,20
**final**
23:2,5,5,9,16 24:2,13
24:15 27:12,16
59:22 60:11 72:1
**financially**
143:23
**find**
122:14
**fine**
7:10 21:20 62:6
142:3
**finish**
5:11,14
**finishing**
127:13
**first**
4:5,17 24:1,3 26:21
26:21 27:2 41:6
45:1,7 71:10 80:21
86:21 95:10 143:9
**five**
31:14 56:21
**five-year**
93:6
**flag**
120:8
**Floor**
2:8,13
**Flyway**
1:8 2:11 26:17 27:18
62:24 84:22
**focus**

87:14 139:10
**focusing**
92:15 110:7
**follow**
31:22 82:13,21 83:1
95:20 96:12 100:21
107:14 108:10
**follow-up**
39:12,15 56:21 69:13
70:6,8 138:13
**followed**
115:20 116:13
**following**
49:1 70:12 120:25
**follows**
4:6
**forget**
100:20 101:2
**form**
24:15,23 27:17 29:19
37:7,10 39:22 51:20
52:2 53:11,13 60:1
64:8 83:14 97:5
100:3,6 103:6
106:25 137:8 140:5
**formal**
100:25
**format**
136:7
**former**
8:22
**forms**
38:9 51:25 139:17,18
**forth**
114:12
**found**
24:6
**four**
31:14 57:16
**fourth**
112:22
**frame**
109:1
**front**
77:5 101:24 109:17
114:10

**full**
10:8 62:13
**fully**
46:5 68:23 84:14
87:22
**further**
39:7 118:12 120:7
140:21 143:14,19

---

**G**

**G**
3:18 70:5,9
**GBA**
29:2,3 31:6 41:21,23
41:25 43:20 53:12
53:15,19,19 56:9
103:15
**general**
1:11 2:16 4:12 11:19
12:1 29:1,4 30:11
103:25 133:12,15
**generally**
14:25 31:25 41:14
50:5 58:17 59:16
65:21 66:12,16 67:3
82:6 84:13 87:23
129:10 139:9
140:14
**generically**
59:1
**gentlemen**
135:14
**getting**
22:2 81:18 121:7
**GGL**
136:1,10
**GGL0026060**
116:20
**GGL0026067**
48:19 52:10 111:12
**GGL0031463**
129:25
**give**
4:16 5:22 76:4 95:3
110:12 122:17
128:10 131:6



135:11
**given**
99:15 108:9 118:3
120:3
**gives**
126:17
**giving**
76:23
**gleaned**
24:10
**go**
17:16,25 20:17 28:17
30:6 45:6 46:23
57:8 75:8 80:17
82:12 104:19
121:21 132:23
**goes**
30:7 95:19 110:8
**going**
4:16 5:17 10:7 17:16
20:17 27:24 28:18
32:15 42:20 47:10
47:16,17 48:2 51:1
51:9 52:7,19 54:2
58:2,2 61:24 62:19
63:16 64:7 71:6
72:9 82:16 91:6
99:21 101:21
105:22 108:10
111:10 119:7,9
127:14 128:20
132:19 138:23
139:11
**good**
4:9 12:11 21:12 61:6
61:8 126:24
**Gray**
112:6 113:1 120:4
**Great**
139:6
**ground**
4:17
**guess**
5:19,24 21:25 24:3
26:20 29:22 37:10
55:14 84:14

**guideline**
126:4
**guidelines**
3:14 31:21 32:4,7,14
32:24 33:6,11,17
34:20,22 35:1,13
36:24 40:25 41:5,13
41:15,20 42:6,11,22
64:12 82:22 83:1,9
83:23 93:10 95:5,21
96:12,19 104:3,8
107:13 108:13
115:16,19 122:6
126:2 133:4,21
134:3,10
**guys**
61:9 76:18

**H**

**H**
3:10,19 75:4,9
**half**
8:12,13 61:8
**handle**
12:1
**handled**
59:7
**happen**
65:18 83:13
**happened**
65:4 97:6
**happening**
64:15 97:4
**happens**
132:21
**hate**
104:6
**Hawley**
1:4,15 3:3 4:3 11:2,3
14:15,23 15:4,9,14
18:16 22:22 23:4
25:2,20 29:15,17,25
30:17,20,24 31:3,10
32:10 33:7,12,18
34:11,18 35:6,16,19
36:1,4,10,18 37:3,6

37:11,14,16 38:10
38:25 39:2,3,4,6,13
39:21 40:17 41:6,19
44:1,12,16,18 45:12
45:23 46:3 48:19,22
49:15,18 50:8,23
52:25 53:4,10,14
56:12,16 57:7,10,18
58:4 59:13 63:22
64:4,13,21 65:9,20
66:19,23 70:15,24
71:3,9,19 73:22
76:25 78:24 80:3,9
80:20 84:24 85:4,11
85:16 87:2,4,6,19
93:11 94:19,23,25
95:3,4,13,19,22
96:5,7 97:1,15 98:1
98:5,16 99:10 100:5
102:24 103:3,15
105:25 106:22
107:15,20 109:5
114:17,23,24 115:6
115:15 116:1
118:11 120:6,21,24
121:9 122:15 123:1
123:2,17 125:21
126:3 128:2 131:1
131:11 135:25
136:5,11,17,23
137:3,12 140:14
143:8
**Hawley's**
9:18,24 19:12 23:19
24:22 35:21 37:12
40:2 42:10 46:16
53:7 64:4 65:11
68:16 71:23 74:22
82:22 99:4,12,19
103:4 109:24
110:18 126:2
**head**
5:5 56:8 83:19
**health**
8:3
**hear**

7:12,18,21 84:2
**heard**
6:7
**help**
111:19
**helpful**
141:9
**helps**
135:3
**hereunder**
54:11
**hide**
87:6
**high**
43:8
**highest**
13:20
**highlight**
73:17 111:10
**highlighting**
73:18
**Highway**
129:19
**Hoffman**
3:18 22:23 23:22
24:1,9 26:7 56:4,6
60:14 62:16,22 63:8
68:7 69:15,19 86:8
86:22 93:18,25
94:11 108:19,24
**Hoffman's**
27:6 59:18 69:14
93:16
**hold**
12:13
**holding**
10:23
**honestly**
73:7
**horse**
108:9
**host**
62:25 76:8,12
**hour**
61:7,17
**human**



117:24
**hypothetical**
65:16,17 138:3
**hypothetically**
34:14

---

**I**

**idea**
16:4
**identification**
18:7 28:3 33:2 51:7
58:8 67:13 70:10
75:5,18 110:5
128:15
**identifies**
51:21
**identify**
101:7 103:23 128:17
**Illinois**
13:24 143:3
**importance**
118:1
**important**
82:21,24 96:20,22,24
99:15 101:9,15,17
101:25 115:5
**impose**
38:11
**impossible**
117:19,23
**impression**
81:19
**inaccurate**
122:23 124:9,12,17
**include**
12:7 55:2 131:24
**included**
49:4
**includes**
139:16
**including**
54:11 112:1 126:4
140:8
**inclusion**
43:3
**incomplete**

122:23 124:10,12,18
**incorporated**
68:23 139:24
**incorrect**
22:15 34:15 122:22
124:9,11,17 137:24
**increases**
43:10
**incurred**
70:24
**Indemnity**
13:7
**independent**
78:6
**indicated**
34:5,7
**indicates**
90:14
**indirectly**
143:24
**individual**
71:25
**individually**
50:9,25 76:24
**industry**
43:6 97:4 133:12
**ineligible**
42:24 43:4,13,16
103:14,18 105:8,11
115:9 118:6 133:8
133:24 134:10,12
134:15
**inexhaustive**
104:25
**Info**
62:22
**information**
20:20 22:25 24:10,18
24:19,24 29:20,21
32:3 34:15 37:23
38:5,12,17 39:25
40:22 74:25 85:6
99:19 112:23 113:3
122:23 123:23,25
124:10,12,18 127:9
136:21 137:18

139:19 140:9
**informed**
113:17 125:3
**informing**
116:1
**initial**
23:10 45:1 63:12
81:11
**initially**
35:2,4
**instance**
64:19 83:18
**instances**
63:19,24 140:1
**institution**
14:8
**instructs**
6:14
**insurance**
1:4,12,15 2:17 3:3
4:3,13 10:21 11:2
17:8,14 19:15 29:12
29:19 30:5 31:2,3
37:24 38:3,12,18
43:6 44:11 50:7
55:18 87:25 88:7
94:21 96:22 97:4,16
113:23 122:25
124:5,7 136:17
137:19 143:8
**insure**
133:17
**insured**
24:11,19 28:16,20
30:4 36:25 48:10
51:22 52:2 63:12
66:7 86:21 87:24
96:21 107:20
108:25 113:13
120:19 129:17
137:2 138:4 140:9
140:12
**insureds**
33:9 84:21
**insurer**
10:25 97:7,8 98:12

131:21
**insurers**
133:16
**interchangeably**
88:17
**interested**
143:23
**interfere**
47:5
**internal**
71:18 74:13,16 75:1
**internally**
73:21 74:11
**Internet**
106:20
**interpretation**
54:12 55:9
**interpreted**
54:22
**intervener**
4:14
**Intervenor**
1:13 2:16
**investigate**
63:9
**investigated**
138:5
**investigation**
22:25 23:13 59:18
60:7,16
**inviting**
101:16
**invoice**
3:21 129:11,12,21
130:6,13,18
**involve**
19:13
**involved**
21:7 63:21 64:20
69:16
**involves**
85:3
**issuance**
44:6 46:4 126:4
139:20
**issue**



15:5 21:16 29:1
32:5 34:17 35:15
36:25 43:22 44:21
45:2 50:23 59:15
67:6 69:7,12 70:7
86:23 95:3,20 98:3
99:16 106:12
111:16 112:2 114:7
115:2 116:4,9 118:3
118:17,20 119:22
123:7 132:4 138:6
140:7
**issued**
31:10,24 32:12 33:19
37:4,12,14 44:2,16
45:19 47:18 52:6
53:19 55:16 59:21
63:20 64:2,19 65:7
66:18 105:23 106:2
119:3 120:23
123:16 129:16
134:20 135:25
136:4,11,17,24
**issues**
34:14 39:8 80:25
108:7
**issuing**
36:18,21 50:6,21
56:1 107:14
**iteration**
42:5

_____

**J**

**J**
3:21,23 128:14,18,22
**job**
13:16
**jobs**
8:22
**joined**
62:25
**judgement**
16:12
**judgment**
9:25 14:14,19 15:8
16:6 17:1 45:3 46:9

70:18 71:7,11 72:17
73:5 84:17 131:21
132:5
**July**
62:25
**jump**
48:4

_____

**K**

**K**
16:17,17
**Kanelkallakes**
77:19
**Kanellakes**
16:10 72:3,4 74:19
77:20,21 112:15
**Katzenmeier**
2:12 3:4,7 4:8,11
7:14,22 16:18 17:23
18:8 21:19,24 44:22
46:24 47:12 51:8
58:11,13 61:4,13,18
61:23 67:14 75:6
76:6 82:15 88:6,9
104:11,15 109:12
127:17 132:24
133:2 134:22 135:5
135:15 138:8,19
141:10
**keep**
82:16
**Kevin**
10:9 60:1
**Kevin's**
7:13 75:22
**kind**
129:11
**knew**
64:1 118:16 121:2
**know**
5:20 6:17 16:5,20,24
17:2 21:17 26:11
30:22 31:11,12
33:23 37:5 41:5,10
41:12 42:8,15,18
44:7 47:6 48:2

49:10 53:12,17,21
57:9 70:7,22 72:19
73:7,17 81:1,2,14
81:16,17 84:21
85:13 86:3,19 88:15
91:21,23 97:12 98:5
98:6,11,12 99:6,11
100:2,24 102:8,14
103:10 113:8
118:15 120:22
121:9 123:21
126:19 131:7
132:14 138:22
**knowing**
85:12 121:10
**knowledge**
20:16,23 38:14 78:7
80:4,16,23 81:2,3,4
83:7,22 95:17
124:13
**knowledgeable**
78:25 79:5,17,24
80:3,10 81:20 82:1
82:7 83:21
**known**
65:5 109:6
**Kuipers**
1:21 76:9 143:5
144:8

_____

**L**

**L**
10:10,10 16:17,17
**lack**
78:12
**language**
106:24 131:16
**larger**
43:24
**lastly**
6:24
**law**
2:2 3:19 13:21,22,23
54:9,15,17 55:15,18
57:6,19,24 131:12
131:19 132:8

**laws**
54:21,23
**lawsuit**
9:19 15:6 22:17
**lead**
100:13,16
**leading**
71:19
**learned**
22:24 23:12 85:8
86:22 115:7
**lease**
91:16,17 92:22 93:4
93:5,5,6,6
**leave**
6:21 13:8
**led**
39:8 59:14 74:13,23
87:19
**legal**
47:3,6 54:24 55:20
71:21 95:1,11,16
132:4
**length**
92:21
**let's**
11:21 17:25 20:10
27:23 39:10 45:6
46:13 47:13 51:4
57:5 60:9 61:5 67:7
85:14 87:14 92:18
102:23 112:22
130:4 139:10
**letter**
3:15,18,19 48:10,16
48:24 49:25 51:3
52:11,14 55:19 56:2
59:12,15,21 60:4,11
61:1 68:6,13,17,17
68:21,24 69:13,19
69:24,25 70:6,8
72:7,16 73:11,12
74:17 75:2 81:12
**letterhead**
129:15
**lettering**



**letters**
68:25 69:7 98:13
**level**
13:20
**levels**
80:16
**liability**
11:19 12:2
**likewise**
119:7
**limitation**
139:17
**line**
111:13 113:24 114:6
114:9,11 116:12
135:19
**lines**
22:1
**list**
21:1 80:18 104:25
**listed**
19:20 42:24 69:23
77:15 105:4,11
113:21,23 133:7,24
137:2
**Listen**
141:22
**litigation**
15:24 24:7 119:23
121:12 131:4
**little**
7:15 11:22 22:10
23:21 33:14 52:8
66:3 90:4,7 126:14
135:13
**lived**
90:20 141:20
**lkatzenmeier@rik...**
2:15
**LLC**
1:7,8 2:6,10,11
129:18,19
**LLP**
2:12
**logically**
116:17

**long**
7:9 11:6,13 34:19
53:22 77:25 80:18
132:22
**long-term**
91:16,23 93:4
**look**
26:7 32:23 62:8 77:6
86:5 118:11 120:6
125:12 126:23
128:23 131:9
**looked**
133:21
**looking**
42:21 48:18 51:20
54:4 59:11 126:16
**looks**
19:7 20:24 26:16
42:2 54:2 62:10
76:13 90:4,6 129:22
**loss**
22:19 23:14 43:11
53:5 63:15 86:24
**Lots**
120:1
**loud**
26:23 89:5 112:25
139:14
**Lucas**
2:12 4:10
**Luke**
21:14 44:19 76:2
82:12 88:3 104:5
109:10 127:14
132:22 135:4
138:17 141:1
**lunch**
138:23

---
**M**
---

**mail**
42:17
**Main**
2:3
**major**
118:3

**making**
115:5
**manage**
11:18
**Management**
1:8 2:11
**manager**
26:14
**managing**
11:23 29:4 30:11
**mandatory**
53:13,16,18
**March**
11:15,16 12:23 53:25
54:1
**mark**
17:25 27:23 32:21
51:4 58:4 67:9 70:4
75:8 128:21
**marked**
18:7 19:25 28:3 33:2
35:23 39:12 51:3,7
58:8 67:13 70:10
75:5 110:5,11
128:15,18,20
**matter**
4:13 23:22 35:7 65:9
68:20 73:21 74:11
78:10 112:8 131:12
**matters**
54:10
**mean**
7:2 9:23 15:16 21:19
21:25 36:20 37:9
38:20 42:12 49:12
53:10 54:21 57:13
60:4 81:5 83:12
106:22 115:4
116:17,21,22 117:2
117:4,8 118:1 129:6
**means**
4:18 5:4 30:10 34:4
80:7 106:19,23
132:15
**media**
14:7

**medications**
7:24
**medium**
42:12
**meeting**
94:4
**memory**
26:1
**mention**
40:14
**mentioned**
10:15 18:18 19:11
24:14 32:13 33:21
34:16 42:25 45:15
46:14 49:4 66:11
81:7 122:4
**MGA**
30:8,9,16
**MGAs**
31:8,14
**MH1305**
3:20 110:25
**microphone**
7:13
**Middleton**
112:7,25
**mind**
122:14 138:17
**misrepresentation**
19:16,17 20:3,8,15
20:22 22:13 28:15
87:11,14 88:23
**misrepresentations**
19:13
**misrepresenting**
87:18
**mistake**
65:24 117:20
**mode**
7:6
**moment**
66:13 74:2
**Monday**
141:6,8
**money**
92:23



**month**
92:23
**monthly**
89:16 90:1,11,16,25
  91:2,15 92:18 93:3
  108:3
**months**
34:2 91:1 93:12
  108:14
**morning**
4:9
**mouth**
21:22
**move**
102:21 135:13
**movement**
135:14
**moving**
109:20
**Mt**
1:4,15 3:3 4:3 9:18
  9:24 11:2,3 14:15
  14:23 15:4,9,14
  18:16 19:12 22:22
  23:4,19 24:22 25:2
  25:20 29:15,17,25
  30:17,20,24 31:3,10
  32:10 33:7,12,18
  34:11,18 35:6,16,19
  35:21 36:1,4,10,18
  37:3,6,11,12,14,16
  38:10,25 39:2,3,4,6
  39:13,21 40:2,17
  41:6,19 42:10 44:1
  44:12,16,18 45:12
  45:23 46:3,16 48:19
  48:22 49:15,18 50:8
  50:23 52:25 53:4,7
  53:10,14 56:12,16
  57:7,10,18 58:4
  59:13 63:22 64:4,4
  64:13,21 65:9,11,20
  66:19,23 68:16
  70:15,24 71:3,9,19
  71:23 73:22 74:22
  76:25 78:24 80:3,9

80:20 82:22 84:24
  85:4,11,16 87:2,4,6
  87:19 93:11 94:19
  94:23,25 95:3,4,13
  95:19,22 96:5,7
  97:1,15 98:1,5,16
  99:4,10,12,19 100:5
  102:24 103:3,4,15
  105:25 106:22
  107:15,20 109:5,24
  110:18 114:17,23
  114:24 115:6,15
  116:1 118:11 120:6
  120:21,24 121:9
  122:15 123:1,2,17
  125:21 126:2,3
  128:2 131:1,11
  135:25 136:5,11,17
  136:23 137:3,12
  140:14 143:8
**multiple**
114:12

**N**

**N**
1:21 3:1 10:9 16:17
  143:5 144:8
**name**
4:10 10:8 16:9,14
  25:10,12 58:23
  75:18
**named**
52:2
**names**
22:1
**Nationwide**
1:11 2:16 3:11 4:12
  18:1,6 27:23 28:2
  32:22 33:1 51:5,6
  58:5,7 59:14 67:10
  67:12 70:4,9 75:4,9
  110:4 128:14
**necessarily**
93:17
**necessary**
36:17 38:25

**need**
5:2,9 6:16 7:17 35:13
  59:6 67:9 74:3
  87:20 102:15 113:3
  141:8,20
**needed**
85:13 133:22
**nefarious**
87:5
**never**
112:18 114:13 119:3
  130:15
**new**
1:2 2:4,8,8,14,14
  54:16,16,21,23 55:6
  55:10,13,18 57:6
  123:15 131:12,20
  132:8 143:2
**nine**
31:7,15
**nine-month**
93:5
**noon**
138:25
**normal**
28:15
**note**
63:10 67:10
**notes**
3:17 24:6,9,23 25:1
  27:20 62:11,14,15
  108:23
**notice**
1:17 25:20 48:11
  49:4 77:4 79:18
  122:16
**noticing**
59:12
**notwithstanding**
54:16
**November**
3:15 48:16 51:3 56:1
  59:9,12,22 60:5 61:3
**number**
48:19 52:8,9,11
  69:23 111:16,24

116:14 129:25
  136:10
**numbers**
135:18,24 136:8

**O**

**O**
10:9
**oath**
4:18
**object**
6:11 28:19 59:25
  64:8 100:15
**objected**
84:3
**objection**
6:13 64:24 65:14
  66:1,25 77:24 79:2
  84:3,6 85:20 86:16
  87:8 90:12,21 91:5
  91:25 92:6 97:19,24
  105:20 114:20
  116:5,23 117:5,21
  118:22 120:9,17
  121:4,13 122:9
  125:5 126:12,20
  132:2 137:7,14,25
**obligated**
141:24
**obligation**
79:23
**obtain**
13:23 14:10 29:5
**obviously**
57:16
**occasion**
112:9
**occupants**
43:9
**occurred**
57:2 60:22,24
**occurring**
121:3
**offer**
50:3
**offered**



49:25
**official**
144:1
**Oh**
56:20
**okay**
4:22 5:8,15,17,23 6:2
6:22,24 7:8,10,16
7:23 8:7,10,13,18
8:23 9:3,8,14,20,23
10:6,11 11:3,9,13
11:21 12:5,11,19,24
13:2,11,15,18,22
14:1,4,9,12,17 15:7
15:12 16:3,19 17:5
17:10,13,16,20,25
18:9,12 19:3,9,23
20:5,10,17,24 21:5
21:12 22:9,21 23:20
23:25 24:12 25:2,12
25:16,24 26:2,5,10
26:20 27:1,9,21,24
28:10 29:8,13,22
30:2,12,15,22 31:1
32:13,18,21 33:5
34:13 35:3,8,18
36:3,9,15 37:1,9,15
37:20 38:10,15,24
39:9 40:10,24 41:4
41:18 42:1,10,16,20
44:9,14 45:6,11,14
45:18,22 46:1,13
47:22 48:4,7,15,25
49:14,22 50:15,20
51:1,9,13 52:5,7,16
52:19,24 53:6,9,21
54:1,8,20 55:1,25
56:5,10,14,24 57:5
57:18 58:2,11,18
59:9,11,20 60:21
61:4,20 62:8,12
63:7,16,25 64:18
65:2,20 67:7,15,22
68:2,4,11,15,25
69:6,11,22 70:3,14
70:22 71:2,6,15,25

72:7,9,13,16 73:3
73:15,20 74:9 75:6
75:24,25 76:14,15
76:18,21 77:3,11,18
78:22 80:2,17 81:6
82:11,20 83:17
84:12,18 86:7 87:13
88:14,25 89:11,18
91:21 93:14 94:10
94:23 95:15 96:25
97:15,22 98:8,14,25
99:25 100:9 101:20
103:17,22 105:10
105:15 107:3 109:9
109:15,19 110:17
111:3,18 112:1,4
113:8,16 114:13,16
115:3 116:11
117:25 119:8 120:3
120:4,14 121:8
122:12 123:5,14
124:16 125:15
126:1 127:12
128:11 129:4,12,16
129:20,24 130:3,10
130:17 131:6,10
132:9,14,17 133:19
134:22 135:23
136:3,9,23 138:8,16
139:6,10,11,13
140:16,20
**once**
28:13 30:2,4 31:17
72:10 127:19
**one-bedroom**
90:2
**ones**
78:20
**online**
42:23 105:12,19
106:3,17,18 107:2
**operation**
43:18 106:4
**operations**
42:24 43:4 105:12,19
106:17,19 107:2

134:15
**options**
133:23 134:12
**Ounce**
129:18
**outside**
55:22 71:23 94:13
112:19 132:6
**oversee**
11:25
**oversees**
81:24
**owned**
30:20 65:6
**owner**
126:5

---

**P**

**P**
2:6,7
**page**
3:2,11 20:11,12,20
48:5 51:24 54:4
67:25 88:19 110:9
111:3 130:3,4,5
**pages**
77:16 86:5 104:18
**paid**
90:15 128:9 130:18
**paper**
95:4
**paragraph**
26:21 68:23 74:2,5
**parent**
11:1
**parentheticals**
140:3
**part**
9:17 12:9 18:22 19:5
46:11 53:15 70:18
89:2,11,14 91:22
92:15,16 98:3
107:11,13 123:23
125:23 139:23
140:5
**participating**

93:24
**particular**
16:7 29:10 42:5
55:13 58:16 61:1
67:4 87:21 103:20
107:24 110:16
120:20 123:12
135:17
**particularly**
101:1
**parties**
128:6 143:21
**party**
55:25
**pause**
6:13
**pay**
90:18 92:23 141:22
**payment**
49:15,19 85:3 121:1
123:8 130:5,20
**pending**
6:19
**people**
80:14 95:9 112:20
**people's**
81:2
**Perfect**
6:2 7:8
**performance**
54:13
**period**
45:9,16 46:15 48:21
49:3,6,8,11,16,20
49:23 50:22 58:5
85:5 86:1,13,14
109:7 123:17
130:14
**person**
78:23,24 79:16
**personal**
7:5 143:13
**pertaining**
1:19 39:7 41:15
**phone**
2:9,14 7:2,4,5 24:10



24:25 27:7 86:21,23
**phonetic**
77:19
**photo**
75:19
**physical**
42:17
**piece**
24:17
**Pierantoni**
2:6,7 3:5,24 16:13
   75:13,16,24 76:13
   76:17,20 78:3 79:9
   79:11,20 80:1 82:11
   82:19 84:7 88:3,8
   88:13 91:9,12 97:25
   99:25 100:9,22
   101:3,13,20 102:2,6
   102:13,19,22 104:5
   104:14,17,20 109:9
   109:13,14 110:1,6
   110:24 111:1 119:9
   119:16,19 121:23
   122:12,17,19
   125:11,15,19
   126:13,21 127:1,12
   127:21 128:16
   132:17 135:2,11
   138:12,21 139:2,5
   140:20 141:7,16,25
**Pierantoni.139**
3:8
**pinpoint**
128:8
**place**
59:24 94:12 123:15
   123:18 131:23
**placed**
109:16
**Plaintiff**
1:5 2:5
**pleading**
47:8
**pleadings**
9:21
**please**

5:11 6:5,17 10:8,12
   16:23 47:25 67:25
   100:11 119:8
**PLLC**
2:2
**point**
10:2 17:18 22:13
   24:3 75:20 84:17
   86:10 105:8
**pointed**
39:19
**points**
107:20
**policies**
37:16 50:7,17,18
   53:7,11,13,14,18
   57:10 63:20 95:4
   107:14 111:25
   113:23 133:9
   135:24 136:4,4,11
   136:17,24
**policy**
3:16 15:4 22:18
   31:10,23 32:5,12
   33:12,18 34:17
   35:15 36:11,18,21
   36:25 37:3,5,11,14
   43:22 44:2,6,16,21
   45:1,2,9,16,21
   46:15 48:11,19,21
   48:22 49:6,8,10,12
   49:16 50:23 52:6,9
   52:11 54:14,22
   55:10,12 56:12,16
   57:8 58:3,4,16,20
   58:23 59:13 60:17
   60:18 64:3,19 65:8
   65:23 66:18,23
   69:23 85:5 86:5
   103:15 106:2,13
   111:7,11,16 112:1
   114:7 116:4,4,14
   120:25 121:10,17
   122:2,8,15 123:7,16
   123:20 124:22,25
   125:13,16,21 126:3

126:5,5 127:6,7
   129:25 130:13
   131:8,9 135:18,24
   136:7,10,14,15
   137:2 138:6 139:21
   139:24
**portion**
62:14 92:20
**portions**
27:6
**position**
10:16 11:10,14 12:12
   12:13 13:3,4,6,9,12
   68:8,16,18 131:11
**positions**
10:17
**possession**
74:23
**possibility**
115:7 116:2 118:12
**possible**
83:17,20,25 88:4
   113:15 117:11,14
   118:24 119:21,25
   120:1,2,4 136:16,21
**possibly**
118:19
**potentially**
103:24
**power**
95:3
**practice**
54:15
**precludes**
53:4
**prefer**
61:12
**prefix**
136:2
**premium**
43:23 49:15,19,22
   85:3,12,17,25 86:2
   121:1 123:8 128:9
**premiums**
86:4
**preparation**

10:4 21:8 46:6 57:2
**prepare**
9:11,13
**prepared**
29:11 79:7,24 124:4
**presence**
94:13
**present**
31:6 57:4 81:17
   112:10,20 134:17
**presently**
67:10
**President**
22:4 27:3
**presumably**
51:23 134:18
**previous**
57:23 68:17 86:2
   95:7 116:13 136:13
**previously**
8:20 114:23
**print's**
90:6
**printout**
62:11
**prior**
9:5,9,21 10:17 12:12
   18:18 22:18 23:4,19
   24:1,21 44:5 46:4
   47:8 57:19 68:8,21
   69:25
**privileged**
78:5
**privy**
78:15
**probably**
44:7
**problem**
21:17
**problems**
8:4
**procedure**
1:18 15:22 71:19
   138:2
**process**
23:13 28:11 29:3



36:6,10,17,21 37:22
39:1 59:8 60:10
64:5,17 81:24 82:2
82:8 99:17 104:23
105:3 111:24 122:7
125:20,22,24
126:10 127:3
140:10
**processes**
127:5
**produce**
141:24
**produced**
9:17 24:7 46:8 79:5
100:3,8,11 102:16
127:22 128:6
**product**
28:24,25 30:7 31:2,3
31:7,13 41:25 53:12
53:15,20 56:9 81:24
134:16
**production**
9:18 100:19 109:25
110:19
**Professional**
1:23 143:7
**program**
103:16
**promise**
138:24
**prompted**
63:8 68:13 137:3
**promulgated**
41:6 42:6
**proper**
4:16
**properties**
19:21 22:11 43:10
87:24 89:6 92:12,24
106:21 113:22
116:9 133:7,18
137:4,13,20 138:3
**property**
21:6,15 22:5,16,20
23:2,3,14 24:20,21
26:14,14 34:9 39:17

59:23 60:12 63:4,13
63:14 64:1 65:6
85:19 86:23 90:2,3
90:11,15,19,24 91:1
113:4,17,19,21
114:2,4 115:1,8
116:3,19 117:12
118:16,20 119:2,22
119:23 120:21
121:3,11 123:19
131:3 136:19,25
137:1
**provide**
7:25 8:5 79:23 113:4
**provided**
8:25 29:19 33:6,11
42:11 64:13 89:22
122:25 127:9 140:9
140:12
**provides**
37:13
**provision**
55:15 57:6,25
**provisions**
134:6
**pull**
17:17 25:24 32:15
47:18 61:24 67:8
133:22 134:23
**pulled**
67:20,23 68:5
**pulling**
67:15
**purely**
15:21 71:17
**purpose**
9:7,8 48:9 103:9
**purposes**
7:7 139:15,22
**pursuant**
1:17,17 55:16 77:4
**pursue**
120:20
**pursued**
120:12,15
**purview**

55:21
**put**
21:21 28:21 29:22
38:2 55:7,14 60:9
123:15
**putting**
28:14 66:12

___

## Q

**question**
5:4,11,12,15,21 6:4,6
6:8,11,14,19,20
16:21 19:20,25
20:18 21:6 22:5
24:5 27:20 38:1
39:11,16 40:6,19,21
45:21 46:6 47:11
49:1 50:16 54:24
55:20,24 63:7 64:16
66:4,5 67:3 71:22
73:10 74:9 81:1
82:5 86:6 87:21,23
88:22,25 89:2,12,14
89:19 90:9 91:7,11
91:11,14,19,22
92:11,20 93:1,3,7,8
94:1,15 95:7,8,12
98:4 99:16,18,22
100:1 104:1 107:18
107:25 108:6
113:14 115:13
121:7,12 124:23
125:2,18 127:15,16
127:18 133:14
**questions**
5:19 32:8 39:7,12,15
40:6 44:15 54:11
75:14 119:6,12,15
132:20 138:14
140:22 141:2
**quick**
138:13
**quickly**
47:25
**quite**
111:7

quote
113:4 114:2

___

## R

**R**
10:9
**raised**
24:4
**rare**
43:21,23
**Ray**
75:11 79:13 91:6
100:23 101:15
119:14 122:13
134:23 138:11
141:1
**re-reviewed**
60:18
**reached**
24:13 25:18 31:18
**read**
26:22,23,25 46:19,21
54:18 62:4,7 67:19
72:13 84:15 89:5
110:12 112:21,24
122:10 135:21,22
139:12,13
**reading**
26:21 33:22 74:1
125:7
**really**
60:3 64:15 67:3 82:4
91:3 93:1 95:2
**reason**
6:17 8:19 22:7 36:14
36:22 43:2 59:20
60:4 130:12
**reasonable**
73:4
**reasonably**
79:7 100:12 124:4
125:3
**recall**
24:25 25:10,19 86:12
93:9 98:20 101:7
110:15 139:7



receipt
70:12 130:5
receive
25:3 39:4 44:1
received
25:20 66:17 85:4
receives
38:3
recision
46:17 47:9 48:11
  49:5 55:16,17,19
  56:2 59:13,15 71:10
  71:14,20 72:2 74:6
  74:14,24 128:3
recognize
18:10 48:5 51:13
  67:22 68:2 110:10
  111:4 135:23 136:7
recollection
9:4 10:3 25:15,19
recommendation
15:20,23
record
26:24 46:21 64:22
  84:20 89:5 139:14
recovery
70:15
Recross-Examinati...
3:8 139:4
red
120:7
Redirect
3:6 133:1
reduced
143:12
refer
27:19 32:9 34:10
  49:5 50:1 70:20
  74:5 114:7 115:12
  115:14 117:12
  129:2
reference
17:19 32:16 69:4
  74:4,10 92:21
  111:12 114:24
  116:8,17 118:25

122:1
referenced
58:23 74:17 75:1
  119:24
references
108:3
referral
34:22 35:14 36:14,16
  36:23 38:25 39:8
  104:23 105:3
referrals
33:21
referred
27:13 34:3,4 35:7,9
  36:1,8 39:3 44:11
  44:18 45:12,23
  52:22 113:9 115:10
  117:18 130:6
  140:17
referring
19:17 23:16 32:25
  44:20 58:21 63:22
  64:3 65:8 66:19
  68:21 85:15,18,21
  104:2 108:1 114:5
  116:19 133:10
refers
49:7 51:25 91:22
  107:1 114:1 116:9
  119:1 120:13
reflect
24:23
reflected
130:21
reflects
62:24 63:3
refresh
9:4
refreshes
25:14 26:1
regard
50:1 68:18 80:19
  88:21 92:16 93:4,18
  94:16 98:19 99:9
  104:23 112:8
  113:22 117:25

118:1 124:5,18
  127:25 128:1
  138:14
regarding
40:1 75:1 85:7 86:19
  94:3,12 103:3
regions
11:20 12:3,6
Registered
1:22 143:6
regularly
41:9,11,12
regulations
55:3,5,7,9
reiterate
68:8
related
54:12 134:6
Relatedly
44:9
relating
139:20
relative
86:4 143:20,22
relayed
34:15
relevant
108:6
reliance
96:8
relied
95:22 96:3,8 97:15
  97:22 137:17
relies
38:7
relying
80:21
remained
41:16
remains
36:12
remember
13:13 21:9 51:2 58:1
  70:5 81:7 84:10
  96:1 101:6
remitted

130:18
renewal
44:15,21 45:1,4,8,15
  45:19 46:4,11,14
  49:3,20 50:22 70:1
  85:4 111:7,24 122:8
  123:6,9,12,14 124:1
  124:7,19,20,21
  125:20,22,22
  126:11 127:4,6,8
  129:24 130:14
  131:8 134:20
renewal's
123:24
renewals
44:25 46:2
renewed
120:24 121:9
renewing
36:11 50:16,18,22
RENIER
2:6,7
rent
89:17 90:1,18,25
  91:2 93:3 108:4
rental
27:3 33:4 34:8,8
  39:10 40:18 42:23
  43:4,22 58:25 64:2
  64:20 65:7 91:16
  92:18,19 99:19
  103:11,12,21
  105:12,19,24 106:4
  106:9,17,19 107:2
  108:20 109:7
  113:18 115:2,8,15
  118:8,13,17 120:8
  120:13,23 131:2
  133:23 134:12
rentals
34:1,2 35:24 40:13
  40:23 41:16 43:7,8
  43:12,16 63:21
  85:18 86:9,15 87:7
  88:1 91:23 92:5
  93:11 98:19 99:13



103:17,23 104:12
105:4,18 106:8
107:5,7,22,23 108:1
108:14 113:5,25
114:3,19 116:3,8,18
118:3,19,25 121:3
121:11 123:18
126:6
**rented**
19:21 22:12 23:14,17
27:4 39:17 86:24
89:6 90:19,24 91:1
92:12
**renting**
90:10,15
**rents**
106:20
**rephrase**
46:25 85:14 115:12
118:9
**replies**
114:12
**reported**
143:11
**reporter**
1:22,23 4:23 7:20
58:9 76:5,7,10 84:1
110:3 141:4,12
143:6,7
**represent**
4:12 21:15 109:23
**representation**
79:3
**representations**
38:7 53:2
**representative**
113:13
**represents**
88:22
**request**
6:20 100:10,18
101:22 137:19
**requested**
46:21
**requesting**
111:6 128:1

**require**
32:7 34:21
**required**
4:18 53:22
**requirements**
38:11
**rescinded**
49:13
**reserve**
132:19
**resolving**
64:5
**respect**
8:21 16:5 37:22
40:23 44:15 70:25
79:14 133:13
**respond**
66:4
**responded**
92:10
**responding**
5:18
**response**
5:3 100:4,12
**responses**
5:1 38:22
**responsibilities**
13:16
**responsible**
34:24 56:1
**rest**
20:25 43:19 74:1
**resulted**
60:10
**retail**
25:7,11 29:7 30:6
66:7 89:20
**retained**
3:23
**return**
40:24 58:3
**returned**
49:23
**review**
9:3,6,9,20 10:4 32:11
34:12 37:21 63:3

70:13 74:13,16 75:1
84:19,23
**reviewed**
17:13 21:8 40:4,16
46:7 60:17 84:9,13
98:22 105:24
121:15 123:11
124:24 127:10
**reviewing**
18:18 31:22 39:1
73:21 74:11 75:11
**right**
7:4,17 14:12 19:3
21:10 26:6 27:25
31:25 52:16,17 62:2
62:13,18 63:5 72:14
76:21 81:10 83:4
89:4 92:4,15 93:9
96:16 102:6,10
104:22,24 105:2,5
106:15,18 110:8
111:2,10 112:2
114:6,8 115:10,23
116:21 117:13
118:8,18 119:4
120:24 121:3 122:8
124:2 125:1,8
128:17 135:16
139:3 140:4,25
141:6
**rights**
76:4
**Riker**
2:12 4:11
**risk**
34:19 36:23 43:10
103:14 134:10
**risks**
42:25 43:4,13 133:8
133:17,24 134:13
**RLI**
10:19,20 11:4,7,10
12:13,17,20,22,25
13:4,10 77:1
**role**
50:6,9,13,17,21

112:5,5
**roles**
80:15
**Roughly**
8:12
**RPR**
144:8
**RSUI**
29:12,14 40:8,12
97:9 98:5,9,13,23
99:3,9 103:5
**rules**
1:18 4:17 54:17 79:8
**run**
11:18
**running**
11:24
**RUSI's**
99:14

---

**S**

**S**
3:10 16:17 140:2
**safe**
90:8
**saved**
62:23
**saying**
15:25 40:12 102:15
106:6 121:8
**says**
34:1 42:3 54:9,10
60:5,6 62:18,22
63:6 73:20 97:10
104:22 110:25
113:2 124:3 125:16
126:1
**scenario**
137:23
**scope**
78:18
**screen**
17:18,21,24 26:3
27:25 28:1 32:19
41:1 47:16,20 51:10
51:11 52:10 54:6



61:25 62:1 67:17
72:8,10,11,14,22
76:3 78:21 88:11
106:25 119:1
135:14
**screenshots**
62:23
**scroll**
19:4,9 20:10 42:21
47:24 51:15,17 52:2
62:19 67:24 77:9
135:17
**scrolling**
22:10 42:1
**second**
2:8 5:8 8:24 19:19
20:11,12 45:4,15
46:11 68:22 76:14
87:15 95:10 110:12
122:18 123:23
127:7 128:10 131:6
135:12
**section**
54:9 104:7,22 134:10
139:11
**see**
17:21,24 21:1 25:25
26:3 28:1 32:19
33:14,24 41:1 45:20
46:13 47:19 51:11
52:13 54:6 57:5
61:5,21 62:1,23
67:7,17 72:11,21
73:18,19 78:20
87:20 102:23
104:21 109:16,19
111:9,11,22 112:22
117:19 121:24
122:20 125:10
126:7 128:12
129:20,25 130:4,22
135:19 138:9
**seeing**
99:23
**seeking**
15:3 70:15 87:25

111:24 138:4
**seen**
10:1 84:16 107:9
110:16 129:1,4
130:15
**selected**
78:7
**sending**
68:13
**sent**
26:11 37:2,10 48:10
68:7
**sentence**
26:22 27:2 33:23
34:4 73:16 112:22
112:24 140:17
**sentence's**
74:10
**sentences**
139:12
**separate**
91:19
**September**
23:7 24:14 59:24
60:13,25 63:5 73:1
73:6 103:1 124:15
129:23 130:19,21
**September/October**
60:22
**serve**
66:21
**service**
39:18 40:15 54:4
57:21,23 58:25
131:16
**services**
103:14
**set**
31:20
**shake**
5:5
**share**
27:25 51:9 72:9 76:4
**shared**
127:25
**sharing**

27:21 47:16 72:8
76:3 88:11
**short**
29:2 33:22 61:22
138:24
**short-term**
34:1,7 35:24 39:10
40:13,23 41:15 43:8
43:12,16,22 58:25
63:21 64:2,20 65:7
85:18 86:9,15 87:7
88:1 91:17 92:5
93:11 98:19 99:13
103:11,12,17,21,23
104:12 105:4,17,23
106:8,9 107:5,21,23
108:13,20 109:7
113:5,18,24 114:2
114:19 115:2,8,15
116:2,8,18 118:2,8
118:13,17,19,25
120:8,12,23 121:2
121:11 123:18
126:6 131:2
**Shorthand**
1:22 143:6
**shortly**
17:3 61:3
**show**
76:15 77:10 128:8
**showed**
35:22 52:12 57:7
76:18
**sic**
81:7
**signatories**
56:3
**signatory**
81:11
**signature**
67:25 77:10 110:9
144:2
**signed**
73:12
**significantly**
86:1

**similar**
29:21 39:18 40:7,11
42:23 43:3,7,18
58:24 98:17 103:14
105:12,18 106:3,17
106:18 107:2 115:1
133:18,23 134:12
134:15
**simple**
95:12
**simply**
92:22
**singled**
22:11
**sir**
10:14 49:14 68:1
93:15 95:21 111:4
112:2 121:25 126:7
128:11 131:10
**sit**
21:10 40:19 49:9
105:15
**situation**
35:25 106:2,13 120:7
131:2
**six-month**
92:19 93:4
**sleep**
7:6
**slightly**
110:9
**slow**
48:3
**small**
90:4,7
**somebody**
120:15
**soon**
127:13
**sorry**
7:11 16:15,19 33:13
35:19 46:18 61:16
70:19 77:21 84:2
101:13 128:19
135:2,13
**sort**



37:1,21 75:17 106:7
135:12 140:5
**sought**
34:10
**sound**
22:4 25:13 61:8
**sounds**
12:11 21:12
**South**
11:20 12:3,6,8,9
**SOUTHERN**
1:2 143:2
**speak**
7:18 95:2 126:20
**speaking**
31:24 50:5 59:16
65:21 66:12,16 82:6
**speaks**
15:1 106:25
**specific**
10:2 66:13 74:9 94:1
99:5
**specifically**
9:22 19:15 29:16
40:14 58:20,25
87:17 127:7 138:14
**specifics**
99:21
**specified**
143:16
**specify**
114:4
**speculate**
117:2,3
**speculation**
116:25
**spell**
16:14
**split**
142:2
**spoke**
131:17
**spoken**
112:18
**SS**
143:2

**stamp**
110:23
**stand**
98:9,13
**standard**
29:23 39:22 43:5
53:6,10,22 57:10,19
69:7 95:24 133:6
**stands**
97:13 98:6
**Starr**
13:6,16
**start**
5:12 13:12 119:7
**started**
4:15
**state**
10:8 45:8 47:5 54:15
143:3
**stated**
68:22 83:6 108:10
**statement**
82:3
**states**
1:2,19 12:4,7 55:8
102:9,15 143:1
**stating**
24:19 101:25 131:20
**statute**
55:13
**statutes**
55:2,4,6,8
**statutory**
128:2
**stenographically**
143:11
**step**
132:23
**steps**
38:4,16
**stomach**
139:2
**stop**
27:21 47:16 51:18
72:8 88:11 119:10
**stored**

37:18
**strategic**
71:22
**Street**
2:3 22:5 27:3
**strictly**
83:1 95:20 115:20
**strike**
33:13 35:19 59:10
**studies**
14:7
**stuff**
75:11
**subcategory**
107:6
**subheadings**
106:7
**subject**
22:17 46:16 55:12
56:25 63:4 78:10
113:24,24 114:6,9
114:11 116:12,20
117:13 119:22
123:3,19 131:3
135:18
**submission**
105:3
**submit**
32:9 104:22
**submitted**
17:8 18:15,23 25:7
30:5 32:3 38:18
66:15 106:10
137:18 139:19
140:13
**subpart**
91:20
**subsections**
106:7
**subsequent**
45:5 136:14
**subset**
118:5
**subsidiary**
11:4
**substance**

59:17 60:6
**substantially**
40:7,11
**sufficiently**
7:19
**suggested**
98:4
**suit**
54:5 57:22,24 116:10
131:16
**Suite**
2:3
**sum**
59:17 60:6
**summary**
27:6
**supplemental**
3:12 18:14,25 20:6
20:13 28:7,12 29:6
29:9,10,18 30:4
39:20,23 40:2,8,17
63:17 66:6,14 87:11
87:22 88:16 98:18
99:20 100:18
123:22 124:14
**suppose**
64:5 82:10 136:20
**supposed**
115:17,20,22
**sure**
15:16 31:12 36:20
37:7,25 51:16 55:11
60:3 61:10 64:15
65:1 77:7 80:6,8
81:4 93:20 94:16
100:21,22 110:13
111:9,21 113:2
121:6 126:23 129:6
135:9 136:16
**surprised**
113:12
**surrounding**
67:5 103:20
**suspicion**
23:11 24:4 86:19
**suspicious**



86:14
**switch**
76:3 109:10
**switched**
22:2 75:21
**sworn**
4:1,5 143:9

──────── T ────────

**T**
3:10
**table**
7:6
**take**
6:20 24:16 28:11
52:19 60:10 61:6
74:2 107:16 113:19
**taken**
1:16,20 7:24 8:8,19
27:17 38:4,16 87:5
131:11 143:15
**takes**
37:8
**talk**
7:17 122:6
**talked**
133:3
**talking**
5:10 17:19 21:11
28:25 40:22 71:8
80:13 133:11
141:17
**tdelahunt@delahu...**
2:4
**team**
11:19
**tech**
76:11
**tell**
4:19 5:23 13:19
18:12 19:15 30:10
34:3 47:15 48:7
62:12 93:2,7 112:23
113:3
**ten-minute**
56:21

**tenant**
90:18,20
**tenants**
92:23
**term**
140:6
**termed**
20:19
**terms**
58:15,22 88:17 131:7
**territory**
12:10
**test**
7:12
**testified**
4:6 86:7 93:15,19
95:18,22 98:14,21
102:14 108:17
131:14
**testify**
77:23 78:1 98:25
102:21 105:16
121:19 124:3,4,6
125:3 126:9 127:3
143:9
**testifying**
78:11 87:3 119:6,15
119:17 124:13
**testimony**
8:1,5 9:1 76:23 83:10
96:1 97:18,21 98:20
99:8 114:17 115:3
115:11 128:4
133:11 139:7
**text**
72:23
**texting**
7:2
**thank**
10:6,14 17:5 22:9
25:16 28:6 41:4
48:25 49:14 58:12
70:3,14 94:18
109:13 126:22,25
132:18 138:22
140:21,22,24

**Thanks**
141:1
**theirs**
53:16
**thing**
105:10 106:14 117:1
**things**
120:1
**think**
23:22 27:24 36:12
47:2,13 58:6,22
61:19 76:7 91:18
94:6 96:2,3 101:4,9
106:24 121:20
125:7 130:20
132:18 133:10
136:6 137:10,11
138:10 141:14
**thread**
18:3
**three**
57:15 128:5
**three-bedroom**
90:5
**three-month**
93:5
**Tiffaney**
112:7
**Tim**
125:12 140:24
141:12,18
**time**
6:19 22:18 23:13
31:9,13 41:12 56:19
56:19,20 61:6,14
63:15 72:21 86:12
86:13,24 109:1,6
112:11 130:25
134:19 140:23
143:15
**times**
8:10 32:6 112:16
**TIMOTHY**
2:2
**title**
12:21

**today**
7:24 49:9 76:23 81:8
83:10 84:8 99:9
115:3,11 128:4
139:7
**told**
15:20 74:21 75:3
78:8
**top**
51:15 52:9 72:21
97:11 104:13,21,22
**topic**
80:12,24 85:7 121:20
121:25 122:20
124:3 126:1
**topics**
77:14,15,23 78:13,18
78:25 80:5,5,11,16
81:21 121:19
**total**
8:17 113:6
**touches**
17:7
**transcript**
5:9 141:5,23
**transmitted**
42:13
**treated**
95:12
**trial**
9:1
**trick**
6:3
**true**
82:10 83:16
**truth**
4:19 143:10
**truthful**
8:1,5
**try**
5:13
**Tuesday**
56:17,18 94:7 141:8
**turnover**
43:8
**twitch**

56:21



126:14
**two**
44:25 56:3 68:25
80:25 90:24 91:1
95:9 101:8 104:10
134:5 139:12 140:1
**two-bedroom**
90:3
**type**
31:1,2 40:21 66:8
99:18 118:7
**types**
43:7 69:7 107:22
133:9
**typewriting**
143:12
**typically**
38:6 69:20
**typo**
65:24 66:9,17,20,21
66:21 67:5

—————————
U
—————————
**unaware**
64:14
**unchanged**
41:17
**unclear**
91:19
**uncommon**
29:17
**undergo**
104:24
**undergoes**
37:22
**undergrad**
14:5
**undergraduate**
14:6
**underlying**
15:6 21:3,7 22:17
68:19 70:17,25
116:10
**understand**
4:20 5:5,25 6:4 7:9
21:23 37:25 48:20

54:20 55:2 74:3,7
76:22 78:9 79:21
92:14 107:9 123:2
**understanding**
14:22 15:2 24:8
26:13 40:5,20 41:14
43:21 54:25 71:13
78:12 98:15 123:13
133:16
**understood**
6:8
**undertake**
38:21
**underwrite**
30:23
**underwriter**
32:11 34:11 50:12
56:8 105:25
**underwriters**
30:14,15,16,20,23
31:5 41:21,23,24
43:20 135:1 137:17
**Underwriters'**
129:14
**underwriting**
3:14 31:4,21 32:14
32:24 33:6,11,17
34:20,25 35:13 36:5
36:24 40:25 41:5,20
42:5,11,22 46:10
50:13 59:8 64:12
81:23 82:2,8,22
83:20 93:10 95:5,21
95:23,25 96:12,18
98:16 99:12,17
100:5 102:9 103:5
103:10 104:3,8
107:8,12,19 108:13
115:16 121:16
122:5,6,7,11 123:11
123:24 124:25
125:23 126:2,10
127:3,10 133:4,20
134:2,9
**underwritten**
127:8

**unfamiliarity**
43:9
**unit**
16:2,3,9
**United**
1:2,19 12:3,6 143:1
**units**
27:3
**University**
13:24
**unmute**
135:3
**updated**
41:9,11 134:4,9
**updates**
41:20
**Urbana-Champaign**
13:25
**usage**
137:13
**use**
31:3 59:23 60:12
88:17 97:5
**user**
63:3
**USI**
25:12,15,21 94:19
95:7,14 108:22
112:7 135:1,8
**USI's**
112:5
**Usually**
69:20

—————————
V
—————————
**V11/01/2020**
42:3
**vacation**
34:2,8 105:4,17,23
106:8,9 107:5
**validity**
54:12
**various**
80:13,14 107:22
**verbal**
5:2

**verbalize**
5:3
**verbiage**
87:21
**verify**
38:4,11,16 137:5
**version**
40:17 42:3 69:5
134:9
**versus**
103:12
**Vice-President**
11:11,17
**video**
126:24
**violation**
64:12
**virtual**
5:1
**vis-a-vis**
99:10
**voiced**
6:12
**Vrbo**
22:20 23:3,15,18
24:21 27:4 39:18
40:1,14 41:16 42:23
43:3,6,18 58:21
86:25 103:11,13
105:11,18 106:3,6
106:10,16 107:1
114:25 118:4,14
133:7,18,23 134:7
134:11,14 137:3,6
**vs**
1:6

—————————
W
—————————
**W**
10:9
**walked**
81:18
**want**
5:19 7:12 21:15,21
23:6 28:10 47:4
61:11 73:15 82:12



82:16 93:20 100:10
101:2,3,18 102:19
121:20 127:15,18
132:22 135:17
141:5,13,17,22,25
**wanted**
79:15 125:11 126:22
128:7,8 135:9
**wasn't**
75:22 97:1 99:8
120:14 121:18
122:3 123:25
**way**
29:23 38:2 47:14
55:7,14 60:9 67:2
76:2 87:13,16,17
98:9,10 99:14 125:8
128:19 132:12
138:5
**we'll**
8:23 23:20 32:14
61:20 72:8 142:2
**we're**
5:17 6:3 17:19 20:17
21:11 28:6,25 32:16
58:6,10 61:7 66:11
88:18 92:14 101:21
111:2 117:23
135:10 138:23
141:16
**we've**
22:10 40:22 56:5
107:25 114:22
**website**
62:22,23 63:9
**week**
19:22 22:12 89:7
92:13 108:2
**went**
26:17 78:16
**White**
56:4,7,11,15 81:9,19
94:8
**wholly-owned**
11:4
**withdraw**

74:14,24 128:2
**withdrawal**
47:9
**withdrawn**
71:14
**witness**
3:2 4:1,4 16:16 28:4
28:23 33:3 44:23
47:1,11 60:2 64:10
64:25 65:15 66:2
67:1 70:11 76:16,24
79:6,25 83:15 85:21
86:17 87:9 90:13,22
92:1,7 97:20 101:6
101:24 102:3,3,7
105:21 114:21
116:6,24 117:6,22
118:23 119:11,14
120:10,18 121:5,14
125:2,6 126:15,18
132:3 137:9,15
138:1,25 141:3,15
144:1
**witness'**
141:23
**word**
84:15,16 107:16
140:2
**worded**
98:18
**wording**
99:22
**words**
14:22 21:21 69:2
**work**
31:8 41:25 50:11
61:19
**working**
61:14
**works**
16:9 79:19,21
**worry**
76:1
**wouldn't**
57:17 59:6 66:8
90:18

**Wright**
81:6 83:18,21 94:5
94:16
**writing**
82:18 100:21
**written**
112:25
**wrong**
99:1 111:11 133:5

---
### X
**X**
3:1,10

---
### Y
**yeah**
7:8 21:20 42:14 48:1
50:10 51:19 61:17
61:18 62:12 75:13
84:11 88:8,9 104:11
104:14,17 121:22
121:24 125:14
131:15 132:24
138:21 141:7,11
**year**
8:15 14:1 45:5 86:2
120:25
**year's**
136:14,14
**years**
8:15,17,18 23:18
24:21 57:15,16
90:24 134:5
**yesterday**
56:22 94:7
**York**
1:2 2:4,8,8,14,14
54:16 55:13,18 57:6
131:12,20 132:8
143:2
**York's**
54:16,21,23 55:6,10

---
### Z
**zoom**
1:14 52:7 62:5

143:11

---
### 0
**084-004857**
144:11

---
### 1
**1**
54:8 77:15 78:10
89:14 121:20
**1,000**
90:3
**1,032,500**
113:7
**1,800**
90:5
**1:03**
141:3
**1:22-cv-10354**
1:6
**10**
8:16,18
**10:09**
1:24
**10:35**
61:11
**10:40**
61:11
**10105**
2:8
**10110**
2:14
**11**
73:1,6
**11:35**
61:19
**110**
3:20
**12**
34:2 93:12 108:14
**128**
3:21
**133**
3:7
**1345**
2:7



**14**
48:16 77:15 78:10
**14203**
2:4
**146**
22:4 27:3
**14th**
3:15 51:3 56:1 59:12
  59:22 60:5 61:3
**15**
8:17,18
**15th**
1:24 143:17
**17th**
27:10
**18**
3:12 62:20
**1997**
14:11
**19th**
144:2

———————— **2** ————————

**2**
60:25 81:3 89:2,11
  121:20,25 122:2
  126:1
**2000**
14:3,4
**2014**
13:14,15
**2016**
41:7,8,17
**2018**
11:8,9 13:1,2 62:25
  63:5
**2020**
103:1 124:15
**2021**
53:24 54:1
**2022**
23:7 24:14 27:10
  48:16 49:3 60:5,13
  60:22,25 61:3 62:20
  85:5 108:19 109:2
  115:24 118:21

121:9 122:10
123:16 124:21
125:21 129:23
130:14,19 134:19
135:6
**2023**
1:25 11:15,16 12:23
  73:1,6 85:5 86:1
  121:10 123:16
  124:21 125:22
  130:14 134:20
  143:18 144:3
**21**
3:16 45:9 48:21 49:6
  49:7,19,23 50:22
  52:5 58:5 69:25
  125:16
**212**
2:9
**22**
3:16 45:9,16 46:14
  48:21 49:6,8,10,16
  49:19,23 50:22 52:6
  58:5 69:25 121:16
  122:2 125:16
**2202**
85:25
**23**
45:16 46:15 49:3,10
  49:16 121:16 122:2
**28**
3:13
**28th**
130:21
**295**
2:3
**2nd**
23:7 103:1 115:24
  118:21

———————— **3** ————————

**3**
19:20 89:3
**3,000**
90:6
**30(b)(1)**

79:15
**30(b)(6)**
79:4,6,19,21
**3105**
55:18
**33**
3:14
**33rd**
2:13

———————— **4** ————————

**4**
3:4
**40**
129:18
**489**
2:13
**49**
10:13
**4A**
139:11

———————— **5** ————————

**51**
3:15
**538-0800**
2:14
**58**
3:16

———————— **6** ————————

**6**
77:16
**67**
3:17

———————— **7** ————————

**7**
77:16 122:20 125:8
**70**
3:18
**75**
3:5,19

———————— **8** ————————

**8**

129:23
**8/17/22**
3:13
**836**
2:3
**878-3636**
2:9
**8th**
130:19

———————— **9** ————————

**97**
14:12
**973**
2:14

